Thomas H. Nelson, OSB 78315 (nelson@thnelson.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Gadeir Abbas, Va. State Bar # 81161, pro hac vice pending (gabbas@cair.com)
Council of American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.8787

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE**,<br><br>　　Plaintiff,<br><br>　　v.<br><br>**THE FEDERAL BUREAU OF INVESTIGATION**; **ERIC HOLDER**, Attorney General of the United States (sued only in his official capacity); **STATE DEPARTMENT**; **JOHN KERRY**, Secretary of State (sued in his official capacity); **ROBERT S. MUELLER, III**, Director of the FBI (sued in his official capacity); **TIMOTHY HEALY**, Director of FBI Terrorism Screening Center (sued in his official capacity); **DAVID NOORDELOOS**, an FBI Agent (sued in his individual capacity), and **JASON DUNDAS**, an FBI Agent (sued in his individual capacity),<br><br>　　Defendants. | Civil No. 3:13-cv-00899<br><br>**COMPLAINT**<br><br>DENIAL OF CITIZENSHIP RIGHTS; TORTURE; VIOLATION OF THE RIGHT TO LEGAL COUNSEL; VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS<br><br>**JURY TRIAL DEMANDED** |

Page 1 - COMPLAINT

## I. INTRODUCTION

1.      Plaintiff Yonas Fikre seeks redress for denial of his rights as a citizen of the United States, which denial effectively rendered him stateless. Plaintiff also seeks redress for suffering torture at the hands of a foreign power, which torture, on information and belief, was instigated by and facilitated by defendants.

2.      Plaintiff's fundamental claims are (i) that defendants sometime prior to April 21, 2010, placed plaintiff's name on the "No-Fly List" in order to coerce plaintiff into becoming an informant for the FBI, (ii) that on April 21, 2010, during an involuntary interview at the United States Embassy in Khartoum, Sudan, defendants denied plaintiff's request for legal counsel, (iii) that during the April 2010 involuntary interview plaintiff was urged to become an FBI informant in order to, among other things, have his name removed from the No-Fly List, (iv) that when plaintiff refused to become an informant defendants retaliated by instigating and facilitating his torture at the hands of the United Arab Emirates ("UAE") government during the summer of 2011, (v) that defendants denied plaintiff his constitutional right as a citizen to return home to the United States following the UAE government's releasing him without charge by keeping his name on the No-Fly List, thus effectively rendering him stateless, and (vi) that in May 2012 defendants further retaliated against plaintiff for his publicly disclosing his ordeal.

3.      Through this action for declaratory and injunctive relief and for damages plaintiff seeks (i) a declaration that plaintiff's right to assistance of legal counsel has been violated, (ii) redress for the United States' instigating and facilitating his torture by the UAE government, (iii) an injunction preventing the United States from violating the

Page 2 - COMPLAINT

rights specified herein in the future, and (iv) monetary damages from the individual defendants acting in their personal capacities for the events specified in this complaint.

## II. PARTIES

4. Plaintiff is a naturalized American citizen of Eritrean descent. He is not a citizen of Eritrea.

5. Defendant Federal Bureau of Investigation is a bureau of the Department of Justice responsible for, among other things, selecting individuals for inclusion on, and maintaining, the No-Fly List.

6. Defendant Eric Holder is Attorney General, whose office is responsible for, among other agencies, the FBI and the Terrorism Screening Center. Mr. Holder is sued only in his official capacity.

7. Defendant Department of State is the Department of the United States responsible for protecting and assisting United States citizens while those citizens are abroad.

8. Defendant John Kerry is Secretary of State, who is responsible for foreign relations and for protecting and assisting United States citizens while abroad. Mr. Kerry is sued only in his official capacity.

9. Defendant Robert S. Mueller III is Director of the FBI. He is sued only in his official capacity.

10. Defendant Timothy Healy is Director of the Terrorism Screening Center. He is sued only in his official capacity.

11. At all times relevant, a person identifying himself as defendant Jason Dundas, who is sued in his individual capacity, was an employee of the FBI assigned to

Page 3 - COMPLAINT

the Portland office. Defendant Dundas traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff Yonas Fikre at the United States Embassy in Khartoum, and on April 22, 2010, defendant Dundas did so interrogate plaintiff for several hours.

      12.     At all times relevant, defendant David Noordeloos, who is sued in his individual capacity, was an employee of the FBI assigned to and/or reporting to the Portland office of the FBI. Defendant Noordeloos traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff at the United States Embassy in Khartoum, and on April 22, 2010, Defendant Noordeloos did so interrogate plaintiff for several hours.

### III. JURISDICTION AND VENUE

      13.     This is a complaint for injunctive and declaratory relief, and for damages, based upon defendants' violation of plaintiff's' rights as a citizen of the United States. The claims asserted arise under the Citizenship Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment (substantive and procedural), and the Fifth Amendment's prohibition against self-incrimination.

      14.     This Court has jurisdiction over claims against the United States pursuant to 28 U.S.C. § 1331. Jurisdiction over the individual defendants sued in their personal capacities is authorized and instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

      15.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

      16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because defendants are agencies of the United States and because this judicial district is where plaintiff resides and where a substantial part of the events or omissions giving rise to the

Page 4 - COMPLAINT

claims occurred. Venue is also proper in this Court because two of the individuals sued in their personal capacities at all times relevant hereto either resided in, worked in, or were assigned to and/or reported to this District.

### IV. FACTUAL ALLEGATIONS

17.     Air travel is the only practical means of passenger transportation between the North American continent and Europe, Asia, Africa, the Middle East, and Australia.

18.     Defendant FBI is responsible for the maintenance of the "No-Fly List," which lists individuals whom the airlines flying within, into, or over the United States may not transport.

19.     Most individuals on the No-Fly List, and plaintiff in this action, are prohibited from flying into, out of, or over United States and Canadian airspace.

20.     Plaintiff is a 33-year-old naturalized American citizen of Eritrean descent. When he was a small boy war broke out in Eritrea, and thus his family took him to Sudan, where he was when the State of Eritrea came into being in 1993; consequently, plaintiff is not a citizen of Eritrea. From Sudan the Fikre family emigrated to the United States.

21.     Beginning in 2006, plaintiff resided in Portland, Oregon. In late December 2009, after working for an American cell phone company, plaintiff decided attempt to distribute and retail sale of consumer electronic products in East Africa. He began by returning to Sudan, where some of his extended family still reside. Upon arrival in Sudan plaintiff, in compliance with a recommendation by State Department, contacted the United States Consulate in Khartoum and informed a representative of the consulate of his interest in pursuing business opportunities in the country. The

Page 5 - COMPLAINT

representative encouraged plaintiff to pursue business opportunities in Sudan. In reliance upon the representative's recommendation plaintiff began the process of obtaining a Sudanese business license.

22. On or about April 21, 2010, plaintiff was informed by his wife in the United States that she had received a telephone call from the United States Embassy in Khartoum requesting that plaintiff contact defendant Noordeloos, who claimed to be an official at the embassy and whose telephone number his wife gave to plaintiff. On the same day, at approximately 9 p.m. local time, plaintiff called the number given and spoke with defendant Noordeloos. Defendant Noordeloos stated that a number of Americans in Sudan had been invited to the Embassy for a luncheon the following day in order to discuss how Americans might stay safe during a period of political turmoil in Sudan. Plaintiff agreed to attend the luncheon on that basis.

23. The next morning plaintiff appeared at the embassy. After going through security screening, plaintiff met defendant Noordeloos and another person who identified himself as defendant Jason Dundas. Defendants Noordeloos and Dundas escorted plaintiff to a small meeting room and shut the door; defendants positioning themselves between plaintiff and the door. At that point defendants Noordeloos and Dundas produced badges and stated that they were FBI agents assigned to the Portland office.

24. Upon being informed that defendants Noordeloos and Dundas were FBI agents from the Portland office, plaintiff stated that he wanted to be represented by his legal counsel (plaintiff was then represented by Oregon attorney Brandon Mayfield) during the interrogation. Defendant Noordeloos denied Mr. Fikre's request for such

Page 6 - COMPLAINT

representation on the grounds that plaintiff had been placed on the No-Fly List and thus could not return to the United States to confer with his attorney.

25. Because defendants Dundas and Noordeloos were blocking the door, plaintiff felt he could not leave. During the following interrogation defendants Noordeloos and Dundas questioned plaintiff extensively about the events, activities, and leadership at the As-Saber Mosque in Portland, which plaintiff had attended for prayer services. Defendant Noordeloos also questioned plaintiff about the source of his financial support for this business endeavors in Sudan, and told plaintiff that, because of the Sudan sanctions imposed by the Office of Foreign Assets Control, it was illegal for plaintiff to engage in business transactions in Sudan - a statement that is inconsistent with the advice and recommendation earlier given by the representative of the embassy.

26. Defendant Noordeloos next told plaintiff that the FBI desired plaintiff to become an FBI informant to work upon "a case" that was then developing. Defendant Noordeloos stated that, in return, plaintiff would be paid substantial compensation, be in a position to enjoy "the good life," and that the FBI would take steps to remove plaintiff from the No-Fly List. Defendant Noordeloos then asked, "Don't you love your wife?", which question plaintiff considered an implicit threat. Plaintiff responded that he did not wish to become an FBI informant. The interview lasted for several hours until the close of the business day. As the day wore on, defendant Noordeloos suggested that they resume the discussion on the following day; in order to escape the interrogation room and leave the embassy, plaintiff agreed.

27. At approximately 8:45 a.m. on the following morning, plaintiff called defendant Noordeloos and stated that he did not wish to meet further with the FBI

Page 7 - COMPLAINT

agents because he would be wasting their and his time; he reiterated that he did not wish to become an informant for the FBI. Defendant Noordeloos became agitated and, to the best of plaintiff's recollection, stated, "Wait a minute! Are you trying to tell me you don't want to work with us!" Defendant Noordeloos then stated that, "Whenever you want to go home you come to the embassy."

28. On May 4, 2011, defendant Noordeloos wrote an email to plaintiff which stated:

> Yonas,
> Thanks for meeting with us last week in Sudan. While we hope to get your side of issues we keep hearing about, the choice is yours to make. The time to help yourself is now.
> Be safe in Sudan,
> Dave Noordeloos

29. Plaintiff remained in Khartoum for almost two months following his meeting with defendants Noordeloos and Dundas. During that time he noticed that he was being followed by persons he assumed were affiliated with the Sudanese secret police, and he was told my merchants and other acquaintances that similar individuals had been inquiring about him and his activities.

30. On or about June 15, 2010, plaintiff left Sudan, and on or about September 15, 2010, plaintiff arrived in the United Arab Emirates to pursue similar business interests involving the distribution and retail sale of consumer electronics there. Plaintiff moved to the city of Al Ain in the emirate of Abu Dhabi, where he sought and obtained a residency permit from the UAE in order to conduct business; he invested substantial financial resources provided by family members in pursuing that course.

31. In the evening of June 1, 2011, persons unknown to plaintiff (who plaintiff later learned were UAE plainclothes secret police) invaded plaintiff's home in Al Ain, seized some of his personal property (computer, phone, etc.), and compelled plaintiff to accompany them in a vehicle. Several of plaintiff's friends and neighbors witnessed plaintiff's apprehension. Plaintiff was blindfolded, placed in a confined space in the vehicle, and the air conditioner in the vehicle was turned on high and directed at him with the effect that he became quite chilled.

32. Plaintiff was taken to a then-unknown location approximately two hours' driving time from Al Ain. Still blindfolded, he was led into a building and into a long hall where, by peeking down through the bottom of his blindfold, he noticed that he was passing door after door. His guards stopped at one door and put him inside a windowless cell where he was lodged. Upon removal of his blindfold, he saw that his tiny cell lacked toilet facilities. His cell contained only a bed and some bedding. The cell was very cold because the air conditioning had been set on high.

33. The following morning the interrogations of plaintiff began. Except for the one instance noted below, during all of his interrogations plaintiff was blindfolded. Once blindfolded, he was taken to a room where, throughout his ordeal, plaintiff was questioned for hours in English. Periodically during the 106 days of his imprisonment and torture, plaintiff occasionally was able to peek beneath the blindfold and view shoes and the lower torsos of his interrogators.

34. The primary focus of the blindfolded interrogations was events as Portland's as-Saber Mosque, addressing in particular who plaintiff knew at the mosque had a "jihadi mentality," what topics the mosque's leader, Sheikh Mohamed Kariye,

Page 9 - COMPLAINT

speaks about both in public and in private, and how fundraising at the mosque occurs and who engages in fundraising there. The interrogators also questioned plaintiff about circumstances and events that plaintiff had disclosed to defendants Noordeloos and Dundas during his interrogation at the embassy in Khartoum. Numerous times during the blindfolded interrogations plaintiff's interrogators urged him to cooperate with them and with the FBI by becoming an informant.

35. When plaintiff was returned to his cell at the end of the first day of interrogation he discovered that his bed and bedding had been removed. The air conditioning remained at a high level, which made the cell extremely cold. Because his bed and bedding had been removed, plaintiff was obliged to sleep almost naked on the cold cement floor.

36. During the initial period of his confinement plaintiff resisted answering some of the questions, insisting that he was an American citizen and needed to speak with his ambassador and with his attorney. In response, plaintiff's jailers struck him on his head and he fell to the ground. Throughout course of his confinement plaintiff was repeatedly beaten severely on his head, back, legs, and feet with batons and plastic pipes, required to assume stress positions for hours, and threatened with death by strangulation by use of a flexible plastic pipe. One particularly painful torture method his interrogators used was to force plaintiff to lie on his stomach with his sandals off, whereupon he was beaten severely on the soles of his feet; thereafter, he was required to stand on his feet, which standing caused him great pain.

37. On several occasions plaintiff told his interrogators that the questions he was being asked and the suggestions of cooperation with the FBI were the same

Page 10 - COMPLAINT

questions and suggestion he had heard from defendants Noordeloos and Dundas; he thus inquired whether his confinement and mistreatment was at the request of the FBI. On each such occasion the interrogators responded by beating plaintiff severely.

38. As noted above, during his interrogations plaintiff was occasionally able to peek beneath his blindfold and view the lower torsos of his interrogators. On most occasions, based on their clothing and accents, plaintiff believes that his interrogators were Arabs. On other occasions, however, plaintiff was able to view the shoes and slacks of several individuals who wore Western dress. Plaintiff believes that in those instances representatives of the United States were present and witnessing the interrogations and that those United States representatives controlled the questions being posed to plaintiff.

39. On or about June 14, 2011, plaintiff was informed that he had to take a lie detector test. During the test, for the only time during his confinement, plaintiff was questioned without a blindfold in place. The questioning during the test focused not upon events at Portland's as-Saber Mosque but, rather, whether plaintiff's financial arrangements involved soliciting funds for al-Qaeda. Following the lie detector test plaintiff's bed and bedding were returned to his cell.

40. On June 20, 2011, immediately after learning from plaintiff's family that plaintiff had been apprehended in the UAE (the family had learned of plaintiff's apprehension from witnesses who observed the event), the undersigned Oregon counsel telephoned and then e-mailed the United States Consulate in Abu Dhabi to inform them that plaintiff, a United States citizen, had gone missing and that witnesses in Al Ain had viewed him being placed in a SUV of the type that is commonly used by

Page 11 - COMPLAINT

the UAE secret police. The consulate officials indicated that they would look into the matter. Immediately thereafter, at the request of the undersigned Oregon counsel, Congressman Earl Blumenauer's office contacted the State Department on behalf of plaintiff.

41. The interrogations, including beatings and stress positions, as well as being subjected to temperature extremes, sleep deprivation, and humiliation when not being interrogated, continued daily from June 14 through July 27.

42. On July 28, plaintiff was informed that a woman had arrived to see him. He was told that he was to meet with the American consul and that he should not disclose to the consular officer that he had been mistreated during his detention lest he beaten still more severely.

43. On July 28, 2011, plaintiff, accompanied by two guards, was taken to a meeting room where he met "Marwa," an employee of the State Department who, on information and belief, is of Egyptian extraction. The two guards positioned themselves close to plaintiff, one on each side. Marwa was dressed in Islamic attire (a "hijab," or covering of her hair). By that time plaintiff had lost approximately 30 pounds of body weight.

44. The meeting with Marwa was short and superficial. Although by that time plaintiff had lost approximately 30 pounds, Marwa stated that plaintiff appeared to be in good shape. During the interview plaintiff attempted by facial contortions and winks to indicate that he was under duress, but Marwa either did not notice or disregarded these signals.

Page 12 - COMPLAINT

45. Marwa questioned plaintiff regarding what offense he had been charged with, whereupon plaintiff asked the two guards what he had been charged with. The guards stated that plaintiff was being held without charge and that the authorities were merely conducting an investigation.

46. Marwa's visit was the only United States consular visit during plaintiff's 106 days of detention and torture. Following the meeting with Marwa, plaintiff was returned to his cell and the interrogations and torture resumed.

47. Following the meeting with Marwa, plaintiff's interrogators constantly stated that he would be released "soon" or "tomorrow." However, after approximately a week of continuing interrogation and torture plaintiff became despondent. He believed that the United States had "thrown [him] away," primarily because of his black skin. He consequently began to consider refusing food in an attempt at suicide, but was told that he would be force-fed if necessary.

48. Toward the end of his interrogation plaintiff again inquired of his interrogator whether the FBI had requested that he be detained and interrogated. This time, instead of being beaten, the interrogator stated that indeed the FBI had made such a request and that the American and Emerati authorities work closely on a number of such matters.

49. On September 14, 2011, plaintiff was told that he would be released that day. His belongings were returned to him and money from his wallet was taken to buy him a plane ticket back to the United States. However, when the authorities attempted to purchase his ticket they were told that the United States would not allow him to return by airplane because he was on the No-Fly List. Plaintiff was not given the option of

Page 13 - COMPLAINT

returning to the United States by other means. Therefore plaintiff chose to be sent by air to Sweden, where he had a relative.

50.  Plaintiff arrived in Sweden traumatized, with few financial and other resources, and clothing entirely inappropriate for the Scandinavian weather and climate.

51.  In addition to being stranded with few resources in a foreign country, being placed on the No-Fly List resulted in plaintiff's losing virtually all of his rights as a citizen of the United States - he could not return home to enjoy the rights, privileges and immunities of citizenship. Moreover, his experience with State Department officials in Khartoum and Abu Dhabi demonstrated to him that he could not count on the State Department to protect or even to assist him while overseas.

52.  American passport holders are allowed to visit other countries for only limited periods of time before they have to leave the country they are visiting; in the case of Sweden and other Schengen countries the maximum stay is for 90 days unless special arrangements are made, such as requesting asylum.

53.  Upon arriving in Sweden and being unable to return home, plaintiff contacted a Swedish attorney, Advokat Hans Bredberg, who suggested that plaintiff seek political asylum in that country. Believing that the FBI was responsible for his detention and torture in Abu Dhabi and that he may still be in danger of abuse in countries that condone torture (including the United States), plaintiff submitted an application for asylum to the authorities in Sweden. Plaintiff understands that Swedish authorities have determined that he is not a supporter of terrorism, and that his application for political asylum is pending.

54. On April 18, 2012, a press conference was held in Sweden during which plaintiff's ordeal was disclosed publicly. Less than two weeks later, on May 1, 2012, plaintiff was indicted in the Southern District of California for "conspiracy to structure" 2010 monetary transfers from his family to him in the UAE that plaintiff used to attempt to start his business. On information and belief, this indictment was in retaliation for plaintiff's publicizing of his ordeal.

## CLAIMS FOR RELIEF

**First Claim for Relief: Denial of Citizenship - Right to Return to Homeland**

55. By placing plaintiff on the No-Fly List and prohibiting plaintiff from returning home after his ordeal in the UAE, defendants effectively stripped plaintiff of his rights, privileges, and immunities as a citizen, thereby effectively rendering him stateless in violation of the Fourteenth Amendment to the United States Constitution.

56. The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and Dundas which deprived plaintiff of his rights as a citizen give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

**Second Claim for Relief: Torture**

57. Plaintiff realleges paragraphs 1 through 54.

58. Defendants, including defendants Noordeloos and Dundas, enlisted foreign intermediaries to torture plaintiff at their behest. The foreign intermediaries were directed to torture plaintiff, and plaintiff was tortured in accordance with defendants' instructions.

Page 15 - COMPLAINT

59. The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and Dundas which deprived plaintiff of his rights as a citizen, including the right to be free from torture, give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

### Third Claim for Relief: Denial of Counsel

60. Plaintiff realleges paragraphs 1 through 54.

61. Defendants Noordeloos and Dundas refused plaintiff's demand to be represented by counsel in Khartoum, Sudan, on April 22, 2010. Instead, those defendants continued to interrogate plaintiff notwithstanding such demand and then turned over such information to United States law enforcement defendants, which used information gleaned from plaintiff in securing his indictment which is now pending before the District Court for the Southern District of California.

62. The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and Dundas which deprived plaintiff of his rights as a citizen, give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

### Fourth Claim for Relief: Violation of Right Against Self-Incrimination

63. Plaintiff realleges paragraphs 1 through 54.

64. By continuing the April 22, 2010, interrogation of plaintiff after a demand that he be represented by counsel and inquiring into matters related to the pending

Page 16 - COMPLAINT

indictment of plaintiff in the Southern District of California, Defendants Noordeloos and Dundas violated plaintiff's right against self-incrimination under the Fifth Amendment to the Untied States Constitution.

65.  The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and Dundas which deprived plaintiff of his right against self-incrimination give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

### Fifth Claim for Relief: Substantive Due Process - Right to Return to Homeland

66.  Plaintiff realleges paragraphs 1 through 54.

67.  Defendants Holder, Federal Bureau of Investigation, Mueller, FBI Terrorist Screening Center, and Healy's actions in placing plaintiff on the FBI-maintained, secret No-Fly List resulted in the violation of plaintiff's Fifth Amendment substantive due process right to return to his homeland once abroad.

### Sixth Claim for Relief: Due Process - The No-Fly List

68.  Plaintiff realleges paragraphs 1 through 54.

69.  Defendants Holder, Federal Bureau of Investigation, Mueller, FBI Terrorist Screening Center, and Healy's actions in placing plaintiff on the FBI-maintained, secret No-Fly List without informing him of such placement, the basis for his inclusion on the No-Fly List, the means of removing his name from the No-Fly List, or providing an independent forum in which plaintiff might secure the removal of his name from the No-Fly List, all violated plaintiff's right to procedural due process under the Fifth Amendment.

Page 17 - COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the following relief:

1.    <u>Declaratory Judgment.</u>  A declaratory judgment that --

   a.    Defendants rendered plaintiff stateless by denying him his right as a citizen right to return to the United States once abroad in violation of the Fourteenth Amendment;

   b.    Defendants' participation in the activities that led to plaintiff's imprisonment, interrogation, and torture at the hands of UAE authorities is a denial of plaintiff's substantive due process rights under the Fifth Amendment and a denial of his right as a citizen under the Fourteenth Amendment;

   c.    Defendant Noordeloos and Dundas' denial of plaintiff's right to counsel in the April 22, 2010, interrogation at the United States Embassy is a violation of plaintiff's rights under the Fifth Amendment;

   d.    Defendants' use of plaintiff's coerced testimony gathered during the April 22, 2010, interrogation at the United States Embassy in Khartoum and during his imprisonment, interrogation, and torture in the UAE is a violation of plaintiff's rights under the Fifth Amendment;

   e.    Defendants' placing name on the No-Fly List, which prevented him from returning to his homeland once abroad, is a denial of plaintiff's substantive due process rights under the Fifth Amendment.

   f.    Defendants' placing plaintiff's name on the No-Fly List with no notice thereof, with no reasons given therefor, and with no opportunity to

challenge the basis for such placement is a denial of procedural due process under the Fifth Amendment.

    2.    <u>Injunction.</u> An injunction prohibiting or requiring that --

    a.    Defendants not render United States citizens stateless by preventing them from returning to the United States through placing them on the No-Fly List once outside of the United States;

    b.    Defendants not instigate or facilitate the torture of United States citizens in foreign countries;

    c.    Defendants not interrogate United States citizens in foreign countries once a demand for legal counsel has been made;

    d.    Defendants not use in a criminal proceeding information gathered from a United States citizen after the citizen's demand for legal counsel has been refused;

    e.    Defendants not prevent plaintiff from returning to the United States in the event of future international travel by plaintiff;

    f.    Defendants be required to provide plaintiff notice of placement of his name on the No-Fly List, provide plaintiff with the reasons for such placement, and provide plaintiff an opportunity to challenge or rebut the reasons therefor;

    g.    Defendant State Department not cooperate with law enforcement authorities in facilitating interrogations of United States citizens at United States embassies without first assuring that such citizens will be provided legal counsel upon demand;

      h.    Defendant State Department be required to establish information and protocols to assist United States citizens to return to their homeland who, once abroad, are placed on the No-Fly List.

3.    <u>Damages.</u>    Enter judgment against each defendant sued in his individual capacity in the amount of $5 million each for the violation of plaintiff's clearly established constitutional rights as alleged herein.  Further, it is requested that plaintiff be awarded reasonable attorneys' fees pursuant to 28 U.S.C. § 2412(d), costs, and expenses of all litigation.

4.    <u>Other Relief.</u> Such other relief as the Court may deem just and proper.

DATED this 30th day of May, 2013.

                s/    Thomas H. Nelson, OSB 78315

                Gadeir Abbas, *pro hac vice* pending

                Attorneys for Plaintiff