STUART F. DELERY
Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

BRIGHAM J. BOWEN
SCOTT RISNER
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel.: (202) 514-2395
Fax: (202) 616-8470
E-mail: scott.risner@usdoj.gov

*Attorneys for Defendants Federal Bureau*
*of Investigation, Eric Holder, State*
*Department, John Kerry, James B.*
*Comey, and Christopher M. Piehota[1]*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| YONAS FIKRE,<br><br>        *Plaintiff,* | Case 3:13-cv-00899-BR |
| v.<br><br>THE FEDERAL BUREAU OF<br>INVESTIGATION, et al.,<br><br>        *Defendants.* | **OFFICIAL-CAPACITY DEFENDANTS'<br>MEMORANDUM IN SUPPORT OF<br>MOTION TO DISMISS PLAINTIFF'S<br>FIRST AMENDED COMPLAINT** |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), James B. Comey may be substituted for defendant Robert S. Mueller as the current Director of the Federal Bureau of Investigation, while Christopher M. Piehota may be substituted for defendant Timothy Healy as the current Director of the Terrorist Screening Center.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................... 2

      A.     The Terrorist Screening Center And The No Fly List ................................. 3

      B.     Redress Procedures For Travelers Denied Boarding ................................. 4

ARGUMENT ................................................................................................................ 5

    I.    Plaintiff's Claims Concerning The No Fly List Are Not Ripe For Review ........... 6

    II.   Plaintiff's Claims Concerning The No Fly List Should Be Dismissed Because He Has Failed to Exhaust His Administrative Remedies ....................................... 9

    III.  Plaintiff's First And Fifth Claims Fail To State An Actionable Claim Because He Has Not Been Prevented From Entering the United States ............................ 12

    IV.  Plaintiff's Sixth Claim Should Be Dismissed Because The Government's Traveler Redress Inquiry Program Fully Complies With Due Process ................ 15

      A.     Plaintiff Fails To Allege The Invasion Of A Cognizable Protected Interest ......................................................................................................... 15

      B.     The Government Provides Sufficient Process While Protecting Its Interest in Preventing the Disclosure of Law Enforcement and National Security Information ................................................................. 18

            1.     Due Process Does Not Require The Government To Reveal Whether an Individual Is On The No Fly List ............................. 21

            2.     Due Process Does Not Require The Government To Reveal The Basis For An Individual's Placement On The No Fly List .... 24

            3.     The Redress and Judicial Review Available For Challenges To An Individual's Alleged Placement On The No Fly List Comport With Due Process ......................................................... 26

    V.    Plaintiff's Second Claim Should Be Dismissed ................................................... 30

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ................................................................................................ 6, 7

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ............................................................................... 21, 26

*Al-Kidd v. Gonzales,*
    CV 05-093-EJL-MHW, 2007 WL 4391029 (D. Idaho Dec. 10, 2007) ................... 23

*Armstrong v. Manzo,*
    380 U.S. 545 (1965) ................................................................................................... 18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................... 31, 32, 33

*Barnard v. Dep't of Homeland Sec.,*
    531 F. Supp. 2d 131 (D.D.C. 2008) ......................................................................... 23

*Bassiouni v. C.I.A.,*
    392 F.3d 244 (7th Cir. 2004) .................................................................................... 21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 31, 32, 33

*Boddie v. Connecticut,*
    401 U.S. 371 (1971) ............................................................................................ 19, 28

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) ................................................................................................... 28

*Califano v. Aznavorian,*
    439 U.S. 170 (1978) ................................................................................................... 16

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ..................................................................................................... 5

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) ............................................................................................... 23

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ............................................................................................ 19, 28

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ...................................................................................... 3

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ............................................................................................ 24, 25

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ..................................................................................................... 5

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
  928 F. Supp. 2d 139 (D.D.C. 2013) ................................................................. 4

*FDIC v. Mallen*,
  486 U.S. 230 (1988) ......................................................................................... 28

*Fisher v. Reiser*,
  610 F.2d 629 (9th Cir. 1979) .......................................................................... 16

*Fitzgibbon v. C.I.A.*,
  911 F.2d 755 (D.C. Cir. 1990) ........................................................................ 24

*Gilbert v. Homar*,
  520 U.S. 924 (1997) ........................................................... 18, 19, 21, 28

*Gilmore v. Gonzales*,
  435 F.3d 1125 (9th Cir. 2006) ................................................................. 16, 26

*Global Relief Found., Inc. v. O'Neill*,
  315 F.3d 748 (7th Cir. 2002) .......................................................................... 25

*Gordon v. F.B.I.*,
  388 F. Supp. 2d 1028 (N.D. Cal. 2005) ........................................................ 23

*Green v. Transp. Sec. Admin.*,
  351 F. Supp. 2d 1119 (W.D. Wash. 2005) .................................................... 16

*Haig v. Agee*,
  453 U.S. 280 (1981) ............................................................................. 16, 17, 19

*Holder v. Humanitarian Law Project*,
  130 S. Ct. 2705 (2010) ............................................................................. 20, 29

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) .................................................................. 25, 28

*Ibrahim v. Dep't of Homeland Sec.*,
  538 F.3d 1250 (9th Cir. 2008) .................................................................. 12, 27

*Jifry v. F.A.A.*,
  370 F.3d 1174 (D.C. Cir. 2004) .................................................... 20, 25, 28

*Latif v. Holder*,
  __ F. Supp. 2d __, 2013 WL 4592515 (D. Or. Aug. 28, 2013) ................... 16, 17

*Latif v. Holder*,
  686 F.3d 1122 (9th Cir. 2012) ..................................................................... 8, 27

*League of United Latin Am. Citizens v. Bredesen*,
  500 F.3d 523 (6th Cir. 2007) .......................................................................... 16

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ........................................................... 18, 19, 28, 29, 30

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) ............................................................................ 9, 10, 11

*Miller v. Reed*,
   176 F.3d 1202 (9th Cir. 1999) ................................................................ 16

*Monsanto Co. v. Geertson Seed Farms*,
   130 S. Ct. 2743 (2010) ............................................................................ 5

*Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001) ................................................................ 25

*Neely v. Henkel*,
   180 U.S. 109 (1901) ................................................................................ 18

*Newton v. I.N.S.*,
   736 F.2d 336 (6th Cir. 1984) .................................................................. 13

*Nguyen v. I.N.S.*,
   533 U.S. 53 (2001) .................................................................................. 13

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*,
   484 U.S. 97 (1987) .................................................................................. 2

*Phillippi v. Cent. Intelligence Agency*,
   546 F.2d 1009 (D.C. Cir. 1976) .............................................................. 5

*Rahman v. Chertoff*,
   530 F.3d 622 (7th Cir. 2008) .................................................................. 30

*Raz v. Mueller*,
   389 F. Supp. 2d 1057 (W.D. Ark. 2005) ................................................ 23

*Regan v. Wald*,
   468 U.S. 222 (1984) ................................................................................ 17

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
   483 U.S. 522 (1987) ................................................................................ 13

*Shavitz v. City of High Point*,
   270 F. Supp. 2d 702 (M.D.N.C. 2003) .................................................. 7

*Shearson v. Holder*,
   725 F.3d 588 (6th Cir. 2013) .......................................................... 10, 11, 12

*Standard Alaska Prod. Co. v. Schaible*,
   874 F.2d 624 (9th Cir. 1989) .................................................................. 7

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ................................................................ 31

*Tabbaa v. Chertoff*,
   509 F.3d 89 n.1 (2d Cir. 2007) ............................................................... 20

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ................................................................. 6

*Tooley v. Bush*,
    Case No. 06-cv-306, 2006 WL 3783142 (D.D.C. Dec. 21, 2006)............................. 21, 22, 23

*Town of Southold v. Town of East Hampton*,
    477 F.3d 38 (2d Cir. 2007)...................................................................... 16

*United States ex rel. Siegel v. Shinnick*,
    219 F. Supp. 789 (E.D.N.Y. 1963) ........................................................... 17

*United States v. $124,570 U.S. Currency*,
    873 F.2d 1240 (9th Cir. 1989) ................................................................ 19

*United States v. Hartwell*,
    436 F.3d 174 (3d Cir. 2006).................................................................. 19, 21

*United States v. Hawkins*,
    249 F.3d 867 (9th Cir. 2001) ................................................................ 29

*United States v. Marquez*,
    410 F.3d 612 (9th Cir. 2005) ................................................................ 19

*US W. Commc'ns v. MFS Intelenet, Inc.*,
    193 F.3d 1112 (9th Cir. 1999) ............................................................... 7, 8

*Vo v. Benov*,
    447 F.3d 1235 (9th Cir. 2006) ............................................................... 18

*Walter v. City of Chicago*,
    Case No. 91 C 6333, 1992 WL 88457 (N.D. Ill. Apr. 27, 1992)............................... 7

*Wayte v. United States*,
    470 U.S. 598 (1985).......................................................................... 19

*Weinberger v. Salfi*,
    422 U.S. 749 (1975).......................................................................... 12

*Williams v. Garza*,
    Case No. 06-cv-01569, 2009 WL 3081963 (E.D. Cal. Sept. 22, 2009).................................... 31

*Wright v. Riveland*,
    219 F.3d 905 (9th Cir. 2000) ................................................................ 15

*Zepeda v. U.S. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983) ................................................................. 5

**Statutes and Regulations**

6 U.S.C. § 111 ................................................................................. 2

19 U.S.C. § 1433 ............................................................................... 13

19 U.S.C. § 1459 ............................................................................................... 13

28 U.S.C. § 533 ................................................................................................... 2

49 U.S.C. § 114.................................................................................... 2, 3, 14, 21

49 U.S.C. § 44903 ....................................................................................... 10, 21

49 U.S.C. § 44926 ......................................................................................... 4, 10

49 U.S.C. § 46110 ........................................................................................... 5, 27

50 U.S.C. § 404o ................................................................................................. 2

8 C.F.R. § 235.1 ................................................................................................ 13

28 C.F.R. § 0.85 .................................................................................................. 2

49 C.F.R. § 1520.5 .............................................................................................. 4

49 C.F.R. § 1560.205 ....................................................................................... 4, 5

**Miscellaneous**

9/11 Commission Report, Executive Summary.................................................. 3, 22

DHS TRIP, at http://www.dhs.gov/dhs-trip ........................................................ 4

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)................................ 24

FBI — TSC FAQs, at http://www.fbi.gov/about-us/nsb/tsc/tsc_faqs .......................................... 3, 4

FBI — TSC Vision & Mission, at http://www.fbi.gov/about-us/nsb/tsc/tsc_mission ................ 22

Homeland Security Presidential Directive 6 (Sept. 16, 2003).............................. 3

Step 3: After Your Inquiry, at http://www.dhs.gov/step-3-after-your-inquiry ............................ 5

http://www.dhs.gov/files/programs/gc_1169699418061.shtm................................... 11

**OFFICIAL-CAPACITY DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## INTRODUCTION

In the aftermath of the September 11 attacks, Congress and the Executive Branch have devoted extensive resources to enhancing aviation security. One significant security measure is the use of a consolidated terrorist watchlist, the Terrorist Screening Database ("TSDB"), and its subset lists the No Fly and Selectee Lists. The TSDB, which is maintained by the Terrorist Screening Center ("TSC"), enables United States authorities to identify those individuals known or suspected of engaging in terrorist activity. The No Fly List, a subset of the TSDB, enables relevant agencies within the federal government to identify and deny boarding to individuals who pose a threat to aviation security as they attempt to fly on U.S. commercial aircraft or any commercial aircraft flying into, out of, or over the United States. The No Fly List is a crucial tool in our nation's security efforts, and it is paired with a robust redress process to ensure its accuracy. Pursuant to statutory authority and Executive Branch action, individuals may file inquiries related to delayed or denied boarding on commercial aircraft with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP").

Plaintiff Yonas Fikre alleges that he is on the government's No Fly List and contends that the government's watchlisting efforts are unconstitutional. He further alleges various constitutional violations arising from an interview conducted of him in Sudan, and he seeks wide-ranging injunctive and declaratory relief. Specifically, Plaintiff alleges six counts based on (I) the Fourteenth Amendment's guarantee of a right to citizenship, (II) an unidentified cause of action concerning torture, (III) a right to counsel, (IV) the Fifth Amendment right against self-incrimination, (V) the Fifth Amendment guarantee of substantive due process, and (VI) the Fifth Amendment guarantee of procedural due process. Plaintiff appears to bring Counts I, II, V, and

VI against some or all of the official-capacity defendants, and Counts I, II, III, and IV against two government "agents" in their individual capacities.[2]  With respect to his claims against the Official-Capacity Defendants, Plaintiff's claims are not ripe, have not been presented to the government through the available administrative redress process, and fail to state any actionable violation of the law.

## STATUTORY AND REGULATORY BACKGROUND

Several different components of the federal government work together to secure the nation and its airways from terrorist threats.  The Federal Bureau of Investigation ("FBI") has responsibility for investigating and analyzing intelligence relating to both international and domestic terrorist activities, and the National Counterterrorism Center ("NCTC") serves as the primary organization for analyzing and integrating intelligence relating to international terrorism and counterterrorism.  *See* 28 U.S.C. § 533; 28 C.F.R. § 0.85(l); 50 U.S.C. §§ 404o(a) & (d)(1). The Department of Homeland Security ("DHS") is primarily charged with "prevent[ing] terrorist attacks within the United States" and "reduc[ing] the vulnerability of the United States to terrorism." 6 U.S.C. § 111.  Within DHS, the primary responsibility of the Transportation Security Administration ("TSA") is transportation – including aviation – security.  *See* 49 U.S.C. § 114.

---

[2] It appears that the individual defendants have not been served, and thus they are not properly before the Court at this time. *See Omni Capital Int'l, Inc. v. Rudolph Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.").  Until such time as Plaintiff serves the individual defendants, and counsel is authorized to represent them, the Department of Justice is not appearing on their behalf.  As such, this motion to dismiss does not address Counts III or IV, or any of the other counts as they relate to the individual defendants.

**A.      The Terrorist Screening Center And The No Fly List**

In 2003, the President ordered the establishment of a multi-agency governmental

organization that would "consolidate the Government's approach to terrorism screening and

provide for the appropriate and lawful use of Terrorist Information in screening processes." *See*

Homeland Security Presidential Directive 6 (Sept. 16, 2003).  The TSC, which was established

by Executive Order, maintains the TSDB, a consolidated database of identifying information

about persons known or reasonably suspected of being involved in terrorist activity.  *See* FBI –

TSC FAQs, available at http://www.fbi.gov/about-us/nsb/tsc/tsc_faqs; *see also Daniels-Hall v.*

*Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (court may take judicial notice of

governmental websites).  The creation of TSC was driven by the 9/11 Commission's conclusion

that the lack of intelligence-sharing across federal agencies had created vulnerabilities in the

nation's security.[3]

The TSC also maintains the No Fly List as a subset of the TSDB.  The No Fly List is not

made public, *see* FBI – TSC FAQs, and the criteria for placement on the List (as well as an

individual's status vis-à-vis the List) have been designated as Sensitive Security Information

("SSI").[4]  As a result, neither the criteria for inclusion on the No Fly List, nor the implementation

---

[3] *See* 9/11 Comm'n Report, Exec. Summary, available at http://govinfo.library.unt.edu
/911/report/911Report_Exec.htm ("The missed opportunities to thwart the 9/11 plot were also
symptoms of a broader inability to adapt the way government manages problems to the new
challenges of the twenty-first century.  Action officers should have been able to draw on all
available knowledge about al Qaeda in the government.  Management should have ensured that
information was shared and duties were clearly assigned across agencies, and across the foreign-
domestic divide.").

[4] Congress directed TSA to "prescribe regulations prohibiting the disclosure of information
obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing
the information would . . . be detrimental to the security of transportation."  49 U.S.C.
§ 114(r)(1)(c) (formerly § 114(s)).  Such information is known as SSI, and TSA is authorized by
Congress to determine whether particular material is SSI, and, if so, whether and to what extent
it may be disclosed.  *See id.*; 49 C.F.R. pt. 1520.  The determination that information constitutes

guidance, may be publicly disclosed.  *See* 49 C.F.R. § 1520.5(b)(9)(i).  If a person is denied

boarding and wishes to file an inquiry about that denial, he or she may do so with DHS TRIP, as

explained below.  *See* DHS TRIP, available at http://www.dhs.gov/dhs-trip ("DHS TRIP

Website").

### B.        Redress Procedures For Travelers Denied Boarding

As part of the new procedures adopted following the attacks of September 11, 2001, the

government has developed redress programs to review inquiries of passengers who allege that

they have been denied boarding or repeatedly subjected to additional screening at airports.  *See*

49 U.S.C. § 44926.  The current redress program for such inquiries is DHS TRIP.  *See* DHS

TRIP Website.  DHS TRIP is the central administrative redress process for individuals who have,

for example, experienced denied or delayed airline boarding, denied or delayed entry into or exit

from the United States at a port of entry, or subjected to repeated referrals to additional

(secondary) screening.  *See id.*

After a DHS TRIP inquiry is filed, DHS TRIP refers the inquiry to the appropriate

agencies (including to TSC, in the case of individuals who are an exact match or near match to

an identity in the TSDB), for review, assessment, and adjudication.  *See* DHS TRIP Website;

FBI – TSC FAQs; 49 C.F.R. § 1560.205(d).  If an inquiry is referred to TSC, the TSC Redress

Unit reviews the available information to determine whether the inquiring traveler is an exact

match to a TSDB identity and, if so, whether the individual traveler's status on any subset list

(including the No Fly and Selectee Lists) should be modified or whether the traveler should be

removed from the TSDB.  *See* DHS TRIP Website; FBI – TSC FAQs.  For inquiries about

delayed or denied airline boarding due to TSA security screening, DHS TRIP provides a written

---

SSI is reviewable only in the court of appeals.  *Elec. Privacy Info. Ctr. v. U.S. Dep't of
Homeland Sec.*, 928 F. Supp. 2d 139, 146-47 (D.D.C. 2013).

response as part of the redress process provided pursuant to 49 U.S.C. § 44926.  *See id.*; 49

C.F.R. § 1560.205(d); Step 3: After Your Inquiry, available at http://www.dhs.gov/step-3-after-

your-inquiry.  Pursuant to the government's current "Glomar" policy, the response does not

confirm or deny whether the traveler is in the TSDB or on the subset No Fly and Selectee Lists.[5]

Judicial review of the decisions reflected in the responses involving inquiries concerning delayed

or denied boarding is available in the courts of appeal pursuant to 49 U.S.C. § 46110.

## ARGUMENT

Plaintiff's effort to obtain wide-ranging injunctive relief relating to the administration of

the TSDB and the redress process should be turned aside.[6]  His complaint brings an array of

claims regarding the No Fly List, and the process available to individuals who believe that they

have been denied or delayed boarding on U.S. commercial aircraft to, from, or over the United

States due to their alleged inclusion on the list.  Yet Plaintiff has has not alleged actually being

denied boarding on any plane, and he has never submitted a DHS TRIP inquiry.  Because he has

not been denied the opportunity to fly, and has not even availed himself of the administrative

process he deems insufficient, Plaintiff's challenges are unripe and he has not exhausted

---

[5] "Glomar" refers to a "neither confirm nor deny" response.  This response was first judicially recognized in the national security context in *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976), which raised the issue of whether the CIA could refuse to confirm or deny its ties to Howard Hughes's submarine retrieval ship, the Glomar Explorer.

[6] Although each count of Plaintiff's First Amended Complaint raises claims concerning only Plaintiff, the relief requested includes broad injunctive relief prohibiting the government from taking various actions vis-à-vis "United States citizens" as a class.  *See* Am. Compl., pp. 19-20. This relief is beyond the Court's power.  This is not a class action, and Plaintiff lacks standing to assert the rights of third parties.  *See Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979); *see also Monsanto Co.* v. *Geertson Seed Farms*, 130 S. Ct. 2743, 2760 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (noting that "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs"); *Zepeda* v. *INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court … may not attempt to determine the rights of persons not before the court.").

available administrative remedies.  Plaintiff's claims are also legally without merit, as he has not

been prevented from returning to the United States, and the redress procedures available to

individuals who believe that they are improperly included on the No Fly List fully comport with

due process.  Finally, the remaining count in Plaintiff's complaint fails to satisfy basic standards

of notice pleading and does not state an actionable claim.  Plaintiff's claims against the Official-

Capacity Defendants should therefore be dismissed.

**I.      Plaintiff's Claims Concerning The No Fly List Are Not Ripe For Review.**

Plaintiff's first, fifth, and six claims concern his purported inability to fly based on the

implementation of the No Fly List and the process available for challenging his alleged inclusion

on that list.  But Plaintiff does not allege that he has ever been denied boarding on a plane.  Nor

does he allege that he has ever availed himself of the DHS TRIP process, an administrative

process specifically designed to review and redress allegations that an individual has been

erroneously included on a terrorist watchlist.  Plaintiff's complaint about his alleged placement

on a watchlist thus presents a hypothetical, speculative scenario that is not ripe for adjudication.

Ripeness is designed to "prevent the courts, through avoidance of premature adjudication,

from entangling themselves in abstract disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136,

148 (1967).  The ripeness inquiry is related to the requirement of an actual controversy, as the

court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but

to adjudicate live cases or controversies consistent with the powers granted the judiciary in

Article III of the  Constitution."[7]  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134,

1138 (9th Cir. 2000) (en banc).

---

[7] The requirement of ripeness in this context is similar to the prudential doctrine requiring
exhaustion of administrative remedies, which will be discussed *infra*.  *See* 13B Charles A.
Wright & Arthur R. Miller, Federal Practice & Procedure § 3532.6 (3d ed. 2004) ("[R]ipeness
may be used to express the exhaustion principle that administrative remedies should be tried

Prudential ripeness looks to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.  "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989).  Furthermore, to satisfy the requirement of hardship, Plaintiff must show "that withholding review would result in direct and immediate hardship." *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999).  Plaintiff fails to satisfy either prong of ripeness.

First, Plaintiff's claims concerning his alleged placement on the No Fly List are not "fit for judicial resolution."  Here, Plaintiff seeks review of an alleged decision to place his name on the No Fly List.  But he does not allege ever attempting to board a plane; he says only that, over two years ago (in September 2011), some unidentified "authorities" were told by some other unidentified individual(s) that he would not be permitted to return to the United States.  Am. Compl. ¶ 49.  Rather than presenting a recent denial of boarding and alleging imminent plans to travel with reason to believe that the denial would be repeated, Plaintiff relies on outdated word-

---

before running to the courts.  The close relationship to finality results in many ripeness decisions that emphasize the finality of administrative action."); *see also id.* ("Whether approached as a matter of finality or ripeness, judicial review is least likely to be appropriate if an agency has not yet acted.  Most obviously, a court should not presume to dictate the requirements of due process for agency proceedings that have not yet been undertaken, and should refuse to entertain claims that an agency would be wrong [regarding] an application not yet made to it.").

    This defect could also be viewed through the prism of standing – Plaintiff has no standing to challenge the adequacy of the DHS TRIP redress process if he has never even attempted to use it.  *See, e.g.*, *Shavitz v. City of High Point*, 270 F. Supp. 2d 702, 710 (M.D.N.C. 2003) (Where "Plaintiff has failed to use the process provided to him, he cannot show that he has suffered injury because of the insufficiency of the process provided."); *Walter v. City of Chicago*, No. 91 C 6333, 1992 WL 88457, at *3 (N.D. Ill. Apr. 27, 1992) (questioning whether plaintiff has standing to challenge procedures where plaintiff "never made use of them").  Regardless of which analytical framework is applied, the defect in Plaintiff's case is readily apparent, and therefore this Court should refrain from considering this matter at this time.

of-mouth claims divorced from a serious attempt to travel.  Regardless of whether the statements regarding Plaintiff's status are correct, as explained in more detail below, the administrative process in place – DHS TRIP – could potentially resolve Plaintiff's claims, but he has declined to engage that process.  Instead, the Court is being asked to intervene in the operations of an administrative program to review an alleged determination that the agencies themselves have not been formally asked to review.  Without having allowed this process to run its course, a court charged with reviewing the claim would be without the benefit of the agency's assessment.  Accordingly, at this stage, Plaintiff's allegations are not appropriate for judicial resolution.

Second, delaying adjudication of Plaintiff's claims until he has availed himself of the DHS TRIP process will not cause "direct and immediate hardship," *US W. Commc'ns*, 193 F.3d at 1118, particularly as it is unclear that any harm will ever occur.  More than three years have passed since Plaintiff alleges that he was told in Sudan that he was on the No Fly List, and nearly two years have passed since he alleges that he was told in the United Arab Emirates that he could not fly to the United States.  *See* Am. Compl. ¶¶ 22-24, 49.  Plaintiff alleges that he has been in Sweden for more than a year, unable to return to the United States.  *Id.* ¶¶ 50-54.  But in all that time, Plaintiff makes no allegation that he has made any travel plans, attempted to board any flights, or taken any steps whatsoever to return to the United States.  Indeed, he does not even allege having contacted the U.S. Embassy in Sweden for assistance regarding his desire to return.  Moreover, Plaintiff has failed to avail himself of the process that could provide him with the relief he seeks, DHS TRIP.[8]  Plaintiff's own delay in bringing this suit and his failure to take advantage of the administrative remedy available to him during that time greatly undermine any

---

[8] Plaintiff's failure to invoke the DHS TRIP process makes him unlike the plaintiffs in other cases pending before this court, *Latif* and *Tarhuni*, each of whom submitted DHS TRIP inquiries.  *See Latif v. Holder*, 686 F.3d 1122, 1126 (9th Cir. 2012); *Tarhuni v. Holder*, Case No. 3:13-cv-00001, First Am. Compl., Dkt. 13 (Apr. 23, 2013), ¶ 36.

claim he could make as to the urgency of his present claims.  For all these reasons, adjudicating Plaintiff's claims before a genuine controversy develops between the parties would be premature and unwarranted.

**II.     Plaintiff's Claims Concerning The No Fly List Should Be Dismissed Because He Has Failed To Exhaust His Administrative Remedies.**

        In addition to the lack of ripeness, Plaintiff's first, fifth, and sixth claims should be dismissed as a prudential matter because he has failed to avail himself of the established administrative procedure for seeking redress for claims of denied boarding based on alleged placement on a terrorist watchlist.  Plaintiff alleges that he is wrongfully on the No Fly List, yet he has never submitted an inquiry through the DHS TRIP process, which could resolve his claim.

        Although there is no express statutory requirement of administrative exhaustion in this context, the Supreme Court "long has acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts."  *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992) (superseded by statute on other grounds) ("[W]here Congress has not clearly required exhaustion, sound judicial discretion governs.").  "The exhaustion doctrine recognizes . . . that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer."  *Id.* at 145.  Requiring exhaustion advances "the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  *Id.*

        Here, Congress established an administrative process for the very type of allegations raised by plaintiff regarding security screening when attempting to travel via commercial air transportation.  Congress required the Secretary of Homeland Security to "establish a timely and fair redress process for individuals who believe they have been delayed or prohibited from

boarding a commercial aircraft because they were wrongly identified as a threat."  49 U.S.C.

§ 44926(a).[9]  DHS TRIP was created in response to these congressional requirements.  If an

individual experiences travel difficulties and believes that he has been wrongly included on a

government watchlist, there is thus an administrative process in place that can potentially resolve

his concerns.  While DHS TRIP does not provide for a hearing in which a complainant would be

privy to any sensitive information that may pertain to him, it would result in the agencies

reviewing his specific allegations and correcting any errors they identify.  Moreover, through

DHS TRIP, a complainant would receive a Redress Control number which could be used when

making future air travel plans, potentially preventing future misidentifications or other similar

concerns.

       Plaintiff has not used the DHS TRIP process, but requiring him to do so prior to raising

his claims would serve "the twin purposes of protecting administrative agency authority and

promoting judicial efficiency."  *McCarthy*, 503 U.S. at 144.  *See also Shearson v. Holder*, 725

F.3d 588, 594 (6th Cir. 2013) (requiring plaintiff to exhaust her administrative remedies through

DHS TRIP before bringing a procedural due process challenge).

       By requiring Plaintiff to exhaust his administrative remedies, the Court would allow the

various federal agencies charged with correcting any errors the opportunity to review Plaintiff's

allegations and make any changes to his records if necessary.  As the Sixth Circuit recognized, in

dismissing a procedural due process claim of a plaintiff who had failed to exhaust her

administrative remedies by going through the DHS TRIP process, "making [the plaintiff] submit

[9] The Secretary is further required to ensure that the process includes a method to maintain a
record of individuals who have been misidentified and "have corrected erroneous information."
49 U.S.C. § 44926(b)(2).  Congress also enacted 49 U.S.C. § 44903, requiring TSA to "establish
a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight
because [it was] determined that they might pose a security threat, to appeal such determination
and correct information contained in the system."  *Id.* § 44903(j)(2)(C).

a Traveler Redress inquiry is reasonable to promote judicial efficiency and allow the agencies involved an opportunity to resolve problems with their procedures." *Shearson*, 725 F.3d at 594. Simply put, the court found that "[a]llowing the Terrorist Screening Center to use its expertise to try and resolve [the plaintiff's] claim through the Redress Program is prudent." *Id.* at 595. Indeed, DHS has publicly explained that "[m]any people erroneously believe that they are experiencing a screening delay because they are on a watchlist," but in fact are experiencing delays because of "a name similarity to another person who is on the watchlist." http://www.dhs.gov/files/programs/gc_1169699418061.shtm.  "Ninety-nine percent of individuals who apply for redress are not on the terrorist watchlist, but are misidentified as people who are." *Id.*

Requiring Plaintiff to exhaust the administrative remedies established by Congress could thus remedy Plaintiff's purported injury.  His first and fifth claims contend that he has been denied the ability to return to the United States because he cannot fly, and he seeks an injunction barring Defendants from placing him on the No Fly List or preventing him from returning to the United States "in the event of future international travel."  *See* Am. Compl. ¶¶ 55, 67; *id.*, Prayer for Relief, ¶ 2.  His sixth claim contends that he has been denied adequate process, and seeks an opportunity to "secure the removal of his name from the No-Fly List."  *Id.* ¶ 69; *id.*, Prayer for Relief, ¶ 2.  Accepting *arguendo* Plaintiff's allegation that he is on the No Fly List, by going through the DHS TRIP process, the government would review his status and make any appropriate corrections.  "When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided." *McCarthy*, 503 U.S. at 145.  And even where a "controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial

consideration, especially in a complex or technical factual context." *Id.*; *see also Weinberger v. Salfi*, 422 U.S. 749, 765 (1975). If exhaustion were not required here, the courts could be flooded by claims from any number of individuals alleging some perceived delay or slight associated with government security screening efforts. *See Shearson*, 725 F.3d at 594 (requiring exhaustion through DHS TRIP "will promote judicial efficiency," because "[m]aking it easier for plaintiffs to bypass the Redress Program will burden the courts when many cases can be easily resolved").

Accordingly, this Court should require Plaintiff to exhaust his administrative remedies by submitting an inquiry to DHS TRIP detailing a specific instance where he was denied boarding. After the DHS TRIP redress process has been completed, Plaintiff may then have claims eligible for review in federal court.

### III. Plaintiff's First And Fifth Claims Fail To State An Actionable Claim Because He Has Not Been Prevented From Entering the United States.

If the Court considers Plaintiff's claims against the Official-Capacity Defendants, it should determine that they lack merit.[10] Plaintiff's complaint brings two counts – his first and fifth claims – regarding his "Right to Return to Homeland." *See* Am. Compl. ¶¶ 55, 67. While the first claim arises under a "right to citizenship" under the Fourteenth Amendment and the fifth claim arises under Fifth Amendment substantive due process, both claims contend that the alleged placement of Plaintiff's name on the No Fly List denied him the right to enter the United

---

[10] Insofar as Plaintiff raises any claims against the Department of State and Secretary Kerry, the claims should be dismissed for the simple reason that the Department is not involved in making No Fly List determinations. *See Ibrahim v. DHS*, 538 F.3d 1250, 1256 (9th Cir. 2008) ("The No-Fly List is maintained by the Terrorist Screening Center."). Plaintiff has not alleged that the Department of State has any involvement in his alleged placement on the No Fly List, nor could the Department provide him the relief he seeks, namely removal from the List. Indeed, aside from stray references to unidentified "defendants," none of the six claims for relief even mention the Department of State or Secretary Kerry. *See* Am. Compl. ¶¶ 55-69.

States.  *See id.*  Under either theory, Plaintiff's claims fail.  To the extent that U.S. law permits U.S. citizens to enter at a port of entry, Plaintiff's complaint does not allege that he has been denied such entry, and he thus fails to state a claim upon which relief can be granted.  Accordingly, the Court should dismiss Plaintiff's first and fifth claims.

Even if Plaintiff had asserted facts about denied air travel to support a right-of-entry claim, however, denial of boarding on an airplane is not a denial of entry into the United States.[11] Lawful entry of U.S. citizens does not occur until the individual citizen has presented himself or herself at a U.S. port of entry.  *See* 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section."); 19 U.S.C. §§ 1433 (entry requirements for vessels, vehicles, and aircraft, including place of entry), 1459 (mandating those not entering with a vessel, vehicle, or aircraft must "enter the United States only at a border crossing point designated by the Secretary").

Plaintiff has not alleged that he has presented himself at a port of entry, nor that he was denied entry upon doing so (or even that he was denied boarding on an aircraft bound for the United States).  Instead, Plaintiff's complaint generally alleges, without the provision of any detail whatsoever, that he has been prevented from returning to the United States because he is on the No Fly List.  *See* Am. Compl. ¶¶ 55, 67.  Even if Plaintiff is on the No Fly List –

---

[11] There have been very few occasions for courts to pass upon the contours of the citizen's "right" to enter and reside in the United States.  *See, e.g., Nguyen v. INS*, 533 U.S. 53 (2001) (noting in *dicta* that citizenship includes a right to enter the United States).  While Plaintiff relies on the "rights, privileges, and immunities" of citizens under the Fourteenth Amendment, *see* Am. Compl. ¶ 55, the Privileges and Immunities Clause is a prohibition against *state* conduct.  *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n.21 (1987) ("The Fourteenth Amendment applies to actions by a State.").  Moreover, the Official-Capacity Defendants are aware of no court that has recognized that a right to return to the United States from abroad, much less by air, exists under the Fourteenth Amendment.

something the government neither confirms nor denies – such inclusion does not pose an insurmountable or unreasonable barrier to return to the United States. Defendants acknowledge that any person placed on the No Fly List may face additional complication in traveling to the United States. But Plaintiff is incorrect to suggest that a denial of the ability to fly to the United States constitutes a denial of the opportunity to enter the country. The two are separate and distinct concepts.

Finally, preventing the government from placing U.S. citizens on the No Fly List if they are outside the United States, as Plaintiff requests, would do the government's aviation security program serious harm and would pose grave danger to national security. Under Plaintiff's view of the law, no matter how great a risk they may pose to others, all U.S. citizens would be allowed to fly into U.S. airspace. For good reason, the relevant statutory authorities speak of *individuals* – not aliens – who pose risks to civil aviation. *See* 49 U.S.C. § 114(h)(3). By asserting an absolute right to reenter by airplane, Plaintiff effectively seeks to place himself outside of the standard security screening that applies to *all persons* seeking to fly on a U.S. aircraft or into, out of, or over the United States, simply because of his status as a U.S. citizen.

Plaintiff does not allege that he has ever been denied entry when arriving at a port of entry, and he cannot show that a future denial of entry is likely. He does not allege that he is unable to return to the United States at all, or that he would be prevented from entering once there, only that someone has told him that he is unable to return by plane. Indeed, there is no allegation that Plaintiff has even attempted to travel to the United States by plane or any other means. Nor does Plaintiff plausibly allege that he lacked alternative means of access to a U.S. port of entry via travel through other nations. As a result, his claims regarding the denial of a

"right to return to homeland" are without merit, and his first and fifth claims should be dismissed.

**IV.    Plaintiff's Sixth Claim Should Be Dismissed Because The Government's Traveler Redress Inquiry Program Fully Complies With Due Process.**

Plaintiff's sixth count raises a procedural due process claim against Defendants FBI, TSC, Holder, and Piehota. This claim fails for several reasons. Most fundamentally, Plaintiff does not allege the deprivation of a protected interest. In any event, the government's redress process is appropriately tailored to honor due process in the unique context of transportation and national security, where the government's interests are paramount.

**A.    Plaintiff Fails To Allege The Invasion Of A Cognizable Protected Interest.**

A plaintiff must show that he has been deprived of a protected interest in order to trigger any due process entitlement to notice and a meaningful opportunity to challenge the alleged deprivation. *See Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (To state a procedural due process claim, a plaintiff must allege "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.") (internal citation and quotation omitted). Plaintiff's complaint says virtually nothing about a protected liberty interest. He contends that his alleged placement on the No Fly List deprived him of the right to return to the United States, *see* Am. Compl. ¶ 51, but this assertion is particularly odd given that he has not even tried to fly to the United States, let alone to enter the country. His entire due process claim thus flows from an assumption that he is on the No Fly List, and that he would be denied boarding if he attempted to fly to the United States, but such untested assumptions do not demonstrate the deprivation of any protected interests.

Even if the Court accepts Plaintiffs' unsupported leaps, however, he has still failed to allege the deprivation of a constitutionally-protected interest. To the extent Plaintiff relies on a

liberty interest in air travel, he overstates the nature of the interest because there is no protected liberty interest in traveling by particular means, whether domestically or internationally.

In *Latif v. Holder*, __ F. Supp. 2d __, 2013 WL 4592515 (D. Or. Aug. 28, 2013), this Court held that certain plaintiffs who believe they are on the No Fly List had alleged the deprivation of constitutionally-protected liberty interests in traveling internationally by air. *Id.* at *9. But even in the context of interstate travel, which is recognized as a fundamental right, courts have repeatedly held that there is no right to any particular means of travel, even if the most convenient means of travel is restricted. *See Gilmore v. Gonzales,* 435 F.3d 1125, 1137 (9th Cir. 2006) (holding there is no right to air travel)*; Miller v. Reed,* 176 F.3d 1202, 1206 (9th Cir. 1999) (holding there is no right to drive); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) (holding that there is no protected right to a particular mode of transportation); *Green v. Transp. Sec. Admin*., 351 F. Supp. 2d 1119, 1130 (W.D. Wash. 2005) (holding there is no right to travel "without any impediments" and burdens on a "single" form of transportation are not unreasonable); *see also Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2nd Cir. 2007) ("travelers do not have a constitutional right to the most convenient form of travel").

In its opinion in *Latif*, the Court distinguished *Gilmore* and *Green* because they "involve burdens on the right to *interstate* travel as opposed to *international* travel." *Latif*, 2013 WL 4592515, at *8. But restrictions on international travel are subject to *less* scrutiny than those on interstate travel. *See, e.g., Fisher v. Reiser*, 610 F.2d 629, 637-38 (9th Cir. 1979); *see also Califano v. Aznavorian*, 439 U.S. 170, 177 (1978). If restrictions on a specific means of interstate travel do not trigger or offend the Constitution, this is even more clearly true for international travel. *See Haig v. Agee*, 453 U.S. 282, 306-07 (1981) (recognizing that the

freedom to travel abroad is "subordinate to national security and foreign policy considerations");
*Regan v. Wald*, 468 U.S. 222, 240-43 (1984) (citing "the traditional deference to executive judgment in this vast external realm of foreign affairs" in upholding international travel restrictions).

Moreover, in *Latif* the Court found that international air travel is not "a mere convenience in light of the realities of our modern world," given the potential that individuals may want or need to travel overseas quickly for various reasons. *Latif*, 2013 WL 4592515, at *8. But the question of whether a protected liberty interest in air travel exists abroad does not turn on the relative convenience of international air travel; that question goes primarily to the degree of deprivation. Whether there is an interest in the first instance depends on other factors, such as the diminished scope of personal entitlements abroad as opposed to at home, and the role of the Executive (as opposed to the courts) in foreign affairs and national security. These factors counsel that the individual's liberty interest is diminished, not increased, in the context of international as opposed to interstate travel.

While Plaintiff here asserts an interest in returning to the United States – despite failing to allege that he has actually attempted to do so – the Official-Capacity Defendants have found no authority for striking down Congressional or Executive action that may have made it more difficult for a U.S. citizen to travel overseas and return to the country. Instead, the case law makes it clear that a citizen's ability to return to the United States is qualified insofar as the government may, and routinely does, engage in acts that might burden this asserted right. The United States can deny or revoke a passport, *see generally Haig*, 453 U.S. at 280; and impose quarantines, *see United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963). The United States can even extradite its citizens to face trial and imprisonment in another

country, which could permanently prevent their return.  *See, e.g., Neely v. Henkel,* 180 U.S. 109 (1901); *Vo v. Benov*, 447 F.3d 1235 (9th Cir. 2006).  These actions – all of which have been upheld as lawful – can delay, complicate, or render prohibitively expensive or impossible international travel, including international travel for the purpose of returning to the United States.

The restrictions that flow from the operation of the No Fly List are akin to those actions, and the fact that air travel has become a more convenient or preferred means of travel does not mean that it has risen to the level of a constitutionally-protected liberty interest.  As a result, Plaintiff cannot overcome the threshold requirement that he allege an invasion of a constitutionally-protected interest.  His procedural due process claim must therefore fail.

B.      **The Government Provides Sufficient Process While Protecting Its Interest In Preventing The Disclosure Of Law Enforcement And National Security Information.**

Even if Plaintiff had alleged a deprivation of a protected liberty interest stemming from his purported placement on the No Fly List (or some other watchlist), the procedural protections afforded by the government to redress such alleged harm fully conform with due process requirements.  "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal quotations and citation omitted).  Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.*  (internal quotation and citation omitted).  The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Three factors generally are relevant to this analysis: (1) "the private interest that will be affected by the official action"; (2) "the risk of

an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Gilbert*, 520 U.S. at 931-32 (quoting *Mathews*, 424 U.S. at 335).

Due process procedures may vary "'depending upon the importance of the interests involved.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)). This is particularly so here. Even if Plaintiff has some limited liberty interest in international air travel, the government's interests in this case are at their zenith. "[N]o governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307; *see also Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning."). Planes are known as attractive terrorist targets and possess enormous deadly force when used as weapons. *See United States v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005) ("As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous."); *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1242 (9th Cir. 1989) ("[A]irline travel . . . gives terrorists and other criminals a unique opportunity for inflicting death and destruction."); *United States v. Hartwell*, 436 F.3d 174, 179 (3rd Cir. 2006) ("[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance.").

Considered in the context of these strong governmental interests, the balancing required under *Mathews* demonstrates that Plaintiff's complaint fails to state a viable procedural due process claim. While Plaintiff's complaint contends that he has no "means of removing his name

from the No Fly List,"[12] Am. Compl. ¶ 69, the truth is that the government offers a robust and effective redress process to individuals who believe they were denied boarding because of their wrongful inclusion on the No Fly List.  As described above, this process includes DHS TRIP and culminates with review in the court of appeals, where an individual may obtain judicial review of his inclusion on the List and the substantive reasons for that inclusion.

The available process already includes ample safeguards and protections to diminish the risk that an individual will erroneously be included on the No Fly List.  Plaintiff contends that the government must do more, but any additional value of such procedures must be balanced against the significant harm that would be caused to compelling governmental interests.  Due process does not require the government to put national security at risk by providing additional measures that will cause such harm.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010) ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess."); *see also Jifry v. FAA*, 370 F.3d 1174, 1181–84 (D.C. Cir. 2004); *Tabbaa v. Chertoff*, 509 F.3d 89, 93 n.1 (2d Cir. 2007).  None of the additional procedural measures sought by Plaintiff justifies the harm it would cause to these compelling governmental interests.

### 1. Due Process Does Not Require The Government To Reveal Whether An Individual Is On The No Fly List.

First, due process does not require the government to reveal to Plaintiff whether or not he is on the No Fly List.  The government has a paramount interest in ensuring that TSDB information can be broadly shared across the government to maximize the nation's security,

---

[12] For purposes of this Rule 12 motion the Official-Capacity Defendants assume, without confirming or denying, that Plaintiff is on the No Fly List.

without fear that such information will be disclosed whenever anyone cannot travel as he or she might choose. *See Gilbert*, 520 U.S. at 931–32. As the Ninth Circuit recently recognized "the Constitution certainly does not require that the government take actions that would endanger national security." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012). As the events of recent years have demonstrated, "there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance." *Hartwell*, 436 F.3d at 179. To that end, Congress has required TSA by statute to utilize information from government agencies to evaluate passengers who may be a threat to civil aviation and national security and to prevent such individuals from boarding an aircraft, or take other appropriate action. 49 U.S.C. §§ 114(h)(3), 44903(j)(2)(A). Courts have also recognized the vital role watchlisting plays in securing our nation, along with the government's need to maintain the confidentiality of information regarding that list. *See Tooley v. Bush*, Case No. 06-cv-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *rev'd & remanded in part on other grounds*, *Tooley v. Napolitano*, 556 F.3d 836 (D.C. Cir. 2009), *vacated on reh'g*, 586 F.3d 1006 (D.C. Cir. 2009) (affirming original district court opinion); *cf. Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004) (explaining that if the "CIA opens its files most of the time and asserts the state-secrets privilege only when the information concerns a subject under investigation or one of its agents, then the very fact of asserting the exemption reveals that the request has identified a classified subject or source").

In considering the government's interests in this area, it is clear that the watchlisting process must be appropriately robust to address the evolving terrorist threat facing our nation. The watchlisting process thus allows the intelligence community to share information in order to help identify, detect, and deter terrorists and to make assessments about which persons are likely

to pose a risk of engaging in or preparing for terrorism or terrorist activities.  Indeed, the lack of this kind of centralized information sharing and the failure to watchlist were specifically cited as a government failing by the 9/11 Commission.  *See* 9/11 Comm'n Report, Exec. Summary, available at http://govinfo.library.unt.edu/911/report/911Report_Exec.htm.

While this information is shared within the government (and to third parties as necessary to implement the list), *see* FBI – TSC Vision & Mission, available at http://www.fbi.gov/about-us/nsb/tsc/tsc_mission, requiring the government to publicly confirm or deny whether particular individuals are now or ever have been placed on the No Fly List would disclose highly sensitive information concerning whether the individuals in question have been identified by the federal government as having links to terrorism.  Moreover, if the government were to disclose watchlist status, individuals who know they are in the TSDB could take steps to avoid detection and circumvent surveillance.  Similarly, the disclosure that someone is *not* in the TSDB might lead that person (or a group affiliated with that person) to take advantage of that fact, so that he or she is in a better position to commit a terrorist act against the United States before he or she comes to the attention of government authorities.

For all these reasons, courts have regularly upheld the government's ability to withhold this kind of information.  As one court has observed, "if [the government] were to confirm in one case that a particular individual was not on a watch list, but was constrained in another case merely to refuse to confirm or deny whether a second individual was on a watch list, the accumulation of these answers over time would tend to reveal [sensitive security information]." *Tooley*, 2006 WL 3783142, at *20 (upholding TSA's position that confirming or denying records indicating plaintiff's presence on TSA watch lists would reveal SSI).  Thus, for example, the government is not required to confirm whether the names of particular individuals "appear on

any watch lists," *Gordon v. FBI*, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005); is not required to confirm or deny the existence of "watch list records concerning [a particular individual]," *Tooley*, 2006 WL 3783142, at *19, *20; is not required to produce information about an individual "which may or may not be in the TSDB," *Al-Kidd v. Gonzales*, No. CV 05-093, 2007 WL 4391029, at *8 (D. Idaho Dec. 10, 2007); and is not required to produce "information regarding individuals nominated to the TSDB by the FBI," *Raz v. Mueller*, 389 F. Supp. 2d 1057, 1062-63 (W.D. Ark. 2005); *Barnard v. DHS*, 531 F. Supp. 2d 131, 134 (D.D.C. 2008) (upholding withholding of records in response to plaintiff's FOIA request to "obtain records related to him that could explain why he has been detained, questioned, and/or searched in airports during and after his international trips beginning in January 2003").

The Supreme Court recently discussed these very concerns in *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138 (2013). There, litigants claimed that individuals with whom they have communications (and, by extension, they themselves) were subject to terrorism-related surveillance. When challenged for their lack of evidence of such surveillance, they proposed a judicial procedure that would allow the government to reveal whether or not they were subject to surveillance to a court *ex parte*, so as to facilitate determination of their standing. The Court called this proposal "puzzling," and observed that such a proceeding would permit a terrorist to infer his surveillance status by filing suit and awaiting the result of the *ex parte* proceeding. *Id.* at 1149 n.4. As the Supreme Court recognized, powerful and legitimate national interests counsel against revealing the information Plaintiff seeks to extract from the government.

For all these reasons, due process does not require disclosure to Plaintiff of his status on (or off of) the No Fly List. The government has compelling reasons not to disclose this information, either before, during, or after the redress process.

2.    **Due Process Does Not Require The Government To Reveal The Basis For An Individual's Placement On The No Fly List.**

Plaintiff contends that an individual must be informed of "the basis for his inclusion on the No-Fly List," and that, without knowing the basis for the listing, he cannot adequately challenge that basis administratively.  Am. Compl. ¶ 69.  Beyond the fact that disclosing this information would result in the disclosure of status on the watchlist, which is not required for the reasons explained above, due process does not require disclosure of the reasons for placement on the list.

To the extent an individual is included on the TSDB, or the subset No Fly List, the underlying basis for inclusion typically rests on intelligence and law enforcement information that is either classified or protected by the law enforcement privilege.[13]  Plaintiff's demand for access to such information contravenes precedent holding that the Executive is primarily responsible for protecting such information, and for assessing the risks – like those discussed here – inherent in its disclosure.  *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (recognizing that the authority to determine who may have access to classified information "is committed by law to the appropriate agency of the Executive branch").[14]  Even a protective order

---

[13] The classified information supporting placement on the No Fly List could pertain to various categories of information protected by Executive Order 13526, including "(b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [and] (d) foreign relations or foreign activities of the United States, including confidential sources."  Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), § 1.4.  It is not surprising – indeed, it is axiomatic – that information used to nominate individuals to a list of persons known of being involved with or associated with terrorists or terrorism would involve sensitive information that implicates significant national security concerns.  The TSDB would hardly serve its purpose if the government was constrained from using sensitive information to nominate individuals to the No Fly List because of a concern that the information would be disclosed in litigation.

[14] Faced with similar issues, courts addressing the protection of classified information have consistently acknowledged the Executive's authority and expertise in such matters.  *See, e.g., Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence

requiring information to be disclosed notwithstanding the Executive's classification – let alone a full-blown evidentiary hearing in which such information is disclosed and subject to cross-examination – raises serious separation of powers issues.  *See* U.S. Const. art. II, § 2, cl. 1; *Egan*, 484 U.S. at 527 ("[The Executive's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President.").  "[T]hat strong interest of the government [in protecting against the disclosure of classified information] clearly affects the nature . . . of the due process which must be afforded petitioners."  *Nat'l Council of Resistance of Iran ("NCRI") v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001).  As the D.C. Circuit explained in *NCRI*, disclosure of classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect."  *Id.* at 208-09.[15]

Requiring disclosures of "the basis" for No Fly List nominations would harm national security, and due process does not require that such information be disclosed.  *See Jifry*, 370 F.3d at 1183-84 (In determining whether plaintiffs posed threats to civil aviation, "substitute procedural safeguards may be impracticable [in those cases] and, in any event, are unnecessary" because of "the governmental interests at stake and the sensitive security information" involved; as a result, due process did not require that plaintiffs be given the "specific evidence" upon

_____

sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts.") (internal citation omitted).

[15] *See also Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (rejecting claim that the use of classified information not disclosed to the plaintiff violated due process); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002) (rejecting claim that statute was unconstitutional because it authorized the *ex parte* use of classified evidence, as "The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives." (internal citation omitted)).

which the determinations are based.).[16]  Even if individuals included on the No Fly List have

been deprived of a protected liberty interest, the government retains a compelling interest in

protecting the information underlying such inclusions.  Protecting such information ensures the

integrity of investigations into terrorism and other threats to national security, and enables

agencies to share that information without fear that it will be disclosed whenever someone sues

after he cannot travel as she might choose.

> **3.    The Redress And Judicial Review Available For Challenges To An Individual's Alleged Placement On The No Fly List Comport With Due Process.**

Plaintiff's complaint also contends that he is entitled to challenge the alleged

determination to place his name on the No Fly List, in an "independent forum."  Am. Compl. ¶

69.  But this evinces a fundamental misunderstanding of the process already available to him, as

the government provides meaningful review, including judicial review in the court of appeals of

the reasons for an individual's inclusion on the No Fly List.

---

[16] The Ninth Circuit's ruling in *Al Haramain* does not provide otherwise.  There, the Ninth Circuit considered a challenge to the government's designation of Al-Haramain as an organization that supports al Qaeda on a record that included classified information filed *ex parte* and *in camera*.  686 F.3d at 985.  While the court found that the *Mathews* factors supported Al-Haramain's due process challenge, it required only that the government consider steps to mitigate any burden from reviewing classified information *in camera* and *ex parte*, not to actually disclose the classified information in full to the other side.  *Id.* at 988-89.  In terms of the due process challenge, moreover, the *Al-Haramain* decision has limited value in this distinct context.  There, the blocking of assets by the Office of Foreign Assets Control "deprived AHIF-Oregon of its ability to use any funds whatsoever, for any purpose."  *Id.* at 980, 986.  By contrast, as discussed above, alleged restrictions on Plaintiff's ability to fly by commercial airplane have limited effects on his liberty interests in light of the Ninth Circuit's recognition that there is no constitutional right to travel by particular means.  *Gilmore*, 435 F.3d at 1136.  In addition, asset-blocking orders are public, whereas placement on a watchlist is neither confirmed nor denied publicly.  Where, as here, the government has neither confirmed nor denied an individual's status, it is impractical to provide a classified summary of the basis for status, which itself would reveal status.

If an individual alleges that he has experienced delayed or denied boarding as a result of inclusion on the No Fly List, and is unsatisfied with the results of his DHS TRIP inquiry, he may file a petition for review in the court of appeals pursuant to 49 U.S.C. § 46110. If, after the DHS TRIP review, the government determines that the petitioner should remain on the No Fly List, the government will submit an administrative record to the court of appeals that includes the information that the government relied upon to maintain that listing. This information will be provided along with any information that the petitioner provided to the government as part of the DHS TRIP process. After the government files an administrative record, the court of appeals will review the record "to determine if the government reasonably determined that the petitioner satisfied the minimum substantive derogatory criteria for inclusion" on the No Fly List. As such, Plaintiff already has a forum available to him, but has chosen not to avail himself of it.[17]

By affording a petitioner the opportunity to challenge his or her inclusion on the No Fly List in the court of appeals, the redress process already ensures that information underlying an individual's placement may be reviewed by a federal court, while still respecting the government's need to protect the information from disclosure so that its national security and law enforcement operations are not compromised. To the extent Plaintiff contends that the judicial review must provide an individual with the bases for his inclusion on the No Fly List, that

---

[17] In its decision in *Latif v. Holder*, 686 F.3d 1122 (2012), the Ninth Circuit recognized certain limits on its jurisdiction under 49 U.S.C. § 46110 to consider "broad constitutional claims" challenging the plaintiffs' asserted inclusion on government watchlists that "do not require review of the merits of . . . individual DHS TRIP grievances." 686 F.3d at 1129. It also found that the district court may hear substantive challenges to the plaintiffs' alleged inclusion on the No Fly List, insofar as such claims were brought against TSC or the FBI. *Id.* But the fact that individuals may choose to bring claims in the district court does not mean that they are required to do so. As a general matter, individuals may still obtain review in the court of appeals in order to challenge a specific redress decision issued through the DHS TRIP process by TSA. *Ibrahim*, 538 F.3d at 1256-57. For example, in *Arjmand v. DHS*, the government submitted a record for the court's review. *See generally Arjmand v. DHS*, Dkt. No. 34, No. 12-71748 (9th Cir. filed June 2012).

argument is wrong for the reasons discussed above.  Such procedures would necessarily reveal information that would place law enforcement sources and methods at risk or result in the disclosure of classified information.  Due process does not require such a revelation.  As noted above, due process is a flexible concept, and therefore "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances."  *Mathews*, 424 U.S. at 348.  To the contrary, "'[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'"  *Loudermill*, 470 U.S. at 545 (quoting *Boddie*, 401 U.S. at 378).[18]

The flexibility that the government possesses with respect to administrative remedies is particularly great in cases involving attempts to determine whether particular individuals pose threats to "us[e] civil aircraft as instruments of terror."  *See Jifry*, 370 F.3d at 1183.  Contrary to Plaintiff's complaint, opportunities for confrontation and rebuttal are not absolute requirements of due process, particularly in cases where the information upon which the government acts is highly sensitive.  *See id.* at 1183-84 (In determining whether plaintiffs posed threats to civil aviation, "substitute procedural safeguards may be impracticable [in those cases] and in any event, are unnecessary" because of "the governmental interests at stake and the sensitive security information" involved.); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164

---

[18] Plaintiff does not appear to be asserting a claim that persons on the No Fly List should receive pre-deprivation notice.  *See* Am. Compl., p. 18 (seeking means of removing name from the list). In any event, "postdeprivation process satisfies the requirements of the Due Process Clause" in cases where "it would be impractical to provide predeprivation process."  *Gilbert*, 520 U.S. at 930.  The Supreme Court has held that "due process is not denied when postponement of notice and hearing is necessary" to ensure prompt government action in a variety of circumstances, such as where advance warning might frustrate the purpose of the action.  *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974); *FDIC v. Mallen*, 486 U.S. 230, 241 (1988).

(D.C. Cir. 2003) (rejecting claim that the use of classified information not disclosed to the plaintiff violated due process).

Finally, Plaintiff alleges that he lacks a "means of removing" his name from the No Fly List. Am. Compl. ¶ 69. But that is simply not true. DHS TRIP provides a robust process by which the government can remove individuals who have been erroneously included on a watchlist, and if a traveler is unsatisfied with the results of that process then judicial review is available in the court of appeals. Due process does not require that any individual's name be removed from the list, only that the individual be given an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. The redress process provides this opportunity.

*** 

Establishing a watchlisting program that is both effective and flexible is a critical matter of national security, and the government has carefully considered how to ensure intelligence information is used effectively to include appropriate individuals on the No Fly List without jeopardizing the necessary secrecy of such information. The current redress process represents the government's best efforts to provide redress in this complex and sensitive area, and the government's best judgment based on experience in counterterrorism should not be set aside on account of Plaintiff's contrary assessments regarding how sensitive intelligence information should be protected. *See Humanitarian Law Project*, 130 S. Ct. at 2727 ("[W]hen it comes to collecting evidence and drawing factual inferences in [national security and foreign relations], the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate.") (internal quotation marks and citation omitted); *see also United States v. Hawkins*, 249 F.3d 867, 873 & n.2 (9th Cir. 2001) (The governmental interest in

"ensuring national security" is "important in [itself]… but courts have long recognized that the Judicial Branch should defer to decisions of the Executive Branch that relate to national security."); *Rahman v. Chertoff*, 530 F.3d 622, 627-28 (7th Cir. 2008).

At bottom, Plaintiff cannot show that he lacks an adequate opportunity to be heard regarding his alleged No Fly Status.  That opportunity is fully afforded in a balanced and appropriate way through a robust redress process (albeit one Plaintiff has not even bothered to pursue).  By providing that opportunity without requiring the government to reveal information that ought not to be revealed, the redress process balances "the private interest that [is] affected by the official action" against "the Government's interest" in avoiding the burdens that "additional or substitute procedural requirement[s] would entail."  *See Mathews*, 424 U.S. at 335. Given the government's paramount interests in this context, due process requires none of the additional procedures sought by Plaintiff, and his procedural due process claim should therefore be dismissed.

## V.    Plaintiff's Second Claim Should Be Dismissed.

In addition to his travel-related claims, Plaintiff's complaint raises several claims arising from an alleged interview of Plaintiff conducted in Sudan and subsequent detention in the United Arab Emirates ("UAE").  The third and fourth counts are brought only against defendants Noordeloos and Doe, who are sued in their individual capacities, but the second claim, in which Plaintiff alleges responsibility for torture by "foreign intermediaries," could be read as being raised against the Official-Capacity Defendants as well.  *See* Am. Compl. ¶ 58 ("Defendants, including defendants Noordeloos and Dundas . . . .").  Insofar as this claim is brought against Defendants Holder, FBI, Department of State, Kerry, and Piehota, Plaintiff's complaint falls far short of the minimum standards of notice pleading, and it fails to state an actionable claim.

First, the complaint fails even to identify a cause of action. Federal Rule of Civil Procedure 8(a) requires that, "allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Under the one-word heading of "torture," the claim alleges that "Defendants, including defendants Noordeloos and Dundas, enlisted foreign intermediaries to torture plaintiff at their behest. The foreign intermediaries were directed to torture plaintiff, and plaintiff was tortured in accordance with defendants' instructions." Am. Compl. ¶ 58. This form of pleading does not even include the "[t]hreadbare recitals of the elements of a cause of action" that the Supreme Court found insufficient in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It gives Defendants no notice of the cause of action or the basis for the claimed liability, and fails to identify an applicable waiver of sovereign immunity. Defendants should not be forced to guess as to the basis of Plaintiff's claim.

In addition, the factual allegations in Plaintiff's complaint lack the specificity required to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It is Plaintiff's responsibility to clearly describe for each individual defendant what that defendant did and how that defendant's actions violated Plaintiff's rights or otherwise provides for the basis of a legal claim." *Williams v. Garza*, Case No. 06-cv-01569, 2009 WL 3081963, at *3 (E.D. Cal. Sept. 22, 2009).

Plaintiff's complaint fails under this standard, as he says nothing in his complaint about how the defendants "enlisted foreign intermediaries to torture plaintiff at their behest."  *See* Am. Compl. ¶ 58.  He contends that he was interviewed by two FBI agents in Sudan in April 2010, and that after that interview he remained in Sudan with no apparent contact with the agents or any other U.S. government employees for the next two months.  *See id.* ¶ 30.  He then allegedly went to the UAE in June 2011, and was there for nearly nine months before he was detained by individuals he says were UAE police.  *See id.* ¶¶ 30-31.  Plaintiff contends that, while detained in the UAE, he was subjected to torture, and alleges that on some occasions he glimpsed shoes and pants that suggested the presence of Westerners, and that he was told at one point that the FBI had requested his detention and interrogation.  *See id.* ¶¶ 38, 48.  From that, he claims involvement in the alleged torture by the U.S. government.  These allegations do not provide a basis "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  He does not identify which defendants were responsible for the alleged torture, or what any particular defendant did; indeed, he never even suggests that the Department of State or TSC had any involvement in Plaintiff's alleged interview in Sudan.  He does not identify the "foreign intermediaries" at issue, he does not indicate how or when they were "directed to torture" him, and he offers no allegation as to why that occurred.

As a result, Plaintiff's allegations fail to state a claim.  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555.  Plaintiff must actually provide some factual basis for concluding that Defendants acted unlawfully.  *See id.* ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement

to relief.'") (quoting *Bell Atl. Corp.*, 550 U.S. at 557).  While notice-pleading may not be

particularly demanding, "it does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions."  *Id.* at 678-79.

## CONCLUSION

For all of the reasons discussed above, this action should be dismissed in its entirety as

against the Official-Capacity Defendants.

Dated: November 4, 2013.                    Respectfully submitted,

                                            STUART F. DELERY
                                            Assistant Attorney General

                                            DIANE KELLEHER
                                            Assistant Branch Director

                                            */s/ Scott Risner*
                                            BRIGHAM J. BOWEN
                                            SCOTT RISNER
                                            Trial Attorneys
                                            Civil Division, Federal Programs Branch
                                            U.S. Department of Justice
                                            P.O. Box 883
                                            Washington, D.C.  20044
                                            Tel.: (202) 514-2395
                                            Fax: (202) 616-8470
                                            E-mail: scott.risner@usdoj.gov

                                            *Attorneys for Defendants Federal Bureau of
                                            Investigation, Eric Holder, State
                                            Department, John Kerry, James B.
                                            Comey, and Christopher M. Piehota*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing motion was delivered to all counsel of record via the Court's ECF notification system.

*/s/ Scott Risner*
SCOTT RISNER

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b),

54-1(c), or 54-3(e) because it contains fewer than 35 pages, including headings, footnotes, and

quotations, but excluding the caption, table of contents, table of cases and authorities, signature

block, exhibits, and any certificates of counsel.

/s/ Scott Risner
SCOTT RISNER