Thomas H. Nelson, OSB 78315 (nelson@thnelson.com, zigzagtom@gmail.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Brandon Mayfield, OSB 000824 (mayfieldbrandon@hotmail.com)
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

Gadeir Abbas, Va. State Bar # 81161, *pro hac vice* (gabbas@cair.com)
Council of American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.8787

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE**, | |
| Plaintiff, | Civil No. 3:13-cv-00899-BR |
| v. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO OFFICIAL DEFENDANTS' MOTION TO DISMISS** |
| **THE FEDERAL BUREAU OF INVESTIGATION**, et al, | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

### I. INTRODUCTION

In their November 4 motion to dismiss, the official-capacity defendants posited two primary arguments - that the doctrines of ripeness and exhaustion of administrative remedies should bar plaintiff from proceeding further in this litigation, and then raised a number of secondary arguments. This memorandum responds to that motion; before proceeding into argument, however, the salient background should be considered.

## II. BACKGROUND

The allegations in plaintiff's complaint, which must be accepted as fact for the

purposes of defendants' motion,[1] can be summarized as follows:

- Plaintiff, a naturalized citizen of the United States of Eritrean descent, First Amended Complaint, Dkt. # 10, ¶ 4, and convert to Islam, lived with his family for a while in San Diego, but later moved to Portland, where he attended and had friends at Portland's As-Saber mosque, *id.* ¶ 25;

- After discussing the matter with family members, plaintiff decided to pursue new business interests in East Africa and the Middle East, *id.* ¶ 21;

- To pursue this goal, plaintiff went to Sudan, where he pursued acquiring the necessary business and other licenses to engage in trading of consumer electronics, *id.*;

- While in Sudan, representatives claiming to be with the U.S. Embassy lured him to the embassy by ostensibly inviting him to attend a luncheon meeting with other Americans so that the American community could be briefed on "staying safe" during the election period in Sudan, *id.* ¶ 22;

- When plaintiff arrived at the embassy he was met by two FBI agents, defendants David Noordeloos and one who gave is name as "Jason Dundas," which has proved to be an alias. The agents were affiliated with the Portland FBI field office, *id.* ¶ 23;

- When told that he was to be interviewed by the agents, plaintiff requested that he consult with his attorney, Brandon Mayfield, co-counsel in this case. The agents told him that he could not do so because plaintiff was on the No-Fly List ("List") and could not return to the U.S. for such consultation. From that point forward plaintiff felt trapped in the embassy, *id.* ¶ 24;

- During the interrogation the agents inquired about plaintiff's activities, financing, events and happenings at the Portland mosque, *id.* ¶ 25;

- During the interrogation, the agents stated that they were working on "a case," presumably in Portland, and importuned plaintiff to become a paid informant for the FBI, promising him that he would be removed from the List, be paid substantial amounts of money, and be able to enjoy "the good life," *id.* ¶ 26;

---

[1] In reviewing a motion to dismiss, the Court must accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. *Terbush v. U.S.*, 516 F.3d 1125, 1128 (9th Cir. 2008); *Mohammed v. Jeppeson Dataplan, Inc.*, 614 F.3d 1070, 1073 (9th Cir. 2010).

- Toward the end of the day the agents suggested that they meet the following day to pursue further whether plaintiff would become a paid informant. Plaintiff agreed to such meeting in order to escape the embassy, *id.*;

- Early the next morning plaintiff called agent Noordeloos and told him that he did not want to become an informant and thus would not attend the meeting. Agent Noordeloos expressed exasperation and anger, *id.* ¶¶ 27-28;

- For weeks afterward plaintiff was followed and targeted by persons plaintiff believes were governmental agents, *id.* ¶ 29;

- Plaintiff decided to abandon his efforts in Sudan and instead moved to the United Arab Emirates, where he sought to establish his business dealing in consumer electronics, *id.* ¶ 30;

- On June 1, 2011, while at his home in Al-Ain in the Emirate of Abu Dhabi, plaintiff was arrested by UAE secret police and transferred to a prison in Abu Dhabi, where he endured 106 days of torture, *id.* ¶¶ 31 *et seq.*;

- During his incarceration and torture, plaintiff was repeatedly interrogated regarding his finances, his activities at the Portland mosque, and whether he would be willing to cooperate with law enforcement authorities, *id.* ¶¶ 34, 37;

- After approximately seven weeks of interrogation and torture, an official from the U.S. embassy visited plaintiff; plaintiff was accompanied by two guards (one on each side of him) during the meeting. The guards informed the official that no charges had been brought against plaintiff; rather, his incarceration was merely for investigative purposes, *id.* ¶¶ 42-46;

- Toward the end of his ordeal, one of plaintiff's interrogators acknowledged that him imprisonment and torture was at the request of the United States, *id.* ¶ 48;

- On September 15, 2011, plaintiff was told he was being released without charge but that he would leave the UAE for a year. Plaintiff's jailers took funds from plaintiff to purchase him a ticket to Portland, but were told that plaintiff could not fly to the U.S. because he was on the List list. Consequently, plaintiff was deported to Sweden, *id.* ¶ 49;

- Plaintiff, fearing for his safety, applied for asylum in Sweden, which application has been pending for over two years, *id.* ¶¶ 51-53;

- In Stockholm, plaintiff's Swedish attorney arranged a press conference covering plaintiff's ordeal April 18, 2012. On May 1, 2012, only two weeks after the press conference, plaintiff was indicted for conspiracy to structure international monetary transfers occasioned by the transfer of family funds to plaintiff in the

UAE. *Id.* ¶ 54. The indictment was dismissed and the arrest warrant for plaintiff was withdrawn on October 4, 2013. See Exhibit 1.

With this background, defendants' arguments can be addressed.

### III. ARGUMENT

Before addressing the merits of defendants' argument, a caution is in order. Defendants' arguments regarding ripeness and exhaustion rely upon facts that are contrary to the record or not supported by affiant or evidence (*e.g.,* not attempting to board a plane destined for the United States, not filing a TRIP request). The Ninth Circuit has cautioned that because fact finding by the court deprives litigants of protections otherwise afforded by Rule 56, a motion to dismiss is improper. If there are any disputes as to these factual allegations neither a motion to dismiss nor a motion for summary judgment is appropriate.[2]

Defendants' arguments in support of their motion to dismiss are addressed in the order presented in defendants' memorandum.

### A.   Ripeness for Review

Defendants' ripeness arguments are (i) that plaintiff has not alleged that he has been denied boarding on a plane and (ii) that he has initiated the DHS TRIP process. The first argument is ill-founded and the second simply wrong.

#### 1.   Denied Boarding

Addressing whether plaintiff has been denied boarding, the events on September

---

[2] "Jurisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711 F.2d 138, 139 (9th Cir. 1983) (citations omitted).

15, 2011, while plaintiff was in custody at the UAE secret prison, establish that the United States prevented plaintiff from even acquiring a ticket and boarding pass to board a plane for a flight home. Because plaintiff's captors required plaintiff to be deported immediately, plaintiff was required to select some foreign country to which he would be sent against his will. This is how plaintiff came to seek refuge in Sweden. In sum, not only was plaintiff denied boarding, he was denied the opportunity even to purchase a ticket and request a boarding pass *before* being denied boarding. Because having a ticket and a boarding pass are prerequisites to boarding an airplane for any destination, defendants' argument that plaintiff was not denied boarding is false.

    2.    <u>DHS TRIP Redress Process</u>

Defendants' next ripeness argument is that plaintiff has not initiated the DHS TRIP redress process. However, since the filing of defendants' motion, plaintiff has indeed initiated that process and has obtained a Redress number. See Exhibit 2. Even if he had not taken these steps, however, it is clear that the Redress process is completely inadequate.

Filing for a Redress number provides the applicant with no remedy; specifically, it will not result in informing the applicant whether he/she is on the List nor any reasons for, or opportunity to challenge, such presence on the List. This is because the primary function of the Redress process is to eliminate "false positives" from the identification process; see *Latif v. Holder*, 686 F.3d 1122, 1125 (9th Cir. 2012) ("*Latif*"). In addition, notwithstanding the Ninth Circuit's decision in *Latif,* the government still apparently has not abandoned the notion that the sole remedy to one who does initiate the Redress

process is to appeal any determination or lack thereof to the Court of Appeals -- a remedy that the Court of Appeals for the Ninth Circuit found inadequate in *Latif*.

In footnote 8 at page 15, defendants argue that plaintiff's actions are unlike other cases now before this court, *viz. Latif* and *Tarhuni v. Holder*. Defendants are wrong, at least insofar as their reference to the *Tarhuni* case: Mr. Tarhuni filed his TRIP request after the filing of his complaint, just like plaintiff in this case. And, in Mr. Tarhuni's case, it is clear that his filing provided absolutely no remedy: He still has not been given an opportunity to challenge the reasons why he is on the list and he remains on the list to this day.[3]

Defendants at page 8 assert that the claim is not ripe because plaintiff has not attempted to return home after being deported to Sweden. Although plaintiff is a citizen of the United States, in light of the circumstances set forth in the "Background" portion, *supra*, it is not surprising that plaintiff has been wary and careful about returning to this country: He now has refuge in one of the few remaining countries that neither countenances nor condones torture. And, as a matter of fact, plaintiff has, through his attorney, had discussions with the United States about plaintiff's possible return.[4] Because of the government's past deceptions, the State Department's abandonment of him, and defendants' participation in plaintiff's abuse, plaintiff is fearful of returning and thus asked the government to give him two guarantees: That he would not again be subjected to torture or other extra-judicial process and that he would be allowed to leave

---

[3] The Ninth Circuit's *Latif* decision itself highlights the inadequacy of the TRIP process: "TSA sends a determination letter to the traveler when determination is complete, but does not confirm or deny whether the traveler is (or ever was) on the [No-Fly] List or provide any assurances about future travel." *Latif* at 1124.
[4] See Declaration of Thomas H. Nelson, Exhibit 3, ¶¶ 9-12.

the United States if he were to return. The government refused to provide assurances

on either point; the government's sole position appears to be that, should plaintiff desire

to return, he should visit the U.S. Embassy in Stockholm to arrange passage.[5] It is

utterly unreasonable to ask plaintiff, who has suffered so much already, to leave the

protection of his host country in order to visit the U.S. Embassy only to seek permission

to return to his home. It is particularly inappropriate for defendants to so suggest without

recognizing both his right not to be illegally abused further and to leave this country

should he return.

      3.   <u>Exhaustion</u>

      Defendants concede that the exhaustion requirement is in this instance merely a

prudential limitation. Def. Mem. at 9. The exhaustion issue should be treated as moot

because plaintiff has filed a DHS TRIP request. See Exhibit 2.[6]

## C.   **Plaintiff Has "Not Been Prevented from Entering the United States"**

      Defendants next move to dismiss because plaintiff has not presented himself to a

port of entry and been denied admission to the U.S. But, because plaintiff is on the List

he is not free to travel to a port of entry. Plaintiff's UAE captors were unable to obtain a

ticket and boarding pass for plaintiff to travel to the United States, which caused

plaintiff's deportation to Sweden. Defendants simply are preventing plaintiff from

---

[5] This suggestion itself establishes that plaintiff today is still on the List: Why should an American citizen have to contact his embassy merely to arrange return travel to his home?

[6] Much of defendants' argument at pages 10 and 11 focuses upon the primary benefit of the benefits of the TRIP process: Any misidentification of plaintiff could be resolved. Misidentification is not an issue in plaintiff's case; here plaintiff was told in person and face-to-face by FBI Agent Noordeloos that he was on the List, and that statement was corroborated by plaintiff's inability to acquire a ticket and boarding pass for the United States upon his forced deportation to Sweden.

presenting himself at a port of entry, and thus should not be heard to blame plaintiff for

his inability to arrive at a port of entry.

Defendants next misconstrue plaintiff's claim by arguing at page 14 that plaintiff

is seeking to be relieved of screening requirements at airports. Plaintiff does not, and

never has, objected to such screening. Plaintiff seeks nothing more than recognition of

his right to return to his home and be afforded the constitutional protections most

citizens enjoy without having to litigate the matter in federal court.

## D.    Due Process and the Redress Program[7]

To the merits of the constitutionality of the DHS' TRIP Redress process: At

numerous points in their memorandum, defendants assert that the TRIP process is

"robust."[8] Defendants, however, oppose a peek behind the convenient cloak of "national

security," and thus defendants' assertion has to be taken as an assertion of faith,

certainly not of fact.[9] As is developed below, the secret Redress process lacks even the

most rudimentary of due-process procedures -- there is neither notice nor opportunity

_____

[7] This matter has already been presented to this Court on a motion to dismiss and motion for summary judgment in the *Latif* matter. For example, the defendants in *Latif* argued that the court lacked subject matter jurisdiction over plaintiffs' presence on the List as the matter was an administrative one that could only be reviewed by the Court of Appeals in accordance with 49 U.S.C. § 46110(a) and not the district court. On remand, this Court held that it did have jurisdiction, and that the government failed to afford plaintiffs placed on the List with adequate opportunity to contest their apparent inclusion on the List. This Court went through the three-factor balancing test discussed *infra* to determine whether under the circumstances (being placed on the no fly List under the current TRIP process) plaintiffs had been provided due process and concluded that they had not. *Latif v. Holder*, 3:10-cv-0750-BR, Dkt # 110 at 9. The same factors apply in the present case. Defendants' arguments are meritless.

[8] See, *e.g.*, Def. Mem. at 20, 21, 29, & 30. If the government's alleged controls over massive contemporary surveillance programs are an indication, the claim that the controls over the Redress process are "robust" may well be, at best, a wild exaggeration.

[9] History is replete with examples of the United States' exaggeration of circumstances and facts to avoid judicial scrutiny; perhaps the most relevant example involves the birth of the "state secrets" privilege, in which the United States argued that disclosure of the cause of an airline crash would harm national security. *United States v. Reynolds*, 345 U.S. 1 (1953). Forty-seven years later it was discovered that the cause of the crash had absolutely no bearing on national security; rather, the crash had been caused by poor maintenance. Https://www.aclu.org/national-security/background-state-secrets-privilege.

for an individual to contest the secret determinations made by the Terrorism Screening Center.

### 1.      "A Cognizable Protected Interest"

On page 15, defendants argue that plaintiff has failed to allege the invasion of a cognizable protected interest. On the contrary, plaintiff in the first Count alleges that one of the rights of citizenship as guaranteed by the Fourteenth Amendment is to enter one's own country, and in the fifth Count plaintiff alleges that the right to return to his homeland is guaranteed by the Fifth Amendment. That the specific Fifth Amendment interest is a "liberty" interest -- from among the Fifth Amendment's universe of "life, liberty, or property" -- seems too obvious to require pleading. Moreover, by barring plaintiff from returning to the United States, it has effectively removed virtually *all* of the constitutional protections plaintiff might enjoy as a United States citizen, relegating him instead to the status of a stateless, homeless refugee seeking the benign protection of the people of Sweden.

Defendants then argue that there is no constitutional right to *air* travel because alternative means may be available. Def. Mem. at 16. In plaintiff's case such an alternative necessarily would involve ocean travel. Defendants do not disclose that the List is used to screen cruise line passengers,[10] and therefore the unidentified alternatives are illusory.

---

[10] "The [Customs and Border Protection] screens international passengers. CBP also uses these lists [including the List] to screen cruise line passengers." *Report Assessing the Impact of the Automatic Selectee and No Fly Lists on Privacy and Civil Liberties as Required Under Section 4012(b) of the Intelligence Reform and Terrorism Prevention Act of 2004, Public Law 108-458* at i, *available at* http://www.dhs.gov/xlibrary/assets/privacy/privacy_rpt_nofly.pdf.

Defendants follow this argument by asserting that restrictions on international air travel are subject to less scrutiny than interstate travel. *Id.* Here, however, the contrast to interstate air travel is alarming: In contrast to a citizen's desire to embark on purely domestic travel, the restriction on plaintiff's international air travel resulted in him becoming both stateless and homeless. And this result certainly could not have been a surprise to the United States, for it well knew of plaintiff's incarceration and that plaintiff would face deportation upon being released from the UAE secret prison.

Defendants conclude their argument by noting that the government legitimately may qualify the right to international travel. Plaintiff does not dispute this assertion, but it is inapposite in the present situation. The cited causes for qualifying the right -- revocation of a passport, imposing quarantines, and extraditing citizens, Def. Mem. at 17-18 -- all require significant procedural due process protections, and none of these burdens results in converting a United States citizen into a homeless, stateless refugee.

**2.    The Sufficiency of the TRIP Process: Balancing of Interests**

Plaintiff concurs with defendants' argument at page 18 that the scope and sufficiency of due process protections are elastic depending upon the circumstances.[11] Defendants argue that the government's interest in "national security" is compelling, and plaintiff also generally does not dispute this contention, even though "national security" has increasingly been used as a justification for acts that previously were deemed

_____

[11] Defendants note that due process "'is not a technical conception with a fixed content unrelated to time, place and circumstances,'" and "'is flexible and calls for such procedural protections as the particular situation demands.'" Def. Mem at 18 (citations omitted).

abhorrent.[12]  Even assuming that "national security" might somehow be implicated when plaintiff, one of over 5000 American citizens on the List, simply seeks to return to his homeland, it is against this somewhat tenuous interest that plaintiff's own rights and interests must be balanced. In plaintiff's case, his interest is manifestly compelling: Whether he, as a United States citizen, will be allowed to board a commercial flight in order to return to the comfort of his family and enjoy the rights, privileges, and immunities as an Oregonian or, alternatively, whether he must become a homeless and stateless refugee seeking the protection of a foreign country simply because defendants said plaintiff cannot board such a flight. In short, the competing interests in this situation overwhelmingly favor plaintiff.

To summarize, if one is to balance defendants' interest in its broadly defined, amorphous "national security" concept against plaintiff's interest in not becoming a stateless refugee today obliged to rely on the compassion and decency of the Swedish people, it is clear in which direction the balance tips. But this inquiry into balancing begs the question: Precisely what due-process protections have defendants offered or afforded plaintiff? Their answer: None.

      a.     *Notice*

At page 18 of their Memorandum, Defendants cite *Mathews v. Eldridge*, 424 U.S. 319 (1976) ("*Mathews*"), which is the wellspring for analyzing what due-process protections must be afforded in various circumstances. In *Mathews*, the Supreme Court

---

[12] The previously unthinkable have become routine. Examples abound: Torture (waterboarding, stress positions, beatings, etc.), assassination of American citizens without any judicial process (Anwar al-Awlaki and his 16-year-old son Abdulrahman Al-Awlaki), "extraordinary rendition " (kidnapping), and the wholesale invasions of privacy still being revealed by documents obtained by Edward Snowden are some of the practices now justified by "national security" that not long ago were thought to be beyond the pale.

stated that "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it,'" *Mathews* at 348.[13]

In this instance, the only official "notice" given to plaintiff was by FBI Agent Noordeloos, who in 2010 told plaintiff up close and personal that he was on the List. This "notice," however, was not part of an administrative process; rather, Agent Noordeloos made the disclosure as part of a threat to pressure plaintiff to agree to become an FBI informant. Agent Noordeloos' statement does not even meet the *Mathews* criteria, for by the criteria of *Mathews* plaintiff was not informed of "the case against him," and certainly not an "opportunity to meet it." Indeed, plaintiff has *never* been given an opportunity to address the reasons why he is on the List.

        b.    *Opportunity to Be Heard*

To determine what type of hearing an individual faced with a governmental deprivation is entitled to, *Mathews* established a three-step process: (i) An analysis of the private interests affected by the governmental action, (ii) the risk of an erroneous determination though the procedures used and the possible remediation provided by additional safeguards, and (iii) the government's interest, including consideration of any impact that additional procedures would entail. *Id.* at 335.

        i.    *Plaintiff's Private Interest*

Plaintiff's "private interest" is far more crucial than the claimant's in *Mathews*; Mr. Fikre's interest is in his citizenship in the United States and the protections that such

---

[13] *Quoting Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. at 171 (Frankfurter, J, concurring).

citizenship had been thought to guarantee. By denying plaintiff the right to return to his

homeland after lengthy abuse and torture at the hands of foreign captors acting in

coordination with the United States, defendants have denied plaintiff his citizenship,

forcing him to seek refuge in a state not his own.[14] Excepting perhaps capital

punishment, it is hard to imagine a more critical private interest.

ii.    *The Risks Caused by the Procedures Used*

Defendants' Redress process provides those who are denied boarding no notice

of why they have been denied boarding; rather, the primary purpose of the Redress

process is to ascertain in secret that the person denied boarding is the same person

that the government intended to deny boarding in order that a misidentified person not

be further inconvenienced.[15] This review is conducted in secret, and at no time is one

on the List *ever* informed of the reasons for his/her presence on the List. If one is never

told why defendants placed him/her on the List, how can one possibly respond to, let

alone refute, such reasons?

*Mathews* also requires consideration of "the probable value, if any, of additional

or substitute procedural safeguards." *Id.* Because no procedural safeguards exist in the

DHS TRIP Redress process, *any* safeguards would enhance the accuracy of that

---

[14] Defendant State Department's treatment of plaintiff is particularly galling. It engaged in the subterfuge that lured plaintiff to the embassy in Khartoum, where plaintiff's Fifth Amendment right against self-incrimination was violated. Then the State Department waited more than a month after being informed that the UAE secret police had arrested plaintiff to arrange an interview with him. The interview was in the presence of two guards, one on each side of plaintiff, an obviously coercive situation. The interview was cursory in the extreme. Even though the guards told the consular representative that there were no charges being brought against plaintiff, the State Department failed to arrange a second interview during the subsequent seven weeks that plaintiff was held in custody. And when plaintiff was deported upon release, the State Department did absolutely nothing either to facilitate plaintiff's return to his home or to facilitate his travel to a country where he could seek refuge.

[15] As the DHS website states, " DHS TRIP helps resolve inconveniences resulting from name similarities by providing a redress control number that allows systems to prevent misidentifications from happening again." Http://www.dhs.gov/one-stop-travelers-redress-process.

process. At a minimum, defendants should inform one denied boarding of the basis for their suspicion that he/she might be linked to terrorism. Such a disclosure can in no way harm "national security," for merely by being denied boarding will such a person understand that such a suspicion exists. And, indeed, if the purported concerns about "national security" are something more than a justification for the convenient cloak of secrecy, there are numerous ways to accommodate such a concern, *e.g.*, disclosing the outlines of the basis for the suspicion under a protective order or requiring that the recipient of such information be investigated and receive authorization to receive classified information.[16] *Any* procedure that gives notice of why defendants imposed this draconian sanction would be an improvement over the current system.

iii.    *The Government's Interest*

*Mathews*' third factor is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* While the government does have an interest in assuring the security of air travelers, surely there are effective means short prohibiting approximately 21,000 people from any flying whatsoever.[17] For example, informing persons denied boarding the reason for such denial would impose no additional fiscal or administrative burden on the government, and additional special screening and searches can assure that individuals are carrying no contraband, and such screening and searches and would cause only negligible additional fiscal and administrative burdens, if any.

---

[16] This was the process employed by the District Court in the *Al-Haramain* litigation, in which Mr. Steven Goldberg, co-counsel in the *Tarhuni* litigation, was given top secret security clearance.
[17] Http://en.wikipedia.org/wiki/No_Fly_List.

3.    __The Defendants' Arguments against *Mathews v. Eldridge*__

a.    __*Revealing Plaintiff's Presence on the No-Fly List*__

Defendants first claim that due process does not require defendants either to admit or to acknowledge that plaintiff is on the List. This is somewhat peculiar, for defendant Noordeloos already acknowledged that plaintiff's name is on the List, and also defendants earlier acknowledged that *Mathews v. Eldridge* requires both notice and an opportunity to be heard. The cases cited in support of defendants' claim that notice need not be given are in no way applicable to plaintiff's situation; none involves a challenge to the lack of constitutional notice in the List context; indeed, the cases do not even deal with persons who were denied boarding, let alone an individual who become stateless as a consequence of the List. This point is significant, for *Mathews* instructs that the individual's interest in the sanction being imposed are critical, whereas  the individuals' interests in the cases cited by defendants involve a far less draconian sanction and thus under *Mathews* logically would require far fewer due-process procedures. For example, defendants cite *Tooley v. Bush*, Case No. 06-cv-306, D.D.C. 2006), which involved a person who mentioned a "bomb" in speaking with an airline representative and suffered the consequences therefrom, FOIA cases (*Gordon v. FBI*, 388 F.Supp. 2d 1028 (2005)) (no allegation of denial of boarding), *Al-Kidd v. Gonzales*, No. cv-05-093 (D. Id. 2007) (removal from airplane in order to be a witness in a trial), *Raz v. Mueller*, 389 F.Supp. 2d 1057 (W.D. W. Ark. 2005) (alleging surveillance), and *Barnard v. DHS*, 531 F.Supp. 2d 1131 (D.D.C. 2008), *on new complaint*, 598 F.Supp.

2d 1 (2009) (detention and search at airport, but no denial of boarding).[18] In sum, plaintiff's interest in his own citizenship and being able to travel to and from, and reside within, his own homeland far outweighs the interests in the cases cited by defendants. Consequently, defendants should be obliged to disclose to plaintiff whether he is on the List.

        b.    *Revealing the Basis for Listing*

        Defendants next argue that they should not be required to disclose *why* plaintiff is on the List. The *Mathews* opinion cited by defendants quoted Justice Frankfurter on due-process notice requirements: "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it . . . .'" *Mathews* at 348. In light of the overwhelming individual interest plaintiff has avoiding becoming a refugee and in enjoying all of the rights of citizenship, it is hard to imagine a more compelling instance in which an individual would not be entitled to the reasons why he was placed on the List.

        Defendants do not consider plaintiff's interest; instead, they blithely mention classified information and "national security," and raise separation of powers issues in an attempt to defeat this Court's jurisdiction. Addressing the latter argument first, it was Chief Justice Marshall in *Marbury v. Madison*[19] who noted that, "The Government of the United States has been emphatically termed a government of laws, and not of men. It

_____

        [18] Defendants also cite *Clapper v. Amnesty International*, 113 S.Ct. 1138 (2013), an electronic surveillance case which the Supreme Court dismissed on standing grounds -- the plaintiffs could not establish that they had been subjected to surveillance under the Foreign Intelligence Surveillance Act ("FISA"). While the citation to *Clapper* is interesting, it is both irrelevant and inapposite to plaintiff's situation. It is inapposite because plaintiff can, in fact, establish by the government's own admission that plaintiff was subjected to surveillance under FISA. See Exhibit 4.
        [19] 5 U.S. (1 Cranch) 137 (1803).

will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right."[20] Justice Marshall then penned words that still have enormous force: "It is emphatically the province and duty of the Judicial Department to say what the law is."[21] When the government has invaded interests as vital as plaintiff's, Article III courts have both the right and the duty to exercise their jurisdiction.

Addressing defendants' assertions regarding classified information and "national security," courts have long fashioned remedies to meet those concerns. For example, redactions might be employed to protect the source of such information should such be warranted, such information might be released to plaintiff or his attorneys under a protective order, or plaintiff's attorneys might be required to acquire the necessary security clearance to view the information. These solutions can be worked out after the government discloses why and what part of the information is sensitive.[22] In summary, plaintiff is entitled to know why he is on the List so that he can attempt to refute such bases.

c.   *The Adequacy of the Redress Process*

The Redress process is no process at all; rather, the Terrorism Screening Center, under a cloak of secrecy, issues its ruling, and that's it. Consistent with policy, that ruling neither confirms nor denies that the person is on the List; rather, as pointed out in *Latif*, it normally merely states that, "DHS has researched and completed our review of your case," and that "we can neither confirm nor deny any information about

---

[20] *Id.* at 163.
[21] *Id.* at 177.
[22] The Ninth Circuit so held in *Latif*: "We also leave to the sound judgment of the district court how to handle discovery of what may be sensitive intelligence information." *Latif* at 1130.

you which may be within federal watchlists." *Latif* at 1126. And the procedures advanced by defendants are equally lacking in merit; without being told whether a person with a Redress number is on the List and, if so, why, defendants argue that filing an "appeal" in the Court of Appeals will remedy the situation. The Court of Appeals in *Latif*, however, recognized that issues of this type are appropriately lodged in this District Court for initial resolution.

## E.   Torture

Although since 9/11 torture by the United States has been a popular topic,[23] and although American citizens have suffered torture in the UAE[24] and other counties,[25] there are no relevant appellate decisions on the topic. Perhaps this is because until this case the courts were not presented with a citizen victim residing in a safe haven who was willing to face down his own government.

Defendants argue that insufficient facts have been pleaded to justify this Court's jurisdiction over plaintiff's claim of torture. Plaintiff has alleged torture at the hands of a foreign power and that a representative of that foreign power conceded that plaintiff's detention and torture was part of a cooperative arrangement with the United States. The State Department's cursory interview at the torture site on July 28, 2011, the State Department's failure to pursue a follow-up interview, and the lack of assistance provided by the State Department upon plaintiff's deportation from the UAE are all further

---

[23] See Editorial, "Torture by Proxy," *New York Times*, March 8, 2005, *available at* http://www.nytimes.com/2005/03/08/opinion/08tue1.html?_r=0.

[24] American Naji Hamdan suffered almost exactly the same treatment as plaintiff during his incarceration in the same Abu Dhabi secret prison. See http://www.thenation.com/article/naji-hamdans-nightmare#. Like plaintiff, Mr. Hamdan was blindfolded during all of his interrogations and also has not been able to return to the United States since his deportation from the UAE.

[25] See *Meshal v. Higgenbotham*, No. 09-cv-2178-EGS (D.D.C.) (torture by FBI agents in three foreign countries).

indications of official complicity. Additional facts are doubtless available from defendant Noordeloos, who has so far successfully evaded service of process; once discovery commences and Mr. Noordeloos is made available, additional facts will be provided. Consequently, it is premature to dismiss the claim of torture against the United States.

### IV. CONCLUSION

Defendants argue that this matter should not be before this Court and, in a sense, they are correct. An American citizen should not be tricked into coming into his own embassy under the guise of being afforded protection, only to find FBI agents who insist on interrogating him without his attorney present. An American citizen should not be imprisoned and tortured for 106 days by an ostensible ally of the United States, only to be released without charge, and with no remonstrance by or repercussion from the United States. An American citizen should not be forced to enter the dark, cold winter of Stockholm -- his third -- because his country denied his return home after his arranged ordeal. Indeed, this matter should not be before this Court -- but, frankly, this Court is the only place left for plaintiff to turn.

Defendants argue that this matter should be dismissed because it is not ripe and because plaintiff has not exhausted his administrative remedies. These arguments have been dealt with. Defendants then argue that due process requires no process -- that plaintiff is not entitled to be told why his government took away his precious citizenship rights. These arguments clearly violate the letter and the spirit of *Mathews*, not to mention the text of the Citizenship Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment. On the torture claim, plaintiff has pleaded

sufficient facts to overcome a motion to dismiss; additional salient facts will become available during discovery, when Mr. Noordeloos and other sources become available.

For the foregoing reasons, plaintiff respectfully requests that defendants' motion to dismiss be denied.

DATED at Zigzag, Oregon, on December 9, 2013

Respectfully submitted,

*/s/ Thomas H. Nelson*
Thomas H. Nelson
(nelson@thnelson.com;
zigzagtom@gmail.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Brandon Mayfield, OSB 000824
(mayfieldbrandon@hotmail.com)
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

Gadeir Abbas, Va. State Bar # 81161
*pro hac vice* (gabbas@cair.com)
Council of American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.8787