IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

YONAS FIKRE,                                          3:13-cv-00899-BR

                Plaintiff,                    OPINION AND ORDER

v.

FEDERAL BUREAU OF INVESTIGATION; ERIC
HOLDER, in his official capacity as
Attorney General of the United States;
DEPARTMENT OF STATE; JOHN KERRY, in
his official capacity as Secretary of
State; JAMES B. COMEY, in his official
capacity as Director of the Federal
Bureau of Investigation; CHRISTOPHER
M. PIEHOTA, in his official capacity
as Director of the FBI Terrorist
Screening Center; DAVID NOORDELOOS, an
employee of the Federal Bureau of
Investigation, in his individual
capacity; and JOHN DOE I, also known
as JASON DUNDAS, an employee of the
Federal Bureau of Investigation, in
his individual capacity,

                Defendants.

**GADEIR I. ABBAS**
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 2003
(720) 291-0425

**BRANDON B. MAYFIELD**
3950 S.W. 185th Avenue
Beaverton, Oregon 97007
(503) 941-5101

**THOMAS H. NELSON**
P.O. Box 1211
Welches, Oregon 97067-1211
(503) 622-3262

           Attorneys for Plaintiff

**ERIC HOLDER**
United States Attorney General
**BRIGHAM J. BOWEN**
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-6289

           Attorneys for Defendants


**BROWN, Judge.**

    This matter comes before the Court on the Motion (#21) to

Dismiss for Failure to State a Claim and for Lack of Jurisdiction

filed by Defendants Federal Bureau of Investigation (FBI), Eric

Holder, Department of State, John Kerry, James B. Comey, and

Christopher M. Piehota (collectively referred to as Official

2 - OPINION AND ORDER

Capacity Defendants).[1]

For the reasons that follow, the Court **GRANTS** the Official Capacity Defendants' Motion (#21) to Dismiss for Failure to State a Claim and for Lack of Jurisdiction; **DISMISSES with prejudice** Claim One; **DISMISSES without prejudice** Claims Two, Five, and Six with leave to file a Second Amended Complaint consistent with this Opinion and Order no later than **June 27, 2014;** and directs these Defendants to file their responsive pleading to the Second Amended Complaint no later than **July 25, 2014.**

## PROCEDURAL BACKGROUND

The Official Capacity Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) the claims against them in Plaintiff Yonas Fikre's First Amended Complaint (FAC) (#10) on the grounds that Plaintiff failed to present a ripe case or controversy in Claims One, Five, and Six; failed to exhaust available administrative remedies with respect to Claims One, Five, and Six; and failed to state a claim on which relief

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), James B. Comey is automatically substituted for Robert S. Mueller III, and Christopher M. Piehota is automatically substituted for Timothy Healy.

may be granted in Claims One, Two, Five, and Six.[2]

On March 14, 2014, the Court heard oral argument on the Official Capacity Defendants' Motion.  At oral argument the Official Capacity Defendants acknowledged their arguments concerning exhaustion of administrative remedies are no longer applicable because Plaintiff exhausted his administrative remedies since filing the FAC, and Plaintiff advised the facts concerning exhaustion will be included in his Second Amended Complaint to be filed following this Opinion and Order. Accordingly, the Court need not address the parties' arguments concerning exhaustion of administrative remedies.

The Court took the remaining issues in Official Capacity Defendants' Motion under advisement at the conclusion of oral argument.

**FACTUAL BACKGROUND**

Plaintiff alleges the following pertinent facts in his FAC:

**I.   The No-Fly List**

The FBI is responsible for development and maintenance of the No-Fly List which identifies individuals who are "prohibited

---

[2] David Noordeloos and Jason Dundas, the defendants sued in their individual capacities, have not yet been served and, therefore, are not currently parties to this litigation.  Thus, Claims Three and Four are not at issue in the Motion to Dismiss because those claims relate exclusively to Noordeloos and Dundas.

from flying into, out of, or over the United States," or into, out of, or over Canadian airspace, by commercial airlines.

## II.  **Plaintiff's Interrogation and Inclusion on the No-Fly List**

Plaintiff is a 33-year-old naturalized American citizen of Eritrean descent who was a resident of Portland, Oregon, beginning in 2006.  In late 2009 Plaintiff decided to use his experience working for a cellular telephone company in the United States to pursue the business of distributing and selling consumer electronic products in East Africa, and, accordingly, Plaintiff traveled to Sudan where some of his extended family lives.  Once in Sudan Plaintiff informed the United States Embassy in Khartoum of his presence in the country and of his intention to pursue business opportunities there.  Based on encouragement from Embassy personnel, Plaintiff began the process of obtaining a Sudanese business license.

On April 21, 2010, Plaintiff received a telephone call from the Embassy requesting Plaintiff to contact Defendant Noordeloos, who represented himself as an Embassy official.  Plaintiff called Noordeloos, who invited Plaintiff to a luncheon at the Embassy the following day to discuss safety during a period of political turmoil in Sudan.

The next morning Plaintiff arrived at the Embassy and was met by Noordeloos and Defendant John Doe I, who introduced

himself as Jason Dundas.[3]  Noordeloos and Dundas escorted
Plaintiff to a small meeting room, shut the door, positioned
themselves between Plaintiff and the door, and informed Plaintiff
that they worked for the FBI Field Office in Portland.

When he was told Noordeloos and Dundas were FBI agents from
Portland, Plaintiff requested to be represented by his legal
counsel during any interrogation.  Noordeloos, however, informed
Plaintiff that he could not return to the United States to confer
with his legal counsel because Plaintiff had been placed on the
No-Fly List.

The ensuing interrogation lasted several hours until the end
of the business day.  Throughout the course of the interrogation
Noordeloos and Dundas questioned Plaintiff about the As-Saber
Mosque in Portland where Plaintiff had attended prayer services.
In addition, Noordeloos and Dundas questioned Plaintiff about the
source of financial support for his business endeavors and told
him that sanctions made his business activities in Sudan illegal.
Finally, Noordeloos asked Plaintiff to be an informant for the
FBI in exchange for "substantial compensation" and removal from
the No-Fly List.  Plaintiff responded he did not wish to become
an informant.  At the end of the business day Noordeloos

_____

[3] For purposes of this Opinion, the Court refers to John Doe
I as "Dundas."

6 - OPINION AND ORDER

suggested they resume the discussion the following day.
Plaintiff agreed.

The following morning Plaintiff called Noordeloos on the
telephone and informed him that he did not wish to meet further
with Dundas and Noordeloos.  Noordeloos became agitated when
Plaintiff stated he did not want to be an informant.  Noordeloos
concluded the conversation by telling Plaintiff:  "Whenever you
want to go home you come to the embassy."  On May 4, 2010, a
little more than a week after their final conversation,
Noordeloos emailed Plaintiff as follows:

> Yonas,
>
> Thanks for meeting with us last week in Sudan.
> While we hope to get your side of issues we keep
> hearing about, the choice is yours to make.  The
> time to help yourself is now.
>
> Be safe in Sudan,
> Dave Noordeloos

FAC ¶ 28, p. 8.  Plaintiff remained in Khartoum for approximately
two months during which time he noticed he was being followed by
persons he assumed to be associated with the Sudanese secret
police.  He learned from acquaintances that similar individuals
had been inquiring about him and his activities.  Plaintiff left
Sudan on approximately June 15, 2010.

On approximately September 15, 2010, Plaintiff traveled to
the United Arab Emirates (UAE) to pursue similar business
interests.  Plaintiff obtained a residency permit in the UAE in

7 - OPINION AND ORDER

order to conduct business, and he invested substantial financial resources provided by his family to that end.

On the evening of June 1, 2011, Plaintiff was forcibly taken from his home by persons he later learned were Emirati secret police.  The police seized some of Plaintiff's personal property, blindfolded him, and placed him in a heavily air-conditioned car. Plaintiff's captors drove him for approximately two hours to a building where he was housed in a heavily air-conditioned, windowless cell with only a bed.

The next morning Plaintiff was led to a room in which he would undergo the first of repeated interrogations during 106 days of imprisonment.  During these interrogations Plaintiff was blindfolded while he was questioned in English for extended periods of time.  Periodically Plaintiff was able to peek beneath his blindfold and view the shoes and lower torsos of his interrogators, some of whom wore Western dress.

The substance of the interrogations focused on the activities, fundraising, and leadership of the As-Saber Mosque. In addition, the interrogators questioned Plaintiff about "circumstances and events that [P]laintiff had disclosed" to Noordeloos and Dundas in Khartoum, and the interrogators urged Plaintiff "numerous times" to cooperate with the FBI by becoming an informant.

8 - OPINION AND ORDER

Plaintiff was subjected to multiple threats and beatings throughout the course of his confinement.  In response to his resistance to answering questions, Plaintiff was struck on the head.  Besides being hit on the head, Plaintiff was repeatedly beaten on his back, legs, and the soles of his feet with batons and plastic pipes.  When Plaintiff returned to his cell at the end of the first day of interrogation, his bed had been removed and Plaintiff slept on the floor of his very cold cell.  When Plaintiff asked his interrogators on several occasions whether his confinement and interrogation were at the request of the FBI, the interrogators severely beat Plaintiff.

On June 14, 2011, Plaintiff took a "lie-detector test" during which he was questioned about whether his "financial arrangements involved soliciting funds for al-Qaeda," but he was not asked about the As-Saber Mosque.  That evening the bed was returned to his cell.

On June 20, 2011, Plaintiff's family learned from Plaintiff's neighbors in the UAE that he was missing. Plaintiff's counsel notified the United States Consulate in Abu Dhabi that Plaintiff had disappeared after being placed in an SUV of the type commonly used by the Emirati secret police.

The interrogations and beatings continued until July 28, 2011, when Plaintiff met with a United States Department of State employee named Marwa.  Before the meeting Plaintiff's captors

instructed him not to disclose his mistreatment.  During the interview guards told Marwa that Plaintiff was being held without charge as part of an ongoing investigation.  Despite Plaintiff losing approximately 30 pounds since his kidnapping, Marwa found Plaintiff was in good health.  Plaintiff "attempted by facial contortions and winks to indicate that he was under duress," but Marwa either did not notice or disregarded the signals.

The interrogations and beatings resumed after Marwa's visit. Following the meeting interrogators repeatedly told Plaintiff that he would be released "soon" or "tomorrow," but his release was not forthcoming.  Plaintiff considered refusing food in an attempt at suicide, but he was told he would be force-fed.

Near the end of his detention Plaintiff again asked an interrogator whether the FBI had requested his detention and interrogation.  This time, however, the interrogator confirmed the FBI had made such a request and that American and Emirati authorities work closely on a number of such matters.

On September 14, 2011, Plaintiff was told he would be released that day.  Interrogators took money from Plaintiff's wallet to purchase an airline ticket back to the United States, but they were told Plaintiff would not be allowed to return to the United States by air because he was on the No-Fly List. Thus, Plaintiff chose to fly to Sweden where, in the belief that he might still be in danger of abuse in countries that condone

torture, Plaintiff submitted an application for asylum.  Based on his experience with State Department officials in Khartoum and the UAE, Plaintiff does not believe he can rely on the State Department to protect or to assist him while overseas.

## III.  **Plaintiff's Claims**

Plaintiff asserts four claims against the Official Capacity Defendants:

### A.    **Claim One**

In Claim One Plaintiff alleges his placement by all Defendants on the No-Fly List while abroad prevented him, a United States citizen, from returning to the United States and "effectively stripped [P]laintiff of his rights, privileges, and immunities as a citizen, thereby effectively rendering him stateless in violation of the Fourteenth Amendment to the United States Constitution."  FAC ¶ 55, p. 15.

Plaintiff seeks a declaration that "Defendants rendered him stateless by denying him his right as a citizen to return to the United States," and Plaintiff seeks an injunction requiring "Defendants not render United States citizens stateless by preventing them from returning to the United States through placing them on the No-Fly List once outside of the United States."  FAC at pp. 18-19.

### B.   Claim Two

In Claim Two Plaintiff alleges all Defendants "enlisted foreign intermediaries to torture [P]laintiff at their behest. The foreign intermediaries were directed to torture [P]laintiff, and [P]laintiff was tortured in accordance with [D]efendants' instructions."  FAC ¶ 58, pp. 15-16.

Plaintiff seeks a declaration that "Defendants' participation in the activities that led to Plaintiff's imprisonment, interrogation, and torture at the hands of UAE authorities is a denial of [P]laintiff's substantive due process rights under the Fifth Amendment and a denial of his right as a citizen under the Fourteenth Amendment," and he seeks an injunction requiring "Defendants not instigate or facilitate the torture of United States citizens in foreign countries."  FAC at pp. 18-19.

### C.   Claim Five

In Claim Five Plaintiff alleges Defendants Holder, FBI, Comey, and Piehota violated Plaintiff's substantive due-process "right to return to his homeland once abroad" by placing him on the No-Fly List.[4]  FAC ¶ 67, p. 17.

Plaintiff seeks a declaration that his placement on the

---

[4] Plaintiff also listed the FBI Terrorist Screening Center (TSC) as a participant in Claims Five and Six, but Plaintiff did not name the TSC as a defendant in his FAC.

No-Fly List in a manner that prevented him from "returning to his homeland once abroad" denied Plaintiff his substantive due-process rights under the Fifth Amendment.  In addition, Plaintiff seeks an injunction prohibiting Defendants from preventing Plaintiff "from returning to the United States in the event of future international travel" and requiring Defendant State Department to "establish information and protocols to assist United States citizens to return to their homeland who, once abroad, are placed in the No-Fly List."  FAC at pp. 18-20.

**D.   Claim Six**

In Claim Six Plaintiff alleges Defendants Holder, FBI, Comey, and Piehota violated Plaintiff's procedural due-process rights by "placing [P]laintiff on the FBI-maintained, secret No-Fly List without informing him of such placement, the basis for his inclusion on the No-Fly List, the means of removing his name from the No-Fly List, or providing an independent forum in which [P]laintiff might secure the removal of his name from the No-Fly List."  FAC ¶ 69, pp. 17-18.

Plaintiff seeks a declaration that the placement of his "name on the No-Fly List with no notice thereof, with no reasons given therefor, and with no opportunity to challenge the basis for such placement is a denial of procedural due process under the Fifth Amendment."  Plaintiff also seeks an injunction requiring Defendants to "provide [P]laintiff notice of placement

13 - OPINION AND ORDER

of his name on the No-Fly List, provide [P]laintiff with the reasons for such placement, and provide [P]laintiff an opportunity to challenge or rebut the reasons therefor." FAC at pp. 18-19.

## STANDARDS

### I.   Federal Rule of Civil Procedure 12(b)(1)

When deciding a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court may consider affidavits and other evidence supporting or attacking the plaintiff's jurisdictional allegations. *Autery v. U.S.*, 424 F.3d 944, 956 (9th Cir. 2005). The court may permit discovery to determine whether it has jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). The court has broad discretion in granting discovery and may narrowly define the limits of such discovery. *Id.* When the court "receives only written submissions, the plaintiff need only make a *prima facie* showing of jurisdiction." *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir. 2002). Plaintiff has the burden to establish that the court has subject-matter jurisdiction. *Ass'n of American Med. Coll. v. United States*, 217 F.3d 770 (9th Cir. 2000).

## II.  Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Twombly*, 550 U.S. at 546).  When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

The pleading standard under Federal Rule of Civil Procedure 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  *See also* Fed. R. Civ. P. 8(a)(2).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing

*Twombly*, 550 U.S. at 555).  A complaint also does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id.* at 557.

## DISCUSSION

The Official Capacity Defendants move to dismiss Claims One, Five, and Six pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction on the ground that Plaintiff's allegations as to those claims do not present a ripe case or controversy.  In addition, the Official Capacity Defendants move to dismiss Claims One, Two, Five, and Six pursuant to Rule 12(b)(6) for failure to state a claim on which relief may be granted.

**I.    Subject-Matter Jurisdiction**

The Official Capacity Defendants move to dismiss Plaintiff's Claims One, Five, and Six relating to the No-Fly List on the ground that Plaintiff has failed to allege facts sufficient to establish a ripe case or controversy.

"Ripeness is one component of the Article III case or controversy requirement" designed "'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012)(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).

16 – OPINION AND ORDER

"'The ripeness inquiry contains both a constitutional and a prudential component.'" *Id.* (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)).

**A.    Constitutional Ripeness**

"The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).  "Whether framed as an issue of standing or ripeness, the inquiry is largely the same:  whether the issues presented are 'definite and concrete, not hypothetical or abstract.'"  *Id.* (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)).  "In assuring that this jurisdictional prerequisite is satisfied," the court considers "whether the plaintiffs face 'a realistic danger of sustaining a direct injury as a result of'" the defendant's allegedly illegal action "or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement."  *Id.*

The Official Capacity Defendants argue Plaintiff's claims as to the No-Fly List do not present a ripe case or controversy because Plaintiff has never personally attempted to purchase an airline ticket or to board a flight to the United States.  The

Official Capacity Defendants argue Plaintiff relies on "vague, outdated, word-of-mouth allegations about the actions of foreign 'authorities'" to establish that Plaintiff's injury due to his status on the No-Fly List is sufficiently definite and concrete to present a ripe case of controversy.  Official Capacity Defs.' Reply Mem. in Supp. of Mot. to Dismiss (#31) at 9.

The Court notes, however, the statement of the Emirati authorities that Plaintiff could not travel to the United States by air because he is on the No-Fly List is not the only alleged basis for Plaintiff's claim that he is on the List.  For example, Plaintiff alleges Noordeloos, an FBI agent, told Plaintiff during the interview at the Khartoum Embassy on April 22, 2010, that Plaintiff was on the List and that Noordeloos told Plaintiff the FBI could "take steps to remove [P]laintiff from the No-Fly List" if he agreed to be an informant.  Thus, Plaintiff's allegations suggest Noordeloos not only knew Plaintiff was on the No-Fly List, but also that Noordeloos had influence over Plaintiff's continued status on the List.

These allegations, accepted as true at this stage of the proceedings, are sufficient to demonstrate that Plaintiff's status on the No-Fly List and the alleged injuries that have arisen from that status are sufficiently definite and concrete to establish a ripe case or controversy.  The statements of the Emirati authorities and Noordeloos may be somewhat dated, but

there is not any evidence of an intervening event that would have changed Plaintiff's status on the List.  Although a denial of boarding may be necessary to ripen a typical plaintiff's No-Fly List claims, here Plaintiff alleges he was told by a credible authority that he is on the List, and, therefore, the Court concludes it is not necessary for Plaintiff to attempt to make futile travel plans in order to establish constitutional ripeness.

Accordingly, the Court concludes Plaintiff's claims that arise from being on the No-Fly List present a constitutionally ripe case or controversy.

**B.  Prudential Ripeness**

"To evaluate the prudential component of ripeness," the court weighs "two considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Wolfson*, 616 F.3d at 1060 (quoting *Abbott Labs.*, 387 U.S. at 149).  "'A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'"  *U.S. West Communc'ns v. MFS Intelnet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)(quoting *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989)).  To establish hardship "'a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial

loss.'" *Wolfson*, 616 F.3d at 1060 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).  When evaluating a claim of hardship, the court considers "'whether the regulation requires an immediate and significant change in [the plaintiff's] conduct of [his] affairs with serious penalties attached to noncompliance.'"  *Id.*

The Court finds Plaintiff's allegations in his FAC are sufficient to establish prudential ripeness.  Plaintiff's No-Fly List claims are primarily legal and do not require the development of any additional facts.  Moreover, Plaintiff would suffer considerable hardship if the Court did not consider his No-Fly List claims because Plaintiff's alleged status on the No-Fly List deprives him of the right to board any flight that enters American airspace.

Accordingly, the Court concludes Plaintiff's No-Fly List claims are appropriate for the Court's consideration under prudential ripeness.

## II. Failure to State a Claim

The Official Capacity Defendants argue Plaintiff fails to state a claim against them.  *See* Fed. R. Civ. P. 12(b)(6).

### A.  Claim One:  Fourteenth Amendment

In Claim One Plaintiff alleges:  "By placing [P]laintiff on the No-Fly List and prohibiting [P]laintiff from returning home after his ordeal in the UAE, [D]efendants effectively stripped

[P]laintiff of his rights, privileges, and immunities as a
citizen, thereby effectively rendering him stateless in violation
of the Fourteenth Amendment to the United States Constitution."
FAC ¶ 55, p. 15.  Although it may not be clear on the face of
Plaintiff's FAC, Plaintiff clarified at oral argument that Claim
One is based on the Citizenship Clause of the Fourteenth
Amendment.[5]

The Citizenship Clause of the Fourteenth Amendment provides:
"All persons born or naturalized in the United States, and
subject to the jurisdiction thereof, are citizens of the United
States and of the State wherein they reside."  U.S. Const. amend.
XIV, § 1.  "[T]he protection afforded to the citizen by the
Citizenship Clause of [the Fourteenth] Amendment is a limitation
on the powers of the National Government as well as the States."
*Saenz v. Roe*, 526 U.S. 489, 507-08 (1999).

The Citizenship Clause serves as a "constitutional
definition and grant of citizenship."  *Afroyim v. Rusk*, 387 U.S.
253, 262 (1967).  The Citizenship Clause provides the
constitutional basis for claims regarding an individual's legal
status as a citizen.  *See, e.g.*, *Vance v. Terrazas*, 444 U.S. 252

---

[5] To the extent that Plaintiff seeks to state a claim under
the Privileges and Immunities Clause of the Fourteenth Amendment
in Claim One, the Court concludes that effort fails because the
Privileges and Immunities Clause "applies in terms only to
actions taken by states, not to those  . . . taken by the federal
government."  *Russell v. Hug*, 275 F.3d 812, 822 (9th Cir. 2002).

(1980)(to extinguish an individual's citizenship status, a trier of fact must find that the citizen intended to renounce his citizenship); *Afroyim*, 387 U.S. at 267 (citizenship can only be revoked upon the voluntarily relinquishment of citizenship by the citizen); *Rabang v. Immigration and Naturalization Serv.*, 35 F.3d 1449, 1452 (9th Cir. 1994)(birth in the Philippines during its territorial period does not "constitute birth 'in the United States' under the Citizenship Clause . . . and thus does not give rise to United States citizenship.").

As an initial matter, Plaintiff is undoubtedly correct that the right to return to the United States is inherent in American citizenship.  See *Nguyen v. Immigration and Naturalization Serv.*, 533 U.S. 53, 67 (2001)(citizenship in the United States includes "an absolute right to enter its borders.").  Plaintiff, however, seeks to extend the Citizenship Clause not only to protect an individual's *status* as a citizen, but also to protect the *rights* of citizenship.

Plaintiff does not cite any cases and the Court does not find any in which the Citizenship Clause has been interpreted to protect the rights of citizenship.  Instead the Citizenship Clause only defines and protects an individual's status as a citizen while other constitutional limitations on the powers of the government protect the rights of citizenship.  Indeed, this was the role of the Citizenship Clause within the Fourteenth

Amendment at its passage:  "[W]hen the Fourteenth Amendment passed the House without containing any definition of citizenship, the sponsors of the Amendment in the Senate insisted on inserting a constitutional definition and grant of citizenship."  *Afroyim*, 387 U.S. at 262.  Plaintiff's interpretation of the Citizenship Clause as protecting the rights of citizenship would transform the provision from a "constitutional definition and grant of citizenship" (*see id.*) into a catchall provision protecting every right reasonably characterized as a right of citizenship contrary to the plain meaning and purpose of the Citizenship Clause.

The Court notes Plaintiff does not allege Defendants have taken any action to strip him of his United States citizenship, and, therefore, the Court concludes Plaintiff does not state a claim for relief in Claim One under the Citizenship Clause of the Fourteenth Amendment.  Because that deficiency cannot be cured by amendment, the Court dismisses Plaintiff's Claim One with prejudice.

**B.   Claim Two:  Torture**

In Claim Two Plaintiff alleges all Defendants "enlisted foreign intermediaries to torture [P]laintiff at their behest. The foreign intermediaries were directed to torture [P]laintiff, and [P]laintiff was tortured in accordance with [D]efendants' instructions."  FAC ¶ 58, pp. 15-16.

Although a claim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), the Court notes Plaintiff fails to plead any legal basis upon which he seeks relief in Claim Two.

Accordingly, the Court concludes on this record that Plaintiff has failed to meet the pleading requirements of Rule 8. The Court, therefore, dismisses Plaintiff's Claim Two without prejudice and with leave to amend to plead facts that provide a legal basis for the relief that he seeks in Claim Two.

## C.    Claim Five:    Substantive Due Process

In Claim Five Plaintiff alleges the actions of Defendants Holder, FBI, Comey, and Piehota "in placing [P]laintiff on the FBI-maintained, secret No-Fly List resulted in the violation of Plaintiff's Fifth Amendment substantive due process right to return to the homeland." FAC ¶ 67, p. 17.

"Substantive due process 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Mohamed v. Holder*, No. 1:11-CV-50 (AJT/TRJ), 2014 WL 243115, at *13 (E.D. Va. Jan. 22, 2014)(quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). Substantive due process "protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor

justice would exist if they were sacrificed.'" *Glucksberg*, 521
U.S. at 720-21 (quoting *Moore v. City of East Cleveland, Ohio*,
431 U.S. 494, 503 (1977)(plurality opinion), and *Palko v.
Connecticut*, 302 U.S. 319, 325-26 (1937)).

To establish a substantive due-process claim, the plaintiff
must carefully describe the fundamental liberty interest. *Id.* at
721. In this case the only infringed liberty interest alleged by
Plaintiff is his right to return to the United States.

The Official Capacity Defendants, however, contend
Plaintiff's assertion of such an infringed liberty interest fails
on three grounds: (1) no court has recognized a right to return
to the United States; (2) even if such a right exists, it only
serves to permit a citizen entry upon presentation to a port of
entry and does not extend to the right to reach a port of entry;
and (3) even if the right to return extends to more than a right
to cross the border, Plaintiff has failed to allege his inclusion
on the No-Fly List presents an insurmountable barrier to
returning to the United States.

Because the Supreme Court has described the right of an
American citizen to return to the United States from abroad as
"absolute," *Nguyen*, 533 U.S. at 67, the Court finds the right of
a citizen to return to the United States from abroad is

cognizable under substantive due process.[6]  As Judge Anthony J.
Trenga's concluded in *Mohamed*:

> {A] U.S. citizen's right to reenter the United
> States entails more than simply the right to step
> over the border after having arrived there.  At
> some point, governmental actions taken to prevent
> or impede a citizen from reaching the [border]
> infringe upon the citizen's right to reenter the
> United States.

*Mohamed*, 2014 WL 243115, at *14 (citations omitted).

Thus, to plead a substantive due-process claim based on a
deprivation of the right to return to the United States,
Plaintiff must allege facts sufficient to demonstrate that
Defendants have deprived him of every viable means of returning
to the country.  Here Plaintiff alleges "[a]ir travel is the only
practical means of passenger transportation between the North
American continent and Europe, Asia, Africa, the Middle East, and
Australia."  FAC  ¶ 17, p. 5.  "Although this may be the sort of
conclusory allegation that ordinarily is not entitled to
acceptance as true at this stage of the proceedings, it is,
nevertheless, consistent with the realities of the modern world."
*Tarhuni v. Holder*, No. 3:13-cv-00001-BR, 2014 WL 1269655, at *11
(D. Or. Mar. 26, 2014).  *See also Mohamed*, 2014 WL 243115, at *6;
*Latif v. Holder*, 969 F. Supp. 2d. 1293, 1302-03 (D. Or. 2013);

---

[6] The Court need not decide at this stage of the proceeding
the level of scrutiny that applies to burdens on a citizen's
right to return to the United States.

*Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2012 WL
6652362, at *7 (N.D. Cal. Dec. 20, 2012).

Plaintiff's allegations, nevertheless, reveal he has been
offered a viable means of returning to the United States.  As
noted, Plaintiff alleges Defendant Noordeloos told him:
"Whenever you want to go home you come to the embassy."  FAC
¶ 27, p. 8.  Although Plaintiff's lack of confidence in State
Department personnel is understandable in light of the facts he
alleges, Plaintiff's concerns do not establish the option of
making arrangements to return to the United States through the
embassy is actually unavailable to Plaintiff.  Thus, Plaintiff
has not sufficiently alleged facts to support a conclusion that
Defendants Holder, FBI, Comey, and Piehota have deprived him of
all viable means of returning to the United States.

On this record, therefore, the Court concludes Plaintiff has
failed to state a claim against Defendants Holder, FBI, Comey,
and Piehota that they deprived him of all practical means of
returning to the United States.  In fact, the Court notes
Plaintiff's specific allegations about the limitations imposed
upon him by his presence on the No-Fly List are particularly
sparse.  *See* FAC ¶ 19, p. 5.  Moreover, because the Court finds
Plaintiff's allegations show that Plaintiff has a viable means of
returning to the United States, the Court need not determine on

27 - OPINION AND ORDER

this Motion whether these minimal allegations are sufficient to implicate Plaintiff's right to return to the United States.

Accordingly, the Court dismisses Plaintiff's Claim Five without prejudice and with leave to amend.

### D.   Claim Six: Procedural Due Process

In Claim Six Plaintiff alleges the actions of Defendants Holder, FBI, Comey, and Piehota "in placing [P]laintiff on the FBI-maintained, secret No-Fly List without informing him of such placement, the basis for his inclusion on the No-Fly List, the means of removing his name from the No-Fly List, or providing an independent forum in which [P]laintiff might secure the removal of his name from the No-Fly List, all violated [P]laintiff's right to procedural due process under the Fifth Amendment."  FAC ¶ 69, pp. 17-18.

When presented with a procedural due-process claim, the Court must weigh three factors in evaluating the sufficiency of procedural protections:  (1) "the private interest that will be affected by the official action"; (2) "the risk of erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  To

28 - OPINION AND ORDER

state a claim under procedural due process, a plaintiff must at a minimum sufficiently plead the deprivation of a protected liberty or property interest and the denial of adequate procedural protections. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982-83 (9ᵗʰ Cir. 1998).

In Claim Six Plaintiff fails to state a claim against Defendants Holder, FBI, Comey, and Piehota under procedural due process because he does not identify any protected interest that he has been deprived of by Defendants' official actions. Thus, because Plaintiff has not alleged any protected private interest that has been affected in Claim Six, further analysis of Plaintiff's procedural due-process claim is impossible under the *Mathews* balancing factors.

Accordingly, on this record the Court dismisses Plaintiff's Claim Six without prejudice and with leave to amend.

## CONCLUSION

For these reasons, the Court **GRANTS** the Official Capacity Defendants' Motion (#21) to Dismiss for Failure to State a Claim and for Lack of Jurisdiction; **DISMISSES with prejudice** Claim One; **DISMISSES without prejudice** Claims Two, Five, and Six with leave to file a Second Amended Complaint consistent with this Opinion and Order no later than **June 27, 2014;** and directs these

29 - OPINION AND ORDER

Defendants to file their responsive pleading to the Second

Amended Complaint no later than **July 25, 2014**.

    IT IS SO ORDERED.

    DATED this 29th day of May, 2014.

                    /s/ Anna J. Brown

                    _____

                    Anna J. Brown
                    United States District Judge