Thomas H. Nelson, OSB 78315 (nelson@thnelson.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Brandon Mayfield, OSB 000824 (mayfieldbrandon@hotmail.com)
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

Gadeir Abbas, Va. State Bar # 81161, *pro hac vice* (gabbas@cair.com)
Council of American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.8787

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE**, | |
| Plaintiff, | Civil No. 3:13-cv-00899 |
| v. | **SECOND AMENDED COMPLAINT** |
| **THE FEDERAL BUREAU OF INVESTIGATION**; **ERIC HOLDER**, Attorney General of the United States (sued only in his official capacity); **STATE DEPARTMENT**; **JOHN KERRY**, Secretary of State (sued in his official capacity); **JAMES B. COMEY**, Director of the FBI (sued in his official capacity); **CHRISTOPHER M. PIEHOTA**, Director of FBI Terrorism Screening Center (sued in his official capacity); **DAVID NOORDELOOS**, an FBI Agent (sued in his individual capacity), **JOHN DOE I**, a.k.a. **JASON DUNDAS**, an FBI Agent (sued in his | FALSE ARREST; FALSE IMPRISONMENT; ASSAULT; BATTERY; TORTURE; VIOLATION OF THE RIGHT TO LEGAL COUNSEL; VIOLATION OF THE FIRST AMENDMENT FREEDOM OF ASSOCIATION; VIOLATION OF THE INTERNATIONAL CONVENTION AGAINST TORTURE AND THE TORTURE VICTIM PROTECTION ACT; VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS<br><br>**JURY TRIAL DEMANDED** |

individual capacity), and **JOHN/JANE
DOES II-X**, agents of the United States
(sued in their individual capacities),

     Defendants.

## I. INTRODUCTION

1.    Plaintiff Yonas Fikre, an American citizen, seeks redress for (i) the denial

of his right to travel internationally, which denial prevented him from returning to the

United States when he was expelled from the United Arab Emirates, (ii) the denial of his

right to procedural due process leading to his inability to travel internationally, (iii) a

violation of his right to counsel by FBI agents and others acting on their behalf, which

violation resulted in his prosecution in the Federal District Court for the Southern District

of California, and (iv) suffering false arrest, false imprisonment, assault, battery, and

torture at the hands of a foreign power, which torture, on information and belief, was

instigated and facilitated by defendants, acting at times under the actual or apparent

authority of said foreign power.

2.    Plaintiff's fundamental claims are (i) that defendants sometime prior to

April 21, 2010, placed plaintiff's name on the "No-Fly List" in order to coerce plaintiff into

becoming an informant or agent provocateur for the FBI, (ii) that on April 21, 2010,

during an involuntary interview at the United States Embassy in Khartoum, Sudan,

defendants denied plaintiff's request for legal counsel, (iii) that during the April 2010

involuntary interview plaintiff was urged to become an informant or agent provocateur

for the FBI in order to, among other things, have his name removed from the No-Fly

List, (iv) that when plaintiff refused to become an informant or agent provocateur

defendants retaliated by instigating and facilitating his false arrest, false imprisonment, assault, and torture at the hands of the UAE government during the summer of 2011, (v) that defendants denied plaintiff his constitutional right as a citizen to return home to the United States following the UAE government's releasing him without charge by keeping his name on the No-Fly List, thus effectively rendering him stateless, and (vi) that in May 2012 defendants further retaliated against plaintiff for his publicly disclosing his ordeal by indicting him in the District Court for the Southern District of California using information gathered during his interrogation at the U.S. Embassy in Khartoum and during his interrogation and torture in the UAE.

3.    Through this action for declaratory and injunctive relief and for damages plaintiff seeks (i) a declaration that plaintiff's right to assistance of legal counsel has been violated, (ii) a declaration that plaintiff's fundamental right to return to the United States by air, and his right to travel by air, have been infringed, (iii) a method whereby plaintiff can challenge the inclusion of his name on the No-Fly List in accordance with due process procedures, (iv) redress for false arrest, false imprisonment, assault, and torture, (v) an injunction preventing the United States from violating the rights specified herein in the future, and (vi) monetary damages from the individual defendants acting in their personal capacities for the events specified in this complaint.

## II. PARTIES

4.    Plaintiff is a naturalized American citizen of Eritrean descent. Plaintiff has never openly nor surreptitiously engaged in any acts of terrorism or supported terrorism in any form.

Page 3 - SECOND AMENDED COMPLAINT,  *Fikre v. FBI, Civil No. 3:13-cv-00899 (BR)*

5.      Defendant Federal Bureau of Investigation is a bureau of the Department of Justice responsible for, among other things, selecting individuals for inclusion on, and maintaining, the No-Fly List.

6.      Defendant Eric Holder is Attorney General, whose office is responsible for, among other agencies, the FBI and the Terrorism Screening Center. Mr. Holder is sued only in his official capacity.

7.      Defendant Department of State is the Department of the United States responsible for protecting and assisting United States citizens while those citizens are abroad.

8.      Defendant John Kerry is Secretary of State, who is responsible for foreign relations and for protecting and assisting United States citizens while abroad. Mr. Kerry is sued only in his official capacity.

9.      Defendant James B. Comey is Director of the FBI. He is sued only in his official capacity.

10.      Defendant Christopher M. Piehota is Director of the Terrorism Screening Center. He is sued only in his official capacity.

11.      Up to April 22, 2010, Individual defendant David Noordeloos, who is sued in his individual capacity, held himself out to plaintiff as an employee of the State Department. Previously, however, on April 6, 2010, defendant Noordeloos held himself out as a special agent of the FBI in a meeting with Portland Police Bureau Chief Rosanne Sizer, and on April 22, 2010, defendant told plaintiff that defendant Noordeloos is in fact an employee of the FBI assigned to and/or reporting to the

Page 4 - SECOND AMENDED COMPLAINT,  *Fikre v. FBI, Civil No. 3:13-cv-00899 (BR)*

Portland office of the FBI. Defendant Noordeloos traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff at the United States Embassy in Khartoum, and on April 22, 2010, Defendant Noordeloos did so interrogate plaintiff for several hours. Moreover, on July 11, 2011, in an email to plaintiff's attorney, defendant Noordeloos once again held himself out as an employee of the State Department.

12.     At all times relevant, Individual defendant FBI Agent John Doe I, a person identifying himself as defendant Jason Dundas, who is sued in his individual capacity, was an employee of the FBI assigned to the Portland office. Defendant John Doe I (Jason Dundas) traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff at the United States Embassy in Khartoum, and on April 22, 2010, defendant John Doe I (Jason Dundas) did so interrogate plaintiff for several hours.

13.     John/Jane Does II-X are unknown agents of the United States who, acting under the actual or apparent authority of the UAE, participated in facilitating the false arrest, false imprisonment, assault, battery, and torture of plaintiff at the UAE secret prison in Abu Dhabi from June 1 through September 13, 2011.

### III. JURISDICTION AND VENUE

14.     This is a complaint for injunctive and declaratory relief, and for damages, based upon defendants' violation of plaintiff's' Constitutional rights and of his rights under international treaty obligations. The claims asserted arise under the Due Process Clause of the Fifth Amendment (substantive and procedural), and the Fifth Amendment's prohibition against self-incrimination, and under international treaty obligations.

15.    This Court has jurisdiction over claims against the United States pursuant to 28 U.S.C. § 1331.  Jurisdiction over the individual defendants sued in their personal capacities is authorized and instituted pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and other authority as specified.

16.    The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because defendants are agencies of the United States and because this judicial district is where plaintiff resides and where a substantial part of the events or omissions giving rise to the claims occurred. Venue is also proper in this Court because two of the individuals sued in their personal capacities at all times relevant hereto either resided in, worked in, or were assigned to and/or reported to this District.

## IV. FACTUAL ALLEGATIONS

18.    Air travel is the only practical means of passenger transportation between the North American continent and Europe, Asia, Africa, the Middle East, and Australia.

19.    Information upon which a determination is made to place an individual on the No-Fly List is kept secret, and individuals on the No-Fly List are not informed when their names are placed on the List, when their names are removed from the No-Fly List, or what their current status is vis-à-vis the No-Fly List.

20.    Defendant FBI is responsible for the maintenance of the "No-Fly List," which lists individuals whom the airlines flying within, into, or over the United States may not transport.

21.    The criterion for placing an individual's name on the No-Fly List was developed in secret by the Terrorism Screening Center without Congressional oversight or approval. Under the present criterion, a person may be "nominated" to be on the List if "there is a reasonable suspicion to believe that a person is a known or suspected terrorist."

22.    Most individuals on the No-Fly List, and plaintiff in this action, are prohibited from flying into, out of, or over United States and Canadian airspace.

23.    Plaintiff is a 33-year-old naturalized American citizen of Eritrean descent. When he was a small boy war broke out in Eritrea, and thus his family took him to Sudan, where he was when the State of Eritrea came into being in 1993. From Sudan the Fikre family emigrated to the United States.

24.    Beginning in 2006, plaintiff resided in Portland, Oregon. In late December 2009, after working for an American cell phone company, plaintiff decided to attempt to distribute and to sell on the retain market consumer electronic products in East Africa. He began by returning to Sudan, where some of his extended family still reside. Upon arrival in Sudan plaintiff, in compliance with a recommendation by the State Department, contacted the United States Consulate in Khartoum and informed a representative of the consulate of his interest in pursuing business opportunities in the country. The representative encouraged plaintiff to pursue business opportunities in

Sudan. In reliance upon the representative's recommendation plaintiff began the process of obtaining a Sudanese business license.

25. On Tuesday, April 20, 2010, defendant Noordeloos sent an email to plaintiff, which stated: "Younas, I work at the embassy in Khartoum and need to meet up with you on wed 4/21. Can you email me back and let me know what time in the afternoon works for you? Best, David Noordeloos US Department of State".

26. On Wednesday, April 21, defendant Noordeloos sent an email to plaintiff, which stated: "Yonas, I hope this finds you well. I still need to meet with you as soon as possible, can you give me a call and let me know what time works for you to meet? You can email me back or try me at the Embassy or on my cell, but please contact me soonest. Regards, David Noordeloos, US Department of State" [telephone numbers redacted].

27. On April 21, at approximately 9 p.m. local time, plaintiff called the number given and spoke with defendant Noordeloos. Defendant Noordeloos stated that a number of Americans in Sudan had been invited to the Embassy for a luncheon the following day in order to discuss how Americans might stay safe during a period of political turmoil in Sudan. Plaintiff agreed to attend the luncheon on that basis.

28. The next day plaintiff appeared at the embassy. After going through security screening, plaintiff met defendant Noordeloos and another person, defendant John Doe I, who identified himself as Jason Dundas. Defendants Noordeloos and John Doe I (Jason Dundas) escorted plaintiff to a small meeting room and shut the door; defendants positioning themselves between plaintiff and the door. At that point

defendants Noordeloos and John Doe I (Jason Dundas) produced badges and stated that they were FBI agents assigned to the Portland office.

29.   Upon being informed that defendants Noordeloos and John Doe I (Jason Dundas) were FBI agents from the Portland office, plaintiff stated that he wanted to be represented by his legal counsel (plaintiff was then represented by Oregon attorney Brandon Mayfield) during the interrogation. Defendant Noordeloos denied Mr. Fikre's request for such representation on the grounds that plaintiff had been placed on the No-Fly List and thus could not return to the United States to confer with his attorney.

30.   Because defendants John Doe I (Jason Dundas) and Noordeloos were blocking the door, plaintiff, who had never before been detained or arrested, felt he could not leave. During the following interrogation defendants Noordeloos and John Doe I (Jason Dundas) questioned plaintiff extensively about the events, activities, and leadership at the As-Saber Mosque in Portland, which plaintiff had attended for prayer services. Defendant Noordeloos also questioned plaintiff about the source of his financial support for this business endeavors in Sudan, and told plaintiff that, because of the Sudan sanctions imposed by the Office of Foreign Assets Control, it was illegal for plaintiff to engage in business transactions in Sudan - a statement that is inconsistent with the advice and recommendation earlier given by the representative of the embassy.

31.   Defendant Noordeloos next told plaintiff that the FBI desired plaintiff to become an FBI informant to work upon "a case" that was then developing. Defendant Noordeloos stated that, in return, plaintiff would be paid substantial compensation, be in a position to enjoy "the good life," and that the FBI would take steps to remove plaintiff

from the No-Fly List. Defendant Noordeloos then asked, "Don't you love your wife?", which question plaintiff considered an implicit threat. Plaintiff responded that he did not wish to become an FBI informant. The interview lasted for several hours until the close of the business day. As the day wore on, defendant Noordeloos suggested that they resume the discussion on the following day; in order to escape the interrogation room and leave the embassy, plaintiff agreed.

32.     At approximately 8:45 a.m. on the following morning, plaintiff called defendant Noordeloos and stated that he did not wish to meet further with the FBI agents because he would be wasting their and his time; he reiterated that he did not wish to become an informant for the FBI. Defendant Noordeloos became agitated and, to the best of plaintiff's recollection, stated, "Wait a minute! Are you trying to tell me you don't want to work with us!" Defendant Noordeloos then stated, "Whenever you want to go home you come to the embassy." Plaintiff understood this to mean that plaintiff's name would not be removed from the No-Fly List unless he became an informant and/or an agent provocateur for the FBI.

33.     On May 4, 2010, defendant Noordeloos wrote an email to plaintiff which stated: "Yonas, Thanks for meeting with us last week in Sudan. While we hope to get your side of issues we keep hearing about, the choice is yours to make. The time to help yourself is now. Be safe in Sudan, Dave Noordeloos".

34.     Plaintiff remained in Khartoum for almost two months following his meeting with defendants Noordeloos and John Doe I (Jason Dundas). During that time he noticed that he was being followed by persons he assumed were affiliated with the

Sudanese secret police, and he was told by merchants and other acquaintances in his neighborhood that similar individuals had been inquiring about him and his activities.

35.    On or about June 15, 2010, plaintiff left Sudan, and on or about September 15, 2010, plaintiff arrived in the UAE to pursue similar business interests involving the distribution and retail sale of consumer electronics there. Plaintiff moved to the city of Al Ain in the emirate of Abu Dhabi, where he sought and obtained a residency permit from the UAE in order to conduct business; he invested substantial financial resources provided by family members in pursuing that course.

36.    In the evening of June 1, 2011, persons unknown to plaintiff (who plaintiff later learned were UAE plainclothes secret police) invaded plaintiff's home in Al Ain, seized plaintiff's computer, phone, and other items, and compelled plaintiff to accompany them in a vehicle. Several of plaintiff's friends and neighbors witnessed plaintiff's apprehension. Plaintiff was blindfolded, placed in a confined space in the vehicle, and the air conditioner in the vehicle was turned on high and directed at him with the effect that he became quite chilled.

37.    Plaintiff was taken to a then-unknown location approximately two hours' driving time from Al Ain. Still blindfolded, he was led into a building and into a long hall where, by peeking down through the bottom of his blindfold, he noticed that he was passing door after door. His guards stopped at one door and put him inside a windowless cell where he was lodged. Upon removal of his blindfold, he saw that his tiny cell lacked toilet facilities. His cell contained only a bed and some bedding. The cell was very cold because the air conditioning had been set on high.

38.    The following morning the interrogations of plaintiff began. Except for the one instance noted below, during all of his interrogations plaintiff was blindfolded. Once blindfolded, he was taken to a room where, throughout his ordeal, plaintiff was questioned for hours in English. Periodically during the 106 days of his imprisonment and torture, plaintiff occasionally was able to peek beneath the blindfold and view shoes and the lower torsos of his interrogators.

39.    The primary focus of the blindfolded interrogations concerned events at Portland's as-Saber Mosque, addressing in particular who plaintiff knew at the mosque who had a "jihadi mentality," what topics the mosque's leader, Sheikh Mohamed Kariye, speaks about both in public and in private, and how fundraising at the mosque occurs and who engages in fundraising there. The interrogators also questioned plaintiff about circumstances and events that plaintiff had disclosed to defendants Noordeloos and John Doe I (Jason Dundas) during his interrogation at the embassy in Khartoum. Numerous times during the blindfolded interrogations plaintiff's interrogators urged him to cooperate with them and with the FBI by becoming an informant.

40.    When plaintiff was returned to his cell at the end of the first day of interrogation he discovered that his bed and bedding had been removed. The air conditioning remained at a high level, which made the cell extremely cold. Because his bed and bedding had been removed, plaintiff was obliged to sleep almost naked on the cold cement floor.

41.    During the initial period of his confinement plaintiff resisted answering some of the questions, insisting that he was an American citizen and needed to speak

with his ambassador and with his attorney. In response, plaintiff's jailers struck him on his head and he fell to the ground. Throughout the course of his confinement plaintiff was repeatedly beaten severely on his head, back, legs, and feet with batons and plastic pipes, required to assume stress positions for hours, and threatened with death by strangulation by use of a flexible plastic pipe. One particularly painful torture method his interrogators used was to force plaintiff to lie on his stomach with his sandals off, whereupon he was beaten severely on the soles of his feet; thereafter, he was required to stand on his feet, which standing caused him great pain.

42.    On several occasions plaintiff told his interrogators that the questions he was being asked and the suggestions of cooperation with the FBI were the same questions and suggestion he had heard from defendants Noordeloos and John Doe I (Jason Dundas); he thus inquired whether his confinement and mistreatment was at the request of the FBI. On each such occasion the interrogators responded by beating plaintiff severely.

43.    As noted above, during his interrogations plaintiff was occasionally able to peek beneath his blindfold and view the lower torsos of his interrogators. On most occasions, based on their clothing and accents, plaintiff believes that his interrogators were Arabs. On other occasions, however, plaintiff was able to view the shoes and slacks of several individuals who wore Western dress. Plaintiff believes that in those instances some or all of the Individual defendants, acting as representatives of the United States, were present and witnessed the interrogations and that those Individual defendants participated in interrogating plaintiff.

Page 13 - SECOND AMENDED COMPLAINT,  *Fikre v. FBI, Civil No. 3:13-cv-00899 (BR)*

44.    All Individual defendants who attended and participated in the interrogation of plaintiff were present with the permission, and were under the physical and legal control, of UAE authorities who operated and maintained the secret prison.

45.    On or about June 14, 2011, plaintiff was informed that he had to take a lie detector test. During the test, for the only time during his confinement, plaintiff was questioned without a blindfold in place. The questioning during the test focused not upon events at Portland's as-Saber Mosque but, rather, upon whether plaintiff's financial arrangements involved soliciting funds for al-Qaeda. Following the lie detector test plaintiff's bed and bedding were returned to his cell.

46.    The interrogations, including beatings and stress positions, as well as being subjected to temperature extremes, sleep deprivation, and humiliation when not being interrogated, continued daily from June 14 through July 27.

47.    On June 20, 2011, immediately after learning from plaintiff's family that plaintiff had been apprehended in the UAE (the family had learned of plaintiff's apprehension from witnesses who observed the event), Oregon counsel Thomas Nelson telephoned and then e-mailed the United States Consulate in Abu Dhabi to inform them that plaintiff, a United States citizen, had gone missing and that witnesses in Al Ain had viewed him being placed in a SUV of the type that is commonly used by the UAE secret police. The consulate officials indicated that they would look into the matter.

48.    On July 21, 2011, Oregon counsel Nelson on behalf of plaintiff contacted Representative Earl Blumenauer's office to request assistance in locating plaintiff and

made contact with staff member Emily Barrett. Ms. Barrett stated that Congressman Blumenauer would look into the situation.

49.     On July 28, plaintiff was informed that a woman from the American consulate had arrived to see him. He was told that he was to meet with the American consul and that he should not disclose to the consular officer that he had been mistreated during his detention lest he beaten still more severely.

50.     On July 28, 2011, plaintiff, accompanied by two guards, was taken to a meeting room where he met "Marwa," a consular employee of the State Department who, on information and belief, is of Egyptian extraction. The two guards positioned themselves close to plaintiff, one on each side. Marwa was dressed in Islamic attire (a "hijab," or covering of her hair). By that time plaintiff had lost approximately 30 pounds of body weight.

51.     The meeting with Marwa was short and superficial. Although by that time plaintiff had lost approximately 30 pounds, Marwa stated that plaintiff appeared to be in good shape. During the interview plaintiff attempted by facial contortions and winks to indicate that he was under duress, but Marwa either did not notice or disregarded these signals.

52.     Marwa questioned plaintiff regarding what offense he had been charged with, whereupon plaintiff asked the two guards what he had been charged with. The guards stated that plaintiff was being held without charge and that the authorities were merely conducting an investigation.

Page 15 - SECOND AMENDED COMPLAINT,  *Fikre v. FBI, Civil No. 3:13-cv-00899 (BR)*

53.    Following the meeting with Marwa, plaintiff was returned to his cell and the interrogations and torture resumed. Marwa's visit was the only United States consular visit during plaintiff's 106 days of detention and torture; the consulate did not visit or make any contact with plaintiff during his remaining 49 days of his confinement and torture, nor did it provide any assistance to plaintiff when he was deported from the UAE.

54.    Following the meeting with Marwa, plaintiff became despondent. Because the consul's office had sent a Muslim woman wearing a hijab to interact with the prison authorities and the two guards, plaintiff came to believe that, because of his black skin, the United States had "thrown [him] away." He consequently began to consider refusing food in an attempt at suicide, but was told that he would be force-fed if necessary.

55.    Toward the end of his interrogation plaintiff again inquired of his interrogator whether the FBI had requested that he be detained and interrogated. This time, instead of being beaten, the interrogator stated that indeed the FBI had made such a request and that the American and Emerati authorities work closely on a number of such matters.

56.    On September 14, 2011, plaintiff was told that he would be released that day but would have to leave the UAE and stay out for at least a year. His belongings were returned to him and money from his wallet was taken to buy him a plane ticket back to the United States while plaintiff remained in custody. Such a ticket was purchased from a travel agency; however, when the jailer took the ticket to the airport to

Page 16 - SECOND AMENDED COMPLAINT,  *Fikre v. FBI, Civil No. 3:13-cv-00899 (BR)*

obtain a boarding pass, the boarding pass was refused on the grounds that plaintiff was on the No-Fly List.

57.    Plaintiff's custodian was visibly upset because he could not board the flight out of the UAE, and asked plaintiff, "What kind of country would refuse a citizen's return to his own country?" or words to that effect. The custodian then reiterated that plaintiff could not stay in the UAE, and therefore would have to go somewhere else, and asked where plaintiff wished to be sent. Because plaintiff had a relative in Sweden, plaintiff indicated that he should be sent there. Therefore, the custodian took more money from plaintiff's wallet and arranged the purchase of a ticket to Stockholm, Sweden. This time a boarding pass was issued for plaintiff.

58.    The United States consulate in the UAE knew or should have known that plaintiff would be deported upon his release from prison, but the consulate took no action to provide assistance to plaintiff upon his release.

59.    Plaintiff arrived in Sweden traumatized, with few financial and other resources, and clothing entirely inappropriate for the Scandinavian weather and climate.

60.    Shortly after arriving in Stockholm plaintiff contacted the airline that had refused to issue him a boarding pass in the UAE and discussed his situation with them. The representative he spoke with confirmed that he had been denied boarding on the flight from the UAE to the United States but stated that she could not provide any reasons for such refusal. Plaintiff then requested a refund of the ticket price, but the representative stated that because the ticket had been purchased through a travel agency in the UAE he would have to get the refund (if any) from that travel agency.

61.    To date plaintiff has been unable to obtain a refund for the unused ticket from the UAE to the United States.

62.    In addition to being stranded with few resources in a foreign country, being placed on the No-Fly List resulted in plaintiff's losing virtually all of his rights as a citizen of the United States - he could not return home to enjoy the rights, privileges and immunities of citizenship. Moreover, his experience with State Department officials in Khartoum and Abu Dhabi demonstrated to him that the State Department would neither protect nor assist him while overseas; rather, it would actively work to his detriment.

63.    Nationals of one country are allowed to visit foreign countries for only limited periods of time before they have to leave the country they are visiting; in the case of Sweden and other Schengen countries the maximum stay is for 90 days for holders of United States passports unless special arrangements are made, such as requesting asylum.

64.    Upon arriving in Sweden and being unable to return home, plaintiff contacted a Swedish attorney, Advokat Hans Bredberg, who suggested that plaintiff seek protective asylum in that country. Believing that the United States, through the FBI, was responsible for his detention and torture in Abu Dhabi and that he may still be in danger of abuse in countries that condone torture (including the United States), plaintiff submitted an application for asylum to the authorities in Sweden. Plaintiff understands that Swedish authorities have determined that he is not a supporter of terrorism, and that his application for protective asylum is pending.

65.    On April 18, 2012, a press conference was held in Advokat Bredberg's office in Stockholm during which plaintiff's ordeal was disclosed publicly. Less than two weeks later, on May 1, 2012, plaintiff and two other individuals were indicted in the Southern District of California, Docket No. 3:12-cr-06189-JAH, for "conspiracy to structure" 2010 monetary transfers from his family to him in the UAE between April 14, 2010, and April 19, 2010, which funds plaintiff used to attempt to start his business. On information and belief, this indictment was in retaliation for plaintiff's publicizing of his ordeal through the April 18, 2012 press conference in Stockholm, and based at least in part upon information the United States obtained from the interview at the United States Embassy in Khartoum and from plaintiff's 106 days of interrogation and torture in the UAE.

66.    A May 4, 2012, filing in the criminal docket in the Southern District of California disclosed that the United States, pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, had surreptitiously monitored email and telephonic communications involving plaintiff. Docket No. 3:12-cr-06189-JAH, Doc. # 10.

67.    On October 4, 2013, the indictment referred to in paragraph 65, *supra*, was dismissed and the arrest warrant for plaintiff was recalled.

68.    Sometime in the fall of 2013 a representative of defendants contacted counsel for plaintiff and suggested that if plaintiff wished to return to the United States he should visit the United States embassy in Stockholm to make necessary arrangements. After conferring with plaintiff in Stockholm, plaintiff's representatives

informed the representative of defendants that plaintiff was apprehensive about entering

the embassy grounds and that plaintiff would, under the present circumstances,

consider returning if the United States (1) guaranteed plaintiff's safety from extra-judicial

actions, and (2) provided adequate assurances that plaintiff could leave the United

States once he returned. The representative of defendants indicated that the United

States would not provide such guarantees and assurances.

        69.    In early November 2013 plaintiff filed with DHS a TRIP request and was

assigned a redress number. By letter dated January 23, 2014, DHS informed plaintiff

that "It has been determined that no changes or corrections are warranted at this time"

and suggesting that plaintiff might wish to take an administrative appeal from this

decision. Because it is unclear from the DHS letter whether plaintiff is now on the No-Fly

List, and thus it is unclear whether plaintiff is aggrieved by this decision, by letter dated

February 24, 2014, plaintiff requested clarification and a stay pending resolution of this

issue and the resolution of the current litigation. By letter dated March 11, 2014, DHS

replied that an extension to take an appeal would be granted to April 22, 2014. Plaintiff

has since abandoned his efforts with DHS.

        70.    Because of the separation occasioned by plaintiff's inability to return to the

United States and because of the stigma attaching to plaintiff occasioned by the United

States' putting him on the No-Fly List, plaintiff's wife sought and received a divorce from

plaintiff.

        71.    Plaintiff has suffered mistreatment at the hands of defendants including,

but not limited to, denial of legal counsel, being placed on the No-Fly List without notice

or opportunity to be heard, false arrest and false imprisonment, assault and battery, torture, violation of his right to freedom of association, and violation of his substantive and procedural due process rights. Plaintiff intends to continue to attempt to exercise his rights, including the right to legal counsel, to travel by air, to be free from false arrest and false imprisonment, assault and battery, and torture, to freedom of association, and his substantive and procedural due process rights, but based upon defendants' past misconduct plaintiff has a reasonable fear of further future mistreatment by defendants and other agents of the United States.

### CONSTITUTIONAL CLAIMS FOR RELIEF AGAINST OFFICIAL DEFENDANTS

### First Claim: Fifth Amendment Substantive Due Process - Fundamental Right to Return to Homeland

72.     Plaintiff, once outside of the United States, has a fundamental liberty right under the Fifth Amendment to return by air to, and to re-enter, his or her country. Official defendants violated this right by placing plaintiff on the No-Fly List after he had departed the United States and then maintaining his name on that List after he had been arrested and incarcerated in the UAE, knowing at that time that the UAE would deport him from the UAE upon his release from prison without charge, which caused plaintiff to be deported to Sweden instead of being allowed to return home, all in violation of plaintiff's Fifth Amendment substantive due process right to return, and subsequently to leave, his homeland.

**Second Claim: Fifth Amendment Substantive Due Process -**

**Right to International Travel**

73.     Plaintiff realleges paragraphs 1 through 71.

74.     Plaintiff has a liberty right to international travel under the Fifth Amendment. By placing plaintiff's name on the No-Fly List official defendants violated this right, preventing plaintiff from departing, flying over, or returning to the United States, all in violation of plaintiff's Fifth Amendment substantive due process right to travel internationally.

**Third Claim: Fifth Amendment Substantive Due Process -**

**Vagueness and Overbreadth**

75.     Plaintiff realleges paragraphs 1 through 71.

76.     Plaintiff has a substantive due process right not to be sanctioned based upon vague, overbroad, or unknowable standards of conduct. The No-Fly List is an administrative sanction created by defendant Terrorism Screening Center, and the standard for placing individuals on the No-Fly List is the "existence of a reasonable *suspicion* to believe that a person is a known or *suspected* terrorist."  Emphasis added.

77.     The "existence of a reasonable suspicion to believe that a person is a known or suspected terrorist" is vague and overbroad, and because of such vagueness and overbreadth has led to discriminatory enforcement of the criterion, specifically by coercing plaintiff and others nominated to the List to become agents, agent provocateurs, or informants for the FBI in return for having their names removed from the List.

**Fourth Claim: Fifth Amendment -**

**Violation of Right to Counsel**

78.     Plaintiff realleges paragraphs 1 through 71.

79.     It is a policy, custom, and practice of defendants to place individuals on the No-Fly List once they have departed the United States in order to arrange for interrogation of such individuals at American embassies abroad without the assistance of legal counsel. In plaintiff's case, upon being informed by defendant Noordeloos that Noordeloos was an FBI agent and wished to question plaintiff, plaintiff requested to be represented by counsel during such interrogation. In response, defendant Noordeloos told plaintiff he could not have legal counsel because plaintiff was on the No-Fly List, whereupon the interrogation continued for several hours. Defendants used the information gathered from plaintiff during such interrogation to, among other things, obtain an indictment against plaintiff in the Southern District of California, and an arrest warrant was issued calling for plaintiff's arrest, all in violation of plaintiff's Fifth Amendment right to counsel.

**Fifth Claim: First Amendment -**

**Violation of Right to Freedom of Association**

80.     Plaintiff realleges paragraphs 1 through 71.

81.     It is a policy, custom, and practice of defendants to place individuals on the No-Fly List in order to coerce them into becoming informants and/or agents provocateurs for the FBI. Plaintiff has a right under the First Amendment to associate, and not to associate, with whom he pleases. Defendants placed plaintiff on the No-Fly

List in order to coerce plaintiff into associating with the FBI by becoming an informant and agent provocateur in a case then under investigation in Portland. Moreover, when plaintiff declined to become an informant and agent provocateur, defendants maintained plaintiff's name on the No-Fly List in retaliation, which ultimately led to plaintiff's being forced to seek protection and asylum in Sweden, all in violation of plaintiff's First Amendment right of freedom of association.

### Sixth Claim: Fifth Amendment Procedural Due Process -
### Placement and Retention on the No-Fly List

82.     Plaintiff realleges paragraphs 1 through 71.

83.     Defendants Holder, Federal Bureau of Investigation, Mueller, FBI Terrorist Screening Center, and Healy's actions in placing plaintiff on the FBI-maintained, secret No-Fly List without informing him of such placement, of the basis for his inclusion on the No-Fly List, of the means of removing his name from the No-Fly List, and without providing an independent forum in which plaintiff might secure the removal of his name from the No-Fly List, all violated plaintiff's right to procedural due process under the Fifth Amendment.

### CLAIMS FOR RELIEF AGAINST INDIVIDUAL DEFENDANTS
### First Individual Defendants Claim:
### Fifth Amendment False Arrest and Imprisonment

84.     Plaintiff realleges paragraphs 1 through 71.

85.     Plaintiff has a Fifth Amendment right to be free from false arrest and imprisonment. Some or all Individual defendants (*viz.,* defendants Noordeloos, John

Doe I (Jason Dundas), and John/Jane Does II-X), enlisted foreign intermediaries to cause the arrest of plaintiff by UAE secret police without probable cause that he had committed a crime. The foreign intermediaries did so arrest plaintiff and imprisoned him without charge for 106 days, from June 1, 2011, through September 15, 2011.

86.     Some or all Individual defendants have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of false arrest and imprisonment.

87.     At all relevant times, Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, Individual defendants' conduct has proximately caused harm to plaintiff.

88.     The actions, orders, authorizations, and other conduct of the Individual defendants as specified *supra* deprived plaintiff of his right to be free from unlawful arrest and imprisonment without probable cause and give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

**Second Individual Defendants Claim:**

**Common Law False Arrest and Imprisonment**

89.     Plaintiff realleges paragraphs 1 through 71.

90.     Plaintiff has a common law right to be free from false arrest and imprisonment. Some or all Individual defendants enlisted foreign intermediaries to cause the arrest of plaintiff by UAE secret police without probable cause that he had committed a crime. The foreign intermediaries did so arrest plaintiff and imprisoned him without charge for 106 days, from June 1, 2011, through September 15, 2011.

91.     Some or all Individual defendants have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of false arrest and imprisonment.

92.     At all relevant times, Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, Individual defendants' conduct has proximately caused harm to plaintiff.

93.     The actions, orders, authorizations, and other conduct of the individual defendants specified *supra* deprived plaintiff of his right to be free from unlawful arrest and imprisonment without probable cause and give rise to a cause of action for

damages directly under the common law. Plaintiff has been damaged in the amount of $10 million.

### Third Individual Defendants Claim: Fifth Amendment Assault and Battery

94.     Plaintiff realleges paragraphs 1 through 71.

95.     Plaintiff has a Fifth Amendment right to be free from assault and battery by agents working on behalf of the United States. Some or all Individual defendants enlisted foreign intermediaries to assault plaintiff in the UAE secret police prison in Abu Dhabi, UAE, and the UAE secret police did so assault and batter plaintiff for 106 days, from June 1, 2011, through September 15, 2011.

96.     Some or all Individual defendants, present during some of the acts complained of herein, said presence having been authorized by UAE officials,  have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of assault and battery.

97.     At all relevant times, some or all Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, Individual defendants' conduct has proximately caused harm to plaintiff.

98.     The actions, orders, authorizations, and other conduct of the individual defendants specified in paragraph 96 deprived plaintiff of his right to be free from

assault and battery and give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

### Fourth Individual Defendants Claim: Common Law Assault and Battery

99.    Plaintiff realleges paragraphs 1 through 71.

100.    Plaintiff has a common law right to be free from assault and battery by agents working on behalf of the United States. Some or all Individual defendants enlisted foreign intermediaries to assault and batter plaintiff in the UAE secret police prison in Abu Dhabi, UAE, and the UAE secret police did so assault and batter plaintiff for 106 days, from June 1, 2011, through September 15, 2011.

101.    Some or all Individual defendants, present during some of the acts complained of herein, said presence having been authorized by UAE officials, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of assault and battery.

102.    At all relevant times, some or all Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, Individual defendants' conduct has proximately caused harm to plaintiff.

103.    The actions, orders, authorizations, and other conduct of the individual defendants specified *supra* deprived plaintiff of his right to be free from assault and battery and give rise to a cause of action for damages directly under the common law. Plaintiff has been damaged in the amount of $10 million.

## Fifth Individual Defendants Claim: Torture

## International Convention Against Torture; Torture Victim Protection Act

104.    Plaintiff realleges paragraphs 1 through 71.

105.    The United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention") was adopted by the U.N. General Assembly on December 10, 1984, by unanimous vote.  It entered into force on June 26, 1989, and the United States ratified it on April 18, 1988.

106.    Plaintiff was tortured within the meaning of the Torture Convention, which defines torture as -

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him . . . information or a confession, punishing him for an act he . . . has committed or is suspected of having committed, or intimidating or coercing him . . . or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Torture Convention, Article I.

107.    The Torture Convention was enveloped into the Torture Victim Protection Act ("TVPA"), a "note" appended to 28 U.S.C. sec. 1350.  The TVPA creates a cause of

action for damages against "any individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture." Id., note (a)(1).

108.    It is a policy, custom, and practice for defendants, at least after September 11, 2001, to engage in torture by proxy. See, e.g., 24 August 2009 and 13 December 2012 NY Times; see also www.huffingtonpost.com/2009/08/28/new-cia-docs-detail-bruta_n_271299.html.  Some or all Individual defendants, in cooperation with plaintiff's UAE captors, and physically present and acting under the apparent or actual authority of the UAE, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of torture.

109.    At all relevant times, some or all Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference to, and/or with reckless disregard of, plaintiff's rights.  By the acts alleged herein, Individual defendants' conduct has proximately caused harm to plaintiff.

110.    As a proximate cause of defendants' unlawful conduct, plaintiff has suffered severe physical harm, emotional distress, and economic loss, and is entitled to relief under the Constitution, the Torture Convention, and the TVPA.

**Sixth Individual Defendants Claim: Torture (Fifth Amendment Due Process)**

111.    Plaintiff realleges paragraphs 1 through 71.

112.    It is a policy, custom, and practice for defendants, at least after September 11, 2011, to engage in torture by proxy. Some or all Individual defendants, in cooperation with plaintiff's UAE captors, and physically present and acting under the apparent or actual authority of the UAE, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of torture.

113.    At all relevant times, some or all Individual defendants committed, knew of and/or acquiesced in all of the above-described acts. Individual defendants' conduct was done intentionally, with deliberate indifference to, and/or with reckless disregard of, plaintiff's rights.

114.    The Individual defendants' unlawful conduct has caused plaintiff severe physical harm, emotional distress, and economic loss, and gives rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

### Seventh Individual Defendants Claim:

### Denial of Right to Counsel and Right Against Self-Incrimination

115.    Plaintiff realleges paragraphs 1 through 71.

116.    Defendants Noordeloos and John Doe I (Jason Dundas) refused plaintiff's demand to be represented by counsel in Khartoum, Sudan, on April 22, 2010. Instead, those defendants continued to interrogate plaintiff notwithstanding such demand and

then turned over such information to United States law enforcement defendants, which used information gleaned from plaintiff in securing his indictment in the District Court for the Southern District of California.

117.    The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and John Doe I (Jason Dundas) which deprived plaintiff of his right to counsel give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the following relief:

1.    <u>Declaratory Judgment.</u>  A declaratory judgment that --

a.    Official Capacity defendants violated plaintiff's substantive due process right as a citizen under the Fifth Amendment to the United States Constitution to return to the United States when plaintiff was expelled from the United Arab Emirates;

b.    Official Capacity defendants violated plaintiff's substantive due process rights as a citizen under the Fifth Amendment to the United States Constitution by denying plaintiff the right to travel to, from, and over the United States;

c.    Official Capacity defendants violated plaintiff's substantive and procedural due process rights as a citizen of the United States by promulgating a

vague and overbroad standard for including plaintiff's name on the No-Fly List
and by providing no realistic means to challenge said inclusion;

      d.     Official Capacity defendants violated plaintiff's right to legal counsel
under the Fifth Amendment to the United States Constitution by denying
plaintiff's request to consult with an attorney prior to plaintiff's being interrogated
by defendants Noordeloos and John Doe I (Jason Dundas) at the United States
Embassy in Khartoum, Sudan, in April 2010, and then using the information
gleaned from such interrogation to indict plaintiff in the Federal District Court for
the Southern District of California in May 2012;

      e.     Official Capacity defendants violated plaintiff's right to freedom of
association under the First Amendment to the United States Constitution by
requiring him to associate with the FBI as an informant and/or agent provocateur
in order to have his name removed from the No-Fly List;

      f.     Official Capacity defendants violated plaintiff's right to procedural
due process under the Fifth Amendment to the United States Constitution by
placing and retaining his name of the No-Fly List without notice or meaningful
opportunity to contest such placement;

      g.     Some or all Individual defendants violated plaintiff's substantive due
process rights under the Fifth Amendment to the United States Constitution to be
free from arbitrary arrest, false imprisonment, assault, battery, and torture;

      h.     Some or all Individual defendants violated plaintiff's rights under the
International Convention Against Torture and the Torture Victim Protection Act;

i.    Individual defendants Noordeloos and John Doe I (Jason Dundas) violated plaintiff's right to legal counsel under the Fifth Amendment to the United States Constitution by denying plaintiff's request to consult with an attorney prior to plaintiff's being interrogated by defendants Noordeloos and John Doe I (Jason Dundas) at the United States Embassy in Khartoum, Sudan, in April 2010, which information was then was used by Official Capacity defendants to indict plaintiff in the Federal District Court for the Southern District of California in May 2012.

2.    Injunction. An injunction requiring that --

a.    Official Capacity defendants, except to the extent required by exercise of standard security precautions at airports, not prevent plaintiff from returning to, flying over, or departing from the United States;

b.    Official Capacity defendants, except to the extent required by exercise of standard security precautions at airports, not prevent plaintiff from traveling internationally by air;

c.    Official Capacity defendants not interrogate plaintiff once plaintiff requests to be assisted by legal counsel;

d.    Official Capacity defendants not deny plaintiff the opportunity to consult with legal counsel prior to and during any interrogation of plaintiff;

e.    Official Capacity defendants not use in a criminal proceeding any information gathered from plaintiff during an interrogation of plaintiff at which interrogation plaintiff was not represented by legal counsel after so requesting the assistance of legal counsel;

   f.  Official Capacity defendants not condition the removal of plaintiff's name from the No-Fly List upon plaintiff's agreeing to become an informant or agent provocateur on behalf of Official Capacity defendants;

   g.  Official Capacity defendants not deny plaintiff written notice whenever his named is added to the No-Fly List;

   h.  Official Capacity defendants not deny plaintiff written notice whenever his name is removed from the No-Fly List;

   i.  Official Capacity defendants not deny plaintiff with the specific reasons why his name was added to the No-Fly List;

   j.  Official Capacity defendants to not agree to, arrange, or condone plaintiff's arrest by any foreign power when there is not probable cause to indicate that plaintiff has committed a crime within the jurisdiction of the foreign power;

   k.  Official Capacity defendants to not agree to, arrange, or condone plaintiff's imprisonment by any foreign power when there is not probable cause to indicate that plaintiff has committed a crime within the jurisdiction of the foreign power;

   l.  Official Capacity defendants to not agree to, arrange, or condone assaults on plaintiff by agents of a foreign power;

   m.  Official Capacity defendants to not agree to, arrange, or condone battery upon plaintiff by agents of a foreign power;

n.      Official Capacity defendants to not agree to, arrange, or condone

torture of plaintiff by agents of a foreign power.

3.      <u>Damages.</u>      Enter judgment against each Individual defendant sued in

his individual capacity in an amount to be determined at trial but not less than ten million

dollars ($10,000,000), plus punitive damages in an amount to be determined at trial, for

the violation of plaintiff's clearly established constitutional rights as alleged herein.

Further, it is requested that plaintiff be awarded reasonable attorneys' fees pursuant to

28 U.S.C. § 2412(d), costs, and expenses of all litigation.

4.      <u>Other Relief.</u> Such other relief as the Court may deem just and proper.

DATED this 27th day of June, 2014.


s/      Thomas H. Nelson, OSB 78315
Brandon Mayfield, OSB 000824
Gadeir Abbas, *pro hac vice*

Attorneys for Plaintiff