Thomas H. Nelson, OSB 78315 (nelson@thnelson.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Brandon Mayfield, OSB 000824 (mayfieldbrandon@hotmail.com)
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

Gadeir Abbas, Va. State Bar # 81161, *pro hac vice* (gadeir.abbas@gmail.com)
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.8787

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE**,<br><br>Plaintiff,<br><br>v.<br><br>**THE FEDERAL BUREAU OF INVESTIGATION**, et al,<br><br>Defendants. | Civil No. 3:13-cv-00899-BR<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO OFFICIAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Oral Argument Requested |

## I. INTRODUCTION

Defendants posit seven grounds for dismissing plaintiff's Second Amended Complaint, Dkt. # 37 ("Complaint"), ranging from ripeness through failure to state a claim and into arguments that his due-process challenges lack merit. Many of the legal issues raised by defendants have been resolved, or are in the process of being resolved, in the two other No-Fly List cases before this Court, *Latif v. Holder*, Case No.3:10-cv-00750-BR ("*Latif*"), and *Tarhuni v. Holder*, Case No. 3:13-cv-00001-BR

("*Tarhuni*"). Specifically, this Court has determined that the No-Fly List violates the Fifth Amendment's Due Process right to international travel of those on the List, *Latif*, Dkt. # 136 (June 24, 2014), and the Court is currently considering possible remedies for this violation. Accordingly, this response will address primarily issues that the Court has not yet had before it.

## II. BACKGROUND

The allegations in plaintiff's Complaint, which must be accepted as fact for the purposes of defendants' motion,[1] can be summarized as follows:

- Plaintiff is a naturalized citizen of the United States of Eritrean descent, Complaint, ¶ 4, and convert to Islam. He lived with his family for a while in San Diego, but later moved to Portland, where he attended and had friends at Portland's As-Saber mosque, see *id.* ¶ 30;

- To pursue this business interests, plaintiff went to Sudan in late 2009, where he sought the necessary business and other licenses to engage in trading in consumer electronics, *id.* ¶ 24;

- While in Sudan, defendant Noordeloos, who claimed to be with the U.S. Embassy, lured him to the embassy by inviting him to attend a luncheon meeting with other Americans so that the American community could "stay safe" during his stay in Sudan, *id.* ¶ 27;

- When plaintiff arrived at the embassy on April 22, 2010, he was met by Mr. Noordeloos and another FBI Agent from Portland, John Doe I (Jason Dundas) *id.* ¶ 28;

- When Mr. Noordeloos told him that he was going to be interrogated, plaintiff requested that he consult with his attorney, Brandon Mayfield, co-counsel in this case. Mr. Noordeloos told plaintiff that plaintiff could not do so because plaintiff was on the No-Fly List ("List") and could not return to the U.S. for such consultation. From that point forward plaintiff felt trapped in the embassy, *id.* ¶¶ 29-30;

---

[1] In reviewing a motion to dismiss, the Court must accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. *Terbush v. U.S.*, 516 F.3d 1125, 1128 (9th Cir. 2008); *Mohammed v. Jeppeson Dataplan, Inc.*, 614 F.3d 1070, 1073 (9th Cir. 2010).

Page 2 - PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
         COMPLAINT, *Civil No. 3:13-cv-00899-BR*

- During the interrogation the agents inquired about plaintiff's activities, financing, events, and happenings at the Portland mosque. Other topics about which plaintiff was interrogated included then-ongoing transfers of funds from his brother in San Diego through a money transferor in Seattle, *id.* ¶ 30;

- During the interrogation, the agents stated that they were working on "a case," presumably in Portland, and importuned plaintiff to become a paid informant for the FBI to work on "the case." Mr. Noordeloos promised him that he would be removed from the List, be paid substantial amounts of money, and be able to enjoy "the good life," *id.* ¶ 31;

- Toward the end of the day the agents suggested that they meet the following day to pursue further whether plaintiff would become a paid informant. Plaintiff agreed to such meeting in order to escape the embassy, *id.*;

- Early the next morning plaintiff called agent Noordeloos and told him that he did not want to become an informant and thus would not attend the meeting. Mr. Noordeloos expressed exasperation and anger, *id.* ¶ 32;

- For weeks afterward plaintiff was followed and targeted by persons plaintiff believes were governmental agents, *id.* ¶ 34;

- Plaintiff decided to abandon his efforts in Sudan and instead moved to the United Arab Emirates, where he sought to establish his business dealing in consumer electronics, *id.* ¶ 35;

- On June 1, 2011, while at his home in Al-Ain in the Emirate of Abu Dhabi, plaintiff was arrested by UAE secret police and transferred to a prison in Abu Dhabi, where he endured 106 days of torture, *id.* ¶¶ 36 *et seq.*;

- During his incarceration and torture, plaintiff was repeatedly interrogated regarding his finances, his activities at the Portland mosque, and whether he would be willing to cooperate with law enforcement authorities, *id.* ¶ 39;

- After approximately seven weeks of interrogation and torture, an official from the U.S. embassy visited plaintiff. During that visit plaintiff was accompanied by two guards (one on each side of him). The guards informed the official that no charges had been brought against plaintiff; rather, his incarceration was merely for investigative purposes, *id.* ¶¶ 50-52;

- Toward the end of his ordeal, one of plaintiff's interrogators acknowledged that him imprisonment and torture was at the request of the United States, *id.* ¶ 55;

- On September 15, 2011, plaintiff was told he was being released without charge but that he would have to leave the UAE for a year. Plaintiff's jailers took funds

- from plaintiff to purchase him a ticket to Portland, but were told that plaintiff could not fly to the U.S. because he was on the No-Fly List. Consequently, plaintiff was deported to Sweden, where he has a relative, *id.* ¶¶ 56-57;

- Plaintiff, fearing for his safety, applied for asylum in Sweden, which application remains administratively active, *id.* ¶¶ 62-64;

- In Stockholm, plaintiff's Swedish attorney arranged a press conference covering plaintiff's ordeal on April 18, 2012. On May 1, 2012, only two weeks after the press conference, plaintiff was indicted for conspiracy to structure international monetary transfers from the period of April 13, 2010, though April 22, 2010, about which plaintiff had been questioned during the April 22, 2010, interrogation of plaintiff in Khartoum by defendants Noordeloos and John Doe I (Jason Dundas), *id.* ¶ 65;

- The indictment was dismissed and the arrest warrant for plaintiff was withdrawn on October 4, 2013, *id.* ¶ 67;

- Since the commencement of this litigation defendants have suggested that plaintiff might return to the United States by getting clearance from the U.S. Embassy in Stockholm. Defendants have refused to guarantee plaintiff's safety from further extra-judicial actions should he leave the refuge of Sweden. Defendants have also refused to state that plaintiff could leave the United States should he return home, *id.* ¶ 68;

- Plaintiff's filing of a DHS TRIP Request in November 2013 indicated that plaintiff remains on the No-Fly List. *Id.* ¶ 69.

With this background, defendants' arguments can be addressed.

### III. ARGUMENT

A.  <u>Ripeness</u>

Defendants allege that, because plaintiff has not recently attempted to fly to the United States, his claim is not ripe. Of course, as defendants note, this Court has already considered and rejected this argument. Defendants' Memorandum (Dkt. # 41) at 7, *citing* May 29, 2014 Order at 17–20. Because plaintiff's reluctance if not inability to

seek to return to the United States is entirely the fault of the No-Fly program itself, this argument should be rejected.

First, based upon the shabby treatment plaintiff suffered in Khartoum in April 2010 and then his 106 days of torture in Abu Dhabi with the connivance of defendants, plaintiff is understandably fearful of returning to the United States unless some procedures are in place to guarantee that extra-judicial means will not be again employed to abuse him. Plaintiff has requested assurances from the United States that such extra-legal means will not again be deployed against him, but his request was denied. Consequently, plaintiff is understandably reluctant to submit himself to the chance of further illegal ordeals.

Second, plaintiff's inability to return to the United States is entirely the consequence of the casual cruelty inherent in the No-Fly List program. Defendants instructed plaintiff that, in order to seek to return to the United States, he must first purchase, for thousands of dollars, an airline ticket from Stockholm to Portland and then, with the paid-for ticket in hand, he must go to the airport and seek a boarding pass. Only then will he be told whether he can fly to the United States.[2]

Third, there is a severe penalty that would attach should plaintiff return to the United States: He would be barred from future air travel. In effect, plaintiff would be imprisoned within the borders of the continental United States, and be unable to cover the vast domestic distances by air to visit his family in San Diego, seek gainful employment away from Portland and its environs, and engage in other normal human

---

[2] Based on the interrogations in Khartoum and the United Arab Emirates, defendants are well aware of plaintiff's lack of financial resources

Page 5 -  PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
          COMPLAINT, *Civil No. 3:13-cv-00899-BR*

activities in 21st Century America. For this very reason plaintiffs Kashan, Mohamed, and Rana in the *Latif* case likewise have refused to attempt to return to the United States. *Latif* Third Amended Complaint, Dkt. # 83, ¶¶ 133-34 (Jan. 11, 2013). Moreover, Mr. Tarhuni's continuing ordeal - most recently, he was denied the right to attend his brother's funeral in Libya - illustrates why returning to the United States while on the No-Fly List creates a significant risk to his constitutional right to travel internationally. In sum, at this point plaintiff is unwilling to surrender his right to international travel in return for being "allowed" to return to the United States. While the restriction on international travel that this Court found unconstitutional in *Latif* remains in place, plaintiff simply cannot be expected to want to return to the United States. Consequently, plaintiff's claim is ripe.

B.    Presentment at Border

Defendants next argue that plaintiff has not presented himself physically at a border station and thus his claim should be dismissed. Here, defendants would have plaintiff purchase an airline ticket and attempt to board a plane for the United States merely to prove that a boarding card will not be issued which, of course, would reinforce defendants' argument of failure to reach a border crossing. The obvious logical fallacy here is that defendants themselves are preventing plaintiff from gaining access to a border crossing. Consequently, this argument should be rejected.

C.    International Travel and Due Process

Plaintiff's First Claim is that he has a fundamental right under the Due Process Clause of the Fifth Amendment to return to his homeland, and his Second Claim is that he has a fundamental right under the same clause to air international travel. While these

Page 6 - PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
          COMPLAINT, *Civil No. 3:13-cv-00899-BR*

claims are similar, plaintiff pleaded them in this manner to call attention to the extreme hardship imposed when defendants wait until a citizen or permanent resident is outside of the United States to place him/her on the No-Fly List. Adding to plaintiff's predicament was that he was given no opportunity to go to the U.S. Embassy in Abu Dhabi on his release from prison following 106 days of torture, a circumstance not of plaintiff's making and probably the result of defendants' connivance. Consequently, plaintiff was forced to pick a foreign refuge for recovery and re-entry into society. Fortunately Sweden, which has a policy and history of protecting human rights, accepted plaintiff.

Plaintiff's Second Claim is that he has a fundamental right to international air travel. Plaintiff does not claim that this right is absolute; he acknowledges that different levels of screening and other routine protections are entirely appropriate.[3] This Court in *Latif* found there is a due process right to international travel. *Latif*, Opinion and Order, Dkt # 136 (June 24, 2014); of course, plaintiff's claim mirrors the *Latif* plaintiffs'. For the reasons set forth in this memorandum as well as those the Court advanced in the *Latif* decision, the Court should reject this basis for dismissing plaintiff's complaint.

D.     Vagueness and Overbreadth

Plaintiff's Third Claim was pleaded based on the Fifth Amendment's Due Process Clause and claims vagueness and overbreadth. Defendants point out, however, that the overbreadth doctrine implicates the First Amendment. For purposes of this Third Claim plaintiff is abandoning reliance on First Amendment principles, including overbreadth.

---

[3] *E.g.,* requiring special screening for those issued boarding passes stamped "SSSS" and restricting the traveler to flights on which air marshals are present.

Page 7 - PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
                COMPLAINT, *Civil No. 3:13-cv-00899-BR*

The vagueness doctrine is triggered (i) when an average person facing a potential sanction realistically cannot ascertain what conduct is the basis for the sanction, *F.C.C. v. Fox Television Stations*, 556 U.S. 502 (2012) (voiding FCC's imposition of sanctions for "obscene, indecent, or profane language"), or (ii) when the delegation to administrators is so broad that it leads to arbitrary imposition of sanctions. *Grayned v. City of Rockford*, 408 U.S. 104 (1972).[4] The doctrine has application to administrative sanctions such as the No-Fly List. *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048–51 (1991) (holding that attorney disciplinary rule was unconstitutionally vague as applied).

Since the Complaint in this action was filed, further information about the watchlisting and No-Fly List has become available that highlights just how vague the standard for inclusion on the List is. Specifically, in July 2014 a website associated with Glenn Greenwald released a 166-page document titled, "March 2013 Watchlisting Guidance" issued by the National Counterterrorism Center, which spells out the defendants' secret rules for putting individuals in the main terrorist database as well as the No-Fly List.[5]

The analysis begins with the "reasonable suspicion" standard - which turns out not to be a standard at all. The Watchlisting Guidance defines the term as follows:

---

[4] In *Grayned* the Supreme Court noted, "[I]f if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." 408 U.S. at 108-09.

[5] The document is available at https://firstlook.org/theintercept/2014/07/23/blacklisted/ and is referred to herein as "Watchlisting Guidance."

Page 8 - PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
            COMPLAINT, *Civil No. 3:13-cv-00899-BR*

> To meet the REASONABLE SUSPICION standard, the NOMINATOR, based on the totality of the circumstances, must rely upon articulable intelligence or information which, taken together with rational inferences from those facts, reasonably warrants a determination that an individual is known or suspected to be or has been knowingly engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES.

Watchlisting Guidance, *supra* note 5, ¶ 3.4 at 33. The Guidance then amplifies on what might be considered to meet this term:

> In determining whether a REASONABLE SUSPICION exists, due weight should be given to the specific reasonable inferences that a NOMINATOR is entitled to draw from the facts in light of his/her experience and not on unfounded suspicions or hunches. Although irrefutable evidence or concrete facts are not necessary, to be reasonable, suspicion should be as clear and as fully developed as circumstances permit.

*Id.* ¶ 3.5 at 34.

Defendants in their Memorandum in Support forward as the appropriate standard the one they adopted in a Joint Stipulation in the *Latif* case, which is the "existence of a *reasonable suspicion* to believe that a person is a known or *suspected* terrorist" (emphasis added). *Latif*, Joint Stipulations [Dkt. # 41] at ¶¶ 17–18. Addressing the first suspicion, the "reasonable suspicion," the question is what precisely constitutes "reasonable suspicion." The Congressional Research Service, in a memorandum to the Senate Select Committee, addressed the meaning of that term. It said,

> The reasonable suspicion standard is of relatively recent origins. Although never expressly mentioned there, it comes from *Terry*, which recognized that under certain exigencies of time and place police officers may conduct a limited seizure and search with less than probably cause, *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion has been described as "something more than an inchoate and unparticularized suspicion or hunch . . . [as a] level of suspicion . . . considerable less than proof of wrongdoing by a preponderance of the evidence. . . . [as a] . . . level of suspicion . . . obviously less demanding than that for probable cause. . . [but a level of] suspicion supported by articulable facts that

criminal activity "may be afoot," even if the officer lacks probable cause," *United States v. Sokolow*, 490 U.S. 1, 7 (1989); as "a particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002); and as "a particularized and objective basis for suspecting the person stopped of criminal activity," *Ornelas v. United States*, 517 U.S. at 690, citing, *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Congressional Research Service Memorandum to Senate Select Committee on Intelligence at 3-4 (January 2006), *available at* http://fas.org/sgp/crs/intel/m013006.pdf.

Addressing the second "suspicion," that someone is a "suspected terrorist," this begs the question, "*Who* is doing the suspecting?" Certainly not the "nominator," who him/herself has to have a reasonable suspicion that *someone else* knows or suspects that the individual is a terrorist. Moreover, there is no requirement that the second suspicion itself be reasonable, which of course lowers the already low threshold for being included on the No-Fly List.

It is important to illustrate as concretely as possible just how flimsy a "reasonable suspicion" of another suspicion is. Let us assume that, in mathematical terms, the lower end of "reasonable suspicion" is that it is 25 percent likely - .25, or a one-in-four chance - that the suspicion turns out to be correct.[6] Let us further assume that both of the suspicions - the nominator's own suspicion and the third party's suspicion of terrorism - are "reasonable." Because meeting the "standard" merely requires a suspicion of a suspicion, each suspicion must be accorded that 25 percent - .25, or one-in-four -

---

[6] To put these numbers in context for the sake of this discussion, it seems clear that the terms "preponderance of the evidence" in the civil context and "probable cause" in the criminal context indicate that something must be more probable than not, *i.e.*, above a 50-percent probability. The term "beyond a reasonable doubt" indicates that something must be a near certainty (*i.e.*, above, say, a 90 or 95 percent probability). The term "clear and convincing evidence" indicates that the likelihood must be above a "preponderance" but short of "beyond a reasonable doubt."

Page 10 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
             COMPLAINT, *Civil No. 3:13-cv-00899-BR*

chance of being correct. Simple mathematics establishes that when the two suspicions are stacked in this manner, the likelihood of the ultimate fact being borne out may be as low as 6.25 percent - .0625, or 1 in 16 chance of being correct,[7] - again, engaging in the assumptions (i) that "reasonable suspicion" equates to at least a one-in-four chance and (ii) that the second "suspicion" must be reasonable.

In sum, the "suspicion of a suspicion" standard is so vague and susceptible to wildly varying subjective interpretations that it is whimsical.[8] This point is all the more critical in light of the severe consequences that attach when some unnamed bureaucrat operating under a cloak of extensive secrecy determines that an individual meets the standard. Finally, in the only litigated case to date the whole No-Fly List process itself was found to be sloppy and wanting. See *Ibrahim v. Dept. of Homeland Security*.[9]

E.  <u>Right to Counsel</u>

Plaintiff's Fourth Claim is that defendants denied his explicit request to be represented by his attorney during the April 22, 2010, interrogation by FBI agents Noordeloos and John Doe I (Jason Dundas), and then used the information gleaned

---

[7] Doing the simple math and assuming that the "probable cause"/"preponderance of evidence" standards are 50 percent likelihood, this means that the "reasonable suspicion" standard requires proof that is one-eighth of the quantum of proof required to reach the "probable cause"/"preponderance of evidence" standards.

[8] For example, does a mere request for legal counsel provide sufficient suspicion when the FBI proposes that a person become a counterterrorism informant, as in the case of plaintiff Mashal in *Latif*? See *Latif*, Opinion and Order, Dkt. # 136, (June 24, 2014) at 20-21. Or is merely refusing to waive all *Miranda* and other rights in order to take a lie detector test following an extensive FBI counterterrorism interview? See *Tarhuni*, First Amended Complaint, Dkt # 13, ¶ 29; see also discussion of plaintiff Shinwari in *Tanvir v. Comey*, Case No. 13-cv-6951, First Amended Complaint, Dkt. # 15 at ¶ 149 (S.D.N.Y., Apr. 22, 2014). Or, as in *Mohamed v. Holder*, Case No. 1:11-cv-00050, Memorandum Opinion (Dkt # 50) (E.D. Va. Jan 22, 2014) and this case, refusing to become an informant following coercive torture?

[9] Findings of Fact, etc., *Ibrahim v. Dept. of Homeland Security*, Case No. 3:06-cv-545, Dkt. # 701 (N.D. Cal. Feb. 6, 2014)  (FBI agent's clerical mistake in 2004 leading to plaintiff's name being on No-Fly List for years).

Page 11 -   PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
            COMPLAINT, *Civil No. 3:13-cv-00899-BR*

from that interview to obtain a since-dismissed indictment against him for money laundering. In the Complaint, plaintiff also alleges that it is the defendants' custom to arrange for interviews of American Muslims in embassies overseas without legal counsel present in order to extort cooperation; that cooperation in plaintiff's case included to become an informant and/or *agent provocateur*. Second Amended Complaint, ¶ 79.

Other cases illustrate just how common denial of counsel to No-Fly List targets has become. For example, Ibraheim Mashal, one of the plaintiffs in *Latif*, alleges that FBI agents promised him assistance in getting off the No-Fly List in return for his agreeing to become an informant, but when he requested counsel assist him in that matter, the agents terminated the meeting. *Latif*, Third Amended Complaint, Dkt. # 83, ¶ 112 (Jan. 11, 2013). In the *Tarhuni* case, after assuring that time constraints prevented Mr. Tarhuni from having the benefit of American legal counsel present, the defendants attempted to coerce Mr. Tarhuni into waiving all of his *Miranda* rights and submitting to a lie detector test. In addition, the undersigned is personally familiar with at least one other instance in which a similar process was attempted to be employed. Indeed, similar practices are now coming to light consequent to other No-Fly List litigation.[10]

At this time in this docket, only the official defendants parties are before this Court; Mr. Noordeloos and Mr. John Doe I (Jason Dundas) have not been located, and because defendants have refused to receive process for them they have not been

---

[10] See *Tanvir v. Comey*, Case # 13-CV-6951, First Amended Complaint, Dkt. # 15, (S.D.N.Y., Apr. 22, 2014) (plaintiff Navid Shinwari placed on No-Fly List and required to submit to interrogation and requested to submit to lie-detector test at Dubai consulate prior to being allowed to return home to the United States).

Page 12 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
             COMPLAINT, *Civil No. 3:13-cv-00899-BR*

served. While the Second Amended Complaint requests relief from those non-official defendants, now the only issue before the Court is whether official defendants' pattern of abuse of the right to counsel should be addressed. Here, of course, the official defendants' pattern of abuse threatens to be repeated, for Mr. Noordeloos told plaintiff that if he wants to return to the United States he should first visit the embassy, and during the course of this litigation defendants' counsel recently advised plaintiff's attorney that such a requirement is still in place. The only plausible reason for requiring plaintiff to go on land that is technically U.S. soil is to impose restrictions and pressures on him that defendants could not impose if plaintiff were to remain on foreign soil - just as defendants did in *Tarhuni*. For this reason, an injunction should be issued preventing defendants from repeating such conduct.

Plaintiff simply requests that, in all future encounters with United States interrogators occasioned by his desire to return home, plaintiff be allowed to be represented by counsel at such interrogations. To accomplish this result, plaintiff respectfully requests that this Court require defendants to make all necessary time accommodations to allow plaintiff's legal counsel to travel to a site other than embassy/consular ground in time to be present at the interrogation, *i.e.*, that defendants be prohibited from repeating their conduct in the *Tarhuni* matter of placing unreasonable time constraints regarding when and where such interrogation must occur.

F.    Freedom of Association

Although the freedom of association is nowhere mentioned in the text of the First

Page 13 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
             COMPLAINT, *Civil No. 3:13-cv-00899-BR*

Amendment,[11] it is now part of the gloss on the Amendment.[12] Plaintiff's Fifth Claim asserts that his right to associate freely was infringed by defendants when Mr. Noordeloos indicated that his inclusion on the No-Fly List could be solved by his agreeing to become an informant/*agent provocateur* on behalf of the FBI.[13] Of course, plaintiff's continued presence on the No-Fly List was confirmed on September 24, 2011, when plaintiff was unable to return to his home and instead had to fly to Sweden to seek refuge there, and more recently defendants' counsel indication that plaintiff must visit the U.S. Embassy in order to receive clearance to return home further establishes that plaintiff remains on the No-Fly List.

The Supreme Court has recognized that there are "negative protections"[14] arising from the freedom of association, *i.e.*, that the government may not compel one to associate him/herself with activities and beliefs with which the individual disagrees. There are three leading cases that the Court should consider. First, in 1943 the Supreme Court held that a school may not require a student to engage in the conduct of reciting the pledge of allegiance. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S.

---

[11] The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[12] *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 , 463 (1958); *NAACP v. Button*, 371 U.S. 415, 429 -30 (1963); *Cousins v. Wigoda*, 419 U.S. 477, 487 (1975); *In re Primus*, 436 U.S. 412, 426 (1978); *Democratic Party v. Wisconsin*, 450 U.S. 107, 121 (1981).

[13] As indicated above, it is now apparently a custom, pattern, and practice for the FBI to use Muslims' presence on the No-Fly List as a bargaining chip to induce them to become informants/*agents provocateur* for the FBI. See First Amended Complaint, *Tanvir v. Comey*, Dkt. # 15, Case # 13-CV-6951 (S.D.N.Y., Apr. 22, 2014).

[14] The term "negative protection" afforded by the right to freedom of association under the First Amendment is taken from David B. Gaebler, *First Amendment Protection Against Government Compelled Expression and Association*, 23 B.C.L.Rev. 995, 996 (1982).

Page 14 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
             COMPLAINT, *Civil No. 3:13-cv-00899-BR*

624 (1943) ("*Barnette*"). Second, in 1977 the Supreme Court in *Wooley v. Maynard*, 430 U.S. 705 (1977) ("*Wooley*"), held that a state may not require an individual to display the state motto imprinted on all automobile license plates, "Live Free or Die". Third, also in 1977, the Supreme Court addressed the negative protection afforded by the freedom of association under the First Amendment in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) ("*Abood*") (compelled financial support of collective bargaining representative when funds were used for political purposes unrelated to collective bargaining).

The right to be free from compelled expression or conduct is not absolute; whether that right will be afforded judicial protection requires an analysis of each case as it arises and a balancing of the individual's right in light of the government's need. In *Barnette*, *Wooley*, and *Abood* the Supreme Court engaged in such balancing and in all three cases held that the individuals' right to be free of compulsion to associate overcame the professed government need to require such expression or conduct. Consequently, it is appropriate to consider and balance the impacts and interests involved. Plaintiff suggests four factors for the balancing analysis, below.

    1.    <u>*Nature of Required Expression/Conduct*</u>

The first factor that should be considered when balancing to determine whether there has been a violation of the right of association is the nature of the required expression or conduct. Acceding to the government's request that plaintiff become an informant/*agent provocateur* for the FBI would have a far more extensive and critical impact upon both plaintiff's expressions and his conduct than in any of the cases of *Barnette*, *Wooley*, and *Abood*. In *Barnette* the mere mouthing of a prescribed set of words was required; nothing required the plaintiff to engage in any affirmative conduct.

Likewise, in *Wooley*, plaintiff was merely required to display a vehicle license plate containing words that were to him offensive - he was not required to engage in any conduct that would reflect the offensive words. *Abood*, on the other hand, did require some minimal conduct - the payment of union dues. In *Abood* the Court justified compelled membership in the union in order to promote labor harmony, but with the important exception that the portion of those funds designated for political activities had to be refunded to plaintiff.

Here, defendants through Mr. Noordeloos proposed that, in order to have his name removed from the No-Fly List, plaintiff would have to become an FBI informant/*agent provocateur.* Becoming an informant/*agent provocateur* requires that the person adopt views and attitudes that that person does not hold, and thus requires continuing expressions of support. Specifically, in order to gain the confidence of any extremist co-religionists in his local Portland mosque, plaintiff would have to espouse and pretend to support violent *jihadi* principles - principles that are at least as offensive to him as the mere words "Live Free or Die" were to the plaintiff in *Wooley.* But that is not the end of an informant/*agent provocateur*'s role: When a target either identifies himself or is identified, plaintiff would be required both to work closely with the target and to report to and coordinate his actions with the FBI - either or both of whom he may strongly dislike. Consequently, the degree of expression and conduct required of plaintiff goes far beyond both the expressions and the conduct required in any of the three cases.

    2.    <u>Link Between Expression/Conduct and Plaintiff</u>

The second factor to consider is how closely is the expression/conduct linked to plaintiff's interest. In *Barnette* the link was very close and personal: the plaintiff would

Page 16 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
                 COMPLAINT, *Civil No. 3:13-cv-00899-BR*

have to actually make an individual, affirmative, and public oral statement of loyalty. The link in *Wooley* was not so close - he was not required individually to say anything. Rather, he was required to exhibit a political expression with which he disagreed on the bottom of license plates on his vehicle. Finally, the link was very weak in *Abood*, where the plaintiff's union dues would be commingled with those of other union members and then spent; the specific dollars for political activities could not be traced directly back to plaintiff.

In the present situation plaintiff was told that in order to avoid the sanction of being on the No-Fly List he would have to become an informant and/or an *agent provocateur*. In order to be an effective informant/*agent provocateur*, plaintiff would be required to make statements and adopt political and religious positions with which he strongly disagreed and, based on those false statements, engage in affirmative conduct with both the target and the FBI. Such statements and actions go to the very heart of what the person is perceived to believe - indeed, who he is perceived to be. Consequently, the link between plaintiff and his required expressions and conduct is much stronger in the present situation than it was in the three negative protection cases.

  3. <u>*Severity of Sanction Imposed by Government*</u>

The third factor that should be considered in the balancing of interests is the sanction that the government imposes. In *Barnette*, it was possible expulsion from school for being insubordinate; in *Wooley*, it the payment of a fine for defacing a license plate, and in *Abood* no sanction was specified (although plaintiff was required to continue membership in the union). Here, plaintiff's interest is in, at least, the freedom to travel internationally and, once in the United States, to travel freely about the country

Page 17 - PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED COMPLAINT, *Civil No. 3:13-cv-00899-BR*

and overseas on family and business affairs. Unless his name is removed from the No-Fly List he will be perpetually barred from travel into, from, or over the United States. Thus the sanction imposed on plaintiff far exceeds any of the sanctions imposed in *Barnette*, *Wooley*, or *Abood.*

### 4. *Governmental Interest at Stake*

The final issue to be addressed in balancing to determine whether the compelled expressions and/or conduct violate the right to freedom of association under the First Amendment is the interest of the government. As defendants have repeatedly insisted in this and other No-Fly List litigation, the government has an interest in preventing terrorism. It is, of course, possible to overstate that interest, particularly when constitutional values are at stake: Plaintiff's becoming an informant/*agent provocateur* for the FBI simply could not end terrorism. Thus the specific question that should be addressed in the balancing of interests is whether *Yonas Fikre*'s right to freedom of association can be overcome in light of the facts surrounding this case, *i.e.*, a "case" that was developing in Portland in April 2010.

Public proceedings have since disclosed that there was one high-profile terrorism "case" that was in its infancy and undisclosed publicly in April 2010 and that had a tangential connection to the mosque where plaintiff worshipped; that case involved "sting operation"[15] target Mohamed Mohamud, who was convicted of attempting to use

---

[15] "Sting" operations involving informants and *agents provocateur* are a commonplace in counterterrorism cases. On July 21, 2014, Columbia Law School Human Rights Institute and Human Rights Watch issued an exhaustive 220-page report on federal counterterrorism cases. That report states,

> Indeed, in some cases the Federal Bureau of Investigation may have created terrorists out of law-abiding individuals by conducting sting operations that facilitated or invented

a weapon of mass destruction in January 2013. Because plaintiff worshipped at a mosque where Mr. Mohamud worshipped and thus had a passing acquaintance with Mr. Mohamud, it seems highly likely that this was the "case" in which Mr. Noordeloos, on April 22, 2010 in Khartoum, invited plaintiff to become involved. Obviously, plaintiff did not become involved in that case, and just as obviously defendants obtained a conviction of Mr. Mohamud by using a different informant/*agent provocateur.* Thus the question becomes whether the government's use of compulsion (placing/keeping Mr. Fikre on the No-Fly List) is justified in the pursuit of a terrorism "sting" operation. When the actual competing interests involved in requiring individuals to become informants/*agents provocateur* are explicitly identified in this manner, it becomes clear that the individual's freedom of association should prevail.

G.    Procedural Due Process

Plaintiff's Sixth Claim alleges a violation of procedural due process. This Court has already held in *Latif* that there is a due-process right to international travel and is now in the process of considering what due-process procedures must be employed in order to protect that right. Prior briefing in this docket has addressed why the procedures employed by defendants are woefully inadequate under *Mathews v. Eldridge.* Because plaintiff's fact pattern is virtually identical to many of the plaintiffs in

---

the target's willingness to act. According to multiple studies, nearly 50 percent of the more than 500 federal counterterrorism convictions resulted from informant-based cases; almost 30 percent of those cases were sting operations in which the informant played an active role in the underlying plot.

Columbia Law School Human Rights Institute & Human Rights Watch, *Illusion of Justice - Human Rights Abuses in U.S. Terrorism Prosecutions* at 2 (July 21, 2014), *available at* http://www.hrw.org/sites/default/files/reports/usterrorism0714_ForUpload_1_0.pdf.

Page 19 -    PLAINTIFF'S MEM. OPP. MOTION TO DISMISS SECOND AMENDED
             COMPLAINT, *Civil No. 3:13-cv-00899-BR*

*Latif*, plaintiff herein expects that the same analyses adopted in those dockets will be applied here.

### IV. CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that defendants' motion to dismiss be denied.

DATED: September 26, 2014

        Respectfully submitted,

        */s/ Thomas H. Nelson*
        Thomas H. Nelson, OSB 78315
        P.O. Box 1211
        Welches, OR  97067
        Phone: 503.622.3262
        nelson@thnelson.com

        Brandon Mayfield, OSB 000824
        3950 SW 185th Avenue
        Beaverton, OR 97007
        Phone: 503.941.5101
        mayfieldbrandon@hotmail.com

        Gadeir Abbas, Va. Bar # 81161
        c/o Council of American-Islamic Relations
        453 New Jersey Avenue, S.E.
        Washington, D.C. 20003
        Phone: 202.488.8787
        gadeir.abbas@gmail.com