Thomas H. Nelson, OSB 78315 (nelson@thnelson.com)
P.O. Box 1211
Welches, OR  97067
Phone: 503.622.3262

Brandon Mayfield, OSB 000824 (mayfieldbrandon@hotmail.com)
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

Gadeir Abbas, *pro hac vice* (gadeir.abbas@gmail.com)
1155 F Street NW, Suite 1050
Washington, DC 20004
Phone: 720.251.0425

William J. Burgess, *pro hac vice* (wburgess@cair.com)
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 20003
Phone: 202.488.0833

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE**, | |
| Plaintiff, | Civil No. 3:13-cv-00899-BR |
| v. | **FOURTH AMENDED COMPLAINT,** *Corrected per Order of the Court, ECF # 61* |
| **THE FEDERAL BUREAU OF INVESTIGATION**; **ERIC HOLDER**, Attorney General of the United States (sued only in his official capacity); **STATE DEPARTMENT**; **JOHN KERRY**, Secretary of State (sued in his official capacity); **UNITED STATES OF AMERICA**; **JAMES B. COMEY**, Director of the FBI (sued in his official capacity); **CHRISTOPHER M. PIEHOTA**, Director of FBI Terrorism Screening Center (sued in his official capacity); **JAMES CLAPPER**, Director | FALSE ARREST; FALSE IMPRISONMENT; ASSAULT; BATTERY; TORTURE; VIOLATION OF THE RIGHT TO COUNSEL; VIOLATION OF THE FIRST AMENDMENT FREEDOM OF ASSOCIATION; VIOLATION THE TORTURE VICTIM PROTECTION ACT; VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS; VIOLATION OF FOURTH AMENDMENT; VIOLATION OF STORED |

of National Intelligence (sued in his official capacity); **MICHAEL S. ROGERS**, Director of the National Security Agency (sued in his official capacity); **NATIONAL SECURITY AGENCY**; **DAVID NOORDELOOS**, an FBI Agent (sued in his official and individual capacity), **JOHN DOE I**, a.k.a. **JASON DUNDAS**, an FBI Agent (sued in his official and individual capacities), and **JOHN/JANE DOES II-XX**, agents of the United States (sued in their official and individual capacities),

COMMUNICATIONS ACT; VIOLATION OF WIRETAP ACT

**JURY TRIAL DEMANDED**

Defendants.

---

**I. INTRODUCTION**

1.     Plaintiff Yonas Fikre, an American citizen, seeks redress for (i) the denial of his right to travel internationally, which denial prevented him from returning to the United States when he was expelled from the United Arab Emirates and prevents him from domestic and international air travel today (ii) the denial of his right to procedural due process leading to denial of his right to travel internationally, (iii) the violation of his right to counsel by FBI agents and others acting on their behalf, which violation resulted in his prosecution in the Federal District Court for the Southern District of California and other harms, (iv) violation of his First Amendment right of association, (v) suffering false arrest, false imprisonment, assault, and torture at the hands of a foreign power, which, on information and belief, was instigated by and facilitated by defendants, acting at times under the actual or apparent authority of said foreign power, (vi) violation of his right to be free from unconstitutional searches and seizures, and (vii) violation of his statutory protections against unlawful electronic surveillance.

2.     Plaintiff's allegations in summary are (i) that defendants sometime prior to April 21, 2010, placed plaintiff's name on the "No-Fly List" in order to coerce plaintiff into becoming an informant/*agent provocateur* for the FBI, (ii) that on April 21, 2010, during an involuntary interview at the United States Embassy in Khartoum, Sudan, defendants denied plaintiff's request for legal counsel, (iii) that during the April 2010 involuntary interview plaintiff was urged to become an informant/*agent provocateur* for the FBI in order to, among other things, have his name removed from the No-Fly List, (iv) that when plaintiff refused to become an informant/*agent provocateur*, defendants retaliated by instigating and facilitating his false arrest, false imprisonment, assault, and torture at the hands of the UAE government during the summer of 2011, (v) that defendants denied plaintiff his constitutional right as a citizen to return home to the United States following the UAE government's releasing him without charge by keeping his name on the No-Fly List, thus effectively rendering him temporarily stateless, (vi) that in May 2012 defendants further retaliated against plaintiff for his publicly disclosing his ordeal by indicting him in the District Court for the Southern District of California using information gathered during his interrogation at the U.S. Embassy in Khartoum, during his interrogation and torture in the UAE, and by means of unlawful electronic surveillance, and (vii) that plaintiff was subject to warrantless electronic surveillance in violation of the Constitution and statutory law.

3.     Through this action for declaratory and injunctive relief and for damages plaintiff seeks (i) a declaration that plaintiff's right to assistance of legal counsel has been violated, (ii) a declaration that plaintiff's fundamental right to return to the United States by air, and his right to travel by air, have been and are being infringed, (iii) a

method whereby plaintiff can challenge the inclusion of his name on the No-Fly List in accordance with due process procedures, (iv) redress for the instigation and facilitation of the false arrest, false imprisonment, assault, and torture by the UAE government, (v) an injunction preventing the United States from violating the rights specified herein in the future, (vi) a declaration that the interception and/or acquisition of plaintiff's wire and electronic communications was unconstitutional and illegal, (vii) the retrieval, purging, destruction and prevention of further dissemination of all illegally intercepted and/or acquired voice and electronic communications and related data and information arising from such interceptions and/or acquisitions, and (viii) monetary damages for the events specified in this complaint.

## II. PARTIES

4.      Plaintiff is a naturalized American citizen of Eritrean descent. Plaintiff has never engaged in any acts of terrorism or supported terrorism in any form.

5.      Defendant Federal Bureau of Investigation is a bureau of the Department of Justice responsible for, among other things, selecting individuals for inclusion on, and maintaining, the No-Fly List.

6.      Defendant Eric Holder is Attorney General, whose office is responsible for, among other agencies, the FBI and the Terrorism Screening Center. Mr. Holder is sued only in his official capacity.

7.      Defendant Department of State is the Department of the United States responsible for protecting and assisting United States citizens while those citizens are abroad.

8.      Defendant John Kerry is Secretary of State, who is responsible for foreign

relations and for protecting and assisting United States citizens while abroad. Mr. Kerry is sued only in his official capacity.

9.     Defendant James B. Comey is Director of the FBI. He is sued only in his official capacity.

10.     Defendant Christopher M. Piehota is Director of the FBI's Terrorism Screening Center. He is sued only in his official capacity.

11.     Defendant United States of America is the United States of America, its departments, agencies, and entities.

12.     Up to April 22, 2010, individual defendant David Noordeloos, who is sued in his individual capacity, held himself out to plaintiff as an employee of the State Department. Previously, however, on April 6, 2010, defendant Noordeloos held himself out as a special agent of the FBI in a meeting with Portland Police Bureau Chief Rosanne Sizer, and on April 22, 2010, defendant Noordeloos told plaintiff that defendant Noordeloos is in fact an employee of the FBI assigned to and/or reporting to the Portland office of the FBI. Defendant Noordeloos traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff at the United States Embassy in Khartoum, and on April 22, 2010, Defendant Noordeloos did so interrogate plaintiff for several hours. Moreover, on July 11, 2011, in an email to plaintiff's attorney, defendant Noordeloos once again held himself out as an employee of the State Department.

13.     Defendant James R. Clapper is Director of National Intelligence. He is sued only in his official capacity.

14.     Defendant Admiral Michael Rogers is the Director of the National Security Agency, which is a part of the United States Department of Defense.  As NSA Director,

Admiral Rogers has authority to supervise and implement all operations and functions of the NSA, which include the interception of wire and electronic communication.  He is sued only in his official capacity.

15.    Defendant National Security Agency is a part of the United States Department of Defense.

16.    At all times relevant, individual defendant FBI Agent John Doe I, a person identifying himself as defendant Jason Dundas, who is sued in his individual capacity, was an employee of the FBI assigned to the Portland office. Defendant John Doe I (Jason Dundas) traveled to Khartoum, Sudan, in April 2010, in order to interrogate plaintiff at the United States Embassy in Khartoum, and on April 22, 2010, defendant John Doe I (Jason Dundas) did so interrogate plaintiff for several hours.

17.    John/Jane Does II-X are unknown agents of the United States who ordered, directed, undertook, or in some manner participated in facilitating the false arrest, false imprisonment, assault, battery, and torture of plaintiff at the UAE secret prison in Abu Dhabi from June 1 through September 13, 2011.

18.    John/Jane Does XI-XX are unknown agents of the United States, who ordered, directed, undertook, or in some manner participated in the interception and/or acquisition of plaintiff's electronic, and stored communications and/or utilized or disseminated such communications. On information and belief, John/Jane Does XI-XX are continuing the activities specified in this paragraph.

### III. JURISDICTION AND VENUE

19.    This is a complaint for injunctive and declaratory relief, and for damages, based upon defendants' violation of plaintiff's constitutional, statutory, and common law

rights. The claims asserted arise under the Due Process Clause of the Fifth Amendment (substantive and procedural), the Fifth Amendment's right to counsel and prohibition against self-incrimination, the First Amendment's right to freedom of association, the Fourth Amendment's prohibition against unreasonable searches and seizures, 50 U.S.C. § 1810, 18 U.S.C. § 2707(a), 18 U.S.C. § 2712, 18 U.S.C. § 2520(a), the Torture Victim Protection Act, and the common law.

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 18 U.S.C. § 2712, 28 U.S.C. § 1367, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

21.    The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because defendants include the United States and agencies of the United States, because this judicial district is where plaintiff resides and because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper in this Court because defendants David Noordeloos and John Doe I (Jason Dundas) at all times relevant hereto either resided in, worked in, or were assigned to and/or reported to superiors located in this District.

## IV. FACTUAL ALLEGATIONS

*General Factual Allegations*

23.    Air travel is the only practical means of passenger transportation between the North American continent and Europe, Asia, Africa, the Middle East, and Australia.

24.    Defendant FBI is responsible for selecting individuals for inclusion on, and

maintaining, the "No-Fly List," which lists individuals whom the airlines flying within, into, or over the United States may not transport.

25.     Information upon which a determination is made to place an individual on the No-Fly List is kept secret, and individuals on the No-Fly List are not informed when their names are placed on the List, when their names are removed from the No-Fly List, or what their current status is vis-à-vis the No-Fly List.

26.     The criterion for placing an individual's name on the No-Fly List was developed in secret by the Terrorism Screening Center without congressional oversight or approval. Under the present criterion, a person may be "nominated" to be on the List if "there is a reasonable suspicion to believe that a person is a known or suspected terrorist."

27.     Most individuals on the No-Fly List, and plaintiff in this action, are prohibited from flying on commercial aircraft into, out of, or over United States and Canadian airspace.

*Plaintiff's Background, Travel, Imprisonment, Torture, and Release*

28.     Plaintiff is a naturalized American citizen of Eritrean descent. When he was a small boy, war broke out in Eritrea, and thus his family took him to Sudan, where he was when the State of Eritrea came into being in 1993. From Sudan the Fikre family emigrated to the United States.

29.     Beginning in 2006, plaintiff resided in Portland, Oregon. In late December 2009, after working for an American cell phone company, plaintiff decided to attempt to distribute and to sell consumer electronic products on the retail market in East Africa. He began by returning to Sudan, where some of his extended family still reside. Upon

arrival in Sudan, plaintiff, in compliance with a recommendation by the State Department, contacted the United States Consulate in Khartoum and informed a representative of the consulate of his interest in pursuing business opportunities in the country. The representative encouraged plaintiff to pursue business opportunities in Sudan. In reliance upon the representative's recommendation plaintiff began the process of obtaining a Sudanese business license.

30.    On Tuesday, April 20, 2010, defendant Noordeloos sent an email to plaintiff, which stated: "Younas, I work at the embassy in Khartoum and need to meet up with you on wed 4/21. Can you email me back and let me know what time in the afternoon works for you? Best, David Noordeloos US Department of State".

31.    On Wednesday, April 21, defendant Noordeloos sent an email to plaintiff, which stated: "Yonas, I hope this finds you well. I still need to meet with you as soon as possible, can you give me a call and let me know what time works for you to meet? You can email me back or try me at the Embassy or on my cell, but please contact me soonest. Regards, David Noordeloos, US Department of State" [telephone numbers redacted].

32.    On April 21, at approximately 9 p.m. local time, plaintiff called the number given and spoke with defendant Noordeloos. Defendant Noordeloos stated that a number of Americans in Sudan had been invited to the Embassy for a luncheon the following day in order to discuss how Americans might stay safe during a period of political turmoil in Sudan. Plaintiff agreed to attend the luncheon on that basis, which turned out to be a false pretense.

33.    The next day plaintiff appeared at the embassy. After going through

security screening, plaintiff met defendant Noordeloos and another person, defendant John Doe I, who identified himself as Jason Dundas. Defendants Noordeloos and John Doe I (Jason Dundas) escorted plaintiff to a small meeting room and shut the door; defendants positioning themselves between plaintiff and the door. At that point defendants Noordeloos and John Doe I (Jason Dundas) produced badges and stated that they were FBI agents assigned to the Portland office.

34.    Upon being informed that defendants Noordeloos and John Doe I (Jason Dundas) were FBI agents from the Portland office, plaintiff stated that he wanted to be represented by his legal counsel (plaintiff was then represented by Oregon attorney Brandon Mayfield) during the interrogation. Defendant Noordeloos denied Mr. Fikre's request for such representation on the grounds that plaintiff had been placed on the No-Fly List and thus could not return to the United States to confer with his attorney.

35.    Because defendants John Doe I (Jason Dundas) and Noordeloos were blocking the door, plaintiff, who had never before been detained or arrested, felt he could not leave. During the following interrogation, defendants Noordeloos and John Doe I (Jason Dundas) questioned plaintiff extensively about the events, activities, and leadership at the as-Saber Mosque in Portland, which plaintiff had attended for prayer services. Defendant Noordeloos also questioned plaintiff about the source of his financial support for this business endeavors in Sudan, and told plaintiff that, because of the Sudan sanctions imposed by the Office of Foreign Assets Control, it was illegal for plaintiff to engage in business transactions in Sudan - a statement that is inconsistent with the advice and recommendation earlier given by the representative of the embassy as set forth in ¶ 29, *supra*.

36.     Defendant Noordeloos next told plaintiff that the FBI desired plaintiff to become an FBI informant to work upon "a case" that was then developing. Defendant Noordeloos stated that, in return, plaintiff would be paid substantial compensation, be in a position to enjoy "the good life," and that the FBI would take steps to remove plaintiff from the No-Fly List. Defendant Noordeloos then asked, "Don't you love your wife?", which question plaintiff considered an implicit threat. Plaintiff responded that he did not wish to become an FBI informant. The interview lasted for several hours until the close of the business day. As the day wore on, defendant Noordeloos suggested that they resume the discussion on the following day; in order to escape the interrogation room and leave the embassy, plaintiff agreed.

37.     At approximately 8:45 a.m. on the following morning, plaintiff called defendant Noordeloos and stated that he did not wish to meet further with the FBI agents because he would be wasting their and his time; he reiterated that he did not wish to become an informant for the FBI. Defendant Noordeloos became agitated and, to the best of plaintiff's recollection, stated, "Wait a minute! Are you trying to tell me you don't want to work with us!" Defendant Noordeloos then stated, "Whenever you want to go home you come to the embassy." Plaintiff understood this to mean that plaintiff's name would not be removed from the No-Fly List and he could not travel to the United States unless he became an informant/*agent provocateur* for the FBI.

38.     On May 4, 2010, defendant Noordeloos wrote an email to plaintiff which stated: "Yonas, Thanks for meeting with us last week in Sudan. While we hope to get your side of issues we keep hearing about, the choice is yours to make. The time to help yourself is now. Be safe in Sudan, Dave Noordeloos."

39.     Plaintiff remained in Khartoum for almost two months following his meeting with defendants Noordeloos and John Doe I (Jason Dundas). During that time he noticed that he was being followed by persons he assumed were affiliated with the Sudanese secret police, and he was told by merchants and other acquaintances in his neighborhood that similar individuals had been inquiring about him and his activities.

40.     On or about June 15, 2010, plaintiff left Sudan, and on or about September 15, 2010, plaintiff arrived in the UAE to pursue similar business interests involving the distribution and retail sale of consumer electronics there. Plaintiff moved to the city of Al Ain in the emirate of Abu Dhabi, where he sought and obtained a residency permit from the UAE in order to conduct business; he invested substantial financial resources provided by family members in pursuing that course.

41.     In the evening of June 1, 2011, persons unknown to plaintiff (who plaintiff later learned were UAE plainclothes secret police) invaded plaintiff's home in Al Ain, seized plaintiff's computer, phone, and other items, and compelled plaintiff to accompany them in a vehicle. Several of plaintiff's friends and neighbors witnessed plaintiff's apprehension. Plaintiff was blindfolded, placed in a confined space in the vehicle, and the air conditioner in the vehicle was turned on high and directed at him with the effect that he became quite chilled.

42.     Plaintiff was taken to a then-unknown location approximately two hours' driving time from Al Ain. Still blindfolded, he was led into a building and into a long hall where, by peeking down through the bottom of his blindfold, he noticed that he was passing door after door. His guards stopped at one door and put him inside a windowless cell where he was lodged. Upon removal of his blindfold, he saw that his

tiny cell lacked toilet facilities. His cell contained only a bed and some bedding. The cell was very cold because the air conditioning had been set on high.

43.    The following morning the interrogations of plaintiff began. Except for the one instance noted below, during all of his interrogations plaintiff was blindfolded. Once blindfolded, he was taken to a room where, throughout his ordeal, plaintiff was questioned for hours in English. Periodically during the 106 days of his imprisonment and torture, plaintiff occasionally was able to peek beneath the blindfold and view shoes and the lower torsos of his interrogators.

44.    The primary focus of the blindfolded interrogations was events at Portland's as-Saber Mosque, addressing in particular who plaintiff knew at the mosque who had a "jihadi mentality," what topics the mosque's leader, Sheikh Mohamed Kariye, speaks about both in public and in private, and how fundraising at the mosque occurs and who engages in fundraising there. The interrogators also questioned plaintiff about circumstances and events that plaintiff had disclosed to defendants Noordeloos and John Doe I (Jason Dundas) during his interrogation at the embassy in Khartoum. Numerous times during the blindfolded interrogations plaintiff's interrogators urged him to cooperate with them and with the FBI by becoming an informant.

45.    When plaintiff was returned to his cell at the end of the first day of interrogation he discovered that his bed and bedding had been removed. The air conditioning remained at a high level, which made the cell extremely cold. Because his bed and bedding had been removed, plaintiff was obliged to sleep almost naked on the cold cement floor.

46.    During the initial period of his confinement plaintiff resisted answering

some of the questions, insisting that he was an American citizen and needed to speak with his ambassador and with his attorney. In response, plaintiff's jailers struck him on his head and he fell to the ground. Throughout course of his confinement plaintiff was repeatedly beaten severely on his head, back, legs, and feet with batons and plastic pipes, required to assume stress positions for hours, and threatened with death by strangulation by use of a flexible plastic pipe. One particularly painful torture method his interrogators used was to force plaintiff to lie on his stomach with his sandals off, whereupon he was beaten severely on the soles of his feet; thereafter, he was required to stand on his feet, which standing caused him great pain.

47.    On several occasions plaintiff told his interrogators that the questions he was being asked and the suggestions of cooperation with the FBI were the same questions and suggestion he had heard from defendants Noordeloos and John Doe I (Jason Dundas); he thus inquired whether his confinement and mistreatment was at the request of the FBI. On each such occasion the interrogators responded by beating plaintiff severely.

48.    As noted above, during his interrogations plaintiff was occasionally able to peek beneath his blindfold and view the lower torsos of his interrogators. On most occasions, based on their clothing and accents, plaintiff believes that his interrogators were Arabs. On other occasions, however, plaintiff was able to view the shoes and slacks of several individuals who wore Western dress. Plaintiff believes that in those instances some or all of the Individual defendants, acting as representatives of the United States, were present and witnessed the interrogations and that those Individual defendants participated in interrogating plaintiff.

49.     All Individual defendants who attended and participated in the
interrogation of plaintiff were present with the permission, and were under the physical
and legal control, of UAE authorities who operated and maintained the secret prison.

50.     On or about June 14, 2011, plaintiff was informed that he had to take a lie
detector test. During the test, for the only time during his confinement, plaintiff was
questioned without a blindfold in place. The questioning during the test focused not
upon events at Portland's as-Saber Mosque but, rather, upon whether plaintiff's financial
arrangements involved soliciting funds for al-Qaeda. Following the lie detector test
plaintiff's bed and bedding were returned to his cell.

51.     The interrogations, including beatings and stress positions, as well as
being subjected to temperature extremes, sleep deprivation, and humiliation when not
being interrogated, continued daily from June 14 through July 27.

52.     On June 20, 2011, immediately after learning from plaintiff's family that
plaintiff had been apprehended in the UAE (the family had learned of plaintiff's
apprehension from witnesses who observed the event), Oregon counsel Thomas
Nelson telephoned and then e-mailed the United States Consulate in Abu Dhabi to
inform them that plaintiff, a United States citizen, had gone missing and that witnesses
in Al Ain had viewed him being placed in a SUV of the type that is commonly used by
the UAE secret police. The consulate officials indicated that they would look into the
matter.

53.     On July 21, 2011, plaintiff's Oregon counsel Thomas Nelson on behalf of
plaintiff contacted Representative Earl Blumenauer's office to request assistance in
locating plaintiff and made contact with staff member Emily Barrett. Ms. Barrett stated

that Congressman Blumenauer would look into the situation.

54.    On July 28, 2011, plaintiff was informed that a woman from the American consulate had arrived to see him. He was told that he was to meet with the American consul and that he should not disclose to the consular officer that he had been mistreated during his detention lest he beaten still more severely.

55.    On July 28, 2011, plaintiff, accompanied by two guards, was taken to a meeting room where he met "Marwa," a consular employee of the State Department who, on information and belief, is of Egyptian extraction. The two guards positioned themselves close to plaintiff, one on each side. Marwa was dressed in Islamic attire (a "hijab," or covering of her hair). By that time plaintiff had lost approximately 30 pounds of body weight.

56.    The meeting with Marwa was short and superficial. Although by that time plaintiff had lost approximately 30 pounds, Marwa stated that plaintiff appeared to be in good shape. During the interview plaintiff attempted by facial contortions and winks to indicate that he was under duress, but Marwa either did not notice or disregarded these signals.

57.    Marwa questioned plaintiff regarding what offense he had been charged with, whereupon plaintiff asked the two guards what he had been charged with. The guards stated that plaintiff was being held without charge and that the authorities were merely conducting an investigation.

58.    Following the meeting with Marwa, plaintiff was returned to his cell and the interrogations and torture resumed. Marwa's visit was the only United States consular visit during plaintiff's 106 days of detention and torture; the consulate did not visit or

make any contact with plaintiff during his remaining 49 days of his confinement and torture, nor did it provide any assistance to plaintiff when he was deported from the UAE.

59.     Following the meeting with Marwa, plaintiff became despondent. Because the consul's office had sent a Muslim woman wearing a hijab to interact with the prison authorities and the two guards, plaintiff came to believe that, because of his black skin, the United States had "thrown [him] away." He consequently began to consider refusing food in an attempt at suicide, but was told that he would be force-fed if necessary.

60.     Toward the end of his interrogation plaintiff again inquired of his interrogator whether the FBI had requested that he be detained and interrogated. This time, instead of being beaten, the interrogator stated that indeed the FBI had made such a request and that the American and Emerati authorities work closely on a number of such matters.

61.     On September 14, 2011, plaintiff was told that he would be released that day but would have to leave the UAE and stay out for at least a year. His belongings were returned to him and money from his wallet was taken to buy him a plane ticket back to the United States while plaintiff remained in custody. Such a ticket was purchased from a travel agency; however, when the jailer took the ticket to the airport to obtain a boarding pass, the boarding pass was refused on the grounds that plaintiff was on the No-Fly List.

62.     Plaintiff's custodian was visibly upset because he could not board the flight out of the UAE, and asked plaintiff, "What kind of country would refuse a citizen's return to his own country?" or words to that effect. The custodian then reiterated that plaintiff

could not stay in the UAE, and therefore would have to go somewhere else, and asked where plaintiff wished to be sent. Because plaintiff had a relative in Sweden, plaintiff indicated that he should be sent there. Therefore, the custodian took more money from plaintiff's wallet and arranged the purchase of a ticket to Stockholm, Sweden. This time a boarding pass was issued for plaintiff.

63.    The United States consulate in the UAE knew or should have known that plaintiff would be deported upon his release from prison, but the consulate took no action to provide assistance to plaintiff upon his release.

64.    Plaintiff arrived in Sweden traumatized, with few financial and other resources, and clothing entirely inappropriate for the Scandinavian weather and climate.

65.    Shortly after arriving in Stockholm plaintiff contacted the airline that had refused to issue him a boarding pass in the UAE and discussed his situation with them. The representative he spoke with confirmed that he had been denied boarding on the flight from the UAE to the United States but stated that she could not provide any reasons for such refusal. Plaintiff then requested a refund of the ticket price, but the representative stated that because the ticket had been purchased through a travel agency in the UAE he would have to get the refund (if any) from that travel agency.

66.    To date plaintiff has been unable to obtain a refund for the unused ticket from the UAE to the United States.

67.    In addition to being stranded with few resources in a foreign country, being placed on the No-Fly List resulted in plaintiff's losing virtually all of his rights as a citizen of the United States - he could not return home to enjoy the rights, privileges and immunities of citizenship. Moreover, his experience with State Department officials in

Khartoum and Abu Dhabi demonstrated to him that the State Department would neither protect nor assist him while overseas; rather, it would actively work to his detriment.

68.    Nationals of one country are allowed to visit foreign countries for only limited periods of time before they have to leave the country they are visiting; in the case of Sweden and other Schengen Agreement countries the maximum stay is for 90 days for holders of United States passports unless special arrangements are made, such as requesting asylum.

69.    Upon arriving in Sweden and being unable to return home, plaintiff contacted a Swedish attorney, Advokat Hans Bredberg, who suggested that plaintiff seek protective asylum in that country. Believing that the United States, through the FBI, was responsible for his detention and torture in Abu Dhabi and that he may still be in danger of abuse in countries that condone torture (including the United States), plaintiff submitted an application for asylum to the authorities in Sweden.

70.    On April 18, 2012, a press conference was held in Advokat Bredberg's office in Stockholm during which plaintiff's ordeal was disclosed publicly. Less than two weeks later, on May 1, 2012, plaintiff and two other individuals were indicted in the United States District Court for the Southern District of California, Docket No. 3:12-cr-06189-JAH, for "conspiracy to structure" monetary transfers from his family to him in the UAE between April 14, 2010, and April 19, 2010, which funds plaintiff used to attempt to start his business. On information and belief, this indictment was in retaliation for plaintiff's publicizing of his ordeal through the April 18, 2012 press conference in Stockholm, and based at least in part upon information the United States obtained from the interview at the United States Embassy in Khartoum, from plaintiff's 106 days of

interrogation and torture in the UAE, and from the electronic surveillance of plaintiff.

71.    Sometime in the fall of 2013 counsel for defendants  contacted counsel for plaintiff and suggested that if plaintiff wished to return to the United States he should visit the United States embassy in Stockholm to make necessary arrangements. After conferring with plaintiff in Stockholm, plaintiff's representatives informed defendants' counsel that plaintiff was apprehensive about entering the embassy grounds and that plaintiff would, under the present circumstances, consider returning if the United States (1) guaranteed plaintiff's safety from extra-judicial actions, and (2) provided adequate assurances that plaintiff could leave the United States once he returned. Counsel for defendants indicated that the United States would not provide such guarantees and assurances.

72.    In early November 2013 plaintiff filed with the Department of Homeland Security ("DHS") a Traveler Redress Inquiry Program ("TRIP") request and was assigned a redress number. By letter dated January 23, 2014, DHS informed plaintiff that "It has been determined that no changes or corrections are warranted at this time" and suggesting that plaintiff might wish to take an administrative appeal from this decision. Because it was unclear from the DHS letter whether plaintiff was then on the No-Fly List, and thus it was unclear whether plaintiff was aggrieved by this decision, by letter dated February 24, 2014, plaintiff requested clarification and a stay pending resolution of this issue and the resolution of the current litigation. By letter dated March 11, 2014, DHS replied that an extension to take an appeal would be granted to April 22, 2014. Plaintiff then abandoned his efforts with DHS.

73.    Because of the separation occasioned by plaintiff's inability to return to the

United States and because of the stigma attaching to plaintiff occasioned by the United States' putting him on the No-Fly List, plaintiff's wife sought and received a divorce from plaintiff.

74.    Early in 2015 plaintiff's application for asylum in Sweden was denied.

75.    On February 12, 2015, the DHS by letter informed plaintiff that DHS had on its own motion "reevaluated" plaintiff's prior TRIP inquiry and informed plaintiff that he was on the No-Fly List because he had been "identified as an individual who 'may be a threat to civil aviation or national security.'" The DHS provided no factual bases to support this conclusion, and requested plaintiff's response. By a letter dated February 19, 2015, plaintiff categorically denied that he was or is a threat and stated that the bare conclusion contained in the DHS latter of February 12, 2015, prevented plaintiff from providing a meaningful response; consequently, plaintiff asserted that the February 12, 2015, letter violated plaintiff's due process rights. By a "Decision and Order" dated March 9, 2015, the DHS indicated that plaintiff's name would remain on the No-Fly List.

76.    On February 14, 2015, the Swedish government transported plaintiff to Portland, Oregon, by private jet.

*Plaintiff's Surveillance, Indictment, and Dismissal*

77.    In 2010, while he was inside the United States, plaintiff and his brother Dawit Woldehawariat - both US citizens - worked together to set up a lawful business venture abroad. In furtherance of this objective, plaintiff and his brother discussed the parameters of the business venture they envisioned and the financial resources necessary to execute their plan.  These discussions occurred by telephone, email, and text message.

78.    Unbeknownst at the time to either plaintiff or his brother, defendants were intercepting and/or acquiring the content of plaintiff's telephone calls, his text messages, and his emails. Plaintiff now knows this because the United States has confirmed, through Department of Justice filings submitted in a since-dismissed prosecution against plaintiff in the United States District Court for the Southern District of California, that it intercepted the contents of plaintiff's telephone calls, emails, and text messages. *See* U.S. District Court for the Southern District of California, Docket No. 3:12-cr-06189-JAH, Doc. # 10.

79.    These interceptions and/or acquisitions of plaintiff's telephone calls, emails, and text messages were not conducted pursuant to a warrant and were not supported by probable cause or reasonable suspicion.

80.    On information and belief, the information upon which defendants caused plaintiff to meet with defendant FBI agents Noordeloos and John Doe I (Jason Dundas) in Khartoum and upon which defendants caused the UAE to imprison and torture plaintiff was derived from illegal surveillance and searches.

81.    On information and belief, information derived from the electronic surveillance of plaintiff has been disseminated to several agencies and foreign governments including but not limited to the Central Intelligence Agency, the National Security Council, the Department of Defense, the Department of Homeland Security, the Department of Justice/Federal Bureau of Investigation, the US Attorney's Office for the District of Oregon, the Department of the Treasury and the National Security Agency, and the United Arab Emirates.

82.    More than six months before the filing of the additional claims set forth in

this Third Amended Complaint, plaintiff filed a federal tort claim notice with the Department of Justice, NSA, FBI, and other agencies for violating the Foreign Intelligence Surveillance Act, the Wiretap Act, and the Stored Communications Act, and related claims. The named agencies have failed to make a final disposition of the claims at this time, and therefore plaintiff deems such failure to be a denial thereof.

83.     Plaintiff has suffered mistreatment at the hands of defendants including, but not limited to, being placed on the No-Fly List without notice of the factual bases therefor or the opportunity to be heard, denial of legal counsel, false arrest and false imprisonment, assault and battery, torture, violation of his right to freedom of association, illegal surveillance, violation of his right to privacy, and violation of his substantive and procedural due process rights. Plaintiff intends to continue to attempt to exercise his rights, including the right to legal counsel, to travel by air, to be free from false arrest and false imprisonment, assault and battery, and torture, to freedom of association, and his substantive and procedural due process rights, but based upon defendants' past misconduct plaintiff has a reasonable fear of further future mistreatment by defendants and other agents of the United States.

**Claim One**
**Fifth Amendment Substantive Due Process - Fundamental Right to Return to United States**
**Declaratory, Injunctive, and Other Equitable Relief**
**(Against All Defendants)**

84.     Plaintiff, once outside of the United States, has a fundamental liberty right under the Fifth Amendment to return by air to, and to re-enter, the United States. Defendants have violated and are continuing to violate this right by placing plaintiff without cause on the No-Fly List after he had departed the United States and then maintaining his name on that List after he had been arrested and incarcerated in the

UAE, knowing at that time that the UAE would deport him from the UAE upon his release from prison without charge, which caused plaintiff to be deported to Sweden instead of being allowed to return home, all in violation of plaintiff's Fifth Amendment substantive due process right to return to his homeland.

85.    Defendants are continuing to violate this right by continuing to maintain plaintiff on the No-Fly List, preventing him from returning by air to the United States should he again leave the United States.  But for his placement on the No-Fly List, plaintiff would continue to travel overseas and return to the United States by air.

86.    By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

## Claim Two
### Fifth Amendment Substantive Due Process - Right to International Travel
### Declaratory, Injunctive, and Other Equitable Relief
### (Against All Defendants)

87.    Plaintiff realleges paragraphs 1 through 83.

88.    Plaintiff has a liberty right to international travel under the Fifth Amendment. By placing plaintiff's name on the No-Fly List, defendants have violated and are continuing to violate this right, preventing plaintiff from departing, flying over, or returning to the United States, all in violation of plaintiff's Fifth Amendment substantive due process right to travel internationally.

89.    By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

**Claim Three**
**Fifth Amendment Due Process - Vagueness**
**Declaratory, Injunctive, and Other Equitable Relief**
**(Against All Defendants)**

90.     Plaintiff realleges paragraphs 1 through 83.

91.     Plaintiff has a due process right not to be sanctioned based upon vague, overbroad, or unknowable standards of conduct. The No-Fly List is an administrative sanction created by defendant Terrorism Screening Center, and according to defendants' joint stipulation in the *Latif* case, the standard for placing individuals on the No-Fly List is the "existence of a reasonable *suspicion* to believe that a person is a known or *suspected* terrorist."  Emphasis added.

92.     The "existence of a reasonable suspicion to believe that a person is a known or suspected terrorist" is vague, and because of such vagueness has led to discriminatory application of the criterion and its use to unconstitutionally coerce persons placed on the No-Fly List, specifically by coercing plaintiff and others placed on the List to become agents, *agents provocateur*, or informants for the FBI in return for having their names removed from the List.

93.     By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

**Claim Four**
**Fifth Amendment - Violation of Right to Counsel**
**Declaratory, Injunctive, and Other Equitable Relief**
**(Against All Defendants)**

94.     Plaintiff realleges paragraphs 1 through 83.

95.     It is a policy, custom, and practice of defendants to place individuals on

the No-Fly List once they have departed the United States in order to arrange for interrogation of such individuals at American embassies abroad without the assistance of legal counsel. In plaintiff's case, upon being informed by defendant Noordeloos that Noordeloos was an FBI agent and wished to question plaintiff, plaintiff requested to be represented by counsel during such interrogation. In response, defendant Noordeloos in violation of plaintiff's Fifth Amendment right to counsel told plaintiff he could not have legal counsel because plaintiff was on the No-Fly List, whereupon the interrogation continued for several hours.

96.    Defendants used the information gathered from plaintiff during such interrogation to, among other things, obtain an indictment against plaintiff in the Southern District of California, and an arrest warrant was issued calling for plaintiff's arrest, all in further violation of plaintiff's Fifth Amendment right to counsel.

97.    By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

**Claim Five**
**Fifth Amendment – Violation of Right to Counsel and Right Against Self-Incrimination**
**Damages**
**(Against Defendants Noordeloos and John Doe I (Jason Dundas))**

98.    Plaintiff realleges paragraphs 1 through 83.

99.    Defendants Noordeloos and John Doe I (Jason Dundas) refused plaintiff's demand to be represented by counsel in Khartoum, Sudan, on April 22, 2010. Instead, those defendants continued to interrogate plaintiff notwithstanding such demand and then turned over such information to United States law enforcement defendants, which

used information gleaned from plaintiff in securing his indictment in the District Court for the Southern District of California.

100.    The actions, orders, authorizations, and other conduct of individual defendants Noordeloos and John Doe I (Jason Dundas) which deprived plaintiff of his right to counsel give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

**Claim Six**
**Fifth Amendment Procedural Due Process -**
**Placement and Retention on the No-Fly List**
**Declaratory, Injunctive, and Other Equitable Relief**
**(Against All Defendants)**

101.    Plaintiff realleges paragraphs 1 through 83.

102.    Plaintiff has a protected liberty interest in international travel.  Plaintiff also has a protected liberty interest in his reputation and in freedom from government-assigned stigmas that restrict or prevent him from engaging in activities in which he could otherwise engage and in which others not stigmatized are free to engage.

103.    Defendants' actions in placing and keeping plaintiff on the FBI-maintained, secret No-Fly List substantially interferes with and deprives plaintiff of his liberty interest in international travel.  Defendants' actions in placing and keeping plaintiff on the FBI-maintained, secret No-Fly List also injures plaintiff's liberty interest in his reputation by, first, stigmatizing him as a known or suspected terrorist and as an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so and, second, on the basis of that stigma, depriving him of the ability to travel by air domestically and internationally as others are permitted to do and as plaintiff would be permitted to do absent the stigma.

104.    Defendants' actions in placing and keeping plaintiff on the FBI-maintained, secret No-Fly List without informing him of such placement, of the basis for his inclusion on the No-Fly List, of the means of removing his name from the No-Fly List, and without providing an independent forum in which plaintiff might secure the removal of his name from the No-Fly List, all violated and are continuing to violate plaintiff's right to procedural due process under the Fifth Amendment.  Such procedures as do exist for challenging inclusion on the No-Fly List are inadequate to satisfy the notice and hearing requirements of procedural due process.

105.    By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

### Claim Seven
### First Amendment - Violation of Right to Freedom of Association
### Declaratory, Injunctive, and Other Equitable Relief
### (Against All Defendants)

106.    Plaintiff realleges paragraphs 1 through 83.

107.    It is a policy, custom, and practice of defendants to place individuals on the No-Fly List in order to coerce them into becoming informants/*agents provocateur* for the FBI. Plaintiff has a right under the First Amendment to associate, and not to associate, with whom he pleases. Defendants placed plaintiff on the No-Fly List in order both to coerce plaintiff into associating with the FBI, and to coerce plaintiff into harming his associations with others with whom he associates, by becoming an informant/*agent provocateur* in a case then under investigation in Portland. Moreover, when plaintiff declined to become an informant and agent provocateur, defendants maintained plaintiff's name on the No-Fly List in retaliation, which ultimately led to plaintiff's being

forced to seek protection and asylum in Sweden, all in violation of plaintiff's First Amendment right of freedom of association.

108.    By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.

**Claim Eight**
**Fifth Amendment - False Arrest and Imprisonment**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X)**

109.    Plaintiff realleges paragraphs 1 through 83.

110.    Plaintiff has a Fifth Amendment right to be free from false arrest and imprisonment.  On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X enlisted foreign intermediaries to cause the arrest of plaintiff by UAE secret police without probable cause that he had committed a crime. The foreign intermediaries did so arrest plaintiff and imprisoned him without charge for 106 days, from June 1, 2011, through September 15, 2011.

111.    On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of false arrest and imprisonment.

112.    On information and belief, at all relevant times, some or all of individual

defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights. By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

113.   On information and belief, the actions, orders, authorizations, and other conduct of some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X deprived plaintiff of his right to be free from unlawful arrest and imprisonment without probable cause and give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

**Claim Nine**
**Common Law - False Arrest and Imprisonment**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X)**

114.   Plaintiff realleges paragraphs 1 through 83.

115.   Plaintiff has a common law right to be free from false arrest and imprisonment. On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X enlisted foreign intermediaries to cause the arrest of plaintiff by UAE secret police without probable cause that he had committed a crime. The foreign intermediaries did so arrest plaintiff and imprisoned him without charge for 106 days, from June 1, 2011, through September 15, 2011.

116.   On information and belief, some or all of individual defendants

Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of false arrest and imprisonment.

117.    On information and belief, at all relevant times, some or all some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

118.    On information and belief, the actions, orders, authorizations, and other conduct of some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X deprived plaintiff of his right to be free from unlawful arrest and imprisonment without probable cause and give rise to a cause of action for damages directly under the common law. Plaintiff has been damaged in the amount of $10 million.

**Claim Ten**
**Fifth Amendment - Assault and Battery**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X)**

119.    Plaintiff realleges paragraphs 1 through 83.

120.    Plaintiff has a Fifth Amendment right to be free from assault and battery by agents working on behalf of the United States. On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane

Does II-X enlisted foreign intermediaries to assault plaintiff in the UAE secret police prison in Abu Dhabi, UAE, and the UAE secret police did so assault and batter plaintiff for 106 days, from June 1, 2011, through September 15, 2011.

121.    On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X, present during some of the acts complained of herein, said presence having been authorized by UAE officials, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of assault and battery.

122.    On information and belief, at all relevant times, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

123.    On information and belief, the actions, orders, authorizations, and other conduct of some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X deprived plaintiff of his right to be free from assault and battery and give rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

**Claim Eleven**
**Common Law - Assault and Battery**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane**
**Does II-X)**

124.    Plaintiff realleges paragraphs 1 through 83.

125.    Plaintiff has a common law right to be free from assault and battery by agents working on behalf of the United States. On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X enlisted foreign intermediaries to assault and batter plaintiff in the UAE secret police prison in Abu Dhabi, UAE, and the UAE secret police did so assault and batter plaintiff for 106 days, from June 1, 2011, through September 15, 2011.

126.    On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X, present during some of the acts complained of herein, said presence having been authorized by UAE officials, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of assault and battery.

127.    On information and belief, at all relevant times, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

128.    The actions, orders, authorizations, and other conduct of some or all of

individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X deprived plaintiff of his right to be free from assault and battery and give rise to a cause of action for damages directly under the common law. Plaintiff has been damaged in the amount of $10 million.

**Claim Twelve**
**Torture - Torture Victim Protection Act**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X)**

129.    Plaintiff realleges paragraphs 1 through 83.

130.    Plaintiff was tortured within the meaning of the Torture Victim Protection Act, Pub.L. 102–256 (1992) ("TVPA"), which in section 3 defines "torture" as –

(1) . . . any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from--

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

131.    Section 2(a) of the TVPA creates a cause of action for damages against "any individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture."

132.    It is a policy, custom, and practice for defendants, at least after September 11, 2001, to engage in torture by proxy. See, e.g., 24 August 2009 and 13 December 2012 NY Times; see also www.huffingtonpost.com/2009/08/28/new-cia-docs-detail-bruta_n_271299.html. On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X, in cooperation with plaintiff's UAE captors, and physically present and acting under the apparent or actual authority of the UAE, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of torture.

133.    On information and belief, at all relevant times, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

134.    As a proximate cause of defendants' unlawful conduct, plaintiff has suffered severe physical harm, emotional distress, and economic loss, and is entitled to relief under the Constitution and the TVPA.

**Claim Thirteen**
**Fifth Amendment Due Process – Torture**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane**
**Does II-X)**

135.    Plaintiff realleges paragraphs 1 through 83.

136.    It is a policy, custom, and practice for defendants, at least after September 11, 2011, to engage in torture by proxy. On information and belief, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X, in cooperation with plaintiff's UAE captors, and physically present and acting under the apparent or actual authority of the UAE, have directly performed or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, acted in concert with, or conspired in the commission of the above-described acts of torture.

137.    On information and belief, at all relevant times, some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X committed, knew of and/or acquiesced in all of the above-described acts. Defendants' conduct was done intentionally, with deliberate indifference, and/or with reckless disregard, of plaintiff's rights.  By the acts alleged herein, defendants' conduct has proximately caused harm to plaintiff.

138.    The unlawful conduct of some or all of individual defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does II-X has caused plaintiff severe physical harm, emotional distress, and economic loss, and gives rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

**Claim Fourteen**
**Fourth Amendment Violation**
**Damages**
**(Against Defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane**
**Does XI-XX)**

139.    Plaintiff realleges paragraphs 1 through 83.

140.    The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

141.    Plaintiff's telephone communications, emails, text messages, and other communications are protected from interception, search, and seizure by the Fourth Amendment. Plaintiff has a reasonable expectation of privacy in his telephone communications, emails, text messages, and other communications.

142.    Plaintiff's Fourth Amendment rights were violated by defendants' interception, search, and seizure of plaintiff's telephone calls, emails, and text messages.  Defendants' actions were not authorized by a warrant satisfying the Fourth Amendment, were not supported by probable cause or reasonable suspicion, and were unreasonable.

143.    Provisions of the Patriot Act and FISA authorize defendants to acquire the constitutionally protected communications of U.S. citizens and residents (i) without identifying the people to be surveilled, (ii) without specifying the facilities, places, premises, or property to be monitored, (iii) without observing meaningful limitations on the retention, analysis, and dissemination of acquired information, (iv) without obtaining individualized warrants based on criminal or foreign intelligence probable cause, and (v) without making prior administrative determinations that the targets of surveillance are

foreign agents or connected in any way, however tenuously, to terrorism.

144.    On information and belief, the actions, orders, authorizations, and other conduct of defendants Noordeloos, John Doe I (Jason Dundas), and John/Jane Does XI-XX deprived plaintiff of his Fourth Amendment right to be free from unconstitutional searches and seizures and give rise to a cause of action for damages directly under the Fourth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff has been damaged in the amount of $10 million.

**Claim Fifteen**
**Fourth Amendment Violation**
**Declaratory, Injunctive, and Other Equitable Relief**
**(Against All Defendants)**

145.    Plaintiff realleges paragraphs 1 through 83.

146.    The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

147.    Plaintiff's telephone communications, emails, text messages, and other communications are protected from interception, search, and seizure by the Fourth Amendment. Plaintiff has a reasonable expectation of privacy in his telephone communications, emails, text messages, and other communications.

148.    Plaintiff's Fourth Amendment rights were violated by defendants' interception, search, and seizure of plaintiff's telephone calls, emails, and text messages.  Defendants' actions were not authorized by a warrant satisfying the Fourth Amendment, were not supported by probable cause or reasonable suspicion, and were

unreasonable.

149.    Provisions of the Patriot Act and FISA authorize defendants to acquire the constitutionally protected communications of U.S. citizens and residents (i) without identifying the people to be surveilled, (ii) without specifying the facilities, places, premises, or property to be monitored, (iii) without observing meaningful limitations on the retention, analysis, and dissemination of acquired information, (iv) without obtaining individualized warrants based on criminal or foreign intelligence probable cause, and (v) without making prior administrative determinations that the targets of surveillance are foreign agents or connected in any way, however tenuously, to terrorism.

150.    On information and belief, defendants continue to retain, use, and disclose plaintiff's telephone calls, emails, and text messages, and information derived therefrom, that defendants unconstitutionally seized.  By these actions, defendants are irreparably harming plaintiff.  Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and defendants will continue to violate plaintiff's legal rights unless enjoined and restrained by this Court.  Plaintiff seeks an injunction requiring defendants to return or destroy any of plaintiff's unconstitutionally seized telephone calls, emails, or text messages, or information derived therefrom, that defendants continue to retain, and prohibiting any use or disclosure of those communications and information.

151.    Plaintiff seeks a declaration that the provisions of the Patriot Act and FISA which permit the federal government to secretly collect, disseminate, and retain information from a person and which allow one to perform electronic surveillance and wiretaps of a person without first demonstrating to a court the existence of probable cause that the person has committed a crime are unconstitutional.

## Claim Sixteen
## Violation of the Foreign Intelligence Surveillance Act
## Damages
## (Against Defendants United States of America, Defendant Noordeloos, John Doe I, and John/Jane Does XI-XX)

152.    Plaintiff realleges paragraphs 1 through 83.

153.    On information and belief, defendants unlawfully engaged in electronic surveillance of plaintiff and unlawfully used and/or disclosed information obtained by electronic surveillance of plaintiff, in violation of 50 U.S.C. §§ 1801(a),(b),(h),(i), 1804(a), 1806(a), 1809(a)(1), and 1809(a)(2).

154.    Plaintiff and his brother are not foreign powers or agents of foreign powers, and there has never been any probable cause to believe so.  The information obtained from defendants' electronic surveillance of their communications is not foreign intelligence information.  Obtaining foreign intelligence was not the primary purpose and was not a significant purpose of defendants' electronic surveillance of plaintiff's communications.  The information defendants obtained from their electronic surveillance of plaintiff's communications could have been obtained by normal investigative techniques, *e.g.*, normal criminal wiretap warrants conforming to the Fourth Amendment's warrant requirement.

155.    Defendant United States is liable in damages to plaintiff pursuant to 18 U.S.C. § 2712 for the unlawful use and disclosure of information.  Defendants Noordeloos, John Doe I, and John/Jane Does XI-XX are liable in damages pursuant to 50 U.S.C. § 1810.

## Claim Seventeen
## Violation of the Stored Communications Act
## Damages
## (Against Defendants United States of America and John/Jane Does XI-XX)

156.    Plaintiff realleges paragraphs 1 through 83.

157.   On information and belief, defendants United States, FBI, NSA, and John Does XI-XX intercepted and/or acquired, disseminated, and otherwise utilized plaintiff's stored communications, including but not limited to emails and text messages, in violation of 18 U.S.C. § 2703.

158.   Defendant United States is liable in damages to plaintiff pursuant to 18 U.S.C. § 2712.  Defendants John/Jane Does XI-XX are liable in damages pursuant to 18 U.S.C. § 2707(a).

### Claim Eighteen
### Violation of the Wiretap Act
### Damages
### (Against Defendants United States of America and John/Jane Does XI-XX)

159.   Plaintiff re-alleges paragraphs 1 through 83.

160.   On information and belief, Defendants United States, FBI, NSA, and John Does XI-XX intercepted and/or acquired, disseminated, and otherwise utilized plaintiff's electronic communications, including but not limited to phone conversations with his brother, in violation of 18 U.S.C. § 2511.

161.   Defendant United States is liable in damages to plaintiff pursuant to 18 U.S.C. § 2712.  Defendants John/Jane Does XI-XX are liable in damages pursuant to 18 U.S.C. § 2520(a).

### Claim Nineteen
### Motion For Return Of Unlawfully Searched And Seized Property Pursuant To
### Federal Rule of Criminal Procedure 41(g)
### (Against All Defendants)

162.   Plaintiff re-alleges paragraphs 1 through 83.

163.   This Court has civil equitable jurisdiction under Federal Rule of Criminal Procedure 41(g) to order the return of illegally searched and seized property.  *U.S. v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (en banc).

164.   Defendants have unlawfully searched, seized, used, and disclosed plaintiff's telephone calls, emails, and text messages, and information derived therefrom. Plaintiff is aggrieved by defendants' unlawful search, seizure, use, and disclosure of these communications and information.

165.   Plaintiff seeks an order directing the return or destruction of plaintiff's unconstitutionally seized telephone calls, emails, or text messages, or information derived therefrom, in the possession, custody, or control of defendants, their agents, successors, and assigns, and all those in active concert and participation with them.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the following relief:

1.   <u>Declaratory Judgment.</u>  A declaratory judgment that –

a.   the provisions of the Patriot Act and FISA and the FISA Amendment Act of 2008 which permit the federal government to perform electronic surveillance and wiretaps of a person without first requiring the government to demonstrate to a court the existence of probable cause that the person has committed a crime, or alternatively that the primary purpose is to gather foreign intelligence are unconstitutional;

b.   The interception and/or acquisition, retention and dissemination of plaintiff's voice and other electronic communications was illegal and in violation of the Fourth Amendment, FISA, the Stored Communications Act, and the Wiretap Act;

c.      Official Capacity defendants violated plaintiff's due process right as a citizen under the Fifth Amendment to the United States Constitution to return to the United States when plaintiff was expelled from the United Arab Emirates;

d.      Official Capacity defendants violated plaintiff's due process rights as a citizen under the Fifth Amendment to the United States Constitution by denying plaintiff the right to travel to, from, and over the United States;

e.      Official Capacity defendants violated plaintiff's due process rights as a citizen of the United States by promulgating a vague standard for including plaintiff's name on the No-Fly List and by providing no realistic means to challenge said inclusion;

f.      Official Capacity defendants violated plaintiff's right to legal counsel under the Fifth Amendment to the United States Constitution by denying plaintiff's request to consult with an attorney prior to plaintiff's being interrogated by defendants Noordeloos and John Doe I (Jason Dundas) at the United States Embassy in Khartoum, Sudan, in April 2010, and then using the information gleaned from such interrogation to indict plaintiff in the Federal District Court for the Southern District of California in May 2012;

g.      Official Capacity defendants violated plaintiff's right to freedom of association under the First Amendment to the United States Constitution by requiring him to associate with the FBI as an informant and/or *agent provocateur* in order to have his name removed from the No-Fly List;

h.      Official Capacity defendants violated plaintiff's right to procedural due process under the Fifth Amendment to the United States Constitution by

placing and retaining his name of the No-Fly List without notice or meaningful opportunity to contest such placement;

i.      Some or all Individual defendants violated plaintiff's substantive due process rights under the Fifth Amendment to the United States Constitution to be free from arbitrary arrest, false imprisonment, assault, battery, and torture;

j.      Some or all Individual defendants violated plaintiff's rights under the Torture Victim Protection Act;

k.      Individual defendants Noordeloos and John Doe I (Jason Dundas) violated plaintiff's right to legal counsel under the Fifth Amendment to the United States Constitution by denying plaintiff's request to consult with an attorney prior to plaintiff's being interrogated by defendants Noordeloos and John Doe I (Jason Dundas) at the United States Embassy in Khartoum, Sudan, in April 2010, which information was then was used by Official Capacity defendants to indict plaintiff in the Federal District Court for the Southern District of California in May 2012.

2.      Injunction. An injunction requiring that --

a.      Official Capacity defendants, except to the extent required by exercise of standard security precautions at airports, not prevent plaintiff from returning to, flying over, or departing from the United States;

b.      Official Capacity defendants, except to the extent required by exercise of standard security precautions at airports, not prevent plaintiff from traveling internationally by air;

c.      Official Capacity defendants not interrogate plaintiff once plaintiff requests to be assisted by legal counsel;

d.      Official Capacity defendants not deny plaintiff the opportunity to consult with legal counsel prior to and during any interrogation of plaintiff;

e.      Official Capacity defendants not use in a criminal proceeding any information gathered from plaintiff during an interrogation of plaintiff at which interrogation plaintiff was not represented by legal counsel after so requesting the assistance of legal counsel;

f.      Official Capacity defendants not condition the removal of plaintiff's name from the No-Fly List upon plaintiff's agreeing to become an informant or *agent provocateur* on behalf of Official Capacity defendants;

g.      Official Capacity defendants not deny plaintiff written notice whenever his named is added to the No-Fly List;

h.      Official Capacity defendants not deny plaintiff written notice whenever his name is removed from the No-Fly List;

i.      Official Capacity defendants not deny plaintiff with the specific reasons why his name was added to the No-Fly List;

j.      Official Capacity defendants to not agree to, arrange, or condone plaintiff's arrest by any foreign power when there is not probable cause to indicate that plaintiff has committed a crime within the jurisdiction of the foreign power;

k.      Official Capacity defendants to not agree to, arrange, or condone plaintiff's imprisonment by any foreign power when there is not probable cause to indicate that plaintiff has committed a crime within the jurisdiction of the foreign power;

l.    Official Capacity defendants to not agree to, arrange, or condone assaults on plaintiff by agents of a foreign power;

m.    Official Capacity defendants to not agree to, arrange, or condone battery upon plaintiff by agents of a foreign power;

n.    Official Capacity defendants to not agree to, arrange, or condone torture of plaintiff by agents of a foreign power.

o.    Official Capacity defendants and the DOJ, the FBI, the NSA, the State Department, and the United States (including all of entities and instrumentalities such as the CIA, Department of Homeland Security, the Department of Defense, the US Attorney's Offices), to retrieve, purge and destroy all illegally intercepted and/or acquired, voice and electronic communications and related data and information arising from such interceptions and/or acquisitions and to seek the return and destruction from any other agencies or government and to refrain from distributing to any requesting party such communications and information relating to plaintiff and to retrieve and destroy all illegally collected, disseminated and retained information and communications collected pursuant to FISA authorized searches and surveillance relating to plaintiff from government agencies and computer databases.

3.    <u>Damages.</u>    Enter judgment against each Individual defendant sued in his individual capacity in an amount to be determined at trial but not less than ten million dollars ($10,000,000), plus punitive damages in an amount to be determined at trial, for the violation of plaintiff's clearly established constitutional rights, statutory rights, and

common law rights as alleged herein.  Enter judgment against the United States for damages according to proof pursuant to 18 U.S.C. § 2712.  Further, it is requested that plaintiff be awarded reasonable attorneys' fees pursuant to 28 U.S.C. § 2412(d), 18 U.S.C 2707(b), 18 U.S.C. § 2712, 50 U.S.C. § 1810, and costs, and expenses of all litigation.

    4.    <u>Other Relief.</u> Such other relief as the Court may deem just and proper.

DATED this  1st day of April, 2015.


          s/    Thomas H. Nelson, OSB 78315
               Brandon Mayfield, OSB 000824
               Gadeir Abbas, *pro hac vice*
               William J. Burgess, *pro hac vice*

               Attorneys for Plaintiff