IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

YONAS FIKRE,                                    3:13-cv-00899-BR

               Plaintiff,                     OPINION AND ORDER

v.

FEDERAL BUREAU OF INVESTIGATION;
LORETTA E. LYNCH, in her official
capacity as Attorney General of
the United States; DEPARTMENT OF
STATE; JOHN KERRY, in his official
capacity as Secretary of State;
UNITED STATES OF AMERICA; JAMES B.
COMEY, in his official capacity
as Director of the Federal Bureau
of Investigation; CHRISTOPHER M.
PIEHOTA, in his official capacity
as Director of the FBI Terrorist
Screening Center; JAMES CLAPPER,
in his official capacity as
Director of National Intelligence;
MICHAEL S. ROGERS, in his official
capacity as Director of the National
Security Agency; NATIONAL SECURITY
AGENCY; DAVID NOORDELOOS, an
employee of the Federal Bureau of
Investigation, in his official and
individual capacity; JOHN DOE I,
also known as JASON DUNDAS, an
employee of the Federal Bureau of
Investigation, in his official and
individual capacities; and JOHN/JANE
DOES II-XX, agents of the United
States,

               Defendants.

**GADEIR I. ABBAS**
**WILLIAM J. BURGESS**
Council on American-Islamic Relations
453 New Jersey Avenue, S.E.
Washington, D.C. 2003
(720) 251-0425

**BRANDON B. MAYFIELD**
3950 S.W. 185th Avenue
Beaverton, Oregon 97007
(503) 941-5101

**THOMAS H. NELSON**
P.O. Box 1211
Welches, Oregon 97067-1211
(503) 622-3262

Attorneys for Plaintiff

**LORETTA E. LYNCH**
United States Attorney General
**BRIGHAM J. BOWEN**
**SAMUEL M. SINGER**
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-6289

Attorneys for Defendants Federal Bureau of
Investigation, Loretta E. Lynch, Department of
State, John Kerry, James B. Comey, Christopher M.
Piehota, Michael S. Rogers, National Security
Agency, United States of America, and James
Clapper

**BROWN, Judge.**

This matter comes before the Court on the Motion (#90) to

Dismiss Plaintiff's Fifth Amended Complaint filed by Defendants

Federal Bureau of Investigation (FBI), Loretta E. Lynch,

Department of State, John Kerry, James B. Comey, Christopher M.

2 - OPINION AND ORDER

Piehota, Michael S. Rogers, National Security Agency (NSA), United States of America, and James Clapper (collectively referred to as Official Capacity Defendants) and Official Capacity Defendants' Unopposed Motion (#91) Motion for Partial Stay of Due Process Claims.

For the reasons that follow, the Court **GRANTS** Official Capacity Defendants' Motion (#90) to Dismiss and **DISMISSES with prejudice** Plaintiff's Fifth Amended Complaint as to Plaintiff's claims against Official Capacity Defendants.  The Court also **DENIES as moot** Official Capacity Defendants' Unopposed Motion (#91) to Stay Plaintiff's Due Process Claims.


## **PROCEDURAL BACKGROUND**

Plaintiff filed his Fifth Amended Complaint (#87) (FAC) on November 29, 2015.

On January 21, 2016, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) Official Capacity Defendants moved to dismiss the claims that Plaintiff Yonas Fikre brings against them in his FAC as described below and also moved in the

alternative to stay Plaintiff's due-process claims.[1]

On February 11, 2016, Plaintiff filed a Response (#95) in Opposition to Official Capacity Defendants' Motion to Dismiss. On March 3, 2016, Official Capacity Defendants filed a Reply (#96) in Support of Motion to Dismiss.

On May 9, 2016, Official Capacity Defendants filed a Notice (#98) Regarding Plaintiff's Status in which they represented "Plaintiff has been removed from the No Fly List."  That same day by Order (#99) the Court directed the parties[2] to confer and to file no later than May 16, 2016, a single, joint status report in which the parties set out their positions regarding the effect of Plaintiff's removal from the No-Fly List on Official Capacity Defendants' pending Motion (#90) to Dismiss Plaintiff's Fifth Amended Complaint and Official Capacity Defendants' Unopposed Motion (#91) to Stay Due Process Claims and, in particular, to specify the portions of the pending Motions that are rendered moot and the portions that are unaffected by the Notice.

---

[1] David Noordeloos and the John and Jane Doe Defendants, who Plaintiff sued in their individual capacities (collectively Individual Capacity Defendants), have not yet been served and, therefore, are not currently parties to this litigation.  Thus, Claims Two, Five, Six, Seven, Eight, Nine, Ten, and Eleven, are not at issue in this Motion because those claims relate exclusively to Individual Capacity Defendants.

[2] For purposes of this Motion only, the Court's references to the "parties" include only Plaintiff and Official Capacity Defendants.

In a Joint Status Report (#100) filed May 16, 2016, the parties agreed Claims One and Three should be dismissed to the extent that those claims seek injunctive relief related to the removal of Plaintiff's name from the No-Fly List.  Plaintiff, however, contends he remains entitled to other injunctive and declaratory relief on Claims One and Three.

On May 20, 2016, the Court issued Order (#101) in which it concluded oral argument was unnecessary to resolve the pending Motions.  In light of the intervening developments since the filing of Defendants' Motions, however, the Court directed the parties to file a stipulation confirming their agreement as to the extent to which Defendants' Notice (#98) moots or otherwise resolves any of Plaintiff's pending claims.  In addition, the Court provided the parties an opportunity to file simultaneous, supplemental memoranda regarding the effect that Plaintiff's removal from the No-Fly List has on Official Capacity Defendants' Motions and to provide any additional argument.  The parties filed their respective supplemental memoranda (#103, #104) on June 23, 2016, and the Court took this matter under advisement without argument on that date.

**BACKGROUND**

For purposes of these Motions, the Court deems as true the following background facts from Plaintiff's FAC, Official Capacity Defendants' Notice (#98) Regarding Plaintiff's Status, and the parties' Joint Status Report (#100):

**I.    The No-Fly List**

The FBI is responsible for development and maintenance of the No-Fly List, which identifies individuals who are "prohibited from flying into, out of, or over the United States" or into, out of, or over Canadian airspace by commercial airlines.

**II.    Interrogation of Plaintiff and Placement on the No-Fly List**

Plaintiff is a 33-year-old naturalized American citizen of Eritrean descent who was a resident of Portland, Oregon, beginning in 2006.  In late 2009 Plaintiff decided to use his experience working for a cellular telephone company in the United States to pursue the business of distributing and selling consumer electronic products in East Africa, and, accordingly, Plaintiff traveled to Sudan where some of his extended family lives.  In Sudan Plaintiff informed the United States Embassy in Khartoum of his presence in the country and his intention to pursue business opportunities there.  Based on encouragement from Embassy personnel, Plaintiff began the process of obtaining a Sudanese business license.

On April 21, 2010, Plaintiff received a telephone call from the Embassy requesting Plaintiff to contact Defendant Noordeloos. When Plaintiff returned the call, Noordeloos represented himself as an Embassy official working for the State Department. Noordeloos invited Plaintiff to a luncheon at the Embassy the following day to discuss safety during a period of political turmoil in Sudan.

The next morning Plaintiff arrived at the Embassy and was met by Noordeloos and Defendant John Doe I, who introduced himself as Jason Dundas.  Noordeloos and Dundas escorted Plaintiff to a small meeting room, shut the door, positioned themselves between Plaintiff and the door, and informed Plaintiff that they worked for the FBI Field Office in Portland, Oregon.

When he was told Noordeloos and Dundas were FBI agents from Portland, Plaintiff requested to be represented by his legal counsel during any interrogation.  Noordeloos, however, informed Plaintiff that he could not return to the United States to confer with his Oregon-based legal counsel because Plaintiff had been placed on the No-Fly List.

The ensuing interrogation lasted several hours until the end of the business day.  Throughout the course of the interrogation Noordeloos and Dundas questioned Plaintiff about the As-Saber Mosque in Portland where Plaintiff had attended prayer services. In addition, Noordeloos and Dundas questioned Plaintiff about the

source of financial support for his business endeavors and told
him that sanctions made his business activities in Sudan illegal.
Finally, Noordeloos asked Plaintiff to be an informant for the
FBI in exchange for "substantial compensation" and removal from
the No-Fly List.  Plaintiff responded he did not wish to become
an informant.  At the end of the business day Noordeloos
suggested they resume the discussion the following day.
Plaintiff agreed.

    The following morning Plaintiff called Noordeloos on the
telephone and informed him that he did not wish to meet further
with Dundas and Noordeloos.  Noordeloos became agitated when
Plaintiff again stated he did not want to be an informant.
Noordeloos concluded the conversation by telling Plaintiff:
"Whenever you want to go home you come to the embassy."  On
May 4, 2010, a little more than a week after their final
conversation, Noordeloos emailed Plaintiff as follows:

>           Yonas,
>
>           Thanks for meeting with us last week in Sudan.  While
>           we hope to get your side of issues we keep hearing
>           about, the choice is yours to make.  The time to help
>           yourself is now.
>
>           Be safe in Sudan,
>           Dave Noordeloos

FAC ¶ 38.  Plaintiff remained in Khartoum for approximately two
months during which time he noticed he was being followed by
persons he assumed to be associated with the Sudanese secret

8 - OPINION AND ORDER

police.  He learned from acquaintances that similar individuals
had been inquiring about him and his activities.  Plaintiff left
Sudan on approximately June 15, 2010.

On approximately September 15, 2010, Plaintiff traveled to
the United Arab Emirates (UAE) to pursue similar business
interests.  Plaintiff obtained a residency permit in the UAE in
order to conduct business, and he invested substantial financial
resources provided by his family for that purpose.

On the evening of June 1, 2011, Plaintiff was forcibly taken
from his home by persons who he later learned were Emirati secret
police.  The police seized some of Plaintiff's personal property,
blindfolded him, and placed him in a heavily air-conditioned car.
Plaintiff's captors drove him for approximately two hours to a
building where he was housed in a heavily air-conditioned,
windowless cell with only a bed.

The next morning Plaintiff was led to a room in which he
would undergo the first of repeated interrogations during 106
days of imprisonment.  During these interrogations Plaintiff was
blindfolded while he was questioned in English for extended
periods of time.  Periodically Plaintiff was able to peek beneath
his blindfold and to view the shoes and lower torsos of his
interrogators, some of whom wore Western clothes.

The substance of the interrogations focused on the
activities, fundraising, and leadership of the As-Saber Mosque.

In addition, the interrogators questioned Plaintiff about "circumstances and events that [P]laintiff had disclosed" to Noordeloos and Dundas in Khartoum, and the interrogators urged Plaintiff "numerous times" to cooperate with the FBI by becoming an informant.

Plaintiff was subjected to multiple threats and beatings throughout the course of his confinement.  In response to his resistance to answering questions, Plaintiff was struck on the head.  Plaintiff also was repeatedly beaten on his back, legs, and the soles of his feet with batons and plastic pipes.  When Plaintiff returned to his cell at the end of the first day of interrogation, his bed had been removed and he had to sleep on the floor of his cold cell.  When Plaintiff asked his interrogators on several occasions whether his confinement and interrogation were at the request of the FBI, the interrogators severely beat him.

On June 14, 2011, Plaintiff took a "lie-detector test" during which he was questioned about whether his "financial arrangements involved soliciting funds for al-Qaeda," but he was not asked about the as-Saber Mosque.  That evening the bed was returned to his cell.

On June 20, 2011, Plaintiff's family learned from Plaintiff's neighbors in the UAE that he was missing. Plaintiff's counsel notified the United States Consulate in Abu

Dhabi that Plaintiff had disappeared after being placed in an SUV of the type commonly used by the Emirati secret police.

The interrogations and beatings continued until July 28, 2011, when Plaintiff met with a United States Department of State employee named Marwa.  Before the meeting Plaintiff's captors instructed him not to disclose his mistreatment.  During the interview guards told Marwa that Plaintiff was being held without charge as part of an ongoing investigation.  Despite Plaintiff losing approximately 30 pounds since his kidnapping, Marwa found Plaintiff was in good health.  Plaintiff "attempted by facial contortions and winks to indicate that he was under duress," but Marwa either did not notice or disregarded the signals.

The interrogations and beatings resumed after Marwa's visit. Following the meeting interrogators repeatedly told Plaintiff that he would be released "soon" or "tomorrow," but he was not released.  Plaintiff considered refusing food in an attempt at suicide, but he was told he would be force-fed.

Near the end of his detention Plaintiff again asked an interrogator whether the FBI had requested his detention and interrogation.  This time the interrogator confirmed the FBI had made such a request and that American and Emirati authorities work closely on a number of such matters.

On September 14, 2011, Plaintiff was told he would be released that day.  Interrogators took money from Plaintiff's

11 - OPINION AND ORDER

wallet to purchase an airline ticket back to the United States, but they were told Plaintiff would not be allowed to return to the United States by air because he was on the No-Fly List. Thus, Plaintiff chose to fly to Sweden where, in the belief that he might still be in danger of abuse in countries that condone torture, Plaintiff submitted an application for asylum.

Based on his experience with State Department officials in Khartoum and the UAE, Plaintiff does not believe he can rely on the State Department to protect or to assist him while overseas.

On April 18, 2012, Plaintiff and his Swedish attorney held a press conference to detail his experiences in Sudan and the UAE and to announce that he would seek asylum in Sweden. Less than two weeks later Plaintiff and two other individuals were indicted in the United States District Court for the Southern District of California for "conspiracy to structure monetary transfers" from his family to him between April 14, 2010, and April 19, 2010. The charges against Plaintiff were ultimately dismissed.

In the fall of 2013 Defendants' counsel suggested Plaintiff should visit the U.S. Embassy in Stockholm to make the necessary arrangements to return to the United States. Because the government would not assure Plaintiff (1) that his safety from "extra-judicial actions" was guaranteed and (2) that he would be permitted to leave the United States after he returned, Plaintiff declined to return to the United States.

12 - OPINION AND ORDER

In November 2013 Plaintiff filed a DHS TRIP inquiry.  On January 23, 2014, DHS informed Plaintiff that changes to his status were not warranted at that time.  DHS, however, did not verify Plaintiff's status on the No-Fly List.

Plaintiff's wife sought and received a divorce from Plaintiff because of the separation resulting from Plaintiff's inability to return to the United States and because of the stigma attached to Plaintiff's placement on the No-Fly List.

In early 2015 Plaintiff's asylum application in Sweden was denied.  On February 12, 2015, after the parties stipulated DHS would reconsider Plaintiff's DHS TRIP application under the new procedures in light of the Court's June 24, 2014, Opinion and Order in *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014), DHS informed Plaintiff that he remained on the No-Fly List because he had been "identified as an individual who may be a threat to civil aviation or national security."  DHS did not provide any additional factual reasons for Plaintiff's designation.

On February 14, 2015, the Swedish government transported Plaintiff to Portland, Oregon, by private jet.

As noted, on May 9, 2016, Official Capacity Defendants filed a Notice (#98) Regarding Plaintiff's Status in which Official Capacity Defendants indicated Plaintiff had been removed from the No-Fly List.

13 - OPINION AND ORDER

### III. __Defendants' Surveillance of Plaintiff__

In 2010 while Plaintiff was in the United States, he and his brother, Dawit Woldehawariat, worked together to set up a business venture abroad.  Plaintiff and Woldehawariat discussed this venture by telephone, email, and text messages.

As a result of discovery and filings in the Southern District of California criminal case against Plaintiff that was ultimately dismissed, Plaintiff discovered Defendants intercepted the contents of the communications between Plaintiff and Woldehawariat.  Plaintiff alleges Defendants did so without a warrant or probable cause and that the electronic surveillance took place under Foreign Intelligence Surveillance Act (FISA) authority.  These intercepted communications formed the basis for the meeting in the Khartoum Embassy and have been transmitted to several United States government agencies and foreign governments.

### __STANDARDS__

### I.  __Federal Rule of Civil Procedure 12(b)(1)__

When deciding a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court may consider affidavits and other evidence supporting or attacking the plaintiff's jurisdictional allegations.  *Autery v. U.S.*, 424 F.3d 944, 956 (9th Cir. 2005).  The court may permit discovery to

determine whether it has jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). *See also Mujica v. AirScan, Inc.*, 771 F.3d 580, 617 (9th Cir. 2014). The court has broad discretion in granting discovery and may narrowly define the limits of such discovery. *Data Disc, Inc.*, 557 F.2d at 1285. *See also Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008). When the court "receives only written submissions, the plaintiff need only make a *prima facie* showing of jurisdiction." *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir. 2002). Plaintiff has the burden to establish that the court has subject-matter jurisdiction. *Ass'n of American Med. Coll. v. United States*, 217 F.3d 770 (9th Cir. 2000).

## II. **Federal Rule of Civil Procedure 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the plaintiff's complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Twombly*, 550 U.S. at 546).  When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

The pleading standard under Federal Rule of Civil Procedure 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  *See also* Fed. R. Civ. P. 8(a)(2).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Twombly*, 550 U.S. at 555.  A complaint also does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557.


## **DISCUSSION**

As noted, Official Capacity Defendants move to dismiss each of the claims brought against them in Plaintiff's FAC.[3]

**I.  Plaintiff's Due Process Claims:  Substantive Due Process (Claim One) and Procedural Due Process (Claim Three)**

---

[3] In his FAC, Plaintiff only brings Claims One, Three, Four, and Twelve through Sixteen against Official Capacity Defendants.

In Claim One Plaintiff brings a substantive due-process claim against Official Capacity Defendants in which Plaintiff asserts his placement on the No-Fly List violated his fundamental right to international travel.  In Claim Three Plaintiff brings a procedural due-process claim against Official Capacity Defendants in which Plaintiff asserts they provided him with inadequate procedural opportunities to have his name removed from the No-Fly List through the DHS TRIP process.  Plaintiff seeks declaratory and injunctive relief on Claims One and Three.

Official Capacity Defendants move to dismiss Claims One and Three on the basis that those claims are moot as a result of Plaintiff's removal from the No-Fly List.

**A.    Mootness Standard**

The limitation of the judicial branch in Article III of the United States Constitution to adjudicate "cases" and "controversies" requires "those who invoke the power of a federal court to demonstrate standing—a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"  *Already, LLC v. Nike Inc.*, 133 S. Ct. 721, 726 (2013)(quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  "[A]n 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation."  *Already, LLC*, 133 S. Ct. at 726 (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)).  Moreover, a "'plaintiff must

17 - OPINION AND ORDER

demonstrate standing separately for each form of relief sought.'"
*Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010)
(quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.,
Inc.*, 528 U.S. 167, 185 (2000)).

"A case becomes moot — and therefore no longer a 'Case' or
'Controversy' for purposes of Article III — 'when the issues
presented are no longer 'live' or the parties lack a legally
cognizable interest in the outcome.'"  *Already, LLC*, 133 S. Ct.
at 726 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  "No
matter how vehemently the parties continue to dispute the
lawfulness of the conduct that precipitated the lawsuit, the case
is moot if the dispute 'is no longer embedded in any actual
controversy about the plaintiffs' particular legal rights.'"
*Already*, 133 S. Ct. at 727 (quoting *Alvarez*, 558 U.S. at 93).
"'A case becomes moot whenever it loses its character as a
present, live controversy . . . .  The question is not whether
the precise relief sought at the time [the case] was filed is
still available.  The question is whether there can be any
effective relief.'"  *McCormack v. Herzog*, 788 F.3d 1017, 1024
(9th Cir. 2015)(quoting *Siskiyou Reg'l Educ. Project v. U.S.
Forest Serv.*, 565 F.3d 545, 559 (9th Cir. 2009)(ellipses and
bracketed text in original)).

"The voluntary cessation of challenged conduct does not
ordinarily render a case moot because a dismissal for mootness

18 - OPINION AND ORDER

would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emp. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012). *See also Bell v. City of Boise*, 709 F.3d 890, 898 (9th Cir. 2013). "[V]oluntary cessation can yield mootness if a 'stringent' standard is met: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014)(quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 189). *See also McCormack*, 788 F.3d at 1024.

## B.    Analysis

When the government changes a policy, the court must presume the government entity is acting in good faith. *Rosebrock*, 745 F.3d at 971. Nonetheless, "when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id.  See also Bell*, 709 F.3d at 898-99. "A presumption of good faith, however, cannot overcome a court's wariness of applying mootness under 'protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'" *McCormack*, 788 F.3d at 1025 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953)).

"[W]hile a statutory change 'is usually enough to render a case moot,' an executive action that is not governed by any clear or codified procedures cannot moot a claim." *Id.* (quoting *Bell*, 709 F.3d at 898-900). When determining whether an executive action "not reflected in statutory changes or even in changes in ordinances or regulations" is sufficiently definitive to render a case moot, the court considers the following factors: (1) whether "the policy change is evidenced by language that is 'broad in scope and unequivocal in tone,'" (2) whether "the policy change fully 'addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case,'" (3) whether the case in question was the "'catalyst for the agency's adoption of the new policy,'" (4) whether "the policy has been in place for a long time when we consider mootness," and (5) whether the government has engaged in conduct similar to that challenged by the plaintiff since the implementation of the new policy. *Rosebrock*, 745 F.3d at 972 (quoting *White v. Lee*, 227 F.3d 1214, 1243-44 (9th Cir. 2000)(bracketed text in original)). "On the other hand, [the court is] less inclined to find mootness where the 'new policy . . . could be easily abandoned or altered in the future.'" *Rosebrock*, 745 F.3d at 972 (quoting *Bell*, 709 F.3d at 901).

This Court addressed a similar situation in *Tarhuni v. Lynch*, 129 F. Supp. 3d 1052 (D. Or. 2015). In *Tarhuni* the

plaintiff, who was also on the No-Fly List, brought substantive and procedural due-process claims regarding his placement on the No-Fly List similar to those raised here. During the course of the *Tarhuni* litigation and after the government had been required to reconsider Tarhuni's DHS TRIP inquiry pursuant to new procedures that had been promulgated following this Court's previous decision in *Latif*, the defendants notified Tarhuni that he had been removed from the List. Tarhuni, however, maintained his claims for prospective relief remained viable notwithstanding his removal from the No-Fly List because he did not know the specific reasons why he had been placed on the No-Fly List and there was the possibility that the defendants would place him back on the No-Fly List after termination of the litigation. *Tarhuni*, 129 F. Supp. 3d at 1060.

The Court, nevertheless, concluded Tarhuni's claims were moot. The Court reasoned the defendants' conduct was "not a voluntary act in any real sense" because it came at the conclusion of a DHS TRIP reconsideration process that was put into motion by the Court's decision in *Latif*. *Id*. at 1061. The Court noted the only relief that Tarhuni sought was "a declaration that Plaintiff's placement on the No-Fly List violated his substantive due-process rights," and, therefore, the Court ultimately found "[s]uch a declaration would not have any

effect on Plaintiff's substantive legal rights because Plaintiff is no longer on the No-Fly List."  *Id.*

Even if the voluntary-cessation doctrine applied, the Court also concluded in *Tarhuni* that "Defendants have carried their 'heavy burden' to demonstrate Plaintiff's placement on the No-Fly List based on current information will not recur."  *Id.* at 1062 (quoting *Rosebrock*, 745 F.3d at 971).  Although the Court noted the "*Rosebrock* factors do not fit neatly within the context of an individualized determination," the Court, nonetheless, concluded the "principles expressed in *Rosebrock* support a finding that this case is now moot" because the defendants' statements regarding Tarhuni's presence on the No-Fly List were "unequivocal" and the defendants had acted "in a manner consistent with a genuine change in Defendants' assessment of Plaintiff's inclusion on the List" for the more than six months since Tarhuni had been taken off the list.  *Tarhuni*, 129 F. Supp. 3d at 1062.  The Court pointed out that, unlike in *McCormack*, there was "not any evidence in this record from which the Court can conclude Defendants' 'abandonment seems timed to anticipate suit, and there is probability of resumption,'" and, in fact, "the notion that the government would remove from the No-Fly List an individual whom Defendants believe is, in fact, 'an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so'

for the mere purpose of concluding this litigation is, to say the least, far-fetched." *Id.* (quoting *McCormack*, 788 F.3d at 1025.

There are, however, some differences between this case and *Tarhuni*. In *Tarhuni* the plaintiff's removal from the No-Fly List was a direct result of a process that was initiated because of the Court's Order in *Latif*. Here the connection between the Court's coercive Order in *Latif* and Plaintiff's removal from the No-Fly List is more attenuated. Although Official Capacity Defendants reassessed Plaintiff's DHS TRIP inquiry through the revised procedures, that process concluded in March 2015 with a determination that Plaintiff should remain on the No-Fly List. It was not until almost a year later that Official Capacity Defendants, apparently acting on their own initiative, removed Plaintiff from the List. Accordingly, the Court concludes this case is somewhat different than *Tarhuni*, and the voluntary-cessation doctrine applies to this case.

As it did in *Tarhuni*, however, the Court notes the *Rosebrock* analysis "do[es] not fit neatly within the context of an individualized determination." *Tarhuni*, 129 F. Supp. 3d at 1062. Many of the factors the Ninth Circuit set out in *Rosebrock* are based on the assumption that the government action that potentially moots the lawsuit has general applicability and, therefore, is capable of codification in statutes and regulations.

23 - OPINION AND ORDER

In this case, however, the government action is inherently individualized and is not a matter of legislative or executive discretion.  If an individual does not meet the substantive criteria to be placed or maintained on the No-Fly List, the government cannot place or keep that individual on the List.  As in *Tarhuni*, the circumstances in this case, therefore, are somewhat different from those the Ninth Circuit addressed in *Rosebrock*.

Nonetheless, the Court concludes Official Capacity Defendants' removal of Plaintiff from the No-Fly List is a sufficiently definite action to render this case moot.  As in *Tarhuni*, the government affirmatively informed Plaintiff that he had been removed from the No-Fly List, and the government filed a Notice confirming that action in the public record of this case. Also, like *Tarhuni*, more than six months have elapsed since Official Capacity Defendants took that action, and there is not any evidence in the record to suggest Plaintiff's removal from the No-Fly List is not "a genuine change in Defendants' assessment of Plaintiff's inclusion on the List."  *Tarhuni*, 129 F. Supp. 3d at 1062.  Finally, as in *Tarhuni*, the notion that government would remove an individual from the No-Fly List whom it believes is "'a threat to civil aviation or national security,'" for the "mere purpose of concluding this litigation

is, to say the least, far-fetched."[4]  *See Tarhuni*, 129 F. Supp.
3d at 1062.  The Court, therefore, concludes Official Capacity
Defendants have carried their "heavy burden" to demonstrate their
placement of Plaintiff on the No-Fly List based on current
information will not recur.  *See Rosebrock*, 745 F.3d at 971.

Finally, the prospective relief that Plaintiff seeks in this
case would no longer redress any nonconjectural injury, and,
therefore, there is "no longer a 'Case' or 'Controversy' for
purposes of Article III."  *See Already, LLC*, 133 S. Ct. at 726
(quoting *Murphy*, 455 U.S. at 481).  The relevant injunctive
relief that Plaintiff seeks in his substantive due-process claim
(Claim One) would be an order requiring Official Capacity
Defendants to remove Plaintiff's name from the No-Fly List, which
has already occurred.[5]

Plaintiff, nonetheless, asserts his procedural due-process
claim (Claim Three) remains cognizable, and, therefore, Plaintiff

---

[4] This is especially true in light of the fact that many of
the legal issues raised in Plaintiff's Claims One and Three
remain at issue in *Latif v. Lynch*, No. 3:10-cv-00750-BR, as well
as several other cases around the country.  To the extent that
the government may be concerned about the potential legal and
policy implications of those issues, mooting this case would do
little to allay those concerns.

[5] Plaintiff now concedes a requested injunction directing
Official Capacity Defendants to remove Plaintiff from the No-Fly
List is now moot.  *See* Jt. Status Rept. (#100), May 16, 2016.

still seeks an order requiring Official Capacity Defendants to

take the following actions:

> f.    Official Capacity defendants not condition the removal of plaintiff's name from the No-Fly List upon plaintiff's agreeing to become an informant or *agent provocateur* on behalf of Official Capacity defendants;
>
> g.    Official Capacity defendants not deny plaintiff written notice whenever his named is added to the No-Fly List;
>
> h.    Official Capacity defendants not deny plaintiff written notice whenever his name is removed from the No-Fly List; [and]
>
> i.    Official Capacity defendants [provide] plaintiff with the specific reasons why his name was added to the No-Fly List;

FAC at 44.

The Court concludes the relief Plaintiff seeks in paragraphs

(f), (g), and (h) is not cognizable because the circumstance that

could necessitate such relief in the future (*i.e.*, Official

Capacity Defendants again placing Plaintiff on the No-Fly List)

is speculative.  Such "relief," if imposed, would not redress any

actual or imminent injury.  *See Mayfield*, 599 F.3d at 971 ("Once

a plaintiff has been wronged, he is entitled to injunctive relief

only if he can show that he faces a 'real or immediate threat

. . . that he will again be wronged in a similar way.'")(quoting

*Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Similarly, the relief sought in paragraph (i) of Plaintiff's

FAC would not redress any actual or imminent injury because it

would only be effective if Official Capacity Defendants placed Plaintiff on the No-Fly List again for the same or similar reasons.  That, however, is precisely the sort of "speculation or 'subjective apprehension' about future harm" that does not support standing.  *See Mayfield*, 599 F.3d at 971 (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 184).  Thus, because Plaintiff's removal from the No-Fly List deprives Plaintiff of standing to seek prospective relief as to his No-Fly List claims against Official Capacity Defendants, the Court finds Plaintiff's Claims One and Three are moot.

Accordingly, the Court dismisses with prejudice Plaintiff's Claims One and Three as moot.  As in *Tarhuni*, however, the Court emphasizes the courthouse doors will be open to Plaintiff in the future if Official Capacity Defendants again place him on the No-Fly List.

## II.  <u>Claim Four - Right to Freedom of Association</u>

In Claim Four Plaintiff asserts all Defendants violated his right to freedom of association as guaranteed by the First Amendment when they placed him on the No-Fly List in order to coerce him into becoming an *agent provocateur* pursuant to a policy, custom, or practice of doing so.

By Opinion and Order (#81) issued November 11, 2015, the Court dismissed with prejudice an identical claim in Plaintiff's Corrected Fourth Amended Complaint.  *See Fikre v. Fed. Bur. of*

27 - OPINION AND ORDER

*Investigation*, 142 F. Supp. 3d 1152, 1166 (D. Or. 2015).

Accordingly, the Court also dismisses with prejudice Plaintiff's

Claim Four in his FAC.

### III. **Plaintiff's Surveillance Claims - Claims Twelve Through Sixteen**

In Claims Twelve through Sixteen, Plaintiff brings claims

against Official Capacity Defendants for their alleged search and

seizure of Plaintiff's telephone communications, emails, and text

messages.

In his FAC Plaintiff alleges the searches and seizures of

his communications were "not authorized by a warrant satisfying

the Fourth Amendment [and] were not supported by probable cause,"

but instead "were done under purported FISA authority."  FAC ¶¶

138, 144.  Plaintiff alleges the surveillance of his telephone

calls, text messages, and emails under the authority of FISA is

ongoing.  FAC ¶ 140.

Plaintiff's surveillance allegations stem from a disclosure

by the government in a criminal case in the United States

District Court for the Southern District of California that

indicated the government intended to introduce into evidence or

otherwise to use in that case "information obtained or derived

from electronic surveillance and physical searches conducted

pursuant to (FISA)" against Plaintiff's co-defendants in that

case (Dawit Woldehawariat, who is, as noted, Plaintiff's brother, and Abrehaile Haile).

In the Southern District of California case, Plaintiff, Woldehawariat, and Haile were charged with structuring or attempting to structure monetary transactions to avoid federal financial-reporting regulations in violation of 31 U.S.C. § 5324(a)(3) and conspiracy to do so under 18 U.S.C. § 371.  In addition, Woldehawariat was charged with two counts of failure to file a tax return in violation of 26 U.S.C. § 7203.  After Woldehawariat pled guilty to one count of failure to file a tax return, the government dismissed the other three counts against him pursuant to a plea agreement.  The court also dismissed the charges against Plaintiff and Haile on the government's motion.

Official Capacity Defendants move to dismiss Plaintiff's Claims Twelve through Sixteen on the basis that Plaintiff fails to state a claim.

### A.    Claim Twelve - Fourth Amendment

In Claim Twelve Plaintiff brings his claim under the Fourth Amendment contending Defendants intercepted, searched, and seized his telephone calls, emails, and text messages without a "warrant satisfying the Fourth Amendment," probable cause, or reasonable suspicion.  FAC ¶ 138.

Plaintiff seeks a declaration that "the provisions of the Patriot Act and FISA which permit the federal government secretly to collect, disseminate, and retain information from a person and which allow one to perform electronic surveillance and wiretaps of a person without first demonstrating to a court the existence of probable cause that the person has committed a crime are unconstitutional." FAC ¶ 141.

In addition, Plaintiff seeks an injunction "requiring [D]efendants to return or destroy any of [P]laintiff's unconstitutionally seized telephone calls, emails, or text messages, or information derived therefrom, that [D]efendants continue to retain, and prohibiting any use or disclosure of those communications and information." FACC ¶ 140.

Official Capacity Defendants move to dismiss Plaintiff's Claim Twelve for failure to state a claim. Official Capacity Defendants assert the only conclusion that can be drawn from Plaintiff's FAC is that the surveillance took place pursuant to FISA and that the surveillance, therefore, did not violate the Fourth Amendment. Official Capacity Defendants specifically rely on *United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010), for the proposition that FISA is consistent with the Fourth Amendment and, therefore, Plaintiff's Claim Twelve must be dismissed with prejudice because the surveillance was authorized by FISA.

Plaintiff, on the other hand, contends:

> Regardless of whether the surveillance was done with or without FISA authorization, it does not change the outcome where plaintiff has alleged that the interception, search, and seizure of plaintiff's telephone calls, emails, and text messages were not authorized by a warrant satisfying the Fourth Amendment, were not supported by probable cause or reasonable suspicion, and did not contain particulars regarding the persons, premises and things to be searched.

Pl.'s Resp. (#95) at 15.   In any event, Plaintiff contends this Court should follow a previous case in this District in which the court concluded surveillance conducted pursuant to FISA violated the Fourth Amendment.   *See Mayfield v. United States*, 504 F. Supp. 2d 1023, 1036-42 (D. Or. 2007), *vacated on justiciability grounds by Mayfield*, 599 F.3d 964.

With the exception of the *Mayfield* decision in this District that was later vacated on justiciability grounds by the Ninth Circuit, Official Capacity Defendants are correct that there is broad consensus that surveillance conducted pursuant to FISA does not violate the Fourth Amendment.   *See Abu-Jihaad*, 630 F.3d at 120 (collecting cases).   *See also United States v. Duka*, 671 F.3d 329, 341 (3d Cir. 2011).   Moreover, after multiple opportunities to re-plead, Plaintiff's FAC remains devoid of nonconclusory allegations from which this Court could find the alleged surveillance was not authorized by FISA.   Instead Plaintiff sets

out a series of conclusory reasons in his FAC as to why he
believes any FISA authorization may have been legally deficient:

> 146.   Plaintiff and his brother are not foreign
> powers or agents of foreign powers, and there has never
> been any probable cause to believe so.   The information
> obtained from defendants' electronic surveillance of
> their communications is not foreign intelligence
> information.   Obtaining foreign intelligence was not
> the primary purpose and was not a significant purpose
> of defendants' electronic surveillance of plaintiff's
> communications.   The information defendants obtained
> from their electronic surveillance of plaintiff's
> communications could have been obtained by normal
> investigative techniques, *e.g.*, normal criminal wiretap
> warrants conforming to the Fourth Amendment's warrant
> requirement.
>
> 147.   The electronic surveillance was not
> authorized or conducted pursuant to the strict FISA
> procedural requirements, certifications, and privacy
> protections for U.S. persons, and/or the minimization
> procedures that apply only to foreign intelligence and
> not open-ended domestic intelligence activities.

FAC ¶¶ 146-47.  Such allegations, however, are precisely the kind
of "labels and conclusions" or "a formulaic recitation of the
elements of a cause of action [that] will not do."  *See Twombly*,
550 U.S. at 555.  The only plausible, factual conclusion that can
be drawn from Plaintiff's FAC, therefore, is that Official
Capacity Defendants conducted surveillance that captured
Plaintiff's communications pursuant to FISA.  Because Plaintiff
has not established such surveillance violates the Fourth
Amendment as a matter of law, the Court dismisses Plaintiff's
Claim Twelve.

The Court notes Federal Rule of Civil Procedure 15(a) provides a party may amend a pleading after a response has been filed only by leave of court unless the opposing party consents to the amendment.  Rule 15(a), however, also provides leave to amend "shall be freely given when justice so requires."  This policy is to be applied with "extreme liberality."  *Moss v. United States Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009).

The Supreme Court has recognized several factors that a district court should consider when determining whether justice requires the court to grant leave to amend.  Those factors include

> undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  *See also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  The factor that carries the greatest weight is whether the amendment will prejudice the opposing party.  *Eminence Capital*, 316 F.3d at 1052.  "Absent prejudice or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend."  *Id.* "Delay alone is insufficient to justify denial of leave to amend; the party opposing amendment must also show that the amendment

sought is futile, in bad faith or will cause undue prejudice to the opposing party." *Jones v. Bates*, 127 F.3d 839, 847 n.8 (9th Cir.1997)(citing *United States v. Webb,* 655 F.2d 977, 980 (9th Cir. 1981)). *See also Quantum Tech. Partners II, L.P. v. Altman Browning and Co.*, No. 08-CV-376-BR, 2009 WL 1795574, at *19 (D. Or. June 23, 2009)(same). The party who opposes amendment bears the burden to show prejudice. *Eminence Capital*, 316 F.3d at 1052 (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987)).

In the Court's Opinion and Order (#81) in which it dismissed in part Plaintiff's Fourth Amended Complaint (Corrected), the Court noted the multiple opportunities that Plaintiff had been given to produce a viable complaint. In particular, the Court observed:

> In the Court's view, the unusually protracted Rule 12 litigation arises from the moving target that Plaintiff created in his pleadings and that has already significantly delayed this action and potentially prejudiced the Official Capacity Defendants in light of their interest in a reasonably speedy resolution of this matter on the merits. The Court concludes there is now an urgent need to move this matter beyond Rule 12 litigation and toward resolution on the merits.

*Fikre*, 142 F. Supp. 3d at 1170-71. Nonetheless, the Court provided Plaintiff with "one final opportunity to amend" his Complaint. *Id.* at 1711.

At this point (which is more than three years after
Plaintiff filed this litigation) if the Court provided Plaintiff
with another opportunity to amend his Complaint, Official
Capacity Defendants, who have been required to participate in
multiple rounds of Rule 12 litigation, would be unduly
prejudiced.  In addition, the repeated opportunities that
Plaintiff has had to amend his various Complaints and Plaintiff's
apparent inability to plead additional and more specific facts
indicates any further opportunities to amend would be futile.

On this record, therefore, the Court dismisses Plaintiff's
Claim Twelve with prejudice pursuant to Rule 12(b)(6).

**B.   Claim Thirteen - FISA**

In Claim Thirteen Plaintiff seeks to state a claim for
damages against the Official Capacity Defendants' for alleged
FISA violations pursuant to 18 U.S.C. § 2712(a).  Official
Capacity Defendants move to dismiss Claim Sixteen on the basis
that Plaintiff fails to state a claim under FISA.

Plaintiff's sole remaining claim for damages under FISA
arises from the allegation that Official Capacity Defendants
willfully failed to employ and to follow sufficient minimization
procedures on the disclosure of information seized pursuant to

FISA in violation of 50 U.S.C. § 1806(a).[6]  Section 1806(a)

provides:

> Information acquired from an electronic surveillance
> conducted pursuant to this subchapter concerning any
> United States person may be used and disclosed by
> Federal officers and employees without the consent of
> the United States person only in accordance with the
> minimization procedures required by this subchapter.
> No otherwise privileged communication obtained in
> accordance with, or in violation of, the provisions of
> this subchapter shall lose its privileged character.
> No information acquired from an electronic surveillance
> pursuant to this subchapter may be used or disclosed by
> Federal officers or employees except for lawful
> purposes.

Pursuant to 18 U.S.C. § 2712(a) Plaintiff may only obtain damages

for a violation of § 1806(a) if he proves such a violation was

willful.  *See Fikre*, 142 F. Supp. 3d at 1169-70.

Official Capacity Defendants assert Plaintiff's Claim

Thirteen must be dismissed because (1) Plaintiff does not provide

a plausible, nonconclusory allegation that any surveillance

information relating to Plaintiff was actually disclosed; (2)

Plaintiff's FAC does not contain any nonconclusory allegations as

to what the minimization procedures were and which of those

procedures were violated, and (3) Plaintiff fails to allege

---

[6] Plaintiff's FAC purports to include claims for damages
arising from alleged violations of 50 U.S.C. §§ 1801(i) and
1804(a).  This Court, however, previously dismissed those claims
with prejudice on the basis that Plaintiff failed to identify a
valid waiver of sovereign immunity.  *See Fikre*, 142 F. Supp. 3d
at 1168-69.

nonconclusory facts from which the Court could find Plaintiff has pled a claim for willful violation sufficient to waive sovereign immunity under   § 2712(a).

Plaintiff, on the other hand, contends his allegation that "the information upon which defendants caused Plaintiff to meet with Defendant FBI agents Noordeloos and John Doe I (Jason Dundas) in Khartoum and upon which defendants caused the UAE to imprison and torture plaintiff was derived from illegal surveillance and searches" is sufficient to establish at this stage of the proceedings that there was a disclosure of the FISA-derived information that is actionable under § 1806(a). Moreover, Plaintiff contends he could not more specifically allege a failure to follow or to employ minimization procedures because those procedures are secret.

Standing alone, the Court is not troubled by Plaintiff's failure to include specific allegations about the minimization procedures associated with the FISA-derived email, text messages, and telephone conversations between Plaintiff and his brother. The Court notes Rule 12 does not require a plaintiff to plead what he cannot possibly know.  Nonetheless, the remainder of Plaintiff's allegations are insufficient to cross "'the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Plaintiff's nonconclusory factual allegations regarding the

connection between the FISA-derived materials and his

interrogation and torture in the UAE are as follows:

> 77.  In 2010, while he was inside the United
> States, plaintiff and his brother Dawit Woldehawariat -
> both US citizens - worked together to set up a lawful
> business venture abroad.  In furtherance of this
> objective, plaintiff and his brother discussed the
> parameters of the business venture they envisioned and
> the financial resources necessary to execute their
> plan.  These discussions occurred by telephone, email,
> and text message.

> 78.  Unbeknownst at the time to either plaintiff
> or his brother, defendants were intercepting and/or
> acquiring the content of plaintiff's telephone calls,
> his text messages, and his emails.  Plaintiff now knows
> this because the United States has confirmed, through
> Department of Justice filings submitted in a
> since-dismissed prosecution against plaintiff in the
> United States District Court for the Southern District
> of California, that it intercepted the contents of
> plaintiff's telephone calls, emails, and text messages.
> *See* U.S. District Court for the Southern District of
> California, Docket No. 3:12-cr-06189-JAH, Doc. # 10.

FAC ¶¶ 77-78.  In his FAC Plaintiff alleges the general content

of the FISA-derived communications was discussed when Noordeloos

and Dundas interrogated him.

> 35.  Because defendants John Doe I (Jason Dundas)
> and Noordeloos were blocking the door, plaintiff, who
> had never before been detained or arrested, felt he
> could not leave.  During the following interrogation,
> defendants Noordeloos and John Doe I (Jason Dundas)
> questioned plaintiff extensively about the events,
> activities, and leadership at the as-Saber Mosque in
> Portland, which plaintiff had attended for prayer
> services.  Defendant Noordeloos also questioned
> plaintiff about the source of his financial support for
> this business endeavors in Sudan, and told plaintiff

38 - OPINION AND ORDER

that, because of the Sudan sanctions imposed by the
Office of Foreign Assets Control, it was illegal for
plaintiff to engage in business transactions in Sudan -
a statement that is inconsistent with the advice and
recommendation earlier given by the representative of
the embassy as set forth in ¶ 29, *supra*.

FAC ¶ 35.  After Plaintiff moved from Sudan to the UAE and was

imprisoned by Emirati agents, Plaintiff alleged he was

interrogated regarding the following subjects:

    44.  The primary focus of the blindfolded
interrogations was events at Portland's as-Saber
Mosque, addressing in particular who plaintiff knew at
the mosque who had a "jihadi mentality," what topics
the mosque's leader, Sheikh Mohamed Kariye, speaks
about both in public and in private, and how
fundraising at the mosque occurs and who engages in
fundraising there.  The interrogators also questioned
plaintiff about circumstances and events that plaintiff
had disclosed to defendants Noordeloos and John Doe I
(Jason Dundas) during his interrogation at the embassy
in Khartoum.  Numerous times during the blindfolded
interrogations plaintiff's interrogators urged him to
cooperate with them and with the FBI by becoming an
informant.

    * * *

    47.  On several occasions plaintiff told his
interrogators that the questions he was being asked and
the suggestions of cooperation with the FBI were the
same questions and suggestion he had heard from
defendants Noordeloos and John Doe I (Jason Dundas); he
thus inquired whether his confinement and mistreatment
was at the request of the FBI.  On each such occasion
the interrogators responded by beating plaintiff
severely.

    * * *

    50.  On or about June 14, 2011, plaintiff was
informed that he had to take a lie detector test.
During the test, for the only time during his

39 - OPINION AND ORDER

confinement, plaintiff was questioned without a
blindfold in place.  The questioning during the test
focused not upon events at Portland's as-Saber Mosque
but, rather, upon whether plaintiff's financial
arrangements involved soliciting funds for al-Qaeda.
Following the lie detector test plaintiff's bed and
bedding were returned to his cell.

FAC ¶¶ 44, 47, 50.  From these facts Plaintiff concludes:

> 80.  On information and belief, the information
> upon which defendants caused plaintiff to meet with
> defendant FBI agents Noordeloos and John Doe I (Jason
> Dundas) in Khartoum and upon which defendants caused
> the UAE to imprison and torture plaintiff was derived
> from illegal surveillance and searches.

> 81.  On information and belief, information
> derived from the electronic surveillance of plaintiff
> was willfully, knowingly, and/or recklessly
> disseminated for the unlawful purpose of interrogating
> plaintiff without counsel and coercing plaintiff to
> become an informant and then to cause his torture by
> proxy in the UAE.

> 82.  On information and belief, the information
> derived from the electronic surveillance of plaintiff
> was disseminated to several agencies and foreign
> governments including but not limited to the Central
> Intelligence Agency, the National Security Council, the
> Department of Defense, the Department of Homeland
> Security, the Department of Justice/Federal Bureau of
> Investigation, the US Attorney's Office for the
> District of Oregon, the Department of the Treasury and
> the National Security Agency, and the United Arab
> Emirates.

FAC ¶¶ 80-82.

Plaintiff's conclusion that the FISA-derived communications

provided the basis for his interrogation in Khartoum and torture

and interrogation in the UAE, therefore, is based on the rough

commonality of the general subject matter brought up in all three

events.  In particular, the Court notes the subject matter of his

alleged communications with his brother was very specific; *i.e.*,

"plaintiff and his brother discussed the parameters of the

business venture they envisioned and the financial resources

necessary to execute their plan."  FAC ¶ 77.  Plaintiff's

interrogation in Khartoum, on the other hand, concerned

activities at the as-Saber Mosque and "the source of his

financial support for his business endeavors in Sudan."  FAC

¶ 44.  His interrogation in the UAE concerned activities at the

as-Saber Mosque, "circumstances and events that plaintiff had

disclosed to defendants Noordeloos and John Doe I (Jason Dundas)

during his interrogation at the embassy in Khartoum," and

"whether plaintiff's financial arrangements involved soliciting

funds for al-Qaeda."  FAC ¶¶ 44, 50.

    The relationship between these three events (the FISA

surveillance, the Khartoum interrogation, and the UAE

interrogation) as alleged by Plaintiff is tenuous.  Foe example,

Plaintiff does not allege he was ever questioned either in

Khartoum or in the UAE about the communications with his brother,

which allegedly was the subject of the FISA surveillance.

Although the Court appreciates allegations concerning a

disclosure of FISA-derived information will often have to be

circumstantial, a plaintiff remains required to "plead[] factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In this case the relationship between the allegedly FISA-derived material and the alleged interrogations is too attenuated to permit the Court to reasonably infer that Official Capacity Defendants disclosed the FISA-derived information in a manner that would support a claim for damages under § 1806(a) and § 2712(a).

On this record and for the same reasons as with Claim Twelve, the Court dismisses with prejudice Plaintiff's Claim Thirteen for failure to state a claim.

### C.    Claim Fourteen - Stored Communications Act

In Claim Fourteen Plaintiff brings claims for violation of the Stored Communications Act (SCA), 18 U.S.C. § 2703, and states a cause of action for damages under § 2712.  Plaintiff's contention is that Official Capacity Defendants unlawfully compelled the production of stored communications from service providers in violation of the procedures set out in § 2703.

Official Capacity Defendants move to dismiss Plaintiff's Claim Fourteen on the basis that 18 U.S.C. § 2511(2)(a)(ii) provides a safe-harbor provision for government agents who conduct surveillance pursuant to FISA authorization.  Section 2511(2)(a)(ii) provides:

> Notwithstanding any other law, providers of wire or electronic communication service, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications or to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, if such provider, its officers, employees, or agents, landlord, custodian, or other specified person, has been provided with--
>
>> (A) a court order directing such assistance or a court order pursuant to section 704 of the Foreign Intelligence Surveillance Act of 1978 signed by the authorizing judge, or
>>
>> (B) a certification in writing by a person specified in section 2518(7) of this title or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required,

Plaintiff concedes § 2511(2)(a)(ii) would provide a safe harbor for Official Capacity Defendants if the surveillance was, in fact, authorized by FISA, but Plaintiff contends the surveillance in this case was not properly authorized by FISA. As noted, however, Plaintiff fails to sufficiently allege the FISA surveillance was not properly authorized.

Accordingly, the Court dismisses with prejudice Plaintiff's Claim Fourteen pursuant to § 2511(2)(a)(ii).

**D. Claim Fifteen - Wiretap Act**

In Claim Fifteen Plaintiff brings a cause of action for damages pursuant to § 2712 in which Plaintiff alleges Official

43 - OPINION AND ORDER

Capacity Defendants violated the Wiretap Act, 18 U.S.C. § 2511.

Official Capacity Defendants move to dismiss Plaintiff's Claim

Fifteen for failure to state a claim on primarily the same basis

as Claim Fourteen:  Official Capacity Defendants contend

§ 2511(2)(e) precludes liability under the Wiretap Act when the

surveillance is conducted pursuant to FISA.

Section § 2511(2)(e) provides:

> Notwithstanding any other provision of this title or
> section 705 or 706 of the Communications Act of 1934,
> it shall not be unlawful for an officer, employee, or
> agent of the United States in the normal course of his
> official duty to conduct electronic surveillance, as
> defined in section 101 of the Foreign Intelligence
> Surveillance Act of 1978, as authorized by that Act.

As the Court noted in its November 4, 2015, Opinion and Order

(#81), "[a]lthough the Official Capacity Defendants are correct

that § 2511(2)(e) permits surveillance that is conducted pursuant

to FISA, Official Capacity Defendants' contention that

§ 2511(2)(e) immunizes Defendants' conduct is, once again,

premature on this record because Plaintiff has not alleged

Defendants conducted the surveillance in this case pursuant to

FISA." *Fikre*, 142 F. Supp. 3d at 1173.  Official Capacity

Defendants' contention is no longer premature.  As noted, in his

FAC Plaintiff alleges the surveillance was conducted under FISA

authority.

44 – OPINION AND ORDER

Accordingly, the Court dismisses with prejudice Plaintiff's Claim Fifteen.

### E.   Claim Sixteen - Federal Rule of Criminal Procedure 41(g)

In Claim Sixteen Plaintiff raises a stand-alone claim under Federal Rule of Criminal Procedure 41(g) in which Plaintiff seeks the return of allegedly illegally searched and seized property. Accordingly, Plaintiff seeks an order directing Official Capacity Defendants to return or to destroy the records of telephone calls, emails, text messages, and derivative information that Plaintiff alleges Official Capacity Defendants seized unconstitutionally.

In its November 4, 2015, Opinion and Order (#81), however, the Court found Plaintiff's claim under Rule 41(g) was not cognizable as a stand-alone claim because "Rule 41(g) provides a remedy in civil cases in which Plaintiff establishes a Fourth Amendment violation" and the relief sought in Plaintiff's Rule 41(g) claim was "functionally identical to the injunction that he seeks in Claim Fifteen to remedy Defendants' alleged Fourth Amendment violation." *Fikre*, 142 F. Supp. 3d at 1173.  The Court, therefore, dismissed Plaintiff's Rule 41(g) claim "without prejudice to Plaintiff seeking relief authorized by Rule 41(g) in the event that Plaintiff prevails on Claim Fifteen." *Id.*

45 - OPINION AND ORDER

As noted, the Court dismisses Plaintiff's Fourth Amendment claim (Claim Twelve) on the basis that Plaintiff has failed to state a claim in light of his allegation that the surveillance was conducted pursuant to FISA.  Accordingly, because Plaintiff's Claim Sixteen operates only as a potential remedy for Plaintiff's Claim Twelve under the Fourth Amendment, the Court also dismisses Plaintiff's Claim Sixteen with prejudice.

## IV.  **Official Capacity Defendants' Unopposed Motion (#91) to Stay Plaintiff's Due Process Claims**

In their Unopposed Motion (#91) to Stay Plaintiff's Due Process Claims, Official Capacity Defendants request the Court stay adjudication of Plaintiff's procedural and substantive due-process claims until the Court addresses similar claims in *Latif v. Lynch*, No. 3:10-cv-00750-BR.

In light of this Court's conclusion that Plaintiff's Claims One and Three are now moot as a result of Plaintiff's removal from the No-Fly List, the Court finds Official Capacity Defendants' Motion to Stay Plaintiff's Due Process Claims is also moot.

The Court, therefore, **DENIES as moot** Official Capacity Defendants' Motion (#91) to Stay Plaintiff's Due Process Claims.

## CONCLUSION

46 - OPINION AND ORDER

For the reasons that follow, the Court **GRANTS** Official Capacity Defendants' Motion (#90) to Dismiss and **DISMISSES with prejudice** Plaintiff's Fifth Amended Complaint as to Plaintiff's claims against Official Capacity Defendants.  The Court also **DENIES as moot** Official Capacity Defendants' Unopposed Motion (#91) to Stay Plaintiff's Due Process Claims.

After more than three years of litigation the record still reflects none of Individual Capacity Defendants identified in Plaintiff's FAC have been served.  Accordingly, pursuant to Federal Rule of Civil Procedure 4(m), the Court directs Plaintiff to show cause in writing **no later than October 14, 2016**, why this action should not be dismissed as to Individual Capacity Defendants.

IT IS SO ORDERED.

DATED this 28th day of September, 2016.


　　　__/s/ ANNA J. BROWN_____
　　　ANNA J. BROWN
　　　United States District Judge

47 – OPINION AND ORDER