CAIR LEGAL DEFENSE FUND
Lena F. Masri (*pro hac vice*)
    lmasri@cair.com
Gadeir I. Abbas (*pro hac vice*)*
    gabbas@cair.com
453 New Jersey Ave, SE
Washington, DC 20003
Phone: 202.742.6420

LAW OFFICE OF BRANDON MAYFIELD, LLC
Brandon Mayfield (OSB 00824)
    mayfieldbrandon@hotmail.com
3950 SW 185th Avenue
Beaverton, OR 97007
Phone: 503.941.5101

LAW OFFICE OF RICHARD R. WIEBE
Richard R. Wiebe (*pro hac vice*)
    wiebe@pacbell.net
44 Montgomery St., Suite 650
San Francisco, CA 94104
Phone: (415) 433-3200

*Gadeir Abbas is licensed in VA, not in D.C.*
*Practice limited to federal matters.*

*Attorneys for Plaintiff Yonas Fikre*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION**

| | |
|---|---|
| **YONAS FIKRE**, | Civil No. 3:13-cv-00899-MO |
| Plaintiff, | **SEVENTH AMENDED COMPLAINT** |
| v. | VIOLATION OF PROCEDURAL DUE PROCESS |
| **CHRISTOPHER WRAY**, Director of the Federal Bureau of Investigation (sued in his official capacity); | VIOLATION OF SUBSTANTIVE DUE PROCESS |
| | **JURY TRIAL DEMANDED** |

**WILLIAM BARR**, Attorney General of the Department of Justice (sued in his official capacity);

**MIKE POMPEO**, Secretary of the Department of State (sued in his official capacity);

**CHARLES KABLE**, Director of the Terrorist Screening Center (sued in his official capacity);

**CHAD WOLF**, Acting Secretary of the Department of Homeland Security (sued in his official capacity);

**DAVID PEKOSKE**, Administrator of the Transportation Security Administration (sued in his official capacity);

**JOSEPH MAGUIRE**, Acting Director of National Intelligence (sued in his official capacity);

**PAUL NAKASONE**, Director of the National Security Agency (sued in his official capacity);

       Defendants.

## INTRODUCTION

1.    Plaintiff Yonas Fikre, an American citizen, seeks redress for the denial of his right to procedural due process leading to denial of his right to travel domestically and internationally. Plaintiff Yonas Fikre also seeks redress for the denial of his right to travel internationally, which denial prevented him from

returning to the United States when he was expelled from the United Arab Emirates and for years prevented from domestic and international air travel.

2.    Plaintiff's allegations in summary are (i) that Defendants sometime prior to April 21, 2010, placed Plaintiff's name on the "No Fly List" within the Terrorism Screening Database ("TSDB") in order to coerce Plaintiff into becoming an informant/*agent provocateur* for the FBI, (ii) that on April 21, 2010, during an involuntary interview at the United States Embassy in Khartoum, Sudan, Plaintiff was urged to become an informant/*agent provocateur* for the FBI in order to, among other things, have his name removed from the No Fly List, (iii) that when Plaintiff refused to become an informant/*agent provocateur*, Defendants retaliated by instigating and facilitating imprisonment, assault, and torture at the hands of the UAE government during the summer of 2011, and (v) that Defendants denied Plaintiff his constitutional right as a citizen to return home to the United States following the UAE government's releasing him without charge by keeping his name on the No Fly List.

3.    Through this action for declaratory and injunctive relief and for damages Plaintiff seeks (i) a method whereby Plaintiff can challenge the inclusion of his name on the No Fly List and Terrorist Screening Database in accordance with due process procedures, (ii) a declaration that Plaintiff's fundamental right to return to the United States by air, and his right to travel by air, has been infringed, and (iii) an injunction preventing the United States from violating the rights specified herein in the future.

## PARTIES

4.     Plaintiff is a naturalized American citizen of Eritrean descent. Plaintiff has never engaged in any acts of terrorism or supported terrorism in any form.

5.     Defendant Christopher Wray is Director of the Federal Bureau of Investigation ("FBI"). Defendant Federal Bureau of Investigation is a bureau of the Department of Justice responsible for, among other things, selecting individuals for inclusion on, and maintaining, the No Fly List. The FBI and/or its agency subcomponents have both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB. The FBI Defendant Wray is being sued in his official capacity, only.

6.     Defendant William Barr is United States Attorney General of the U.S. Department of Justice ("DOJ"). The DOJ and/or its agency subcomponents have both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB. The DOJ Defendant Barr is being sued in his official capacity, only.

7.     Defendant Mike Pompeo is Secretary of State, U.S. Department of State ("DOS"). DOS and/or its agency subcomponents have both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB. DOS and/or its agency subcomponents act as front-line agencies that utilize the TSDB to screen individuals against the TSDB, including Plaintiff. DOS is responsible for protecting and assisting United States citizens while those citizens are abroad. The DOS Defendant Pompeo is being sued in his official capacity, only.

8.    Defendant Charles H. Kable, IV is the Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI").  TSC has both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB.  TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB") including its No Fly List subcomponent.  TSC accepted and maintained the nomination of Plaintiff to the watchlist.  The TSC Defendant Pompeo is being sued in his official capacity, only.

9.    Defendant Chad Wolf is the Acting Secretary of the Department of Homeland Security ("DHS").    DHS and/or its agency subcomponents have both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB.  DHS and/or its agency subcomponents act as front-line agencies that utilize the TSDB and its No Fly List component to screen individuals against the TSDB, including Plaintiff.  These consequences include impeding domestic and international air travel, including through the outright denial of boarding any flights. Additionally, DHS is responsible for overseeing and administering the DHS Traveler Redress Inquiry Program ("DHS TRIP"), the only administrative complaint process by which Plaintiff may challenge his inclusion on the No Fly List and TSDB.  The DHS Defendant McAleenan is being sued in his official capacity, only.

10.    Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA") of the United States Department of Homeland Security ("DHS").    TSA has both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB.  TSA acts as a front-line

agency that utilizes the TSDB and its No Fly List component to screen individuals against the TSDB, including Plaintiff. These consequences include impeding domestic and international air travel, including through the outright denial of boarding any flights. The TSA Defendant Pekoske is being sued in his official capacity, only.

11.    Defendant Joseph Maguire is Acting Director of National Intelligence of the Office of the Director of National Intelligence ("ODNI"). ODNI has both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB. The ODNI Defendant Coats is being sued in his official capacity, only.

12.    Defendant General Paul M. Nakasone is Commander of the United States Cyber Command and Director of the National Security Agency/Chief ("NSA"), Central Security Service of the U.S. Department of Defense ("DOD"). NSA has both decision-making authority and veto power over watchlisting policies affecting the No Fly List and TSDB. As NSA Director, General Nakasone has authority to supervise and implement all operations and functions of the NSA, which include the interception of wire and electronic communications of those listed on the TSDB. The NSA Defendant Nakasone is being sued in his official capacity, only.

## JURISDICTION AND VENUE

13.    This is a complaint for injunctive and declaratory relief, and for damages, based upon Defendants' violations of Plaintiff's constitutional rights. The claims asserted arise under the Due Process Clause of the Fifth Amendment (substantive and procedural).

14.     Under U.S. CONST. Art. III § 2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.

15.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

16.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants include the United States and agencies of the United States, because this judicial district is where Plaintiff resides, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

*General Factual Allegations*

18.     President George W. Bush executed Homeland Security Presidential Directive-6 on September 16, 2003.  HSPD-6 directed the U.S. Attorney General to "establish an organization to consolidate the Government's approach to terrorism screening."   HSPD-6 created the Terrorist Screening Center ("TSC"), which is administered by the FBI.

19.     HSPD-6 also directs the Attorney General to consolidate terrorism-related information and then use it to support (a) federal, state, local, territorial, tribal, foreign-government, and private-sector screening processes, and (b) diplomatic, military, intelligence, law enforcement, immigration, visa, and protective processes.   The TSC thus houses the Terrorist Screening Database ("TSDB" or

"watchlist").   The TSDB is a centralized collection of information about listed individuals (i.e. "TSDB Listees").   The individual identifying information includes biographic and biometric data, such as names, aliases, birthdates, photographs, fingerprints, and iris scans.

20.   The TSDB is updated continuously and disseminated around the country and to more than 60 foreign governments around the world in real-time.

21.   Federal government agencies and foreign government partners draw the information supporting their nominations from intelligence, law enforcement, homeland security, embassy, consulate, financial, and immigration records.

22.   New additions to the TSDB must include minimal identifying and substantive information.  The minimum identifying information must be sufficient to allow screeners to determine whether an individual's identity is an actual match to a TSDB record.

23.   The minimum substantive information must be enough to satisfy the TSDB inclusion standard, which the Government calls the "reasonable suspicion that the individual is a known or suspected terrorist" standard.

24.   The Government defines a "Known Terrorist" as "an individual who has been (1) arrested, charged by information, or indicted for, or convicted of, a crime related to terrorism and /or terrorist activities by the United States Government or foreign government authorities; or (2) identified as a terrorist or member of a terrorist organization pursuant to statute, Executive Order or international legal obligations pursuant to a United Nations Security Council Resolution."

25.    The Government defines a "Suspected Terrorist" as "an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and /or terrorist activities."

26.    The Government adds individuals to the TSDB if their nomination is based "upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."

27.    The Terrorist Screening Center reviews all nominations to the TSDB and their supporting facts.   The final authority to accept, reject, or modify a nomination rests with the TSC alone.

28.    The TSC may consider an individual's "race, ethnicity, or religious affiliation" as well as their "beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances" as information supporting a nomination to the TSDB.

29.    The TSC may consider an individual's travel history, associates, business associations, international associations, financial transactions, and study of Arabic as information supporting a nomination to the TSDB.

30.    TSDB records are not criminal records.  The TSC includes individuals

in the TSDB who have not been convicted, arrested, investigated, or suspected of any crime. Inclusion in the TSDB does not require evidence that an individual has engaged in any criminal activity. Inclusion in the TSDB does not require evidence that an individual has committed a crime, is committing a crime, or will commit a crime in the future. Individuals who have been acquitted of a terrorism-related crime may still be listed in the TSDB.

31. Based on the specific needs and missions of its various partners, the TSC annotates TSDB records. TSC assigns these annotations based on distinct criteria from TSDB's overall inclusion standard. The final authority to accept, reject, or modify a nomination or annotation to a TSDB rests with the TSC alone. Defendant TSC is responsible for including, maintaining, and/or removing Plaintiff from the No Fly List and the TSDB.

32. For the TSA, the TSC annotates TSDB entries in three ways: (1) No Fly, (2) Selectee, and (3) Expanded Selectee.

33. The TSC assigns a No Fly annotation when the TSC determines the individual poses:

> (1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);
>
> (2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;
>
> (3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; *or,*

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

34.    TSDB Listees with the No Fly List annotation are prohibited from boarding an aircraft that traverses U.S. airspace.

35.    TSDB Listees, whether bearing the No Fly List annotation are not, are also subjected to intensive scrutiny by the Government as a matter of TSDB encounter policy.  This includes the Government subjecting TSDB Listees to lengthy and onerous secondary screening at airports; subjecting TSDB Listees to lengthy and onerous secondary inspection at land borders; subjecting TSDB Listees to the mandatory search and copying of their electronic devices at borders; subjecting TSDB Listees to handling codes requiring their arrest or other adverse treatment during any encounter with federal, state, local, or private law enforcement officers; barring TSDB Listees from access to employment or credentials across federal agencies and public and private infrastructure industries; and subjecting TSDB Listees' traveling companions, relatives, and other associates to comparable scrutiny.

36.    TSC does not notify individuals about their nominations or additions to the TSDB, or their nominations or additions to the No Fly List.  There are no "adversarial hearings" regarding TSDB Listee status.

37.    The TSDB, since 2006, retains copies of all prior versions of listed persons' records.  TSDB Listees are not permitted to know the history of any changes to their watchlist status, or the factual basis for those changes.

38.    Following 2015 litigation in *Latif v. Holder*, the federal government modified the redress process for TSDB Listees who are U.S. Persons and who have

the No Fly List annotation.  If a U.S. Person on the No Fly List files a DHS TRIP complaint, DHS TRIP (following referral to and consultation with TSC) must inform the individual if they are currently on the No Fly List.  The No Fly Listee may then request additional information, including TSC's unclassified summary of the information supporting their No Fly List annotation.  The No Fly Listee may respond by submitting information they consider potentially relevant or responsive to that unclassified factual summary.

39.    The redress policy which governs No Fly List annotations (as set forth below) does not apply to any other TSDB Listees, including those who remain on the TSDB although their No Fly List annotation has been removed.

40.    The TSC Redress Office has final authority to modify or remove a TSDB record during the redress process, including by adjusting or removing the No Fly List annotation.

41.    If the TSC chooses to maintain a person's No Fly List annotation, the TSC must prepare a recommendation to the TSA Administrator regarding the continuing No Fly List annotation on that TSDB Listee's record.  The TSA Administrator them makes the final written determination concerning the maintenance or removal of the No Fly List annotation for U.S. Persons.  The TSC will then technically implement any change to the No Fly List annotation the TSA Administrator directs.

42.    The TSC removing an individual's No Fly List annotation does not mean that the individual is also removed from the TSDB.  The TSC alone remains

responsible for a U.S. Person's overall TSDB Listee status.

43.    If the U.S. Person remains on the No Fly List following both TSC and TSA Administrator review, the TSA Administrator will issue a final order regarding the basis for that individual's continuing placement.  The final order will also notify the individual with the continuing No Fly List annotation of their ability to seek judicial review.

44.    Apart from the DHS TRIP Redress process, the TSC periodically reviews its TSDB listings and No Fly List annotations, based on new or additional information the TSC receives.  Pursuant to that process, the TSC occasionally imposes or removes No Fly List annotations.

45.    Nothing prevents the TSC, after removing an individuals' No Fly List annotation, from re-adding the same individual to the No Fly List based on the same or similar derogatory information.

46.    Plaintiff is justifiably skeptical of Defendants' willingness to engage in meaningful introspection or self-correction.  Famously, in *Ibrahim v. Department of Homeland Security, et al.,* 06-CV-00545, ECF 701-1 (N.D. Cal. Feb. 6, 2014), Defendants vigorously contested a Muslim graduate student's challenge to her No Fly List designation and subsequent revocation of her student visa.  Defendants' actions stranded her in Malaysia for nine years.  Following trial, it was ultimately revealed that her placement on the No Fly List was the result of an FBI agent's error in November 2004.  He had accidentally checked the wrong box.  *Id.* at 9.

47.    Defendants have a pattern of using the TSDB and No Fly List as a

bludgeon to coerce everyday American Muslims into spying on their fellow religious adherents and neighbors and becoming government informants.  Presence on the watchlist is deployed as an intimidation tactic and used to coercively justify the denial of American-Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning.

48.    Along with the experiences of Plaintiff being recruited as an information as described in more detail below, public examples of the Government-informant-recruitment phenomenon abound.  *See, e.g., Latif v. Holder*, 28 F. Supp. 3d 1134, 1145 (D. Or. 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI") ; *Id*. at 1146 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant"): *Id*. (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List"); *Tanvir v Tanzin*, 894 F.3d 449 (2d Cir. 2018) (multiple Muslim Plaintiffs "asked to gather information on members of Muslim communities and report that information to the FBI" and "[i]n some instances, the FBI's request was accompanied with severe pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance").

49.    As detailed below, Plaintiff's watchlist status and his No Fly List annotation has been the subject of personal harm, contention with the United States government, and litigation, for more than a decade.

*Plaintiff's Background, Travel, Imprisonment, Torture, and Release*

50.    Air travel is the only practical means of passenger transportation between the North American continent and Europe, Asia, Africa, the Middle East, and Australia.

51.    Plaintiff Yonas Fikre is a naturalized American citizen of Eritrean descent. When he was a small boy, war broke out in Eritrea, and thus his family took him to Sudan, where he was when the State of Eritrea came into being in 1993. From Sudan the Fikre family emigrated to the United States.

52.    Beginning in 2006, Plaintiff resided in Portland, Oregon. In late December 2009, after working for an American cell phone company, Plaintiff decided to attempt to distribute and to sell consumer electronic products on the retail market in East Africa. He began by returning to Sudan, where some of his extended family still reside. Upon arrival in Sudan, Plaintiff, in compliance with a recommendation by the State Department, contacted the United States Consulate in Khartoum and informed a representative of the consulate of his interest in pursuing business opportunities in the country. The representative encouraged Plaintiff to pursue business opportunities in Sudan. In reliance upon the representative's recommendation Plaintiff began the process of obtaining a Sudanese business license.

53.    On Tuesday, April 20, 2010, Defendants' employee David Noordeloos sent an email to Plaintiff, which stated: "Younas, I work at the embassy in Khartoum and need to meet up with you on wed 4/21. Can you email me back and let me know what time in the afternoon works for you? Best, David Noordeloos US Department of

State."

54.    On Wednesday, April 21, Defendants' employee Noordeloos sent an email to Plaintiff, which stated: "Yonas, I hope this finds you well. I still need to meet with you as soon as possible, can you give me a call and let me know what time works for you to meet? You can email me back or try me at the Embassy or on my cell, but please contact me soonest. Regards, David Noordeloos, US Department of State."

55.    On April 21, at approximately 9 p.m. local time, Plaintiff called the number given and spoke with Noordeloos.  Noordeloos stated that a number of Americans in Sudan had been invited to the Embassy for a luncheon the following day in order to discuss how Americans might stay safe during a period of political turmoil in Sudan. Plaintiff agreed to attend the luncheon on that basis, which turned out to be a false pretense.

56.    The next day Plaintiff appeared at the embassy. After going through security screening, Plaintiff met Noordeloos and another person who identified himself as Jason Dundas. Noordeloos and Dundas escorted Plaintiff to a small meeting room and shut the door, positioning themselves between Plaintiff and the door. At that point Noordeloos and Dundas produced badges and stated that they were FBI agents assigned to the Portland office.

57.    Upon being informed that Noordeloos and Dundas were FBI agents from the Portland office, Plaintiff stated that he wanted to be represented by his legal counsel (Plaintiff was then represented by Oregon attorney Brandon Mayfield) during the interrogation.    Noordeloos denied Mr. Fikre's request for such

representation on the grounds that Plaintiff had been placed on the No Fly List and thus could not return to the United States to confer with his attorney.

58.    Because Dundas and Noordeloos were blocking the door, Plaintiff, who had never before been detained or arrested, felt he could not leave. During the following interrogation, Noordeloos and Dundas questioned Plaintiff extensively about the events, activities, and leadership at the as-Saber Mosque in Portland, which Plaintiff had attended for prayer services. Noordeloos also questioned Plaintiff about the source of his financial support for his business endeavors in Sudan, and told Plaintiff that, because of the Sudan sanctions imposed by the Office of Foreign Assets Control, it was illegal for Plaintiff to engage in business transactions in Sudan - a statement that is inconsistent with the advice and recommendation earlier given by a representative of the embassy.

59.    Noordeloos next told Plaintiff that the FBI desired Plaintiff to become an FBI informant to work upon "a case" that was then developing.  Noordeloos stated that, in return, Plaintiff would be paid substantial compensation, be in a position to enjoy "the good life," and that the FBI would take steps to remove Plaintiff from the No Fly List. Noordeloos then asked, "Don't you love your wife?", which question Plaintiff considered an implicit threat. Plaintiff responded that he did not wish to become an FBI informant. The interview lasted for several hours until the close of the business day. As the day wore on, Noordeloos suggested they resume the discussion on the following day.  In order to escape the interrogation room and leave the embassy, Plaintiff agreed.

60.     Defendants' placement of Plaintiff on the No Fly List and recruitment of him as an informant pressured him to infiltrate his religious community as a government informant, and to spy and eavesdrop on other Muslims' words and deeds—regardless of whether his religious brothers and sisters were suspected of wrongdoing—and then to report his observations to the FBI.

61.     Plaintiff has a sincere religious belief in honesty, integrity, trust, and community within his Muslim faith.

62.     At approximately 8:45 a.m. on the following morning, Plaintiff called Noordeloos and stated that he did not wish to meet further with the FBI agents because he would be wasting their and his time.  Plaintiff reiterated that he did not wish to become an informant for the FBI. Noordeloos became agitated and, to the best of Plaintiff's recollection, stated, "Wait a minute! Are you trying to tell me you don't want to work with us!" Noordeloos then stated, "Whenever you want to go home you come to the embassy." Plaintiff understood this to mean that Plaintiff's name would not be removed from the No Fly List and he could not travel to the United States unless he became an informant/*agent provocateur* for the FBI.

63.     On May 4, 2010, Noordeloos wrote an email to Plaintiff which stated: "Yonas, Thanks for meeting with us last week in Sudan. While we hope to get your side of issues we keep hearing about, the choice is yours to make. The time to help yourself is now. Be safe in Sudan, Dave Noordeloos."

64.     Defendants forced Plaintiff into an impermissible choice between obeying his sincerely held religious beliefs regarding honesty, integrity, trust and

community and remaining on the No Fly List, or disobeying his religious beliefs and succumbing to Government coercion in order to violate his religious beliefs.

65.    Because Plaintiff chose his faith over Government coercion, he continued to experience interrogations and the Government-imposed No Fly List punishment, which severely restricted his travel including his ability to visit loved ones in the United States and abroad.

66.    Defendants' actions in leveraging his No Fly List status based on his agreement to become an FBI informant caused Plaintiff to suffer emotional distress, reputational harm, and economic loss.

67.    Plaintiff remained in Khartoum for almost two months following his meeting with Noordeloos and Dundas. During that time Plaintiff noticed that he was being followed by persons he assumed were affiliated with the Sudanese secret police, and he was told by merchants and other acquaintances in his neighborhood that similar individuals had been inquiring about him and his activities.

68.    On or about June 15, 2010, Plaintiff left Sudan, and on or about September 15, 2010, plaintiff arrived in the UAE to pursue similar business interests involving the distribution and retail sale of consumer electronics there. Plaintiff moved to the city of Al Ain in the emirate of Abu Dhabi, where he sought and obtained a residency permit from the UAE in order to conduct business; he invested substantial financial resources provided by family members in pursuing that course.

69.    In the evening of June 1, 2011, persons unknown to Plaintiff (who Plaintiff later learned were UAE plainclothes secret police) invaded Plaintiff's home

in Al Ain, seized Plaintiff's computer, phone, and other items, and compelled Plaintiff to accompany them in a vehicle. Several of Plaintiff's friends and neighbors witnessed Plaintiff's apprehension. Plaintiff was blindfolded, placed in a confined space in the vehicle, and the air conditioner in the vehicle was turned on high and directed at him with the effect that he became quite chilled.

70.    Plaintiff was taken to a then-unknown location approximately two hours' driving time from Al Ain. Still blindfolded, he was led into a building and into a long hall where, by peeking down through the bottom of his blindfold, he noticed that he was passing door after door. His guards stopped at one door and put him inside a windowless cell where he was lodged. Upon removal of his blindfold, he saw that his tiny cell lacked toilet facilities. His cell contained only a bed and some bedding. The cell was very cold because the air conditioning had been set on high.

71.    The following morning the interrogations of Plaintiff began. Except for the one instance noted below, during all of his interrogations Plaintiff was blindfolded. Once blindfolded, he was taken to a room where, throughout his ordeal, plaintiff was questioned for hours in English. Periodically during the 106 days of his imprisonment and torture, Plaintiff occasionally was able to peek beneath the blindfold and view shoes and the lower torsos of his interrogators.

72.    The primary focus of the blindfolded interrogations was events at Portland's as-Saber Mosque, addressing in particular who Plaintiff knew at the mosque who had a "jihadi mentality," what topics the mosque's leader, Sheikh Mohamed Kariye, speaks about both in public and in private, and how fundraising at

the mosque occurs and who engages in fundraising there. The interrogators also questioned Plaintiff about circumstances and events that Plaintiff had disclosed to Noordeloos and Dundas during his interrogation at the embassy in Khartoum. Numerous times during the blindfolded interrogations Plaintiff's interrogators urged him to cooperate with them and with the FBI by becoming an informant.

73.    When Plaintiff was returned to his cell at the end of the first day of interrogation he discovered that his bed and bedding had been removed. The air conditioning remained at a high level, which made the cell extremely cold. Because his bed and bedding had been removed, Plaintiff was obliged to sleep almost naked on the cold cement floor.

74.    During the initial period of his confinement Plaintiff resisted answering some of the questions, insisting that he was an American citizen and needed to speak with his ambassador and with his attorney. In response, Plaintiff's jailers struck him on his head and he fell to the ground. Throughout course of his confinement Plaintiff was repeatedly beaten severely on his head, back, legs, and feet with batons and plastic pipes, required to assume stress positions for hours, and threatened with death by strangulation by use of a flexible plastic pipe. One particularly painful torture method his interrogators used was to force Plaintiff to lie on his stomach with his sandals off, whereupon he was beaten severely on the soles of his feet; thereafter, he was required to stand on his feet, which standing caused him great pain.

75.    On several occasions Plaintiff told his interrogators that the questions he was being asked and the suggestions of cooperation with the FBI were the same

questions and suggestion he had heard from defendants Noordeloos and Dundas. Plaintiff thus inquired whether his confinement and mistreatment was at the request of the FBI. On each such occasion the interrogators responded by beating Plaintiff severely.

76.     As noted above, during his interrogations Plaintiff was occasionally able to peek beneath his blindfold and view the lower torsos of his interrogators. On most occasions, based on their clothing and accents, Plaintiff believes that his interrogators were Arabs. On other occasions, however, Plaintiff was able to view the shoes and slacks of several individuals who wore Western dress. Plaintiff believes that in those instances Noordeloos, Dundas, or other individuals acting as representatives of the United States, were present and witnessed the interrogations and that those individuals participated in interrogating Plaintiff.

77.     All individuals who attended and participated in the interrogation of Plaintiff were present with the permission, and were under the physical and legal control, of UAE authorities who operated and maintained the secret prison.

78.     On or about June 14, 2011, Plaintiff was informed that he had to take a lie detector test. During the test, for the only time during his confinement, Plaintiff was questioned without a blindfold in place. The questioning during the test focused not upon events at Portland's as-Saber Mosque but, rather, upon whether Plaintiff's financial arrangements involved soliciting funds for al-Qaeda. Following the lie detector test Plaintiff's bed and bedding were returned to his cell.

79.     The interrogations, including beatings and stress positions, as well as

being subjected to temperature extremes, sleep deprivation, and humiliation when not being interrogated, continued daily from June 14 through July 27.

80.    On June 20, 2011, immediately after learning from Plaintiff's family that Plaintiff had been apprehended in the UAE (the family had learned of Plaintiff's apprehension from witnesses who observed the event), Oregon counsel Thomas Nelson telephoned and then e-mailed the United States Consulate in Abu Dhabi to inform them that Plaintiff, a United States citizen, had gone missing and that witnesses in Al Ain had viewed him being placed in a SUV of the type that is commonly used by the UAE secret police. The consulate officials indicated that they would look into the matter.

81.    On July 21, 2011, Plaintiff's Oregon counsel Thomas Nelson contacted Representative Earl Blumenauer's office to request assistance in locating Plaintiff and made contact with staff member Emily Barrett. Ms. Barrett stated that Congressman Blumenauer would look into the situation.

82.    On July 28, 2011, Plaintiff was informed that a woman from the American consulate had arrived to see him. He was told that he was to meet with the American consul and that he should not disclose to the consular officer that he had been mistreated during his detention lest he beaten still more severely.

83.    On July 28, 2011, Plaintiff, accompanied by two guards, was taken to a meeting room where he met "Marwa," a consular employee of the State Department who, on information and belief, is of Egyptian extraction. The two guards positioned themselves close to Plaintiff, one on each side. Marwa was dressed in Islamic attire

(a "hijab," or covering of her hair). By that time plaintiff had lost approximately 30 pounds of body weight.

84.    The meeting with Marwa was short and superficial. Although by that time Plaintiff had lost approximately 30 pounds, Marwa stated that plaintiff appeared to be in good shape. During the interview Plaintiff attempted by facial contortions and winks to indicate that he was under duress, but Marwa either did not notice or disregarded these signals.

85.    Marwa questioned Plaintiff regarding what offense he had been charged with, whereupon Plaintiff asked the two guards what he had been charged with. The guards stated that Plaintiff was being held without charge and that the authorities were merely conducting an investigation.

86.    Following the meeting with Marwa, Plaintiff was returned to his cell and the interrogations and torture resumed. Marwa's visit was the only United States consular visit during Plaintiff's 106 days of detention and torture; the consulate did not visit or make any contact with Plaintiff during his remaining 49 days of his confinement and torture, nor did it provide any assistance to Plaintiff when he was deported from the UAE.

87.    Following the meeting with Marwa, Plaintiff became despondent. Because the consul's office had sent a Muslim woman wearing a hijab to interact with the prison authorities and the two guards, Plaintiff came to believe that, because of his black skin, the United States had "thrown [him] away." He consequently began to consider refusing food in an attempt at suicide, but was told that he would be force-

fed if necessary.

88.    Toward the end of his interrogation Plaintiff again inquired of his interrogator whether the FBI had requested that he be detained and interrogated. This time, instead of being beaten, the interrogator stated that indeed the FBI had made such a request and that the American and Emerati authorities work closely on a number of such matters.

89.    On September 14, 2011, Plaintiff was told that he would be released that day but would have to leave the UAE and stay out for at least a year. His belongings were returned to him and money from his wallet was taken to buy him a plane ticket back to the United States while Plaintiff remained in custody. Such a ticket was purchased from a travel agency; however, when the jailer took the ticket to the airport to obtain a boarding pass, the boarding pass was refused on the grounds that Plaintiff was on the No Fly List.

90.    Plaintiff's custodian was visibly upset because he could not board the flight out of the UAE, and asked Plaintiff, "What kind of country would refuse a citizen's return to his own country?" or words to that effect. The custodian then reiterated that Plaintiff could not stay in the UAE, and therefore would have to go somewhere else, and asked where Plaintiff wished to be sent. Because Plaintiff had a relative in Sweden, Plaintiff indicated that he should be sent there. Therefore, the custodian took more money from Plaintiff's wallet and arranged the purchase of a ticket to Stockholm, Sweden. This time a boarding pass was issued for Plaintiff.

91.    The United States consulate in the UAE knew or should have known

that Plaintiff would be deported upon his release from prison, but the consulate took no action to provide assistance to Plaintiff upon his release.

92.    Plaintiff arrived in Sweden traumatized, with few financial and other resources, and clothing entirely inappropriate for the Scandinavian weather and climate.

93.    Shortly after arriving in Stockholm Plaintiff contacted the airline that had refused to issue him a boarding pass in the UAE and discussed his situation with them. The representative he spoke with confirmed that he had been denied boarding on the flight from the UAE to the United States but stated that she could not provide any reasons for such refusal. Plaintiff then requested a refund of the ticket price, but the representative stated that because the ticket had been purchased through a travel agency in the UAE he would have to get the refund (if any) from that travel agency.

94.    To date Plaintiff has been unable to obtain a refund for the unused ticket from the UAE to the United States.

95.    In addition to being stranded with few resources in a foreign country, being placed on the No Fly List resulted in Plaintiff's losing virtually all of his rights as a citizen of the United States - he could not return home to enjoy the rights, privileges and immunities of citizenship. Moreover, his experience with State Department officials in Khartoum and Abu Dhabi demonstrated to him that the State Department would neither protect nor assist him while overseas; rather, it would actively work to his detriment.

96.    Nationals of one country are allowed to visit foreign countries for only

limited periods of time before they have to leave the country they are visiting; in the case of Sweden and other Schengen Agreement countries the maximum stay is for 90 days for holders of United States passports unless special arrangements are made, such as requesting asylum.

97.    Upon arriving in Sweden and being unable to return home, Plaintiff contacted a Swedish attorney, Advokat Hans Bredberg, who suggested that Plaintiff seek protective asylum in that country. Believing that the United States, through the FBI, was responsible for his detention and torture in Abu Dhabi and that he may still be in danger of abuse in countries that condone torture (including the United States), Plaintiff submitted an application for asylum to the authorities in Sweden.

98.    On April 18, 2012, a press conference was held in Advokat Bredberg's office in Stockholm during which Plaintiff's ordeal was disclosed publicly. Less than two weeks later, on May 1, 2012, Plaintiff and two other individuals were indicted in the United States District Court for the Southern District of California, Docket No. 3:12-cr-06189-JAH, for "conspiracy to structure" monetary transfers from his family to him in the UAE between April 14, 2010, and April 19, 2010, which funds Plaintiff used to attempt to start his business. On information and belief, this indictment was in retaliation for Plaintiff's publicizing of his ordeal through the April 18, 2012 press conference in Stockholm, and based at least in part upon information the United States obtained from the interview at the United States Embassy in Khartoum, from Plaintiff's 106 days of interrogation and torture in the UAE, and from the electronic surveillance of Plaintiff.

99.    Sometime in the fall of 2013 counsel for Defendants contacted counsel for Plaintiff and suggested that if Plaintiff wished to return to the United States he should visit the United States embassy in Stockholm to make necessary arrangements. After conferring with Plaintiff in Stockholm, Plaintiff's representatives informed Defendants' counsel that Plaintiff was apprehensive about entering the embassy grounds and that Plaintiff would, under the present circumstances, consider returning if the United States (1) guaranteed Plaintiff's safety from extra-judicial actions, and (2) provided adequate assurances that Plaintiff could leave the United States once he returned. Counsel for Defendants indicated that the United States would not provide such guarantees and assurances.

100.    In early November 2013 Plaintiff filed with the Department of Homeland Security ("DHS") a Traveler Redress Inquiry Program ("TRIP") request and was assigned a redress number. By letter dated January 23, 2014, DHS informed Plaintiff that "It has been determined that no changes or corrections are warranted at this time" and suggesting that Plaintiff might wish to take an administrative appeal from this decision. Because it was unclear from the DHS letter whether Plaintiff was then on the No Fly List, and thus it was unclear whether Plaintiff was aggrieved by this decision, by letter dated February 24, 2014, Plaintiff requested clarification and a stay pending resolution of this issue and the resolution of the current litigation. By letter dated March 11, 2014, DHS replied that an extension to take an appeal would be granted to April 22, 2014. Plaintiff then abandoned his efforts with DHS.

101.    Because of the stigma Plaintiff's No Fly List placement imposed, Fikre's former wife and her family placed tremendous pressure on their marriage.  The former wife, whenever she traveled, would be asked about Fikre.  The former wife and the family feared that the stigma Fikre's listing inflicted would continue to affect their standing in the community and with government, absent a divorce.  Because of the listing, Fikre's former wife insisted on a divorce, her father asked Fikre and his family for a divorce.  And in accordance with community practices and mores, a local imam got involved in the matter to mediate the marital dispute caused by Fikre's No Fly List placement.

102.    Because of the fear and stigma created by Fikre's placement on the No Fly List, , Plaintiff's wife sought and received a divorce from Plaintiff.

103.    Early in 2015 Plaintiff's application for asylum in Sweden was denied.

104.    On February 12, 2015, the DHS by letter informed Plaintiff that DHS had on its own motion "reevaluated" Plaintiff's prior TRIP inquiry and informed Plaintiff that he was on the No Fly List because he had been "identified as an individual who 'may be a threat to civil aviation or national security.'" The DHS provided no factual bases to support this conclusion, and requested Plaintiff's response. By a letter dated February 19, 2015, Plaintiff categorically denied that he was or is a threat and stated that the bare conclusion contained in the DHS latter of February 12, 2015, prevented Plaintiff from providing a meaningful response; consequently, Plaintiff asserted that the February 12, 2015, letter violated Plaintiff's due process rights. By a "Decision and Order" dated March 9, 2015, the DHS indicated

that Plaintiff's name would remain on the No Fly List.

105.    On February 14, 2015, the Swedish government transported Plaintiff to Portland, Oregon, by private jet.

*Plaintiff's Surveillance, Indictment, and Dismissal*

106.    In 2010, while he was inside the United States, Plaintiff and his brother Dawit Woldehawariat - both US citizens - worked together to set up a lawful business venture abroad. In furtherance of this objective, Plaintiff and his brother discussed the parameters of the business venture they envisioned and the financial resources necessary to execute their plan.  These discussions occurred by telephone, email, and text message.

107.    Unbeknownst at the time to either Plaintiff or his brother, Defendants were intercepting and/or acquiring the content of Plaintiff's telephone calls, his text messages, and his emails. Plaintiff now knows this because the United States has confirmed, through Department of Justice filings submitted in a since-dismissed prosecution against Plaintiff in the United States District Court for the Southern District of California, that it intercepted the contents of Plaintiff's telephone calls, emails, and text messages. *See* U.S. District Court for the Southern District of California, Docket No. 3:12-cr-06189-JAH, Doc. # 10.

108.    These interceptions and/or acquisitions of Plaintiff's telephone calls, emails, and text messages were not conducted pursuant to a warrant and were not supported by probable cause or reasonable suspicion.

109.    On information and belief, the information upon which defendants

caused Plaintiff to meet with defendant FBI agents Noordeloos and John Doe I (Jason Dundas) in Khartoum and upon which Defendants caused the UAE to imprison and torture Plaintiff was derived from illegal surveillance and searches.

110.   On information and belief, information derived from the electronic surveillance of Plaintiff was willfully, knowingly, and recklessly disseminated for the unlawful purpose of interrogating Plaintiff without counsel and coercing Plaintiff to turn informant and then to cause his torture by proxy in the UAE.

111.   On information and belief, the information derived from the electronic surveillance of Plaintiff was disseminated to several agencies and foreign governments including but not limited to the Central Intelligence Agency, the National Security Council, the Department of Defense, the Department of Homeland Security, the Department of Justice/Federal Bureau of Investigation, the US Attorney's Office for the District of Oregon, the Department of the Treasury and the National Security Agency, and the United Arab Emirates.

*Fikre's Continued Suffering Due to His Placement on the Watchlist*

112.   Plaintiff has suffered mistreatment at the hands of Defendants including, but not limited to, being placed on the Terrorist Screening Database and its No Fly List annotation without notice of the factual bases therefor or the opportunity to be heard, denial of legal counsel, false arrest and false imprisonment, assault and battery, torture, violation of his right to freedom of association, illegal surveillance, violation of his right to privacy, and violation of his substantive and procedural due process rights. Plaintiff intends to continue to attempt to exercise his

rights, including the right to legal counsel, to travel by air, and his substantive and procedural due process rights. Based upon defendants' past misconduct Plaintiff has a reasonable fear of further future mistreatment by defendants and other agents of the United States.

113. On May 6, 2015, during the course of this litigation, Defendants informed Plaintiff that the Terrorist Screening Center had removed him from the No Fly List. *See* Dkt. 98.

114. In 2016, Fikre undertook the Islamic religious pilgrimage known as hajj—a one-per-lifetime obligation Muslims have to travel to Mecca to perform certain rituals. It is a communal ritual, and like other American Muslims, Fikre booked his hajj trip through a travel company that specializes in organizing trips to Mecca.

115. Fikre's itinerary to Mecca had him traveling with about 20-25 Muslims in the Seattle-area community to Chicago, where they would meet up with other Muslims from across the country to travel altogether—in a group of about 60-80—to Mecca.

116. When Fikre traveled to the airport in Seattle to begin his trip, he went alone and very early to get his boarding pass. He expected Defendants to make it onerous for him to obtain his boarding pass. And Defendants did require him to wait for a ticketing agent to call Defendants for an individualized permission to print Fikre's boarding pass. His boarding pass was stamped as SSSS, which indicates a person's TSDB status.

117. Though Fikre got his boarding pass alone to hide from others his

watchlist status, Fikre could not do the same when Defendant TSA screened him to enter the sterile area of the airport. Fikre went through the security line alongside the 20-25 community members who were part of his hajj group. As he proceeded through security, Defendant TSA—in accordance with his TSDB status—subjected him to invasive and disparate screening. His co-travelers saw his security screening, understood that Defendant TSA viewed him as a physical threat, and feared him as a result.

118.    When Fikre and his group arrived at their gate, inside the secure area of the airport, there were 3-5 five agents with a swab machine—used to detect chemicals on a person's hands, clothes, or belongings—and a metal detector. The agents inspected each person's boarding pass and ID as they entered the jetbridge, and when Fikre approached, the agents directed him to step aside[1]. He was, again, invasively searched, patted down, swabbed, and otherwise inspected in full view of his hajj group and other passengers.

119.    Because Defendants' watchlisting system is so focused on the Muslim community, many of the TSDB-related consequences Defendants imposed on Fikre are common knowledge among American Muslims. As a result, some of Plaintiff's co-travelers deduced his TSDB status from how Defendants treated him.

120.    In response to the visible consequences of Fikre's TSDB status at the Seattle airport, many individuals in his hajj group stopped speaking with him and

---

[1] These gate screenings are conducted only against a subset of persons in the TSDB and for no other reason.

otherwise sought to avoid any contact with him for the remainder of the trip.  His co-travelers feared that, if they were to associate with Fikre, they would be subject to the same treatment.

121.    Because Fikre's TSDB status was discernable to members of the public, his co-travelers, and fellow passengers, Fikre was humiliated and could discern fear and revulsion of him from those who witnessed how Defendants treated Fikre.

122.    When Fikre and his co-travelers landed in Chicago, his hajj group had to get new boarding passes in order to get to their international flight to Mecca.  After deplaning, the travel group organizers convened everyone and proceeded to the ticketing counter.

123.    When Fikre presented his information for a boarding pass, the ticketing agent asked him to step aside.  The ticketing agent called Defendants to get individualized permission to print out Fikre's boarding pass.  Fikre's co-travelers could see that Defendants required Fikre to obtain special permission to fly via a more onerous process.

124.    Fikre's co-travelers, particularly some who had witnessed how he was treated in Seattle's airport, asked him why he was not getting his boarding pass and why he was being treated in this manner.  These co-travelers could tell that the federal government believed Fikre was dangerous.

125.    Because of the delay in getting his boarding pass, Fikre's hajj group proceeded to the security line before him.  As Fikre's co-travelers went through the security line, the organizers gathered everyone up to wait for Fikre just past the

security line so that, once Defendants completed their invasive searches of Fikre and his property, everyone could proceed to the gate together.

126.    When Fikre finally got his boarding pass to board his international flight from Chicago to Mecca, it was stamped with SSSS—the physical manifestation of Fikre's TSDB status.  When he presented himself at the security line, Defendant TSA subjected him to the same invasive screening of his person and his bags that he had gone through in Seattle.  This time, his whole hajj group could see how he was being treated.  And after he rejoined the group, some individuals were in tears about what they saw Defendants doing to Fikre.  Others told Fikre that they had been praying for his safety.

127.    Some, however, were alarmed that Fikre was in their hajj group and that they would be traveling with him.  Some individuals who had spoken warmly with Fikre prior to witnessing how Defendants treated him subsequently shunned and avoided him.  The tangible consequences of Fikre's TSDB status made him an outcast in his hajj group.

128.    When Fikre's hajj group arrived at the gate and began boarding their flight, an airline gate agent scanned his boarding pass in front of others and, in Arabic, told his colleague that Fikre had been "red-flagged."  The gate agent then treated Fikre with suspicion and reacted in this manner because Defendants disseminated Fikre's TSDB status to them.  Fikre's co-travelers, including some who knew Arabic, could tell that Defendant TSA believed Fikre was a threat and decided to subject him to more onerous processes.

129.    When Fikre arrived in Saudi Arabia and customs agents scanned his passport, he heard the agents tell each other that Fikre had been "red-flagged." This was in front of many in his hajj group. Rather than proceed through customs as everyone else in his hajj group, Fikre was detained by Saudi customs officials for approximately four to five hours because of the TSDB status Defendants imposed on him and disseminated to Saudi Arabia.

130.    To protest his detention, some members of his hajj group stayed in the area immediately past the customs checkpoint—though almost all of his co-travelers had left on a bus to their hotel.

131.    When Fikre finally cleared customs and rejoined the members of his hajj group that had stayed behind, he was greeted with hugs and expressions of grave concern for his safety.

132.    Fikre's treatment at the airports in Seattle, Chicago, and Saudi Arabia on his way to Mecca disclosed to his co-travelers the stigmatizing label Defendants imposed on Fikre. His co-travelers feared Fikre and avoided him because of his status on the watchlist. And because Fikre's co-travelers were part of his religious community, the stigma of his TSDB status spread throughout his religious community.

133.    During his weeks-long hajj trip, almost every person in his group would refuse to associate or talk with Fikre in any manner. Fikre's co-travelers did not want to serve him food or water and looked at Fikre with fear and disgust. Fikre's watchlist status caused his co-travelers to ostracize him.

134.    During the hajj group's return trip to the United States, Fikre and several co-travelers were subject to secondary screening. One traveler told Fikre that the extra screening that the traveler was dealing with were Fikre's fault. The traveler blamed his travel difficulties on his association, via the hajj group, with Fikre. And Defendants watchlisting system does, in fact, target people who associate with listees like Fikre.

135.    Even after entering the United States, Defendants imposed on Fikre separate and more onerous processes that further stigmatized him, Fikre overheard Defendants' agent instructing, in accordance with Fikre's TSDB status, a ticketing agent to make Fikre miss his scheduled connecting flight home. Because of this instruction, Fikre could not continue home with his co-travelers as his hajj group had planned. Co-travelers presumed that Defendants had detained or arrested Fikre.

136.    In his community, as a result of Defendants' decision to impose on him a TSDB status, fellow congregants have opposed him leading prayer or calling the adhan—an Islamic recitation that signals to congregants the start of prayer.

137.    Some in the Muslim community believe, incorrectly, that Fikre's removal from the No Fly List was compensation for government informant work.

138.    When Fikre has tried to start conversations with fellow congregants in his religious community, people do not want to share their names with Fikre or tell Fikre what their jobs are. This is attributable to the stigma of Fikre's watchlist status.

139.    After Fikre took over ownership of a restaurant since returning to the

United States, knowledge of his TSDB status in the community deterred customers to Fikre's restaurant. Community members told Fikre that "your place is hot" and that the "FBI is watching."

140.    Upon information and belief, a friend working in the aerospace industry broke off communication with Fikre due to his TSDB status.

141.    In 2016, Fikre traveled with his wife and 11 month old child by plane to San Diego. As they obtained their boarding passes from a ticketing agent, Fikre heard the ticketing agent tell Defendants' agent over the phone that Fikre was traveling with two others.

142.    Prior to the trip, Fikre tried to explain to his wife why it may be better for them to fly separately. Fikre feared that Defendants would treat his wife and their infant child like they treated him, and Fikre sought to spare his family the ordeal. Fikre also wanted to spare himself the humiliation of having his family see Fikre go through the onerous and disparate processes Defendants impose on him. But Fikre and his wife were newly married with a young infant, and his suggestion to travel separately from his wife was disconcerting to her and the family traveled together.

143.    When Fikre's family was screened by Defendant TSA together, Fikre's wife and 11 month old child were searched invasively as if they were suspected terrorists, just as Fikre had been on his way to Saudi Arabia for hajj. In addition to aggressive patdowns and body searches of Fikre's wife, Defendant TSA patted down the 11 month old baby, touching every part of the infant's body in a manner that alarmed Fikre and his wife. Their child was distressed and crying during this search,

and Fikre felt horrified that his TSDB status was causing this to happen to his wife and their young baby.

144.   After Fikre and his family completed this screening, they proceeded to the gate.  Fikre understood that if they boarded the plane together Defendants would cause the entire family to be screened again at the gate, which would replicate the humiliation they felt when they proceeded through the security line.  For this reason, Fikre sat separately from his family and ignored his infant child who sought Fikre's attention in an effort to spare the child and his wife the humiliation of being screened at the gate in front of other passengers.  It worked, and Fikre alone was invasively patted down and searched at the gate.

145.   As a result of this harrowing experience, Fikre has not flown with his family and, so long as the same constitutionally defective procedures remain, Fikre will continue to be deterred from flying with his family.

146.   Many of Fikre's closest cousins, as a result of Defendants' decision to impose on him a TSDB status, will not talk with him anymore and have ended their relationships with Fikre. The cousins fear that associating with Fikre may get them in trouble with the federal government.

147.   His relationship with his older brother, who has been questioned about Fikre in accordance with Fikre's TSDB status, has been damaged by the TSDB status Defendants assigned Fikre.

148.   On June 16, 2019, the Government asserted that Fikre "will not be placed on the No Fly List in the future based on the currently available information."

Dkt. 130-2 at ¶ 5. But the Government has not explained what "currently available information" means. It is not clear whether that involves non-arbitrary information, or Fikre participating in innocent or even constitutionally-protected conduct. *See Elhady v. Kable,* 391 F. Supp. 3d 562, 581 (E.D. Va. 2019) (Government claims an authority to place individuals on watchlist for innocent and constitutionally-protected reasons). The Government has also made no an assertion to the Court that is binding in any way. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982) (voluntary cessation does not render a case moot when government is "free to return to his old ways"). In other words, despite the declaration, the procedural defects responsible for Fikre's constitutional injury persist.

149.    The government has not assured Fikre that he will not be banned from flying for the same reasons that prompted the government to add him to the list in the first place, nor has it addressed the procedural defects that caused Fikre's constitutional violation in the first place.

150.    Both (1) because the Government has not acknowledged that Fikre was illegally placed on the No Fly List and the TSDB, and (2) because the Government has not acknowledged that Fikre will not be returned to the No Fly List absent a new, independent reason as determined by constitutionally adequate procedures, Fikre remains stigmatized as a known or suspected terrorist and as an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

151.    Until the Government both (1) acknowledges that its investigation revealed Fikre was illegally placed on the No Fly List and the TSDB, and (2)

acknowledges that Fikre will not be returned to the No Fly List via the same defective procedures that led to his illegal placement, Fikre's acquaintances, business associates, and evn family members will continue to persist in shunning or avoiding him despite his renewed ability to travel.

152.    The Government's vague litigation declaration on June 16, 2019 that Fikre "will not be placed on the No Fly List in the future based on the currently available information" does not provide the necessary vindication to eliminate the stigmatizing effects of No Fly List and watchlist placement. Indeed, the declaration is expressly non-vindicating, asserting that Fikre 'was placed on the No Fly List in accordance with applicable policies and procedures" and that he was "removed form the No Fly List upon the determination that he **no longer** satisfied the criteria for placement on the No Fly List." Dkt. 130-2 at ¶ 5 (emphasis added). In other words—in a public document available on PACER—the Government continues to expressly and publicly assert that Fikre at one time properly belonged on the No Fly List, and thus at one time represented a threat of engaging in or conducting a violent act of terrorism and was operationally capable of doing so.

153.    There has been no renouncement by the government of its prerogative and authority to place Fikre on the No Fly List.

**Claim One**
**Fifth Amendment Procedural Due Process -**
**Placement and Retention on the No Fly List and TSDB**
**(Against All Defendants)**

154.    The foregoing allegations are realleged and incorporated herein.

155.    Defendants placed Plaintiff's name in the Terrorist Screening Database

and on its No Fly List subcomponent.

156.    Plaintiff learned that he was placed on the federal terrorist watchlist and No Fly List subsequent to being added to the TSDB and No Fly List.

157.    Plaintiff has experienced economic, reputational, physical, and liberty harms due to Defendants' placement of his name on the TSDB and No Fly List.

158.    Plaintiff's harms attributable to placement of his name on the TSDB and No Fly List include coercion to violate his religious beliefs, foreign detention and torture, inability to travel by air or home to the United States, monitoring of his electronic communications, loss of financial resources, loss of business opportunities, and divorce from his now ex-wife.

159.    Defendants have disseminated Plaintiff's status in the TSDB and his No Fly List annotation to federal agencies, state agencies, foreign governments, and private entities including airlines.

160.    Plaintiff has a protected liberty interest in domestic and international travel.

161.    Plaintiff also has a protected liberty interest in his reputation and in freedom from government-assigned stigmas that restrict or prevent him from engaging in activities in which he can lawfully engage and in which others not stigmatized are free to engage.

162.    Plaintiff also has a protected liberty interest in being able to practice his sincerely-held religious beliefs, free of Government interference and without retribution from the Government.

163.    Defendants have imposed on Plaintiff the stigmatizing label of "known or suspected terrorist."   Plaintiff has a right to be free from false government

stigmatization as an individual who is a "known or suspected" terrorist, or who is otherwise associated with terrorist activity.

164.    Defendants have failed to provide Plaintiff with meaningful notice of his TSDB or No Fly List status, the factual basis for that status, and an opportunity to contest it.

165.    Defendants have failed to provide Plaintiff with an explanation for his TSDB or No Fly List status, any changes to that status, or the factual basis for those changes.

166.    Defendants have failed to provide Plaintiff with a guarantee that he is no longer on the TSDB, or that he will not be re-added via the same constitutionally defective procedures to either the TSDB or the No Fly List absent new "derogatory" information about.

167.    Defendants have failed to remove or expunge the factual basis for or history changes to Plaintiff's TSDB or No Fly List status from Defendants' records.

168.    Defendants have failed to repudiate the original basis of Plaintiff's TSDB or No Fly List status.

169.    Defendants' actions in placing and keeping Plaintiff on the FBI-maintained, secret TSDB and No Fly List substantially interfered with and deprived Plaintiff of his liberty interest in international travel.  Defendants' actions in placing and keeping Plaintiff on the FBI-maintained, secret TSDB and No Fly List also injured Plaintiff's liberty interest in his reputation by, first, stigmatizing him as a known or suspected terrorist and as an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so and, second, on the basis of that stigma, depriving him of the ability to

travel by air domestically and internationally as others are permitted to do and as Plaintiff would be permitted to do absent the stigma.

170.    Defendants' actions in placing and keeping Plaintiff on the FBI-maintained, secret No Fly List without informing him of such placement, of the basis for his inclusion on the No Fly List, of the means of removing his name from the No Fly List, and without providing an independent forum in which Plaintiff might secure the removal of his name from the No Fly List, all violated and are continuing to violate Plaintiff's right to procedural due process under the Fifth Amendment.  Such procedures as do exist for challenging inclusion on the No Fly List are inadequate to satisfy the notice and hearing requirements of procedural due process.

171.    By failing to expunge their records, inform Plaintiff as to whether he remains on the TSDB in any form, or correct the public record regarding Plaintiffs' years-long designation as a known or suspected terrorist on the No Fly List, Defendants have imposed and continue to impose harm.

172.    By these actions, Defendants are irreparably harming plaintiff. Plaintiff has no adequate remedy at law for Defendants' continuing unlawful conduct, and Defendants will continue to violate Plaintiff's legal rights unless enjoined and restrained by this Court.

## Claim Two
## Fifth Amendment Substantive Due Process
## (Against All Defendants)

173.    The foregoing allegations are realleged and incorporated herein.

174.    Substantive due process protects Americans' freedom from government action which infringes upon their fundamental constitutional rights.  Government action which infringes upon these rights cannot be arbitrary and must be narrowly

tailored to serve a compelling government interest.

175.    Defendants have placed Plaintiff on the TSDB and No Fly List despite lacking any reasonable suspicion that Plaintiff is a known, suspected, or potential terrorist.

176.    Defendants consider and rely on race, ethnicity, national origin, religious affiliation, and First Amendment protected activities as factors supporting placement on the TSDB and No Fly List.  Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiff on the TSDB and No Fly List.

177.    Defendants lack a compelling interest in placing innocent persons, particularly those with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terrorist watchlist.

178.    Defendants lack a compelling interest in the TSDB and No Fly List annotation insofar as their true purpose is to provide law enforcement with a tool to harass and intimidate American Muslims, to track such persons, and coerce American Muslims into becoming informants.

179.    Defendants' placement of Plaintiff on the watchlist has placed an undue burden on his fundamental rights to domestic and international travel, including his right as a U.S. citizen to return to the United States.

180.    Defendants' placement of Plaintiff on the watchlist has placed an undue burden on his fundamental right to be free from unreasonable searches and seizures.

181.    Defendants' placement of Plaintiff on the watchlist has placed an undue burden on his fundamental right to be free from government coercion of his religious practices.

182.    Defendants' actions in placing Plaintiff on the TSDB and No Fly List, in imposing the stigmatizing label of "known or suspected terrorists," and widely disseminating the stigmatizing label to numerous governmental, foreign, and private partners, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

183.    Defendants' watchlists are also not narrowly tailored insofar as the federal terrorist watchlists are entirely and demonstrably ineffectual and obvious alternatives exist. The Defendants, for example, have never placed a person who committed a violent act of terrorism inside the United States on the No Fly List prior to the terrorist act.

184.    By placing Plaintiff on the federal watchlist, Defendants have caused him actual, imminent and irreparable injury that cannot be undone through monetary remedies.

185.    Plaintiff has no adequate remedy at law for defendants' continuing unlawful conduct, and Defendants will continue to violate Plaintiff's legal rights unless enjoined and restrained by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    <u>Declaratory Judgment.</u>  A declaratory judgment that –

a.    Defendants violated Plaintiff's due process right as a citizen under the Fifth Amendment to the United States Constitution to return to the United States when Plaintiff was expelled from the United Arab Emirates;

b.      Defendants violated Plaintiff's due process rights as a citizen under the Fifth Amendment to the United States Constitution by denying plaintiff the right to travel to, from, and over the United States;

c.      Defendants violated Plaintiff's right to procedural due process under the Fifth Amendment to the United States Constitution by placing and retaining his name of the No Fly List without notice or meaningful opportunity to contest such placement;

2.      <u>Injunction.</u> An injunction requiring that --

a.      Defendants not place Fikre on the TSDB, and remove all information regarding Fikre from the TSDB permanently.

b.      Defendants, except to the extent required by exercise of standard security precautions at airports, not prevent Plaintiff from returning to, flying over, or departing from the United States;

c.      Defendants, except to the extent required by exercise of standard security precautions at airports, not prevent Plaintiff from traveling internationally by air;

d.      Defendants remove and expunge Plaintiff's watchlist and No Fly List records, including any information in those records obtained as a result of intelligence, surveillance, wiretapping, interrogation without counsel, or foreign cooperation;

e.      Defendants not interrogate Plaintiff once Plaintiff requests to be assisted by legal counsel;

f.      Defendants not deny Plaintiff the opportunity to consult with legal counsel prior to and during any interrogation of Plaintiff;

g.      Defendants not use in a criminal proceeding any information gathered from Plaintiff during an interrogation of Plaintiff at which interrogation Plaintiff was not represented by legal counsel after so requesting the assistance of legal counsel;

h.      Defendants not deny Plaintiff written notice whenever his named is added to the No Fly List;

i.      Defendants not deny Plaintiff written notice whenever his name is removed from the No Fly List;

j.      Defendants not deny Plaintiff the specific reasons why his name was added to the No Fly List;

k.      Defendants not agree to, arrange, or otherwise support Plaintiff's arrest by any foreign power;

l.      Defendants not agree to, arrange, or otherwise support Plaintiff's imprisonment by any foreign power;

m.      Defendants not agree to, arrange, or otherwise support assaults on Plaintiff by agents of a foreign power;

n.      Defendants not agree to, arrange, or otherwise support battery upon Plaintiff by agents of a foreign power;

o.      Defendants not agree to, arrange, or otherwise support torture of Plaintiff by agents of a foreign power.

Page 48 – SEVENTH AMENDED COMPLAINT, *Civil No. 3:13-cv-00899 (BR)*

p.    Defendants repudiate in its entirety the decision to add Fikre to the TSDB with a No Fly List annotation and maintain him there for approximately five years.

3.    <u>Order</u>: An order setting aside the Government's determination to add Fikre to the TSDB with a No Fly List annotation and maintain him there for approximately five years.

4.    <u>Attorneys' Fees:</u>  Reasonable attorneys' fees under 28 U.S.C. § 2412.

5.    <u>Other Relief.</u> Such other relief as the Court may deem just and proper.

DATED this 18th Day of December, 2019.

Respectfully submitted,

CAIR LEGAL DEFENSE FUND

/s/ Lena F. Masri
Lena F. Masri (DC: 1000019) (*pro hac vice*)
    lmasri@cair.com
Gadeir I. Abbas (VA: 81161) (*pro hac vice*)*
    gabbas@cair.com
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C. Practice limited to federal matters.*

LAW OFFICE OF BRANDON MAYFIELD, LLC
Brandon Mayfield (OR 00824)
    mayfieldbrandon@hotmail.com
14631 SW Millikan Way
Beaverton, OR 97003
Phone: 503.941.5101

LAW OFFICE OF RICHARD R. WIEBE
Richard R. Wiebe (CA 121156) (*pro hac vice*)
    wiebe@pacbell.net
44 Montgomery St., Suite 650
San Francisco, CA 94104
Phone: (415) 433-3200
*Attorneys for Plaintiff Yonas Fikre*