**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (DC: 1000019) α
Gadeir I. Abbas (VA: 81161) α ẞ
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420
ldf@cair.com

**LAW OFFICE OF BRANDON MAYFIELD, LLC**
14631 SW Millikan Way
Beaverton, OR 97003
Phone: 503.941.5101
mayfieldbrandon@hotmail.com

α *Pro hac vice*
ẞ *Gadeir Abbas is licensed in VA, not in D.C.*
*Practice limited to federal matters.*

*Attorneys for Plaintiff Yonas Fikre*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **YONAS FIKRE,** | |
| Plaintiff, | |
| vs. | Case No. 3:13-cv-00899-MO |
| | Hon. Michael W. Mosman |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.,* | **OPPOSITION TO GOVERNMENT'S MOTION TO DISMISS** |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 2

ARGUMENT .................................................................................................... 6

   I.   The Government should not be able to moot this case on the back of ex parte evidence. ......................................................................................... 6

   II.   Even without knowing what the ex parte evidence says, it is insufficient to establish mootness. ................................................................................ 11

   III.  The Substantive Due Process claims should survive because Fikre's No Fly List claims are not moot. ....................................................................... 15

   IV.  The No Fly List violates procedural due process. ..................................... 16

      A.   No Fly List placement creates procedural due process rights. ............... 16

         1.   The No Fly List affects Fikre's liberty interest in travel. ...................... 16

         2.   The No Fly List affects Fikre's "stigma-plus" liberty interest. ............... 17

            a.   Dissemination of the No Fly List is stigmatizing. ................................ 17

            b.   The No Fly List creates a mandatory change in status. ....................... 20

      B.   The process provided by DHS TRIP is inadequate .................................. 21

   V.   TSDS status standing alone violates procedural due process. ................... 25

   VI.  The Secretary of State, DNI, and the Director of the NSA may be dismissed without prejudice. ........................................................................................ 25

CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................................21

*Bertuglia v. City of New York*, 839 F. Supp. 2d 703 (S.D.N.Y. 2012) ........................19

*Cederberg v. Washington Cty. Consol. Commc'ns Agency*, No. 3:18-cv-02044-HZ,
    2019 WL 2929505 (D. Or. July 8, 2019) ...............................................................20

*Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122 (7th Cir. 1997).........................6

*Diamond S.J. Enterprise v. San Jose*, 395 F. Supp. 3d 1202 (N.D. Cal. 2019).........21

*Doe v. Dep't of Pub. Safety*, 271 F.3d 38 (2d Cir. 2001) .............................................19

*El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020) ....................................................23

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019)..............................................21

*Elhady v. Piehota*, 303 F. Supp. 3d. 453 (E.D. Va. 2017)..........................................20

*F.T.C. v. Timeshare Mega Media & Mktg. Grp., Inc.*, No. 10-cv-62000, 2011 WL
    6102676 (S.D. Fla. Dec. 7, 2011) ..........................................................................6

*FBI v. Fikre*, 601 U.S. 234 (2024).......................................................................5, 7, 11

*Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022) ......................................................5, 13, 14

*Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2019)..........................................................4, 16

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S.
    167 (2000) ..............................................................................................................11

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) .........................................................9

*Humphries v. Los Angeles*, 554 F.3d 1170 (9th Cir. 2008) ........................................18

*Humphries v. Los Angeles*, 562 U.S. 29, 131 (2010) ..................................................18

*Ibrahim v. Dep't of Homeland Sec.*, No. 06-CV-00545, 2012 WL 6652362 (N.D. Cal.
    Dec. 20, 2012) ........................................................................................................7

*In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251 (6th Cir.1996) ............6

*Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174 at 1177, 1183 (D.C. Cir. 2004) ...........8

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019)...............................2, 13, 14, 15, 20, 21

*Khairullah v. McHenry*, No. CV 23-30095-MGM, 2025 WL 401194 (D. Mass. Jan.
    31, 2025) .............................................................................................................7, 11

*Khalid v. Bondi, et al.*, No. 24-5091 (D.C. Cir. Oct. 28, 2024), ECF No. 2082418
    (Joint Appendix, (D.C. Cir. Oct. 28, 2024)) ..........................................................22

*Kovac v. Wray*, 18-cv-110 (N.D. Tex.)........................................................................10

*Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014)...............................................8, 21

*Latif v. Sessions,* 2017 WL 1434648 (D. Or. Apr. 21, 2017).....................................14

*Long v. Barr*, 38 F.4th 417 (4th Cir. 2022) .................................................................21

*Long v. Barr*, 451 F. Supp. 3d 507 (E.D. Va. 2020) ..............................................21, 22

*Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580 (6th Cir. 2014) .......................... 6

*Lynn v. Regents of Univ. of California*, 656 F.2d 1337 (9th Cir. 1981) ..................... 6

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................................... 20

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) .............................................. 10

*Mohamed v. Holder*, 2015 WL 4394958 (E.D. Va. July 16, 2015) ............................ 16

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) .................................. 20, 23

*Olivares v. TSA,* 819 F.3d 454 (D.C. Cir. 2016) ..................................................... 8

*Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169 (9th Cir. 2009) ....................... 8

*Safety v. Doe*, 538 U.S. 1 (2003) ....................................................................... 19

*Shearson v. Holder*, 725 F.3d 588 (6th Cir. 2013) .................................................. 22

*Singh v. Cissna*, 2018 WL 4770737 (E.D. Cal. Oct. 1, 2018) .................................... 20

*Tarhuni v. Holder*, 8 F. Supp. 3d 1253 (D. Or. 2014) ......................................... 17, 18

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................... 6

*United States v. Collis*, 128 F.3d 313 (6th Cir. 1997) ................................................ 6

*United States v. Fikre*, 12-cr-1689 (S. D. Cal.) ....................................................... 19

*Vining v. Runyon*, 99 F.3d 1056 (11th Cir. 1996) ..................................................... 7

## Statutes

Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109-295
§ 525(d), 120 Stat. 1355, 1382 (Oct. 4, 2006) .......................................................... 10

## INTRODUCTION

As the Supreme Court said in this case, the Government has a formidable burden to show that it will not again place Yonas Fikre on the No Fly List. This analysis must necessarily look at the Government's actions and the Government's practices. This is not only because the Supreme Court instructed so in *Fikre* itself, but also because there is no evidence in the record as to what Fikre's actions and practices are. Nor can there be at this juncture. Discovery has yet to begin, and Fikre cannot introduce evidence to rebut the Government's assertions when the Government won't even tell Fikre what those assertions are.

In light of this burden, an ex parte declaration from the Government that was drafted for this litigation, and not attaching any evidence or testimony of those with direct knowledge of (1) why Fikre was nominated to the No Fly List in the first instance, (2) why that nomination was accepted, or (3) (likely) why Fikre was removed, is not going to cut it.

First and foremost, relying solely on an ex parte declaration violates basic norms of due process. And, without the ability to adequately test the Government's ex parte assertions—here, made solely for purposes of litigation—the risk that the Government is being less than completely forthright would be too great in any event.

Second, the evidence provided, whatever it might be, cannot be adequate. Particularly in light of the prior declaration made by the Government that Fikre was placed on the list correctly, and in the absence of any abiding changes in policy, there is nothing to stop Fikre from being renominated to the list by the agency that

nominated him in the first instance if he does whatever it was that placed him on the list initially. And since that conduct (to the extent it ever actually happened) is not even necessarily unlawful, there is simply nothing in the record that would indicate whether or not he might do it again. Moreover, the mere fact that the Government has declined to provide original source evidence or the testimony of those who actually participated in the decision to list Fikre in the first place, calls into question whether the Government has any real confidence he will not be relisted again.

With Fikre's No Fly List claim not moot, the Government's claim that Fikre fails to state a procedural due process claim is defeated by the law of the case. And the Government's claim that there is no procedural due process claim for No Fly List placement is based on the Ninth Circuit decision in *Kashem*. But *Kashem* only held that the individuals in that case received, as applied to their own cases, sufficient due process. *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019). And that holding was made on summary judgment with a full record. Here, at the motion to dismiss stage, whether or not the Government provided enough due process to defeat Fikre's as-applied and facial claims is dependent on a factual record that has not yet been developed. Dismissal is inappropriate.

## BACKGROUND

Yonas Fikre came to the United States from his native Eritrea as a child and is now a United States citizen. 8AC at ¶ 51. Fikre moved to Portland, Oregon, in 2006, where he worked for a cellular telephone company. *Id.* ¶ 52. In late 2009, Fikre

decided to use his experience in the cellular telephone industry to pursue the business of distributing and selling consumer electronic products in Sudan. *Id.*

In April 2010, while still in Sudan, Fikre was approached by two FBI agents who questioned him about his association with the as-Saber Mosque in Portland and his commercial finances. *Id.* at ¶¶ 56-58. The agents told Fikre that he had been placed on the No Fly List, which not only prohibits one from flying to, from, or within the United States but also causes a host of travel and non-travel-based consequences for the listed individual. *Id.* at ¶ 58. The FBI agents offered to remove Fikre from the list if he became a government informant. *Id.* at ¶ 59. Fikre refused. ER 38 at ¶ 62.

That September, Fikre traveled on business to the United Arab Emirates. *Id.* at ¶ 68. While there, UAE police arrested, imprisoned, and tortured Fikre for 106 days. *Id.* at ¶ 69-79. During this time, Fikre was interrogated about his connection to the as-Saber Mosque and the nature of his financial dealings. *Id.* at ¶ 78. One of the interrogators told Fikre that the FBI had requested his detention. *Id.* at ¶ 88.

Fikre was ultimately released from UAE prison, but he was unable to board a plane bound for the United States because he remained on the No Fly List. *Id* at ¶ 89. Fikre sought refuge in Sweden. *Id* at ¶ 90. While in Sweden, Fikre both applied for asylum in Sweden and sought modification of his No Fly Status through DHS TRIP, which is DHS's redress procedure for travel-related issues. *Id.* at ¶¶ 97-99. Meanwhile, the Government was surveilling Fikre and intercepting his private communications. *Id.* at ¶ 107. Ultimately, the United States Attorney's Office for the Southern District of California indicted him for "conspiracy to struc-ture" monetary

transfers from his family to him in the UAE. *Id.* That indictment was based at least in part on information the United States obtained from Fikre's 106 days of interrogation and torture in the UAE and from the Government's subsequent electronic surveillance. *Id.* at ¶¶ 98,110.

In 2013, while still in Sweden, Fikre brought this lawsuit against the Government. Shortly thereafter, the Government dismissed its indictment of Fikre without any trial, diversion, or plea. *Id.* at ¶ 107. Then, in 2015, DHS informed Fikre that he was and would remain on the No Fly List because he had been "identified as an individual who may be a threat to civil aviation or national security." ER 49-50 ¶ 104. No other reasons were provided for the decision to maintain Fikre on the No Fly List. Later that same year, Sweden denied Fikre asylum and returned him to the United States. *Id.* at ¶ 105.

Meanwhile, this lawsuit proceeded. This lawsuit was still at the Motion to Dismiss stage (which it has yet to move past seven years later) in 2016 when the Government announced that it had removed Fikre from the No Fly List. Dkt. 98. The Government provided no explanation for why it had removed Fikre, nor did it suggest in any way that Fikre never belonged on the No Fly List.

Based on the notice, this Court dismissed the No Fly List claims as moot. Dkt. 105.

Fikre appealed to the Court of Appeals, who reversed. *Fikre v. FBI*, 904 F.3d 1033 (9th Cir. 2019). On remand, the Government tried again, this time with a declaration stating that (1) Fikre was "placed on the No Fly List in accordance with

applicable polices and procedures," (2) Fikre "was removed from the No Fly List upon the determination that he no longer satisfied the criteria placement on the No Fly List," and that (3) Fikre "will not be placed on the No Fly List in the future based on the currently available information." Dkt. 130-2 at ¶ 5.

This Court again ruled that this mooted Fikre's No Fly List claims and subsequently dismissed Fikre's non-No-Fly-List watchlist claims for failure to state a claim. Dkts. 163-65. Fikre appealed, and the Court of Appeals again reversed the mootness ruling. *Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022). This time, the Government sought a writ of certiorari from the Supreme Court, which granted the writ but then affirmed the Court of Appeals unanimously. As the Supreme Court ruled, the Declaration was insufficient to meet the Government's "formidable" burden to "show that the" challenged "practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up).

On remand, Fikre moved to amend his Complaint again, seeking to add certain new facts learned about the Government's watchlisting enterprise and to add a new RFRA claim. Dkt. 184. The Court allowed Fikre to add the new facts but denied amendment as to the new RFRA claim. Dkts. 194, 196.

The Government now moves to dismiss the No Fly List claims as moot, based on a declaration dated February 18, 2025, by Steven McQueen, the Deputy Director of the Terrorist Screening Center. All relevant facts supposedly establishing that Fikre's claim is moot are submitted ex parte, with no access provided either to Fikre or his attorneys. The Motion to Dismiss also makes various Rule 12(b)(6) arguments

against some of the No Fly List claims should the Court determine those claims were not moot and again argued that the non-No-Fly-List watchlist claims did not state a claim for relief.

## ARGUMENT

### I.    The Government should not be able to moot this case on the back of ex parte evidence.

It is a hallmark principle that a party may not use privilege as both a sword and a shield. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Under this theory, a privilege may not be asserted "to disclose some selected communications for self-serving purposes," and that privilege "may implicitly be waived when [a party] asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Thus, when a party discloses privileged information, it waives the privilege as to the "same 'subject matter'" of the disclosure. *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997) (quoting *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251 (6th Cir.1996). This is true of the law enforcement privilege, just as it is with any other privilege. *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997); *F.T.C. v. Timeshare Mega Media & Mktg. Grp., Inc.*, No. 10-cv-62000, 2011 WL 6102676, at *7 (S.D. Fla. Dec. 7, 2011).

Similarly, due process demands "disclosure to the parties of the evidence submitted to the court." *Lynn v. Regents of Univ. of California*, 656 F.2d 1337, 1346 (9th Cir. 1981). It is one thing to disclose information in camera to a court to determine its discoverability or for other procedural or preliminary issues. *Ibrahim*

*v. Dep't of Homeland Sec.*, No. 06-CV-00545, 2012 WL 6652362, at *5 (N.D. Cal. Dec. 20, 2012). But "only in the rarest of circumstances should a district judge, in his or her discretion, receive ex parte argument and evidence in secret from only one side aimed at winning or ending a case over the objection of the other side." *Id.* at *6; *see also Vining v. Runyon*, 99 F.3d 1056, 1057 (11th Cir. 1996).

The Government's attempt to meet its "formidable" burden under *FBI v. Fikre*, 601 U.S. 234, 241 (2024), to "show that the practice cannot reasonably be expected to recur," *id.* (cleaned up), entirely through the use of secret evidence, violates both privilege and Due Process theories. This is why, in a recent decision by the Massachusetts District Court in a different watchlist case, the Court ordered attorneys-eyes-only production of the evidence that the Government was using in its motion to dismiss certain watchlist claims on jurisdiction and venue grounds. *Khairullah v. McHenry*, No. CV 23-30095-MGM, 2025 WL 401194, at *2 (D. Mass. Jan. 31, 2025). As the District Court found, "courts generally insist—as a matter of fundamental fairness, basic due process, and overall accuracy—that each party be provided with access to the other party's evidence and the opportunity to contest it; in other words, secret evidence is inherently improper." *Id.* The Government's cases to the contrary were either "distinguishable or unpersuasive." *Id.* The Court went on to note that counsel could be approved for receiving SSI information and that the law enforcement privilege was overcome by the fact that the government was attempting to use the information to establish its argument. *Id.* at *3-4.

The Government's argument to the contrary is riddled with errors. First, the Government relies on the general theory that this Court "has an obligation to satisfy itself of its own jurisdiction before proceeding to the merits." MTD at 28 (citation omitted). True enough. But the Government's inference that the Court must simply accept all evidence that the Government submits in favor of its mootness argument in the way it is submitted does not follow. Instead, the Government has the "heavy" burden of establishing mootness and must do so through its own admissible evidence rather than by simply pointing to the plaintiff's lack of evidence. *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009). And, of course, a plaintiff cannot rebut evidence that is not provided to them in any event.

The Government then cites a series of cases from the D.C. Circuit, but those cases do not go as far as the Government would like, either. *Olivares v. TSA* did "not involve any materials of a sensitive nature that should not be disclosed due to security concerns." 819 F.3d 454, 462 (D.C. Cir. 2016).  In *Jifry v. Fed. Aviation Admin.*, this Court rejected a challenge to the government's reliance on classified evidence, but the case involved non-resident aliens' interests "in possessing FAA airman certificates to fly foreign aircraft outside of the United States," and the Court emphasized that the case "concern[ed] alien pilots only," not "citizens and resident alien pilots." 370 F.3d 1174 at 1177, 1183 (D.C. Cir. 2004). The interests of U.S. citizens are "substantially greater." *Latif v. Holder*, 28 F. Supp. 3d 1134, 1160 (D. Or. 2014) (distinguishing *Jifry*).

Further, and more straightforward, this is not the Government simply providing classified records to the Court. The ex parte materials consist of a single declaration of a single FBI Supervisory Special Agent, Agent McQueen, who serves as Deputy Director of the Terrorist Screening Center. Dkt. 202-1 at 1. That declaration, on its face, was created in this case on February 18 of this year for the purposes of the motion. It is less in the way of classified evidence and more in the way of ex parte testimony. Nor is it clear that Mr. McQueen even has knowledge of the material submitted under seal. In none of the cases, as far as Fikre's counsel is aware, has a federal Court permitted ex parte testimony for purposes of dismissing a case on mootness grounds; even if such case exists, counsel submits that it would be wrongly decided or limited to specific facts not present here.

In any event, when the government asserts classification as the basis for withholding or suppressing information, it is required to establish that the materials have been properly classified. *See United States v. Reynolds*, 345 U.S. 1, 7–8 (1953) (to assert a state secrets privilege, for example, "[t]here must be formal claim of privilege, lodged by the head of the department which has control over the matter after actual personal consideration by that officer"). But here, the Government's claim that the information is so sensitive is inconsistent with the privileges the Government has chosen not to invoke. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1081 (9th Cir. 2010) (the "government may assert a *Reynolds* privilege claim prospectively, even at the pleading stage, rather than waiting for an evidentiary

dispute to arise during discovery or trial). The Government should not benefit from privileges it does not formally invoke.

In the Freedom of Information Act context, for instance, when the government seeks to withhold classified information from disclosure, it must "submit[] affidavits and other evidence to the court to show that the documents are properly classified." *Hayden v. NSA*, 608 F.2d 1381, 1386 (D.C. Cir. 1979). This requires the agency to show "(1) that it followed proper classification procedures, and (2) that by its description, the document logically falls within the claimed exemption." *Id.* at 1387. And outside the FOIA context, when the government seeks to suppress information in an individual's possession on the ground that it is classified, this Court has required even more: courts must "satisfy themselves from the record, *in camera* or otherwise, that the [agency] in fact had good reason to classify, and therefore censor, the materials at issue." *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983).

Here, there is no affidavit or other evidence showing proper classification. So, the Court should order disclosure. At minimum, the Court should scrutinize the purported classified materials to determine whether the Government "in fact had good reason to classify, and therefore censor, the materials at issue." *McGehee*, 718 F.2d at 1148. Without the Court so doing, the Government has not met its burden of nondisclosure.

The Government moves on to argue that this information should be considered ex parte because it constitutes "Secure Sensitive Information."

Fikre's counsel—thanks to an order in a different case, *Kovac v. Wray*, 18-cv-110 (N.D. Tex.)—has undergone the process of being eligible to review SSI information. To the extent SSI prohibits disclosure of parts of the proper record here—that is, only to the extent the Court allows the Government, consistent with due process, to use SSI information as a sword against Fikre—this Court should, at minimum, require the Government to disclose that information to counsel who has been previously approved to receive SSI information. Such authority is specifically permitted by Section 525(d) of the DHS Appropriations Act of 2007, Pub. L. 109-295, 120 Stat. 1355, 1382 (Oct. 4. 2006), upon "substantial need" "unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation." *Id.*; *see also Khairullah*, 2025 WL 401194, at *3-4.

Substantial need is obvious here. This Court should, at minimum, follow the path of *Khairullah* and order attorneys-eyes-only disclosure of the evidence that the Government is using to establish its mootness case. An attorneys-eyes-only protective order has already been issued (for similar reasons) in this case. Dkt. 139 at 1 (granting Plaintiff's counsel "access to the [law enforcement sensitive] information").

## II. Even without knowing what the ex parte evidence says, it is insufficient to establish mootness.

The Government's "voluntary cessation of a challenged practice" will moot a case only if the defendant can show that the practice cannot "reasonably be expected

to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000). The Government's burden is "formidable." *Fikre*, 601 U.S. at 241. Indeed, the Government must "prove no reasonable expectation remains that it will return to its old ways." *Id.* (cleaned up). Mootness, as *Fikre* explained, focuses on the actions of the Government, not the plaintiff: "speculation about a plaintiff's actions" cannot "make up for a lack of assurance about its own." *Id.* at 243.

The McQueen declaration cannot meet the *Fikre* test set out by the Supreme Court in this very case. Although the declaration remains substantively beyond the reach of not only Fikre but his lawyers in this case, it is, on its face, a declaration by the Deputy Director of the Screening Center, written in the present for the specific purposes of this litigation, without any attached document or other evidence. Mr. McQueen was not the person who nominated Fikre to the No Fly List (the TSC reviews, rather than nominates, individuals), nor was he likely the person who adjudged its placement. It's also unclear if McQueen was the person who removed Fikre from the No Fly List, and if he did, that certainly signifies an irregular practice that would constitute voluntary cessation.

This cannot do. The evidence of Fikre's placement is unreliable regardless of whether the Best Evidence rule applies on its face. Because McQueen has no firsthand knowledge of his nomination, the Screening Center's approval, and likely the Screening Center's removal of Fikre from the No Fly List, McQueen's declaration is either worthless or relying entirely on documents within the Screening Center's possession that it has affirmatively chosen not to share with the Court—not even ex

parte. That information would be, at best, slanted in order to achieve the Government's preferred outcome; it might even be outright false. Indeed, the Government does not always tell the truth, and here, Plaintiff Fikre's allegations reveal a secret program not telling the truth about itself.

Here, McQueen's declaration is at odds with Plaintiff's well-pled allegations. While McQueen proclaims that, for the watchlist, "religion is not considered derogatory," Dkt. 202-1 at 5, Plaintiff's counsel has obtained an actual copy of the Government's watchlist (after it was accidentally posted to the public internet[1]) and knows that is not true. The entire No Fly List—99.6 percent—consists of Muslim names. 8AC at ¶ 189. The broader watchlist? 98.3 percent Muslim names. *Id.* Indeed, the name of Islam's prophet and "just 100 common Muslim names comprise 70% of the entire list." *Id.* ¶ 193. Whether the watchlist and No Fly List even have a valid purpose is just one factual conflict that cannot be resolved before discovery. There are many more *See Id.* at ¶ 193 ("because Defendants consider being a relative, friend, colleague, or fellow community member of a TSDS Listee "derogatory information" supporting placement on the watchlist, Muslim communities are subjected to rapidly unfolding network effects once one member is watchlisted"); *Id.* at ¶ 180 ("while travel to Muslim-majority countries makes a Muslim more likely to land on the watchlist, the same is not true of a non-Muslim").

---

[1] US airline accidentally exposes 'No Fly List' on unsecured server, Daily Dot (June 2, 2023) (available at: https://www.dailydot.com/debug/no-fly-list-us-tsa-unprotected-server-commuteair/)

And that is not the only reason the Government cannot meet its burden under *Fikre*. Remember, the Supreme Court commanded this Court to focus on what the Government does, not what the plaintiff does. That makes sense in this case if for no other reason than Fikre (who has yet to be deposed in this case) has not been told what he used to do that made him a threat to aviation security in the past, that he no longer does so that he is no longer a threat. Without knowing what that is, there can be nothing other than "speculation" as to whether Fikre would do it again. So, unless the Government retracts its prior Cartwright Declaration (Dkt. 130-2) that states that Fikre was properly placed on the No Fly List in accordance with procedures, that those procedures have not meaningfully changed, and that as a result, Fikre no longer belongs on the list, there is almost nothing Fikre can do, except maybe die, that can effectively moot the case.

In the end, there are three ways the Government can moot the case. The first two are described in the Ninth Circuit's decision in *Fikre* that the Supreme Court affirmed: It can make an abiding change in policy that ceases its unlawful conduct, *Fikre v. FBI*, 35 F.4th 762, 770 (9th Cir. 2022), or at minimum, it could confess to Fikre and the world that Fikre never belonged on the list in the first place. *Id.* at 771. Or it could provide, through actual documentary evidence from not only the Screening Center but the nominators who proffered Fikre for the No Fly List in the first place, and to not only the Court but also to Fikre (or at least his counsel), the actual reasons that Fikre was placed and removed from the No Fly List so that Fikre can put forth actual evidence as to whether that conduct is likely to reoccur. At that point, and with

due process satisfied, the Court can judge for itself whether the Government has met its formidable burden.

## III.    The Substantive Due Process claims should survive because Fikre's No Fly List claims are not moot.

This Court previously found, and remains the law of the case, that Plaintiff states a substantive due process claim. Dkt. 81 at 18-19. The Government's only argument for "revisit[ing]" that decision is *Kashem*. But *Kashem* does not alter the holding for two related reasons. *Id.*

First, *Kashem* involved a different substantive due process argument against the No Fly List. That argument was as-applied only. The plaintiffs' as-applied Substantive Due Process claim was that the No Fly List violated substantive due process because the plaintiffs did not belong on the list. *Latif v. Sessions,* 2017 WL 1434648, at *9 (D. Or. Apr. 21, 2017) (affirmed by *Kashem*). The Ninth Circuit rejected jurisdiction over that claim, not because of any sort of broad finding that the No Fly List satisfied due process, but because it found that this was simply a substantive challenge to the decision by the TSA Administrator not to remove plaintiffs from the list. *Kashem*, 941 F.3d at 390-91. The Ninth Circuit here distinguished the holding in *Kashem* because Fikre is challenging his placement on the list in the first instance. *Fikre*, 35 F.4th at 774-775. And, of course, by denying jurisdiction in *Kashem*, the Ninth Circuit did not decide the substantive due process issue on the merits.

Fikre's substantive due process claim is broader. Fikre brings both a facial and as-applied claim. Fikre's facial claim is that the No Fly List could be more narrowly

15 - *Fikre v. Wray, et al.*, 3:13-cv-00899-MO
Plaintiff's Mem. in Opp. of Defs.' Motion to Dismiss Pl.'s Eighth Amend. Compl.

tailored, either by permitting those on the list to fly using the Government's "one-time" exception more broadly or by limiting the No Fly List criteria to those that have actually committed crimes or those whose flying poses an immediate and specific threat to aviation security. *See generally* Dkt. 198 (Eighth Amended Complaint); *see also* Dkt. 203 (Previous MTD). These less restrictive alternatives (investigate a suspicion and make any arrests a validated suspicion warrant) exist in every possible application of the No Fly List, depriving the No Fly List of the "plainly legitimate sweep" it needs to fight off the facial challenge. lacks a "plainly legitimate sweep. *Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024)

Fikre's as-applied claim is also that given whatever reasons (good, bad, nonexistent) for which Fikre was placed on the No Fly List and the evidence that supported it, there were more narrow ways to prevent Fikre from posing a threat to aviation security than an outright ban on flying.

Second, even if the substantive due process claims in both cases were the same, *Kashem* did not decide the merits of the substantive due process claim. So, for this separate reason, *Kashem* does not disturb this Court's prior holding.

## IV. The No Fly List violates procedural due process.

### A. No Fly List placement creates procedural due process rights.

#### 1. The No Fly List affects Fikre's liberty interest in travel.

The Government does not contest that the No Fly List creates a constitutional right to Due Process due to Fikre's travel-related liberty interest. Dkt. 202 at 38 ("this Court previously held that No Fly List status could be a deprivation of a liberty interest in travel"). Because the Court would then necessarily have to move on to

16 - *Fikre v. Wray, et al.*, 3:13-cv-00899-MO
Plaintiff's Mem. in Opp. of Defs.' Motion to Dismiss Pl.'s Eighth Amend. Compl.

whether the Government had adequately provided due process, *see* Section C, below, there is no reason to pass on the Government's argument that the No Fly List does not create a "stigma-plus" liberty interest.

### 2.    The No Fly List affects Fikre's "stigma-plus" liberty interest.

But should the Court reach that issue, it should find (as explained below) that the No-Fly List placement creates a stigma-plus liberty interest.

### a.    Dissemination of the No Fly List is stigmatizing.

Being called a terrorist is inherently stigmatizing. As this Court has already explained (Dkt. 81 at 27), Fikre's "allegations provide a sufficient factual basis at this early stage of the proceedings to state a procedural due-process claim based on … freedom from false government stigmatization." And the Ninth Circuit, without weighing in on the ultimate question, has agreed: "Fikre remains, in his own words, 'stigmatiz[ed]'" by his placement. *Fikre*, 904 F.3d at 1040 (brackets original).

The Government claims that being designated as a "known or suspected" terrorist is not stigmatizing because it is not disseminated to the general public. But as explained in *Mohamed v. Holder*, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015), "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person." This is exactly how Defendants' decision to list him has played out in Fikre's life; the current Complaint is replete with allegations that Fikre's No-Fly status became known to relatives, friends, and business associates, sometimes in humiliating ways. *See*, *e.g.*, 8AC ¶¶ 69, 80, 98, and

114-148. Placement on the No-Fly List even led to his divorce from his wife. *Id.* at ¶¶ 101-102.

Moreover, Defendants do not address Fikre's allegations regarding the flights he took after his removal from the No Fly List, which clearly explain how the stigma imposed outlasts his placement. In 2016, when Fikre traveled with others in his faith community to Mecca for the once-in-a-lifetime religious pilgrimage known in Islam as hajj, his fellow congregants "stopped speaking with him and sought to avoid any contact with him" in response to the "visible consequences of Fikre's TSDB status." 8AC ¶¶ 119-121. Because of his TSDB status, which persisted after his removal from the No Fly List, he was "made an outcast in his hajj group." *Id.* at ¶ 127. Later in the year, Fikre was humiliated in front of his wife when, because of his watchlist status, Defendants "patted down [Fikre and his wife's] 11-month-old baby, touching every part of the infant's body." *Id.* at ¶ 143. And this was not the end of it for Fikre. During this same family trip, as Fikre approached the gate for his flight, he separated himself from his wife and young child because he "understood that if they boarded the plane together Defendants would cause the entire family to be screened again." *Id.* at ¶ 143.

And all this ignores the most critically stigmatizing effect of all. The UAE imprisoned and tortured Fikre for 106 days because of the Government's placement of Fikre on the No Fly List and its decision to broadcast to the UAE that Fikre was a suspected terrorist. See 8AC ¶¶ 68-89. The Government suggests that Fikre concedes that "the Government played no role" in "his alleged extended detention in the UAE,"

suggesting it was Fikre's own fault for "voluntary travel to UAE to pursue business opportunities." MTD at 26 n.8. But Fikre makes clear that the Government placed him on the No Fly List "in order to coerce Plaintiff into becoming an informant/agent provocateur for the FBI," and when he refused, "Defendants retaliated by instigating and facilitating imprisonment, assault, and torture at the hands of the UAE government during the summer of 2011." 8AC ¶ 2. Fikre's torture (not just "alleged extended detention" per the Government's minimization) was a direct, proximate, and intended result of the Government placing him on the No Fly List.

The Government's only case in support of its claim that the No Fly List (as opposed to the broader watchlist) is not stigmatizing is *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014), which found that alleged disclosure of No Fly List status to airlines did "not constitute dissemination of the stigmatizing information in such a way as to reach the community at large. *Tarhuni* was wrongly decided, as the stigma-plus test does not require public dissemination. Instead, all it requires is that entities interacting with a plaintiff "reflexively check the stigmatizing listing—whether by internal regulation or custom—prior to conferring a legal right or benefit." *Humphries v. Los Angeles*, 554 F.3d 1170, 1188 (9th Cir. 2008), *as amended* (Jan. 30, 2009), *rev'd and remanded on other grounds*, 562 U.S. 29, 131 (2010). This is exactly how the No Fly List works, as mandated by TSA's rules and regulations.

But even if *Tarhuni* was correctly decided, the only disclosure alleged there was to Air France and Alaska Airlines. *Tarhuni,* 8 F. Supp. 3d at 1274. Here, the allegations were far more public, with far worse consequences. The operative

Complaint here explains that Fikre's No Fly List status became public, both because Fikre could not hide, from his family or his friends, the reasons for his inability to board a plane back to the United States, just as he was compelled by circumstance to advocate in a visible way against Defendants after his torture and detention in the UAE. *See* 8AC ¶¶ 68-99.  It also explains that even after Defendants removed him from the No Fly List, the visible consequences of his TSDB status made it clear to the dozens with whom Fikre traveled to Mecca that Defendants had listed him. *Id.* at ¶¶ 114-135.  "Fikre's co-travelers did not want to serve him food or water and looked at Fikre with fear and disgust." *Id.* at ¶ 133.

### b.    The No Fly List creates a mandatory change in status.

Fikre's No Fly List placement created a straightforward, mandatory change in status. Airlines flying to, from, or over the United States were simply and flatly prohibited from allowing Fikre to board. *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 726 (S.D.N.Y. 2012) (any deprivation of liberty as a result of stigma satisfies the plus requirement*); see also Doe v. Dep't of Pub. Safety*, 271 F.3d 38, 54 (2d Cir. 2001), *rev'd on other grounds sub nom. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003) (the plus factor must be "some material indicium of government involvement beyond the mere presence of a state defendant to distinguish his or her grievance from the garden-variety defamation claim").

Fikre's broader watchlist status created additional changes in status:

First, Fikre's watchlist status led to his 106-day detainment and torture at the hands of the UAE. See 8AC ¶¶ 68-89. Second, Fikre's watchlist status appears to have

contributed to his indictment in the United States. *See generally, United States v. Fikre*, 12-cr-1689 (S. D. Cal.); 7AC ¶ 98-99, 106. Third, Fikre's watchlist status led to his communications being intercepted in violation of his Fourth Amendment rights. 8AC ¶ 107. And fourth, Fikre's watchlist status led the Government to try and interfere with his sincere religious beliefs protected under RFRA by demanding he act as an informant as a way to get off the No Fly List. 8AC ¶¶ 62-72 & 109.

**B.    The process provided by DHS TRIP is inadequate.**

Alleging that the process is inadequate is enough at this stage because whether the process is sufficient is inherently a fact-dependent inquiry. *See Singh v. Cissna*, 2018 WL 4770737, at *14 (E.D. Cal. Oct. 1, 2018). At minimum, Fikre's allegations that the revised DHS TRIP process provides no meaningful notice or opportunity to rebut the government's supposed evidence, failing the *Mathews* test, must be taken as true at this juncture. The Government's argument to the contrary relies on *Kashem*. But that case was decided on summary judgment after a fully developed record.

Here, there is no record. The parties are at the motion to dismiss stage. As the courts in *Elhady* and *Mohamed* found, "the ultimate merits of that claim are tethered to the *Mathews* factors, which are 'fact-intensive consideration[s],' which 'when considered within the context of [these] allegations, necessarily require an evidentiary record beyond that presented to the Court in connection with the defendants' motion to dismiss." *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Elhady v.*

*Piehota*, 303 F. Supp. 3d. 453, 465-66 (E.D. Va. 2017) (quoting *Mohamed v. Holder*, 995 F. Supp. 2d 520, 538-39 (E.D. Va. 2014).

Previously, the Government has relied on two cases for the proposition that the Court can engage in *Mathews* challenges to find government process adequate at the motion to dismiss case. But *Cederberg v. Washington Cty*. merely held the due process claim was not "legally cognizable" in the first place (for standing grounds, among other reasons) and refused to engage in any *Mathews* analysis. C*ederberg v. Washington Cty. Consol. Commc'ns Agency*, No. 3:18-cv-02044-HZ, 2019 WL 2929505 (D. Or. July 8, 2019); *Mathews v. Eldridge*, 424 U.S. 319 (1976), 18-cv-2044, 2019 WL 2929505 (D. Or. Jul. 8, 2019). And in *Diamond S.J. Enterprise v. San Jose*, the due process claim was that the hearing officer was biased. 395 F. Supp. 3d 1202, 1236 (N.D. Cal. 2019). But because the plaintiff alleged nothing to actually establish any bias, the Court discounted the allegation, *id.* at 1236-37; *see also, Ashcroft v. Iqbal*, 556 U.S. 662 (2009), leaving there nothing to balance. The Court went through the motions anyway, but there appears to be no reason to do so. Here, of course, Fikre's claims of inadequate due process are reasonable, as that was, in fact, what other courts have found as to both the TSDB, *Elhady v. Kable*, 391 F. Supp. 3d 562, 581 (E.D. Va. 2019), and the No Fly List as it existed when Fikre was placed on it, *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014).

But even if *Kashem* was relevant to a case brought at the motion to dismiss stage, it still would not counsel dismissal. *Kashem* was an as-applied case, which (a)

would not apply to the facial challenges brought here and (b) would not apply to Fikre in any event

Finally, the implementation of *Kashem* itself calls into question the assumptions of *Kashem*. Critically, the unclassified summaries provided to individuals have been useless. Take Saadiq Long, for example. Long's entire summary of the reasons he was placed on the No Fly List was as follows:

> You are on the U.S. Government's No Fly list because the U.S. Government has received information that you have participated in training that may make you a threat to U.S. national security. Additionally, your arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government.

*Long v. Barr*, 451 F. Supp. 3d 507, 519 (E.D. Va. 2020), *vacated and remanded*, 38 F.4th 417 (4th Cir. 2022). But Long's military training was provided by the United States: he served in the Air Force from 1987 to 1998. *Id.* And his arrest in Turkey (which was, according to the allegations, caused by his No Fly List placement) occurred several years after Long was placed on the No Fly List. *Id.*

Or take Saad bin Khalid. Khalid's unclassified summary. The full summary stated:

> You are on the U.S. Government's No Fly list because the U.S. Government continues to have concerns about your association with a known terrorist organization. The information you shared during your March 27, 2012, interview with FBI Special Agents regarding your contacts and activities in Pakistan from 2008 to 2012 did not assuage the U.S. Government's concerns. In particular the U.S. Government has continuing concerns relating to your candor during this interview.

[*Khalid v. Bondi, et al.*, No. 24-5091 (D.C. Cir. Oct. 28, 2024), ECF No. 2082418 at 36 (Joint Appendix, at JA114 (D.C. Cir. Oct. 28, 2024))]. But as the Complaint in that

case explained, the only purported "association with a known terrorist organization" that Khalid was aware of (and he only found out sometime after receiving the DHS TRIP summary) was that when, as a child, his father had kidnapped him and taken him to Pakistan during a divorce, his mother (by her own admission) falsely claimed to the FBI he was taking him to a terrorist training camp as a way to try and get the FBI to act to return him. *Khalid* JA35-37. Meanwhile, Khalid's 2012 interview also occurred when Khalid was still a child. *Id.* at JA10.

The Sixth Circuit originally held that DHS TRIP should be exhausted under the Court's ability to require non-mandatory exhaustion in its discretion in watchlist cases. *Shearson v. Holder*, 725 F.3d 588 (6th Cir. 2013). The theory was that DHS TRIP would create a useful record for dealing with watchlist challenges. But that holding soon became stale as it became apparent that DHS TRIP was inadequate for such purposes. The Sixth Circuit's "optimism that exhaustion will aid the decisionmaking process" proved unfounded and has since been rejected by every Court to address the issue. *See El Ali v. Barr*, 473 F. Supp. 3d 479, 506 (D. Md. 2020). As other district courts have explained, the procedures are too sparse to support an exhaustion requirement. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 534-35 (E.D. Va. 2014); *El Ali v. Barr*, 473 F. Supp. 3d 479, 506 (D. Md. 2020). "It is difficult to see how exhaustion of DHS TRIP would significantly assist the Court in adjudicating or resolving [Long's] claims." *Mohamed*, 995 F. Supp. 2d at 534.

So, too, here. It may have been when *Kashem* was decided, and there was no history of the post-*Latif* DHS TRIP process for No Fly Lists, that the Ninth Circuit

held out hope that the process would provide meaningful notice and opportunity to respond. But history has shown it has not. And Fikre ought to be able to test that on a record at summary judgment. Dismissal at this stage is unwarranted.

## V.    TSDS status standing alone violates procedural due process.

As explained in detail in Fikre's Opposition to dismiss the Seventh Amended Complaint, Fikre's TSDS status standing alone gives him due process rights as it violates Fikre's liberty interest in travel and stigma-plus liberty interest, for which DHS TRIP is inadequate. Fikre respectfully understands that the Court has ruled otherwise; the Ninth Circuit vacated that decision to reconsider in light of the fact that Fikre's No Fly List claims were not moot.

Because Fikre's No Fly List claims are still not moot, the combination of his No Fly List status and watchlist status is sufficient to state a due process claim for the reasons stated above and in that previous Opposition, and the Government does not appear to argue otherwise except as described (and countered) above.

Should the Court rule that Fikre's No Fly List claims are moot, Fikre respectfully submits that he still states a due process claim for the reasons stated in his previous Opposition. While he is aware the Court ruled otherwise, Fikre requests the Court reconsider that ruling; in the alternative, Fikre preserves his argument for appeal.

## VI.    The Secretary of State, DNI, and the Director of the NSA may be dismissed without prejudice.

Fikre does not oppose dismissal of these defendants, but reserves the right to seek discovery from them to the extent necessary for the instant case. Fikre likewise

reserves the right to seek leave to amend his Complaint to add these parties back in if discovery turns out they are responsible for Fikre's No Fly List or watchlist placement or are necessary parties for any relief sought in this case.

## CONCLUSION

The Court should dismiss the Secretary of State, the Director of National Intelligence, and the Director of the National Security Agency without prejudice. The Court should otherwise deny the Motion to Dismiss.

DATED: April 25, 2025                          Respectfully Submitted,

CAIR LEGAL DEFENSE FUND

/s/ Lena F. Masri
Lena F. Masri (DC: 1000019) α
Gadeir Abbas (VA: 81161) α ß
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420
lmasri@cair.com
gabbas@cair.com

LAW OFFICE OF BRANDON
MAYFIELD, LLC
14631 SW Millikan Way
Beaverton, OR 97003
Phone: 503.941.5101
mayfieldbrandon@hotmail.com

*α Pro hac vice*
*ß Gadeir Abbas is licensed in VA, not in D.C. Practice limited to federal matters.*

*Attorneys for Plaintiff Yonas Fikre*